# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

(1) Heidi Gilbert,
(2) Amber Means,
(3) Mandy Meloon,
(4) Gabriela Joslin, and
(5) Jane Does 6-50,
on behalf of themselves and
all others similarly situated,

       Plaintiffs,

vs.

(1) United States Olympic Committee,
(2) United States Taekwondo Association,
(3) Steven Lopez,
(4) Jean Lopez, and
(5) John Does 1-5,

       Defendants.

Civil Case No. 1: 18-cv-00981-CMA

---

## FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

# TABLE OF CONTENTS

NATURE OF THE COMPLAINT ..................................................................................1

PARTIES ..................................................................................................................12

    The Plaintiffs..........................................................................................................12

    The Defendants ......................................................................................................13

        United States Olympic Committee ("USOC") ..................................13

        USA Taekwondo ("USA TKD") .........................................................13

        Steven Lopez ..........................................................................................14

        Jean Lopez ..............................................................................................14

JURISDICTION ......................................................................................................16

FACTS COMMON TO ALL COUNTS ....................................................................16

    Overview of the Sports Act, the USOC, and its NGBs .......................................16

    Team USA: The Commercial Quest for Medals and Money Off the Labor of Athletes...19

    The USOC and USA TKD Knowingly Caused and Benefited From the Sexual Abuse, Exploitation, and Trafficking of Plaintiffs and the Class Members ................................31

    Plaintiffs' Complaints and Cries for Help were Ignored, Deferred, Obstructed, Denied, or Covered-Up by Defendants..........................................................................35

    SafeSport: The USOC's Too-Little-Too-Late Response .....................................38

    Congress Steps In: The Sports Abuse Act 2017 ..................................................41

PLAINTIFF-SPECIFIC ALLEGATIONS ..............................................................42

    Sexual Abuse, Exploitation, and Trafficking of Mandy Meloon......................42

    Sexual Abuse, Exploitation, and Trafficking of Kay Poe...................................50

    Sexual Abuse, Exploitation, and Trafficking of Heidi Gilbert .........................52

    Sexual Abuse, Exploitation, and Trafficking of Gabriela (Gaby) Joslin...........57

    Sexual Abuse, Exploitation, and Trafficking of Amber Means.........................60

CLASS ACTION ALLEGATIONS .........................................................................65

CLAIMS FOR RELIEF ............................................................................................67

    Counts of MANDY MELOON for Violations of Federal Law ........................................68

        COUNT 1 ...............................................................................................68

        COUNT 2 ...............................................................................................69

        COUNT 3 ...............................................................................................71

        COUNT 4 ...............................................................................................73

        COUNT 5 ...............................................................................................74

        COUNT 6 ...............................................................................................76

        COUNT 7 ...............................................................................................77

        COUNT 8 ...............................................................................................79

        COUNT 9 ...............................................................................................81

        COUNT 10 ...............................................................................................83

    Counts of HEIDI GILBERT for Violations of Federal Law ...........................................84

        COUNT 11 ...............................................................................................84

        COUNT 12 ...............................................................................................85

        COUNT 13 ...............................................................................................86

        COUNT 14 ...............................................................................................88

        COUNT 15 ...............................................................................................89

        COUNT 16 ...............................................................................................90

        COUNT 17 ...............................................................................................92

    Counts of GABY JOSLIN for Violations of Federal Law .............................................93

        COUNT 18 ...............................................................................................93

        COUNT 19 ...............................................................................................94

        COUNT 20 ...............................................................................................95

        COUNT 21 ...............................................................................................97

        COUNT 22 ...............................................................................................98

        COUNT 23 ...............................................................................................99

        COUNT 24 ...............................................................................................100

    Counts of AMBER MEANS for Violations of Federal Law ..........................................102

        COUNT 25 ...............................................................................................102

        COUNT 26...............................................................................................103

        COUNT 27...............................................................................................104

        COUNT 28 ...............................................................................................106

COUNT 29 ..................................................................................................107

COUNT 30 ..................................................................................................109

COUNT 31 ..................................................................................................110

COUNT 32 ..................................................................................................112

COUNT 33 ..................................................................................................113

COUNT 34 ..................................................................................................115

Counts of All PLAINTIFFS for Violations of State Law...............................................116

COUNT 35 ..................................................................................................116

COUNT 36 ..................................................................................................118

COUNT 37 ..................................................................................................120

DEMAND FOR JURY TRIAL...............................................................................126

PRAYER FOR RELIEF......................................................................................126

**NATURE OF THE COMPLAINT**

1.      This class action involves over two decades of sexual abuse, exploitation, and trafficking of Team USA's Olympic taekwondo athletes by the Olympic entities, officials, coaches, and mentors who were entrusted to protect them.

2.      Rather than upholding the values and spirit of Team USA, these bad actors manipulated the trust placed in them, abused the power and legitimacy bestowed upon them, shattered the innocence and dreams of numerous female athletes, and violated numerous federal and state laws.

3.      The USOC has reached for commercial success at all costs by ignoring, denying, obstructing, or covering up complaints of sexual abuse, deferring and diverting investigations, and continuing to commercially support National Governing Bodies ("NGBs") that tolerate and often facilitate sexual abuse by coaches and other adults.[1]

4.      With hundreds of millions of dollars on its balance sheet (all of it earned off the backs and labor of Team USA's athletes), the USOC and Team USA could have long ago stopped this sexual misconduct, which it has long known is occurring.

5.      Because of the USOC's misdeeds, Congress enacted the *Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017* ("The 2017 Sports Abuse Act") in direct response to "allegations of sexual abuse made against personnel involved with

---

[1] Will Hobson, *Victims Say the USOC Deserves Blame for America's Olympic Sex Abuse Problem*, WASH. POST (Feb. 23, 2018), https://www.washingtonpost.com/sports/olympics/victims-say-the-usoc-deserves-blame-for-americas-olympic-sex-abuse-problem/2018/02/23/b5afe70a-1270-11e8-9065-e55346f6de81_story.html?noredirect=on&utm_term=.303109b367f2.

USA Gymnastics, USA Swimming, and USA Taekwondo and follows hearings [in 2017] before

the Senate Judiciary Committee and the Senate Commerce Committee on athlete safety issues."[2]

6.      Architected by Senators Dianne Feinstein (D-Calif.) and Susan Collins (R-

Maine), the 2017 Sports Abuse Act was introduced with the broad support of "Republican and

Democratic members from both the House and the Senate, and four former Olympic gymnasts."[3]

7.      In testimony on the floor of the Senate, Senator Feinstein emphasized that the

2017 Sports Abuse Act "strengthens the law that allows victims of sex abuse to file suits against

those who abused them to commit crimes such as sex trafficking" and that punitive damages are

now expressly provided by statute "due to the heinous nature of the crimes."[4]

8.      Senator Feinstein further condemned the USOC's and the NGBs' commercial

obsession with "medals and money"—which are pursued over the safety and wellbeing of

America's young athletes:

> One of the common themes I heard from their stories was not just the predatory
> behavior of the perpetrators, but also how the USA Gymnastics institution failed to
> protect them. One of the women told me how she heard USA Gymnastics officials
> say at one point that it was their top priority to obtain "***medals and money***" and that
> a "reputation of a coach" should not be tarnished by an allegation raised by a
> victim.[5]

---

[2] Senator Susan Collins, *At Press Conference with Former Olympic Gymnasts, Senator Collins Urges Colleagues to Support Legislation She Introduced with Senator Feinstein to Protect Athletes from Sexual Abuse*, COLLINS.SENATE.GOV (Jan. 30, 2018), https://www.collins.senate.gov/newsroom/press-conference-former-olympic-gymnasts-senator-collins-urges-colleagues-support

[3] *Id.*

[4] Testimony of Sen. Feinstein, 164 CONG. REC. S589-02, 2018 WL 636521 (Jan. 30, 2018).

[5] Testimony of Sen. Feinstein, 163 CONG. REC. S1634-01, 2017 WL 900895 (Mar. 7, 2017) (emphasis added).

9.     This Congressional action sought to remedy decades of flagrant and knowing sexual abuse at the highest levels of Team USA, across nearly all of the Olympic sports.

10.     Since 1982, more than 290 coaches and officials associated with the USOC sports organizations have been publicly accused of sexual misconduct, according to a *Washington Post* review of sport governing body banned lists, news clips, and court records in several states. The figure spans participants in 15 sports and amounts to an average of eight adults connected to an Olympic organization accused of sexual misconduct every year — or about an act of sexual abuse once every six weeks — for more than 36 years.[6] And for every one of these perpetrator coaches, there are an untold number of victims, left to suffer in the shadows.[7]

11.     When young athletes do report sexual abuse to adults and officials, they are often met with obstruction, denials, and cover-ups.

12.     This teaches young athletes that their complaints and reports of sexual abuse are unimportant because athletes are merely fungible commodities that can be trained and transported to competitions for the sexual gratification and commercial benefit of their coaches and other employees and executives of Team USA.

13.     The toxic Olympic sports culture emboldens adult coaches and athletes to continue and proliferate their sexual exploitation without any fear of prosecution or financial penalty, which causes the toxic culture to metastasize.

---

[6] Will Hobson & Steven Rich, *Every Six Weeks for More than 36 Years: When Will Sex Abuse in Olympic Sports End?*, WASH. POST (Nov. 17, 2017), https://www.washingtonpost.com/sports/every-six-weeks-for-more-than-36-years-when-will-sex-abuse-in-olympic-sports-end/2017/11/17/286ae804-c88d-11e7-8321-481fd63f174d_story.html?utm_term=.24ca96bb8af3

[7] USA Gymnastics team doctor Larry Nassar's known victims alone now total at least 265. Leonard Greene & Jessica Schladebeck, *Judge Says 265 Have Come Forward with Sexual Assault Allegations Against Larry Nasser*, N.Y. DAILY NEWS (Jan. 31, 2018), http://www.nydailynews.com/news/national/judge-265-larry-nassar-victims-article-1.3790363

14.     The combined result is a feedback loop of sexual abuse, exploitation, and trafficking of young athletes, all so that the officials leading the USOC and its NGBs can feed the U.S. Olympics machine, which runs on "medals and money."

15.     Anything or anyone that gets in the way of this commercial quest for "medals and money" is silenced, obstructed, defamed, or intimidated into keeping quiet.

16.     As one of many examples, Plaintiff Mandy Meloon ("Mandy") sought to be on the USOC roster for the 2007 Taekwondo World Championships.

17.     But at the time, she had recently submitted a grievance with Defendant USA Taekwondo ("USA TKD") detailing the decade-long pattern of physical and sexual abuse she had suffered at the hands of Defendants Jean and Steven Lopez.[8]

18.     The Lopez brothers and their siblings are known as the "First Family" of taekwondo in the United States and have generated substantial amounts of "medals and money" for Team USA.

19.     According to *USA Today*, Steven Lopez, now age 39, "is taekwondo's biggest star and the most decorated athlete in that sport. He is a five-time Olympian with gold medals in 2000 and 2004 and a bronze in 2008, as well as five world titles."[9] His brother, Jean, has been Team USA's coach in the 2004, 2008, 2012, and 2016 Olympics—among other competitions.

---

[8] Jonathan Allen, *Former U.S. taekwondo star waits a decade for her #MeToo moment*, REUTERS (Apr. 21, 2018), https://www.reuters.com/article/us-taekwondo-usa-meloon/former-u-s-taekwondo-star-waits-a-decade-for-her-metoo-moment-idUSKBN1HS0DN ("It has taken a decade, but Mandy Meloon, a two-time taekwondo world champion thrown off the U.S. national team in 2007 after accusing her coach of molesting her at age 16, has won a measure of vindication.").

[9] Nancy Armour & Rachel Axon, *Lopez brothers, Olympic taekwondo royalty, hit with sex abuse allegations*, USA TODAY (June 8, 2017), https://www.usatoday.com/story/sports/olympics/2017/06/08/lopez-brothers-olympic-taekwondo-royalty-hit-sex-abuse-allegations/102630358/

20.     Upon hearing these complaints of sexual abuse against the Lopez brothers, USA TKD chose to actively discredit Mandy, not only so that her complaint would not succeed, but also to stop other victims from hearing her story and learning they were not alone.

21.     USA TKD had a lot at stake—the commercial success of Team USA hinged on the "First Family" continuing to deliver "medals and money" for the USOC.

22.     To destroy Mandy's reputation, USA TKD's then-CEO David Askinas declared that Mandy's allegations "weren't credible," and there was no reason to protect her from coach Jean Lopez—or to interfere in his decision to keep Mandy off the team.

23.     Askinas' comments were knowingly false or showed a reckless disregard for the truth. In fact, a polygraph test administered by the USOC tested and verified that Mandy's allegations were "truthful."

24.     Askinas later admitted in a deposition (for the sexual abuse of yet another taekwondo athlete who was sexually abused on his watch, during which he joked about pedophiles and made light of the allegations of abuse within USA TKD) that Mandy's arbitration "hearing" was conducted entirely over the telephone.

25.     When she pursued arbitration to be reinstated to the national team (a forum obviously tilted in favor of the USOC, which controls it), the USOC's own arbitrator wrote the following regarding Mandy's allegations:

> She was, in essence, raised by the USOC and is a product of their system. Ms. Meloon's core message went to the protection of the young girls in the Olympic movement who could be exposed to situations that are inappropriate and potentially damaging . . . .One would hope that this message is not lost and young children are properly supervised, protected and educated. One would hope that the USOC takes a serious look at the level of social interaction between its coaches and athletes and underage drinking by its athletes. One would hope that the circumstances leading to the suspension of Ms. Meloon will not re-occur in the life of another young

Olympic hopeful. Although Ms. Meloon must be held accountable for her actions, one must wonder about the culpability of the system as a whole."[10]

26. In response, Askinas scurried to silence Mandy's allegations so that the Lopez brothers could continue delivering "medals and money" to Team USA.

27. Among other things, he labeled her accusations of rape by Jean Lopez (her coach) at the 1997 World Cup in Egypt a "misrepresentation."

28. Thus, from at least 2007 onward, the USOC and USA TKD have knowingly promoted, empowered, and clothed Jean Lopez with the authority, legitimacy, and trustworthiness of being the official coach of Team USA's taekwondo team and his brother, Steven, with being the superstar of USA taekwondo.

29. In doing so, they have exposed hundreds of young female athletes to two adult sexual predators: the coach of USA Taekwondo and his own brother, who he is supposed to monitor and supervise.

30. By leaving Jean in place as the head coach despite knowing that he was a sexual predator, the USOC and USA TKD further ensconced Jean's status, reputation, legitimacy, and trustworthiness among Team USA and all current, future, and former female taekwondo athletes.

---

[10] Brian Gomez, *Cloud over Taekwondo: Allegation of Underage Drinking, Sexual Harassment Emerge from Some Athletes,* COLO. SPRINGS GAZETTE (Aug. 18, 2007), http://gazette.com/cloud-over-taekwondo-allegations-of-underage-drinking-sexual-harrassment-emerge-from-some-athletes/article/26221 (quoting comments by arbitrator Larry Saichek).

31.     The Twitter page profiles of Jean Lopez and Steven Lopez trumpet their celebrity status as Team USA Olympic champions who "produce" substantial "medals" and money to the USOC and USA Taekwondo:



32.     But for Jean's status as the coach of USA TKD, in which he was clothed with the authority, legitimacy, and trustworthiness of Team USA (and literally clothed in Team USA's head coach uniform), he never could have gained access or power over the female athletes he victimized.

33.     By shielding Jean while simultaneously attacking his accusers, the USOC and USA TKD ratified Jean's criminal acts and signaled to all female athletes that the rape culture of Team USA was acceptable behavior to which all female athletes had to submit.

34.     By hiring and then rehiring Jean as the head coach of Team USA to compete at tournaments around the world, including the 2004, 2008, 2012, and 2016 Olympics (as displayed

above on his Twitter profile, outlined in red), the USOC and USA TKD ratified Jean's criminal acts and signaled to all female athletes that the rape culture of Team USA was acceptable behavior to which all female athletes had to submit.

35. In 2018, more than a decade after the arbitration that USA TKD derailed by attacking Mandy rather than protecting her and terminating her coach/abuser, the world has finally learned that Mandy was telling the truth about her coach, Jean Lopez.

36. On April 3, 2018, the USOC's U.S. Center For Safe Sport ("SafeSport") issued a written opinion finding Ms. Meloon's allegations of rape (along with allegations from many other victims of the Lopez brothers) to be true and, as a result, banned Jean Lopez from the Olympics or any USOC events.[11]

37. This was a long overdue sanction for a serial rapist who had sexually abused, exploited, and trafficked numerous young female athletes.

38. Because he was generating "medals and money" for Team USA, however, he was allowed to prey on female athletes for two decades before he was finally ousted from the sport by the USOC and USA TKD.

39. The timing of Jean's removal is blatant: he was banned only *after* the 2017 Sports Abuse Act took effect in early 2018—and the USOC and USA TKD finally realized they were in danger of being dismantled by Congress and exposed to even more severe civil liability.

---

[11] *See, e.g.*, David Barron, *Former U.S. Taekwondo Coach Jean Lopez Banned from Olympic Sports in U.S.*, HOUSTON CHRON. (Apr. 4, 2018), https://www.usatoday.com/story/sports/olympics/2018/04/17/olympic-champ-steve-lopez-still-under-investigation-u-s-olympic-champion-sexual-misconduct-drags-int/525406002/.

40.     Because he was the coach and the ultimate decider of Team USA's roster and therefore controlled all aspects of taekwondo for Team USA, Jean was able to sexually abuse and traffic female athletes around the world with impunity.

41.     As *USA Today* reported, the Lopez family's "celebrity status, along with the priority the USOC puts on winning medals," signaled to Plaintiffs Mandy Meloon and Heidi Gilbert (among others) that "officials with USA Taekwondo and the USOC [were] not eager to pursue sexual misconduct allegations."[12] In other words, the commercial benefits delivered by the Lopez family to the USOC and USA TKD (medals and money) were more important than the safety and security of Plaintiffs and the other members of the Class.

42.     In the minds of the USOC and USA TKD, if they had removed Jean Lopez, they would have risked losing the entire "First Family" of the taekwondo, which, in turn, would have jeopardized the "medals and money" that the "First Family" was delivering in competition after competition around the world.

43.     In the minds of the USOC and USA TKD, these commercial benefits far outweighed the complaints and reports of sexual abuse made by young female athletes who could easily be replaced with other athletes on the Team USA roster.

44.     The harboring of Steven Lopez continues to this day. SafeSport's investigation of Steven Lopez is still lingering in its fourteenth month—nearly twelve months longer than SafeSport's average for resolving cases.[13]

---

[12] *Id.*

[13] Nancy Armour & Rachel Axon, *Sexual Misconduct Investigation of Olympic champ Steven Lopez drags into 14th month*, USA TODAY (Apr. 17, 2018) https://www.usatoday.com/story/sports/olympics/2018/04/17/olympic-champ-steve-lopez-still-under-investigation-u-s-olympic-champion-sexual-misconduct-drags-int/525406002/

45.     This delay has been willfully caused through a scheme orchestrated by the USOC and USA TKD working in tandem, as exposed last year by *USA Today*.

46.     In their shared lust for "medals and money," the USOC and USA TKD have sheltered Steven Lopez from prosecution because he delivers commercial riches.

47.     They wanted Steven to compete—and he did compete—in the 2016 Olympics in Rio, Brazil.

48.     They wanted Jean to coach—and he did coach—his brother Steven, along with the other Team USA taekwondo athletes, including numerous female athletes that were exposed to his and Steven's sexual predation.

49.     The USOC and USA TKD then permitted the investigation to resume, but only after the Olympics were over[14]—*i.e.*, only after the "medals and money" had been obtained and delivered into the clutching hands of the USOC.

50.     *USA Today* quoted an email from Donald Alperstein to Heidi Gilbert in which he wrote, ""Now that the Olympics are over and things are settling down, I want to get moving again on the Steven Lopez disciplinary case[.]"[15] This was an admission that the Steven Lopez investigation was resumed only after the 2016 Olympics were "over."

---

[14] Nancy Armour & Rachel Axon, *Lopez brothers, Olympic taekwondo royalty, hit with sex abuse allegations*, USA TODAY (June 8, 2017) ("Steven and Jean Lopez, brothers in what is often called the 'First Family of Taekwondo,' were allowed to participate in last summer's Rio Games even though they were being investigated for sexual misconduct, and the allegations against them have since drawn the interest of the FBI. USA Taekwondo began investigating the Lopezes more than two years ago after receiving complaints that they had allegedly sexually assaulted multiple women. No hearings were held and USA Taekwondo, after consulting with the U.S. Olympic Committee agreed to put the inquiries on hold before the Rio Games, meaning two-time Olympic champion Steven and longtime coach Jean were free to represent the United States.").

[15] *Id.*

51.     Starting in 1996-97 and continuing until 2018, Defendants USOC and USA TKD knowingly participated in a venture to transport and traffic Plaintiffs and numerous other unknown other young female USA Taekwondo athletes around the globe to be used for the sexual benefit of Defendants Jean and Steven Lopez, as well as other USOC and USA TKD coaches and officials that will be uncovered during discovery in this case.

52.     The USOC and USA TKD knowingly and willfully participated in this venture by acting as the travel agent and commercial funder for the Lopez brothers in the domestic and international sexual exploitation of young female athletes wearing Team USA on their uniforms but carrying an awful secret about the coaches they were required to listen to, call "Master," bow to, and follow.

53.     If these athletes wanted to stay on Team USA and fulfill their childhood dreams to compete as Olympians for the United States, they had no choice but to submit to the Lopez brothers' sexual demands.

54.     If they refused to do so, they were benched, suspended, or kicked off Team USA by the Lopez brothers, the USOC, and USA TKD.

55.     Ms. Meloon and her co-Plaintiffs file this Action to establish that the USOC-run Olympic sport system in America and its National Governing Bodies (NGBs) are culpable for the repeated rapes, sexual exploitation, and commercial sex trafficking of Team USA's Olympic taekwondo athletes.

56.     This lawsuit focuses on USA Taekwondo, but the other NGBs (for the 46 other Olympic sports) are rife with the same systemic sexual abuse of young athletes.

57. Fortunately, Congress created not only the USOC, but also a long list of federal statutes (including the 2017 Sports Abuse Act) with austere civil remedy provisions specifically crafted to punish and deter the very criminal conduct that was knowingly committed in this case.

58. Through this lawsuit, Plaintiffs shine a light on the USOC, USA TKD, and the Lopez brothers. Plaintiffs, on behalf of themselves and the Class, declare that enough is enough, that no other female athletes should have to endure the "disgusting and unnecessary"[16] exploitation, abuse, and trafficking they experienced year after year at the hands of the Team USA rapists and traffickers who stood at the apex—and served as the gatekeepers—of USA Taekwondo.

## PARTIES

**The Plaintiffs**

59. Plaintiff Mandy Meloon ("Mandy") is a citizen of Texas.

60. Mandy was born in 1981.

61. Mandy can be served via her counsel at 1433 N. Meridian Street, Indianapolis, Indiana 46202.

62. Plaintiff Heidi Gilbert ("Heidi") is a citizen of California.

63. Heidi was born in 1982.

64. Heidi can be served via her counsel at 1433 N. Meridian Street, Indianapolis, Indiana 46202.

---

[16] Quoting Michaela Moroney's tweet from October 2017 under hashtag #MeToo. Tom Schad, *Lawsuit Claims USA Gymnastics Paid to Quiet Olympic Gold Medalist McKayla Maroney Maroney,* USA TODAY (Dec. 20, 2017), https://www.usatoday.com/story/sports/olympics/2017/12/20/lawsuit-usa-gymnastics-paid-quiet-olympic-gold-medalist-mckayla-maroney/969843001/

65. Plaintiff Gabriela Joslin ("Gaby") is a citizen of Texas.

66. Gaby was born in 1983.

67. Gaby can be served via her counsel at 1433 N. Meridian Street Indianapolis, Indiana 46202.

68. Plaintiff Amber Means (n.k.a. Randall) ("Amber") is a citizen of California.

69. Amber was born in 1990.

70. Amber can be served via her counsel at 1433 N. Meridian Street Indianapolis, Indiana 46202.

**The Defendants**

*United States Olympic Committee*

71. Defendant United States Olympic Committee ("USOC") is a federally chartered corporation, 36 U.S.C. § 220502(a), with the capacity to sue and be sued, 36 U.S.C. § 220505(b)(9), with its principal place of business and headquarters in Colorado Springs, Colorado.

72. The USOC can be served at One Olympic Plaza, Colorado Springs, Colorado 80909.[17]

*USA Taekwondo*

73. The Ted Stevens Amateur Sports Act ("The Sports Act") gives the USOC the express authority to authorize National Governing Bodies ("NGBs") in all Olympic Sports.

74. Defendant USA Taekwondo ("USA TKD") is the USOC-recognized and USOC-regulated NGB for the sport of taekwondo.

---

[17] 36 U.S.C. § 220510.

75.    USA TKD was at all times herein mentioned and still is a Colorado Corporation with its principal place of business in the city of Colorado Springs.

76.    USA TKD can be served at One Olympic Plaza Colorado Springs, Colorado 80909.

***Steven Lopez***

77.    Defendant Steven Lopez is a citizen of Texas.

78.    Steven Lopez was born in 1978.

79.    Steven Lopez lives in his parents' house in Texas.

80.    Steven is a three-time Olympic medalist, having won two gold medals and one bronze medal.

81.    Steven Lopez has been an athlete and a coach on numerous USOC teams and has appeared at Sports Act-protected competitions around the world.

82.    Sports Act-protected competitions include the World Championships, World Cup, Pan Am, and Olympic Games.

83.    At these protected competitions, while competing for the USOC's "Team USA," Steven Lopez has received financial and other benefits in the form of, among other things, significant compensation from the USOC.

***Jean Lopez***

84.    Defendant Jean Lopez is a citizen of Texas.

85.    Jean Lopez was born in 1973.

86.    Defendant Jean Lopez has been the USOC's Taekwondo coach at protected competitions around the world.

87.     Defendant Jean Lopez has coached USOC teams in protected competitions and received financial benefits in the form of, among other things, significant compensation from the USOC.

88.     Jean started coaching his brother, Steven, at the 1999 Olympic Qualifier in Porec, Croatia.

89.     Jean was the USOC Taekwondo coach at the 2001 World Championships in Jeju, South Korea.

90.     Jean Lopez was the USOC head coach for the USA Olympic taekwondo team in the 2004, 2008, and 2012 Olympics.

91.     In his capacity as the head coach of the 2004, 2008, 2012, 2016 USA Olympic taekwondo teams, Jean had the actual and apparent authority to select or influence the selection of Olympic team members.

92.     Jean was cloaked (and literally clothed) with the full authority, legitimacy, and trustworthiness of Team USA and to lead Team USA's Taekwondo team and the athletes who competed in taekwondo had no alternative but to submit to his sexual demands.

93.     In 2015, Jean Lopez was the USOC coach at several Sports Act-protected competitions, including the World Championships in Russia and Pan Am Games in Toronto, Canada.

94.     On April 3, 2018, the USOC's U.S. Center for Safe Sport's Response & Resolution Office issued a decision finding "a decades long pattern of sexual misconduct by an older athlete/coach abusing his power to groom, manipulate, and ultimately, sexually abuse younger female athletes" and recommended that Jean Lopez be permanently ineligible to participate in any USOC-controlled sport.

95.     On April 3, 2018, exercising the power bestowed upon it by Congress under the 2017 Sports Abuse Act, the USOC finally banned Jean Lopez from coaching—waiting over two decades to stop him from preying on the numerous female athletes he was entrusted to protect.

## JURISDICTION

96.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367 for the state law claims alleged.

97.     Venue is appropriate in this district because the USOC and USA TKD have their corporate headquarters in this district and there is a substantial connection to this district because a substantial number of the relevant events occurred here.

## FACTS COMMON TO ALL COUNTS

**Overview of the Sports Act, the USOC, and its NGBs**

98.     Congress originally chartered the United States Olympic Association in 1950 to organize and promote the United States' participation in international Olympic competition. This spun into the United States Olympic Committee (the "USOC") in 1964.

99.     In 1978, concerned with "the disorganization and the serious factional disputes that seemed to plague amateur sports in the United States," Congress enacted the Ted Stevens Olympic and Amateur Sports Act ("the Sports Act"), P.L. 95–606 (now codified at 36 U.S.C. § 220501, *et seq*.), to codify the purpose and powers of the USOC, and to create national governing bodies ("NGBs") for each Olympic sport.

100.    Thus, the Sports Act controls the United States Olympic Committee (the "USOC").[18]

---

[18] Title 36 U.S. Code, chapter 2205 organizes and defines the USOC as a "federally chartered corporation." 36 U.S.C. 220501(b)(6); 220502(a).

101.    In 2018, there are 47 NGBs (one for each Olympic sport), ranging from USA Archery to USA Wrestling.

102.    Under the Sports Act, the USOC is mandated to regulate the young athletes who seek to compete in Olympic sports in the United States.

103.    The stated purposes of the USOC include: to develop amateur athletic activity in the United States directly related to international amateur athletic competition;[19] to exercise "exclusive jurisdiction" over "all matters" pertaining to U.S. participation in the Olympic and Pan-American Games;[20] to "obtain for the United States…the most competent amateur representation possible in each event" of the games;[21] to provide "swift resolution of conflicts"; to "protect the opportunity of any amateur athlete, coach, trainer, manager, administrator, or official to participate in amateur athletic competition";[22] and, recently, "to promote a safe environment in sports that is free from abuse, including emotional, physical, and sexual abuse, of any amateur athlete."[23]

104.    In short, the USOC is responsible for the training, entering and funding of U.S. teams for the Olympic, Paralympic, Youth Olympic, Pan American and Para-Pan American Games, while serving as a steward of the Olympic Movement throughout the country. In other words, among the USOC's powers are to "organize, finance, and control the representation of the

---

[19] 36 U.S.C. § 220503(2).

[20] 36 U.S.C. § 220503(3).

[21] 36 U.S.C. § 220503(4).

[22] 36 U.S.C. § 220503(8).

[23] 36 U.S.C. § 220503(15), added Feb. 14, 2018 by PL115-126, 132 Stat 318.

United States in the competitions and events" of, the Olympic, Paralympic, and Pan-American Games (the "Games").[24]

105.    The USOC accomplishes this by recognizing, for each of the various sports represented in the Games, one eligible amateur sports organization as an NGB for that sport, and the USOC provides financial assistance to them.[25]

106.    Each NGB is charged with promoting competition in its respective sports.

107.    Each NGB is charged with selecting the athletes, officials, and coaches for its sport at the Pan Am Games, World Championships, World Cups, and Olympic Games.

108.    The Pan Am Games, World Championships, World Cups, and Olympic Games are "protected competitions" under the Sports Act.

109.    The USOC controls all aspects of every protected competition.

110.    Each NGB then submits its roster of proposed coaches and athletes for protected competitions to the USOC.

111.    The USOC then enters the athletes and coaches in the protected competitions.

112.    The Sports Act gives the USOC the power to control all of the NGBs.

113.    The Sports Act gives the USOC the power to enforce compliance by the NGBs with all requirements of the Sports Act.

114.    Such power includes the power to put NGBs on probation, to replace the entire board of any NGB, or to de-certify an NGB.

115.    The Sports Act allows the USOC to force NGBs to adopt policies and procedures to ensure the physical safety of athletes.

---

[24] 36 U.S.C. 220505(c)(3).

[25] 36 U.S.C. 220505(c)(4), (6).

116. USA TKD is one of forty-seven (47) NGBs recognized by the USOC under the Act that sponsors or arranges amateur athletic competition.[26]

117. The USOC has placed USA TKD on probation more than once since 1999; USA TKD was last on probation in 2013.

118. The USOC has de-certified several NGBs, including the predecessor of USA TKD, United States Taekwondo Union, in 2005.

119. The United States Taekwondo Union was de-certified for financial and overall mismanagement, not for any reasons related to athlete sexual abuse.

120. For example, in 1999, the USOC required all NGBs to purchase insurance to specifically cover the sexual assaults of any minor.

121. If NGBs did not purchase sexual abuse insurance, their members would not be permitted to use the USOC training centers in Chula Vista, California; Lake Placid, New York; Marquette, Michigan; or Colorado Springs, Colorado.

122. In 2013, the USOC forced USA Swimming to adopt a prohibition of coach-athlete sexual relationships.

123. In 2018, the USOC ordered the entire board of USA Gymnastics to resign or face de-certification.

**Team USA: The Commercial Quest for "Medals and Money" Off the Labor of Athletes**

124. Although the USOC is restricted by statute from engaging in business for profit,[27] and although it receives no permanent funding from the federal government, the Olympics—and the competitive amateur sports industry that feeds into it—is big business.

---

[26] 36 U.S.C. 220501(b)(3), (8).

[27] 36 U.S.C. 220507(a).

125.     Olympic athletes and coaches are involved in a commercial endeavor infused with money, contracts, and terms. Every participant (athletes, coaches, USA TKD, and the United States Olympic Committee) is a commercial actor.

126.     Each Olympic athlete has a direct commercial relationship with the USOC, which imposes a list of "commercial terms"[28] upon each athlete as a precondition for participating:



127.     The commercial relationship between the USOC and each Olympic athlete is further confirmed on the USOC's website, which states that the USOC "supports U.S. Olympic …athletes on and off the field of play through programming such as direct athlete funding, health

---

[28] *Commercial Terms*, TEAMUSA.ORG, https://www.teamusa.org/Athlete-Resources/Athlete-Ombudsman/Commercial-Terms.

insurance, tuition grants, media and marketing opportunities, career services and performance-based monetary rewards."[29]

128.    Although this commercial relationship benefits both athletes and the USOC, the commercial benefits that flow to the USOC are massively larger.

129.    In 2016 alone, the USOC generated $339 million in unconsolidated revenue.[30]

130.    The USOC generates billions of dollars in licenses and sponsorships because it controls all aspects of and for the NGBs.

131.    According to Team USA's website, in May 2014, NBC Sports signed a deal worth $7.75 billion to broadcast the Olympic games through 2032.[31]

132.    Larry Probst, the USOC Chairperson, described this as a "terrific deal" and NBC Sports Chairperson Mark Lazarus explained, "The Games are very important pieces of real estate[.]"[32]

133.    The corporate sponsorships of Team USA generate hundreds of millions of dollars of additional revenue off the backs of the athletes who wear Team USA uniforms.

134.    These sponsorships are prominently displayed on Team USA's website (which is owned and held by the USOC)[33]:

---

[29] *About the USOC*, TEAMUSA.ORG, https://www.teamusa.org/About-the-USOC

[30] UNITED STATES OLYMPIC COMMITTEE 2016 ANNUAL REPORT 41 (2016), http://2016annualreport.teamusa.org/USOC_32554_AR16.pdf. Funding sources include Broadcast rights ($169M); Marks rights ($194M); Licensing Royalties ($21M); Contributions ($98M) and Other ($112M).

[31] Amy Rosewater, *NBC, IOC Ink $7.75 Billion Deal for Games*, TEAMUSA.ORG (MAY 7, 2014), https://www.teamusa.org/News/2014/May/07/NBC-IOC-Ink-775-Billion-Deal-For-Games.

[32] *Id*.

[33] *Sponsors*, TEAMUSA.ORG, https://www.teamusa.org/sponsors (last visited May 2, 2018).

## Sponsors

### Worldwide



### Domestic

135. Without Team USA's Olympic athletes competing, the USOC would not earn any revenue, would not have any television deals with NBC, would not have any endorsements, and would not have any sponsors.

136. The USOC itself states this on its website,[34] noting that it "does not receive federal financial support" and that it "generat[es] revenue" by "licenses" to sponsors:



137. Despite having hundreds of millions of dollars to spend on the safety and wellbeing of the athletes whose labor earned this money, the USOC and USA TKD decided over

[34] *Inside the USOC*, TEAMUSA.ORG, https://www.teamusa.org/about-the-usoc/inside-the-usoc (last visited May 2, 2018).

the last two decades to not pay for reasonable compliance or security measures to ensure that coaches or other executives were not sexually abusing, exploiting, or trafficking female athletes—even though they knew this abuse was occurring.

138. The USOC U.S. Center for Safe Sport ("SafeSport"), an ostensibly independent entity designed to investigate and report on sexual misconduct, is sponsored by NBC Sports, the National Basketball Association, and the Women's National Basketball Association,[35] which further shows that all aspects of Team USA and the USOC are commercial:



139. Despite the USOC's knowledge of rampant sexual abuse in its ranks, it continues to leave SafeSport radically underfunded and unsupported.

140. In 2018, the USOC vowed to "double its funding" of SafeSport—but without saying what the original amount being "doubled" even is:

> **How much funding does the USOC dedicate to safe sport?**
>
> Beginning in 2018, the USOC will effectively double its funding for the U.S. Center for SafeSport to enable the hiring of more investigators and staff, improve the timely resolution of cases, enhance ongoing communication for victims and their families, provide age-appropriate training on recognizing and helping to prevent abuse, and offer better and more accessible resources online. [36]

---

[35] *Safesport*, SAFESPORT.ORG, www.safesport.org

[36] *Safe Sport*, TEAMUSA.ORG, https://www.teamusa.org/About-the-USOC/Safe-Sport

141.    The USOC has admitted that it "has an important responsibility to create positive, safe and secure environments for American athletes."[37]

142.    The USOC has stated that its "top priority is to protect, support and empower every athlete in our community."[38]

143.    At the same time, the USOC has admitted: "We recognize that the system failed too many girls and women, and we have already taken many important steps - including commissioning an independent investigation and demanding a complete leadership and culture change at USA Gymnastics."[39]

144.    Despite creating the Safe Sport Initiative in 2012, which it calls the "first-of-its-kind abuse prevention program," it waited two years to even create the U.S. Center for Safe Sport:

> In June 2014, the USOC reaffirmed its commitment to advance the safety and well-being of American athletes by approving the creation of the U.S. Center for SafeSport – an independent entity designed to oversee education programs, and investigate and adjudicate sexual misconduct claims in sports that are managed by USOC-sanctioned NGBs. Participation in the entity – which launched in March 2017 – is a condition of continued membership in the USOC.[40]

145.    As this lawsuit exposes, SafeSport did absolutely nothing until 2018 to stop any of the ongoing sexual abuse of the U.S. Olympic taekwondo athletes.

146.    This is despicable given the actual knowledge that the USOC admits it had back in 2010:

---

[37] *Safe Sport*, TEAMUSA.ORG, https://www.teamusa.org/about-the-usoc/safe-sport
[38] Id.
[39] *Id*.
[40] *Id.*

> **Why was the U.S. Center for SafeSport originally created?**
>
> In 2010, the USOC determined that sexual and physical abuse warranted greater attention and convened a working group of internal and external experts to provide recommendations about how to improve the community's prevention and response efforts. As the recommendations were implemented, the USOC concluded that the U.S. Olympic and Paralympic movements would benefit from the creation of an independent entity dedicated to investigating and resolving all allegations of sexual abuse associated with any of the USOC's recognized NGBs.[41]

147.    In its own words, the USOC has stated that it alone "***is responsible*** for the training, entering and funding" of Team USA and all Olympic sports.[42]

148.    In its own words,[43] the USOC has stated:

> The USOC has two primary responsibilities in its oversight of Olympic and Paralympic sport in the United States. The first is to generate resources in support of its mission, which is to help American athletes achieve sustained competitive excellence. The second is to ensure organizational resources are wisely and effectively used to that end.

149.    As this case demonstrates, the USOC has breached its duty to meet either of its two responsibilities.

150.    In the wake of the Larry Nasser scandal, Scott Blackmun, then-CEO of the USOC, was forced to write an open letter on January 24, 2018, to the victims of sexual abuse caused by the USOC and the NGBs, and in doing so admitted: "We have said it in other contexts, but we have not been direct enough with you. We are … sorry that you weren't afforded a safe

---

[41] *Id.*

[42] *About the USOC*, TEAMUSA.ORG, https://www.teamusa.org/About-the-USOC

[43] *Inside the USOC*, TEAMUSA.ORG, https://www.teamusa.org/About-the-USOC/Inside-the-USOC (emphasis added).

opportunity to pursue your sports dreams. The Olympic family is among those that have failed you."[44]

151.    In this January 24 letter, Mr. Blackmun also stated that the USOC must "**Change the Corporate Structure of the NGB.**"[45]

152.    At the same time they were sexually exploiting and trafficking the very athletes whose labor generated all of the revenue, the Olympic officials made sure to pay themselves exorbitant salaries.

153.    In fact, the former CEO of USOC, Scott Blackmun, made $1 million in salary and bonuses in 2016.

154.    In fact, USOC's "chief of sport performance," Alan Ashley, made nearly $500,000 in 2016.

155.    In fact, 129 members of the USOC staff makes over six figures.

156.    In fact, 14 of the USOC's executives are paid more than $200,000.[46]

157.    These officials did not want to jeopardize their income or the hundred-million-dollar revenues of the USOC and its NGBs (including taekwondo) by stopping the sexual abuse committed by the Lopez brothers. To blow the whistle would have brought negative attention and jeopardized the commercial benefits they were reaping.

---

[44] Open Letters to Team USA Athletes Regarding Nasser Case, TEAMUSA.ORG, Jan. 24, 2018, https://www.teamusa.org/News/2018/January/24/Open-Letters-To-Team-USA-Athletes-Regarding-Nassar-Case

[45] *Id*. (emphasis in original).

[46] Meanwhile, the bonus for an American athlete who wins a gold medal is just $37,500. Until the spring of 2017, the members of the women's hockey squad (a national team that has medaled in every Olympics since 1998) were paid only $6,000 in an entire four-year cycle. *See* Eddie Pells, *With USOC in Turmoil, Athletes Testify About Sex-Abuse Cases*, HOUSTON CHRON. (Apr. 18, 2018), https://www.houstonchronicle.com/news/crime/article/With-USOC-in-turmoil-athletes-testify-about-12845846.php.

158. The USOC provides funding to each NGB.

159. For example, the USOC distributed $55.9 Million in grants to its NGBs in 2016.[47]

160. The USOC is the largest single source of funding for USA TKD.

161. In a 2006 audit of USA Taekwondo, the auditors noted that USA TKD was financially dependent on grants from the USOC.

162. In addition to grants, the USOC also gives USA TKD rent-free office space in Colorado Springs.

163. According to audits, the USOC annually pays athletes and coaches, including Jean and Steven Lopez, hundreds of thousands of dollars a year.

164. In order to participate in USA TKD-sanctioned events, it is necessary to be a USA TKD member.

165. To be a member, an individual athlete must pay dues to USA TKD.

166. Part of the dues paid by Plaintiffs went towards the financial grants awarded to the Lopez brothers by Defendants USOC and USA TKD.

167. Similarly, for a taekwondo club to be considered a USA TKD member club, the club must pay dues, meet certain minimum standards set out by USA TKD including purchasing required sexual abuse insurance.

168. And if the member club seeks to hold a USA TKD sanctioned event at the club, it must pay a fee.

---

[47] UNITED STATES OLYMPIC COMMITTEE 2016 ANNUAL REPORT, *supra*, at 27; *see also* Eddie Pells, *With USOC in Turmoil, Athletes Testify About Sex-Abuse Cases*, HOUSTON CHRON. (Apr. 18, 2018) (noting that USOC, embroiled in sex abuse scandals, and with commercial partners hesitant to strike deals under the current climate, doubled its funding for the US Center for SafeSport, which opened in 2017, to $3.1 million in 2018).

169.     All those who seek to coach, judge, or participate in USA TKD-sanctioned events must also pay a membership fee.

170.     Part of each membership fee is used to purchase specific sexual abuse insurance.

171.     Each NGB is mandated to carry specific sexual abuse insurance coverage by the USOC.

172.     The exchange of money for membership creates a fiduciary relationship and a duty between USA TKD and its members, athletes, and coaches.

173.     Even so, USA TKD took no action to protect its athletes from sexual predators, like the Lopez brothers, who were well known to prey on young athletes. Despite having actual knowledge of the need to do so, USA TKD failed to adopt any policies, rules, or procedures to keep athletes safe from sexual abuse.

174.     In addition to funding USA TKD, the USOC provided funding to the Lopez brothers in the form of, among other things, high performance grants.

175.     USA TKD also provided funding to the Lopez brothers.

176.     On numerous occasions, the USOC has employed Jean Lopez as its taekwondo coach at the Pan Games, World Cup, World Championships, and Olympic Games. Indeed, Jean Lopez was the USOC's taekwondo coach at the 2004, 2008, 2012, and 2016 Olympic Games.

177.     In traditional taekwondo competitions, there are eight weight classes for men and women; at the Olympics, these classes are compressed to four.

178.     Jean Lopez, along with fellow coach Juan Moreno, former USA TKD Director of High Performance Meredith Miller, and former USA TKD CEO David Askinas, devised the procedure to select the weight divisions for the USOC Olympic teams.

179.     Rigging the system, Jean Lopez devised a selection process that artificially favored his family members (who were competing as taekwondo athletes) and those female athletes who submitted to his sexual demands.

180.     Steven Lopez represented the USOC in Taekwondo at the 2000, 2004, 2008, 2012, and 2016 Olympics, and was paid for his performance in the form of, among other things, a per diem and performance-based bonus.

181.     At the 2016 Olympic Games, Jean Lopez had long been under investigation by USA Taekwondo's SafeSport program.

182.     Even so, and despite the USOC and USA TKD knowing that Jean Lopez was a sexual predator, the USOC gave Jean Lopez credentials to attend the Rio Olympics. As a result, Jean coached his brother Steven at the 2016 Rio Olympics.

183.     Jean Lopez also received thousands of dollars in per diem from the USOC at the Rio Olympics.

184.     During this time, Steven Lopez was also under investigation by USA TKD.

185.     But as explained above, USA TKD consulted with the USOC and both entities jointly formed an agreement to stall the investigation so that Steven Lopez could compete on the USOC Taekwondo team in the 2016 Summer Olympics in Rio, Brazil.

186.     Steven Lopez financially benefited from his participation in the 2016 Summer Olympics.

187.     At all relevant times, from the 1990s to 2018, both Lopez brothers were the agents, servants, and/or employees of USA TKD because they coached the taekwondo team.

188.    At all relevant times, from the 1990s to 2018, both Lopez brothers were agents, servants, and/or employees of the USOC because they coached the taekwondo team. They were also cloaked with actual and apparent authority to represent the USOC.

**The USOC and USA TKD Knowingly Caused and Benefited From the Sexual Abuse, Exploitation, and Trafficking of Plaintiffs and the Class Members**

189.    By 2006, USA TKD had received written and verbal complaints that Jean Lopez and Steven Lopez were routinely sexually exploiting, assaulting, and raping multiple female athletes that were entrusted into the protection (and bound by the commercial terms of) the USOC and USA TKD.[48]

190.    The USOC knew or was willfully blind to the fact that the Lopez brothers presented a clear and present danger to young female athletes.

191.    USA TKD knew or was willfully blind that the Lopez brothers presented a clear and present danger to young female athletes.

192.    In 2013, while USA TKD was probation, the current interim CEO of the USOC, Susanne Lyons, directly supervised USA TKD. This meant the USOC was directly controlling USA TKD and all of its athletes. The USOC had hundreds of millions of dollars available on its balance sheet at the time, but it declined to spend any of that money to protect Team USA's taekwondo athletes.

193.    Susanne Lyons had knowledge of the numerous complaints of rape and sexual assault made by female taekwondo athletes against both Lopez brothers.

194.    But Ms. Lyons declined to take any action against the Lopez brothers or to protect Team USA's taekwondo athletes from the Lopez brothers.

---

[48] For purposes of this Complaint, "rape" means any non-consensual sexual activity, that would be considered criminal, including the sexual touching of minors.

195. She declined to do so because the Lopez brothers financially benefited the USOC and USA TKD, which both relied on the medals and money generated by the Lopez brothers. It was more important for Team USA to continue winning, and the female athletes who labored on behalf of Team USA (and were subject to its commercial terms) were viewed as disposable commodities whose safety was secondary to Team USA's commercial success.

196. Ms. Lyons is now the interim Chief Executive Officer of the United States Olympic Committee.

197. Gary Johansen, Associate General Counsel at the United States Olympic Committee, had knowledge of the numerous complaints of rape and sexual assault made by U.S. athletes against the Lopez brothers.

198. But Gary Johansen declined to take any action against the Lopez brothers or to protect Team USA's taekwondo athletes from the Lopez brothers.

199. Rick Adams, another USOC in-house attorney, had knowledge of the numerous complaints of rape and sexual assault made by U.S. athletes against the Lopez brothers or to protect Team USA's taekwondo athletes from the Lopez brothers.

200. But Rick Adams took no action against the Lopez brothers or to protect Team USA's taekwondo athletes from the Lopez brothers.

201. Meredith Miller, Manager of Sports Performance at the United States Olympic Committee, had knowledge of the numerous complaints of rape and sexual assault made by U.S. athletes against the Lopez brothers.

202. But Meredith Miller took no action against either of the Lopez brothers or to protect Team USA's taekwondo athletes from the Lopez brothers.

203.     Devin Johnson, board member and former President of the Board of Directors for USA Taekwondo, had knowledge of the numerous complaints of rape and sexual assault made by U.S. athletes against the Lopez brothers.

204.     But Devin Johnson took no disciplinary actions against the Lopez brothers or to protect Team USA's taekwondo athletes from the Lopez brothers.

205.     Malia Arrington, Director of Ethics and Safe Sport at the USOC, had knowledge of the numerous complaints of rape and sexual assault made by U.S. athletes against the Lopez brothers.

206.     But Ms. Arrington declined to take any action against the Lopez brothers or to protect Team USA's taekwondo athletes from the Lopez brothers.

207.     The USOC declined to take any action against Steven Lopez.

208.     The USOC has long known of sexual assaults of female athletes at their training centers.

209.     Prior to 1996, the USOC had knowledge that female athletes had been raped numerous times at facilities it owned and operated across the United States.

210.     Prior to 1996, the USOC was aware that underage female athletes had been raped at its training center in Marquette, Michigan.

211.     Prior to 1996, the USOC was aware that underage female athletes had been raped at its training center in Lake Placid, New York.

212.     Prior to 1996, the USOC was aware that underage female athletes had been raped at its training center in Colorado Springs, Colorado.

213. Indeed, by the early 1990s, following numerous sexual assaults of minor athletes at USOC training Centers, USOC was concerned about the safety of minor athletes at its facilities.

214. The USOC ordered USA Taekwondo hire an adult male monitor to ensure to help protect minor female athletes.

215. If USA TKD failed to get a monitor, promising minor athletes USA TKD like Kay Poe ("Kay"), Mandy, and Amber would not be permitted to live at the USOC's training centers, including the training center in Colorado Springs.

216. By the late 1990s (when Kay and Mandy started at the training center), however, the USOC stopped enforcing the monitor requirement on USA TKD. This was a knowing disregard of the safety of Team USA's athletes. The USOC had the financial resources to enforce this requirement; it simply chose to abandon the safety and security of its athletes.

217. Sexual relationships between adult male coaches and teenage athletes is an inappropriate, unacceptable, and yet a common part of the Olympic Sports culture in the United States.

218. From 1978 to the present, the USOC has refused to take any meaningful steps to deter coach-athlete sexual relationships in its NGBs.

219. The USOC has known for decades that coach-athlete sexual relationships are prevalent in USA TKD.

220. For example, at the 1992 Olympics in Barcelona, Spain, the USOC had to intervene when the USOC's Taekwondo coach was caught having sex with a young teenage athlete by the landlord of the living space that the USOC had rented for their Taekwondo delegation.

221.    The USOC and USA Taekwondo were aware of other young female athletes who had been raped by their coaches prior to 2007.

222.    The USOC and USA Taekwondo took no action to stop, nor conducted any investigation into allegations of, coaches and officials raping young female athletes prior to 2007.

**Plaintiffs' Complaints and Cries for Help were Ignored, Deferred, Obstructed, Denied, or Covered-Up by Defendants**

223.    In 2006, Plaintiff Mandy Meloon reported in writing to the USOC her physical abuse by Steven Lopez and sexual assault by Jean Lopez at a Team USA event in Cairo, Egypt.

224.    In 2006, Mandy personally handed her written complaint to USOC employee John Rueger.

225.    In 2006, Mandy personally handed her written complaint to USOC employee Gary Johansen.

226.    In 2006, Mandy personally handed her written complaint to David Askinas, then-CEO of USA Taekwondo.

227.    Because the Lopez brothers were generating medals and money for the USOC and USA TKD, however, the USOC purposefully chose to discredit Mandy and leave Jean and Steven Lopez in their positions, which would bring further revenue (money and medals) to the USOC.

228.    Although USA TKD nominally ordered Jean Lopez to stay away from Mandy following the submission of her complaints against Jean, USA TKD took no action whatsoever to enforce this order.

229.    Likewise, USA TKD took no action to protect other female athletes from Jean Lopez, even though they knew that Jean Lopez was a serial sexual predator who had preyed on numerous female athletes, not just Mandy.

230.     In 2008, then-CEO of USA TKD, David Askinas, told Mandy she could be a member of the 2008 Olympic team for the Beijing Olympics in China—but only if she dropped her complaint against Jean Lopez and agreed to sign a statement confessing that she was mentally ill and had fabricated her allegations against Jean Lopez.

231.     Mandy refused USA Taekwondo's attempt to cover-up and conceal her abuse and declined to retract her truthful allegations.

232.     On behalf of USA TKD, Askinas designated Jean Lopez as the coach for Team USA's taekwondo team for the 2008 Olympics in Beijing, China.

233.     Jean Lopez, as coach of the USOC's Olympic Team, was an executive and exercised significant discretion and control in selecting the members of the USOC Olympic Taekwondo Team.

234.     Jean selected his brother, Steven, to the team.

235.     Jean selected his sister, Diana, to the team.

236.     Jean selected his brother, Mark, to the team.

237.     Jean Lopez and David Askinas kept Mandy off of the 2008 Olympic Team in favor of Charlotte Craig, a minor athlete who had begun training with Jean Lopez.

238.     One or more of the Lopez brothers had engaged in a sexual relationship with Charlotte Craig before the 2008 Olympics, which was inappropriate.

239.     Ms. Craig was a minor in 2008.

240.     Despite having received written complaints of rapes from at least two athletes against Jean Lopez, the USOC submitted Jean Lopez's name to the International Olympic Committee as the head coach of Team USA's 2008 Taekwondo team.

241.    The USOC financially compensated Jean Lopez for his coaching services in

Beijing.

242.    Shortly after USA TKD submitted its proposed athletes to the USOC for the 2008

Olympics, USA TKD suspended Mandy from USA Taekwondo.

243.    Jean Lopez has considerable influence over who the USOC selects for its

Olympic, Pan Am, World Cup, and World Championship teams.

244.    Jean Lopez was able to influence the judging and scoring of taekwondo events.

245.    David Askinas and USA TKD submitted the names of athletes to the USOC for

spots on the roster of the USOC teams for Olympic, Pan American, World Cup, and World

Championship rosters.

246.    At all relevant times, during the careers of all Plaintiffs, Jean Lopez had

considerable influence over which names USA TKD submitted to the USOC for spots on World

Cup, World Championship, Pan Am, and Olympic rosters.

247.    At all relevant times during the careers of all Plaintiffs, the USOC had the final

decision-making authority on which athletes would be on their rosters for Pan Am, World Cup,

and World Championships.

248.    In 2015, USA TKD lawyer Donald Alperstein[49] contacted Plaintiff Amber Means

about allegations of sexual abuse in Taekwondo.

249.    Amber told Mr. Alperstein about her sexual abuse at the hands of Steven Lopez.

250.    Amber and Mr. Alperstein had numerous conversations in 2015, 2016, and 2017.

251.    Mr. Alperstein's investigation was halted by the USOC to make sure that Steven

---

[49] Donald Alperstein is a lawyer in Colorado Springs who has been retained by numerous
National Governing Bodies in cases where athletes are accusing coaches and officials of sexual
assault.

Lopez could compete in the 2016 Olympics.

252.     In 2017, Kathleen Smith from the USOC's U.S. Center For Safe Sport contacted Amber about the pending investigations of Steven Lopez for sexual misconduct.

253.     The goal of the USOC SafeSport program is to, ostensibly, curtail sexual abuse in sports.

254.     Despite the pendency of these investigations, the USOC allowed Steven Lopez to compete in the 2017 World Championships, and even paid for his first-class travel.

**SafeSport: The USOC's Too-Little-Too-Late Response**

255.     The USOC commenced a task force to study sexual abuse in Sports in 2010, in large part as a response to the sexual abuse scandal in United States Swimming.

256.     This task force was chaired by Nina Kemmpel, who is or was a USOC board member.

257.     While "studying" the problems, systematic sexual abuse was occurring in multiple NGBs, and the USOC sat idly and watched.

258.     In June 2014, the USOC Board of Directors finally approved the creation of the U.S. Center For Safe Sport. ("SafeSport").

259.     But SafeSport did not begin operating until sometime in March 2017, after a tidal wave of allegations regarding USA Gymnastics' team doctor Larry Nassar made the rampant sexual abuse of young female athletes an unavoidable issue for the USOC.

260.     Rick Adams, a lawyer with the USOC, was in charge of recruiting the original board members for the USOC-created SafeSport.

261.     SafeSport is controlled by the USOC.

262.     SafeSport receives the majority of its funding from the USOC.

263.     SafeSport has the power to expel coaches of any NGB for violations of the USOC code of conduct.

264.     SafeSport has the power to expel coaches of any NGB for violations of an NGB code of conduct.

265.     All coaches in all USOC-controlled NGBs are required to be "Safe Sport Certified."

266.     SafeSport board members are former Board Members of National Governing Bodies, including United States Swimming.

267.     SafeSport investigators work for various NGBs investigating sexual abuse allegations.

268.     SafeSport is charged with investigating reports of child abuse and sexual assault, ethics compliance and administration in the U.S. Olympic and Paralympic movement.

269.     SafeSport compiled evidence from at least three women who said Jean Lopez, now 44 years old, engaged in sexual misconduct in multiple countries on multiple continents over a period of almost a decade.

270.     Investigators described Lopez as "an older athlete/coach abusing his power to groom, manipulate and, ultimately, sexually abuse younger female athletes."50

271.     On April 4, 2018, SafeSport found the sexual abuse and exploitation allegations of Mandy, Kay, and Heidi against Jean Lopez to be true by a preponderance of the evidence.

272.     After decades of complaints about Jean Lopez, the SafeSport deemed Jean Lopez permanently ineligible and banned Jean Lopez for life from participating or coaching in USOC

---

50 David Barron, *Former U.S. Taekwondo coach Jean Lopez banned from Olympic sports in U.S.*, HOUSTON CHRONICLE (Apr. 4, 2018), available at https://www.houstonchronicle.com/olympics/article/Former-U-S-Taekwondo-coach-Jean-Lopez-suspended-12806286.php.

controlled sports, including USA Taekwondo.

273. Since it became operational, SafeSport has had an investigation into allegations of sexual assault by Steven Lopez.

274. The Steven Lopez investigation has been open for over fourteen months.[51]

275. The USOC-controlled SafeSport currently lists Steven Lopez's status as being under a "restriction."[52]

276. However, despite media protest, allegations of sexual misconduct, the pendency of the SafeSport investigation, and related "restrictions," Steven Lopez was permitted to compete in the taekwondo world championships in South Korea in June, 2017.[53]

277. The USOC even paid for Steven Lopez's first-class travel.

278. On the team were 15 athletes, including three teenage women, who were forced to be in his presence.[54]

279. The USOC was dependent upon successful results in order to receive funding for itself and the executives it employed, so it was willing to sacrifice the safety and security of its young, female athletes. Their sexual abuse, exploitation, and trafficking were simply collateral damage that did not outweigh the quest for Olympic—and, in turn, financial—success.

---

[51] Nancy Armour & Rachel Axon, *Sexual misconduct investigation of Olympic champ Steven Lopez drags into 14th month*, USA TODAY (Apr 17, 2018), https://www.usatoday.com/story/sports/olympics/2018/04/17/olympic-champ-steve-lopez-still-under-investigation-u-s-olympic-champion-sexual-misconduct-drags-int/525406002/

[52] https://safesport.org/userviolations/search; Plaintiffs do not know what "restriction" have been placed on Mr. Steven Lopez by the USOC, USA Taekwondo, or the USOC controlled Center for Safe Sport.

[53] Christine Brennan, *Don't Allow U.S. Taekwondo Star Steven Lopez to Go to World Championships*, USA TODAY (June 13, 2017), https://www.usatoday.com/story/sports/columnist/brennan/2017/06/13/steven-lopez-usa-taekwondo-sexual-assault-world-championships/102812808/.

[54] *Id*.

**Congress Steps In: The Sports Abuse Act 2017**

280.    The 2017 Sports Abuse Act was overwhelmingly popular and bipartisan.

281.    It sailed through the House (406-3), was approved by the Senate unanimously, was quickly signed by the President, and took effect in February 2018.

282.    At the time, Senator Nelson said: "It's a stain on our country that many of our own young Olympic athletes were sexually abused for years by the very adults they entrusted to train them and keep them safe." Senator Nelson continued: "No aspiring athlete deserves to have their dream or moment of Olympic gold stolen from them by the actions of a sexual predator. These heinous crimes and the culture that allowed them to go undetected for so long must come to an immediate end."

283.    Senator Donnelly said: "Amateur athletics governing bodies like USA Gymnastics have an obligation to athletes, parents, and the sport to ensure that athletes are safe[.]"[55]

284.    In announcing the 2017 Sports Abuse Act, Senator Collins applauded the multitude of Olympic sex abuse victims who spoke out in the face of retaliation by Team USA, and she criticized the "corrupt system" that had allowed sexual abuse to fester in USA Taekwondo (and nearly all of the other Team USA sports) for decades.[56]

285.    Senator Collins explained that the 2017 Act "reform[s] the law that allows victims to sue sex-crime perpetrators by extending the statute of limitations because it's often difficult

---

[55] Senator Dianne Feinstein, *Senate Passes Bill Requiring U.S. Amateur Athletic Organizations to Report Sexual Abuse*, FEINSTEIN.SENATE.GOV (Nov. 14, 2017), https://www.feinstein.senate.gov/public/index.cfm/press-releases?ID=2BEC8C16-43E4-412A-8660-3E7EC73104F9.

[56] *Id.*

for children to recognize that they have had crimes committed against them until much later on into adulthood."[57]

286.     Senator Feinstein (co-author of the law) pointed out that the 2017 Sports Abuse Act "extends the statute of limitations so that victims can sue their abusers 10 years after they become aware of their abuse. This is important because, tragically, survivors often do not fully become aware of their abuse until later in life."[58]

287.     As part of the 2017 Sports Abuse Act, Congress clarified that an Olympic "event" is more than just the moment of competition; Congress defined the term "event" such that it "includes travel, lodging, practice, competition, and health or medical treatment."[59]

## PLAINTIFF-SPECIFIC ALLEGATIONS

**Sexual Abuse, Exploitation, and Trafficking of Mandy Meloon**

288.     Mandy Meloon was born in Germany in 1981 to a German mother and an American father.

289.     The USOC offered to make Mandy a member of its own residency program for athletes at the USOC owned Olympic Training Center in Colorado Springs.

290.     Based on the promises made to her by the USOC and USA TKD, Mandy elected to compete internationally for the USOC's Team USA, not for Germany's team.

291.     Partially as a result of her decision to compete for the USOC instead of the German National Olympic Committee, Mandy had to give up her German citizenship.

---

[57] *Id.*

[58] *Id.*

[59] 34 U.S.C. § 20341(10).

292.    In 1994, at the age of 13, Mandy moved into the Olympic Training Center in Colorado Springs, so she could train full time.

293.    Mandy and her family relied on the USOC's representations that she would be safe at the USOC facility in Colorado Springs.

294.    Jean Lopez was an employee of the USOC and/or USA TKD when Mandy moved into the USOC's Colorado Springs Training Center.

295.    In 1994, Jean Lopez befriended the 13-year-old Mandy.

296.    Jean Lopez would engage in sexual conversations with Mandy. He would tell her about his sex life and ask her about hers. He referred to Mandy in front of others as his "girlfriend."

297.    Jean offered to adopt Mandy or become her guardian.

298.    In the fall of 1994, while Jean Lopez was captain of the Men's National taekwondo team, he traveled with Mandy and the team to Korea.

299.    The USOC and USA TKD sponsored the athletes and coaches, funded their trip, paid per diem, and paid their flight, hotel and other expenses related to the competition.

300.    On this trip, Jean insisted Mandy sit with him, sit on his lap, give him massages; he would massage her and referred to her as his "girlfriend" in front of members of the National team; he told other team members that Mandy was pregnant with his baby.

301.    Mandy became the youngest member of the USOC's Junior National Team in 1995.

302.    In June 1995, at age 14, Mandy made the USA TKD Senior National Team.

303.    As a result, Mandy began training full time at the USOC's Training Center in Colorado Springs.

304.    At the time, Jean Lopez was openly having sex with a different minor female member of the USOC's National Taekwondo Team at the Olympic Training Center.

305.    In November 1995, Mandy traveled to the Philippines with the USA TKD senior national team.

306.    Jean Lopez was the U.S. National team coach for these World Championships in Manila, held on November 17-21, 1995.

307.    Mandy was 14 years old and was left completely unsupervised on this trip.

308.    In March 1996, Mandy was a member of the USOC's Team USA for the World Cup in Brazil.

309.    Also in 1996, Mandy and other minor athletes traveled without chaperons to Korea for a two-week USOC/USA TKD exchange trip in 1996.

310.    This trip was organized, facilitated, and paid for by USOC and USA TKD.

311.    Jean Lopez was also on this trip to Korea.

312.    On the trip to Korea, male members of the senior team had sex with female members of the junior team (i.e., adult male athletes had sex with minor female athletes).

313.    USA TKD and the USOC were aware that adult senior athletes were engaging in sexual contact with minor junior athletes on their trips.

314.    The USOC and USA TKD took no action whatsoever to prevent sexual contact between minor junior and adult senior athletes.

315.    In 1996, adult males residing at the USOC's Olympic Training Center in Colorado Springs were having open sexual relationships with minor residents of the training center.

316.    The USOC took no action whatsoever to stop these illegal relationships.

317.    Specifically, in 1996, at age 15, Mandy was vaginally raped in her room at the training center by an adult taekwondo national team member, Danny Kim.

318.    Throughout 1996, while Mandy was 15 and while she lived at the USOC's training

44

center, Kim would come to Mandy's room and "teach" her things about sex.

319.    When Kim would give Mandy rides to school between December 1996 to April 1997, he would often force her to perform oral sex on him.

320.    At least twice in 1997, while Mandy was 16, and while they were both living at the USOC training center, Kim filmed he and Mandy having sex.

321.    Kim had sexual intercourse with Mandy in a hotel room in Oakland, California while they were attending the 1997 Senior U.S. Nationals, sponsored by USA TKD.

322.    The USOC and USA TKD sponsored the athletes and coaches, funded their trip, paid per diem, and paid their flight, hotel and other expenses related to the competition in Oakland, California.

323.    Ultimately, in the winter of 1997-1998, when Mandy was 17, she became pregnant by Kim and went to Germany to have an abortion.

324.    Mandy made oral complaints about Kim beginning in 1997, and a written complaint against Kim in 2006, regarding the rape and Kim's ongoing, illegal sexual abuse.[60]

325.    In January 1997, Mandy was again accepted as a member of the USOC's National Taekwondo team.

326.    Jean Lopez was a USOC-approved, USOC-sanctioned, and USOC-credentialed athlete for the 1997 World Cup, which took place in Cairo, Egypt in June 1997.

327.    The USOC and USA TKD sponsored the athletes and coaches, funded their trip, paid per diem, and paid their flight, hotel, and other expenses related to the competition in Cairo.

328.    At the 1997 World Cup in Cairo, Egypt, Mandy was assigned to a shared hotel

---

[60] On April 25, 2018, USA TKD banned Kim for life for his rape and abuse of Mandy Meloon. *See* https://www.teamusa.org/USA-Taekwondo/V2-Resources/Legal/USAT-Suspension-List

room with Kay Poe.

329.    Kay and Mandy pushed their beds together before going to sleep.

330.    Sometime during the night while both girls were asleep, Jean Lopez entered Mandy and Kay's room.

331.    While Mandy was asleep, Jean climbed into the beds of Mandy and Kay.

332.    Jean digitally penetrated Mandy's vagina.

333.    Mandy estimates that Jean had his fingers inside of her vagina for 5 minutes or more.

334.    Mandy pretended to be sleeping while Jean Lopez assaulted her.

335.    Mandy was 15 years old.

336.    The USOC had knowledge that Jean Lopez sexually assaulted female athletes on numerous occasions.

337.    Despite this knowledge, the USOC approved Jean Lopez to be the team captain at of the USOC's Team in the 1997 World Cup.

338.    Throughout 1997, Mandy continued to live at the USOC's training center in Colorado Springs.

339.    USOC employees were responsible for taking Mandy to and from high school, but the USOC failed on numerous occasions to get Mandy to and from school.

340.    As a result, Mandy dropped out of high school in 1996 while living at the Olympic Training Center.

341.    Adult residents of the OTC would take Mandy out to local bars to drink alcohol.

342.    The USOC was aware that Mandy and other minor athletes were drinking alcohol while residing at the USOC Olympic Training Center in Colorado Springs.

343.   The USOC took no action to curb minor athletes drinking while living at the Olympic Training Center in Colorado Springs.

344.   The USOC was fully aware that Mandy had to miss competitions to get an abortion to terminate the pregnancy caused by an adult resident of the USOC Olympic Training Center (Kim).

345.   The USOC took no action to curb sexual relationships between minor athletes living in its Colorado Springs training center and adults living in or working for the USOC Colorado Springs Training Center.

346.   After her abortion in 1998, Mandy moved out of the Olympic Training Center.

347.   Shortly after moving out of the USOC's Olympic Training Center in Colorado Springs, Mandy moved to Texas to train with Jean Lopez at the Lopez' club, Elite Taekwondo, in Sugar Land, Texas.

348.   After moving to Texas, in approximately the year 2000 when Mandy was 18 and 19, Mandy began to have a sexual relationship with Jean's brother, Steven Lopez.

349.   During this time, USOC was paying Jean Lopez, Steven Lopez, and Mandy through grants, stipends, and other forms of financial compensation in exchange for their coaching, training and participation in competitions.

350.   In early 2002, Steven engaged in a sexual relationship with a high school student in Texas.

351.   Steven's sexual relationships with these and other underage girls strained his relationship with Mandy.

352.   Sometime during their relationship, Steven Lopez started to physically abuse Mandy.

353.     In January 2002, in Texas, Steven punched Mandy in the face.

354.     USOC and USA TKD staff and coaches (including Jean Lopez) were aware that Steven had punched Mandy in the face.

355.     In 2004, following Steven being detained for another beating of Mandy, Steven broke into the house Mandy was renting in Sugar Land, TX, and he beat and raped Mandy.

356.     In 2005, Steven again beat and raped Mandy in her home; she ran from the house in a state of undress and Steven chased her down the street.

357.     In April 2005, while Steven and Mandy were travelling as part of the USOC Taekwondo delegation at the World Championships in Madrid, Spain, Steven Lopez brutally assaulted and battered Mandy in their hotel, breaking her ribs.

358.     Jean Lopez, who was the USOC Coach, was aware of the incident.

359.     Shortly after being battered by Steven in Madrid, Mandy began to date other men.

360.     As a result, at the direction of Jean Lopez, Mandy was dropped from the national team.

361.     On May 5, 2006, the Sugar Land Police Department in Sugar Land, Texas, prepared an "Incident Report" based on a burglary committed by Steven Lopez at the residence of Mandy Meloon. The report documented that Steven Lopez had broken into her residence and awakened her by knocking on her bedroom door. She explained that she was "scared that he may return to her home" and that "he is upset that she has a new boyfriend."

362.     Mandy provided the case number of this Incident Report to David Askinas, then-CEO of USA TKD, and John Ruger, who was the USOC's athlete ombudsman from 1999-2014.

363.     In response, they did nothing.

364.     In 2006, Mandy submitted an official written grievance with the USOC and USA

TKD detailing the range of physical and sexual abuse she had suffered at the hands of Steven Lopez and Jean Lopez. She provided this grievance to David Askinas, then-CEO of USA TKD.

365. USA Taekwondo discredited and defamed Mandy: its then-CEO David Askinas concluded that Mandy's allegations "weren't credible," and there was no reason to fire Jean Lopez—or to interfere with his decision to keep Mandy off the team roster.

366. Mandy pursued arbitration in order to be reinstated to the national team, but she was unsuccessful.

367. As detailed above, USA TKD then-CEO David Askinas told Mandy she could be a member of the 2008 Olympic team for the Beijing Olympics in China if she withdrew her complaint against Jean Lopez.

368. Mandy refused USA Taekwondo's conditions and declined to retract her truthful allegations.

369. In retaliation, Jean selected Charlotte Craig, a minor with whom one or more of the Lopez brothers was having sexual relation with, in place of Mandy Meloon to the USOC Taekwondo team in the 2008 Olympics in Beijing.

370. Shortly after USA TKD submitted its proposed athletes to the USOC for the 2008 Olympics, USA TKD expelled Mandy from USA Taekwondo.

371. In August 2008, when the USOC submitted the roster of for its taekwondo team and did not include her, Mandy entirely quit the sport of taekwondo.

372. Mandy has suffered a range of mental and physical symptoms as a result of the personal injuries caused by the actions of the Lopez brothers, the USOC, and USA TKD. Among other injuries she has suffered, in 2015 she was treated for with PTSD caused by the sexual trauma she endured at the hands of the Lopez brothers, the USOC, and USA TKD.

49

**Sexual Abuse, Exploitation, and Trafficking of Kay Poe**

373.    In 1996, at the age of 14, Kay became the youngest-ever member of the United States National Taekwondo team.

374.    In 1997, she participated in the World Championships in Cairo, Egypt.

375.    Defendant USA TKD or its predecessor, The United States Taekwondo Union, held a training camp in Colorado Springs for the 1997 World Championships.

376.    The training camp was held at the USOC's Olympic Training Center in Colorado Springs.

377.    At the training camp for the World Championships, a 22-year-old teammate began having a sexual relationship with Kay.

378.    Kay was only 15 years old.

379.    The USOC has knowledge of this illegal sexual relationship.

380.    Even though Kay was a minor living at the USOC facility in Colorado Springs, the USOC took no steps to intervene in or prevent this illegal sexual conduct.

381.    USA TKD was also aware of the illegal sexual conduct involving Kay.

382.    Like the USOC, USA TKD took no action when they learned of this illicit sexual relationship.

383.    Defendant Jean Lopez forced a sexual relationship with Kay while she was still a minor.

384.    By 1999, Jean Lopez was sexually exploiting Kay and engaging in full sexual intercourse with her.

385.    The sexual exploitation of Kay by Jean was not a secret and became common knowledge in the USA TKD community.

386.    In June 1999, Jean Lopez was the coach of the USA Taekwondo team at the World Championships, held in Edmonton, Alberta, Canada. This was a Sports Act-protected competition.

387.    The USOC and USA TKD sponsored the athletes and coaches, funded the trip, paid per diems, and paid for the travel, hotel and other expenses related to the World Championships in Canada.

388.    At this competition, Jean Lopez engaged in sexual intercourse with Kay, who was 17 years old.

389.    In July 1999, Jean Lopez was the coach of the USA Taekwondo team at the Olympic qualifications in Porec, Croatia. This was a Sports Act-protected competition.

390.    The USOC and USA TKD sponsored the athletes and coaches, funded their trip, paid per diem, and paid their flight, hotel and other expenses related to the Olympic qualifiers in Croatia.

391.    On the flight to Croatia, Jean received a "hand job" from Kay, and he engaged in sexual intercourse with Kay for the remainder of the trip.

392.    Kay was 17 years old.

393.    Jean continued having a sexual relationship with Kay when she turned 18 years old, including while he was the USOC Taekwondo Coach and Kay was an Olympic competitor at the 2000 Olympic Games in Sydney, Australia.

394.    Shortly after the 2000 Sydney Olympics, Kay was able to stop Jean Lopez from forcing sexual intercourse with her.

395.    At the 2002 U.S. Open in Orlando, Florida, Jean Lopez was the USOC Taekwondo Coach and Kay, then age 20, was a competitor.

396.    The USOC and USA TKD sponsored the athletes and coaches, funded the trip, paid

per diems, and paid their flight, hotel and other expenses related to the competition in Orlando, Florida.

397.    Jean followed Kay to her hotel room and, despite her protestations, mounted her, pinned her, and "dry humped" her until he ejaculated in his pants.

398.    Kay left the sport of Taekwondo after failing to make the 2008 Olympic Team.

**Sexual Abuse, Exploitation, and Trafficking of Heidi Gilbert**

399.    In October of 2002, Heidi Gilbert was a member of the USOC's Taekwondo team in the Pan American (Pan-Am) Championships in Ecuador.

400.    Along with the other Plaintiffs, Heidi relied on the authority bestowed upon the Lopez brothers by the USOC and USA TKD to believe the Lopez brothers were credible, safe, responsible, and trustworthy.

401.    Jean Lopez was the USOC's Taekwondo coach at the 2002 Pan-Am Championships in Ecuador.

402.    Jean Lopez was financially compensated by the USOC in 2002.

403.    Jean Lopez was financially compensated by USA Taekwondo in 2002.

404.    The USOC and USA TKD sponsored the athletes and coaches, funded their trip, paid per diem, and paid their flight, hotel and other expenses related to the competition in Ecuador.

405.    After winning a gold medal in the 2002 Pan-Am Championships, Heidi was flexing in front of a mirror with Diana Lopez, who is Jean and Steven Lopez's sister;[61] Diana also competed as a member of the USOC's Taekwondo team at the 2002 Pan-Am Championships.

406.    Jean Lopez entered his room where Heidi and Diana were flexing in front of the

---

[61] Like her brothers, Mark, Jean, and Steven, Diana has received compensation from the USOC and USA TKD.

mirror, celebrating their performances in the Pan-Am Championships.

407.    Diana left the hotel room shortly after Jean entered.

408.    Then Jean wrestled Heidi to the bed.

409.    Heidi initially believed Jean was "wrestling" with her, and she wanted to show Jean how strong she was.

410.    But Jean pinned Heidi in a fetal position on the hotel bed and began "dry humping" Heidi. Jean ejaculated in his pants. When Jean was finished, Heidi stood up and left the room.

411.    In 2003, to further her Taekwondo career and to achieve her dream of being an Olympian, Heidi moved from her home state to Texas to train with Jean Lopez.

412.    While in Texas, Heidi lived at a house owned by the Lopez brothers' parents.

413.    In 2003, Heidi was part of the United States Taekwondo national team.

414.    In September 2003, Heidi competed on the USA Taekwondo team at the World Championships in Garmisch-Partenkirchen, Germany.[62]

415.    At this competition, Heidi received a stipend of approximately $2500.00 for making it to the quarter finals. She was also receiving $1,000.00 a month from USA TKD.

416.    USA TKD made all of the travel arrangements for competition in Germany, purchased the airplane tickets, paid for hotel rooms and paid for the meals of its athletes, coaches, and officials.

417.    USA TKD compensated Jean Lopez for his coaching services in 2003.

---

[62] Upon information and belief, this 2003 competition was not a competition protected by the Sports Act and thus the team that represented the United States was sent by USA Taekwondo and not the USOC.

418.     After the 2003 competition in Germany, Jean, Heidi, Mandy, Peter Lopez,[63] and others attended a party in Germany.

419.     At the party, Jean was sexually aggressive with Heidi by grabbing her, grinding his body into hers, and making inappropriate sexual comments to her.

420.     At same point, Jean gave Heidi a drink that he had drugged.

421.     After consuming this drink, Heidi almost passed out.

422.     Heidi was aware of what was going on but could not move.

423.     Jean ended up putting Heidi in a taxi with himself as the only passengers, where he began to touch Heidi's breasts and vagina through her clothing.

424.     When they reached the hotel, Jean dragged Heidi's limp body inside to a lobby area in the back of the hotel and began slapping her face and choking her.

425.     Heidi was unable to respond physically.

426.     Heidi remembers Jean pulling down her pants and digitally penetrating her vagina.

427.     Heidi remembers Jean performing oral sex on her.

428.     Heidi passed out.

429.     Heidi woke up on the floor of a common area of the hotel in a state of undress; Jean had managed to pull up her jeans but they were unfastened.

---

[63] Peter Lopez is a two time Olympian and Taekwondo coach and known rapist, but he is not related by blood or marriage to defendants Steven and Jean Lopez. Peter Lopez was banned from USA Taekwondo in 2014 for sexually assaulting various athletes; however, the USOC gave Peter Lopez credentials allowing him to enter the Olympic Village during the 2016 Rio Olympics. *See* Nancy Armour & Rachel Axon, *USA Taekwondo Athlete Allowed in Rio Olympics Training Gym After Ban for Sexual Misconduct*, USA TODAY (Aug. 17, 2017), https://www.usatoday.com/story/sports/olympics/2017/09/05/executive-director-out-usa-taekwondo-after-handling-misconduct-cases/634989001/; https://www.usatoday.com/story/sports/2017/08/17/olympics-usa-taekwondo-rio-did-not-notify-usoc-world-group-athlete-suspended-sexual-misconduct/577339001/.

430.    On the plane ride back to the United States, Jean told Heidi that he regretted marrying his wife and wanted to have "Olympic babies" with Heidi.

431.    In April 2003 When Heidi arrived at the airport in Houston from Seattle, Steven Lopez (then a USOC athlete) was there to pick her up.

432.    But Steven refused to drive her home until she gave him a blow job.

433.    Heidi had never had sex with Steven before.

434.    In October 2003, another USOC athlete Peter Lopez, who is not biologically related to Defendants Jean and Steven Lopez, came into Heidi's room at the home owned by Jean and Steven Lopez's parents where Heidi was living in Texas.

435.    Peter took his pants off and demanded that Heidi fellate him.

436.    Heidi immediately started to cry and told Peter to leave the room.

437.    Heidi decided that she should leave Texas.

438.    Heidi returned to Seattle in 2003 and continued participating in taekwondo.

439.    In 2006, as reported by USA Today, David Askinas (then-CEO of USA Taekwondo) and other employees threatened Heidi and warned her not to tell anyone about Jean's sexual assaults.

440.    Heidi has suffered a variety of physical and mental symptoms as a result of the personal injuries caused by Lopez brothers, the USOC, and USA TKD.

441.    In 2002, Heidi suffered retaliation from USA TKD and had to hire an attorney in order to be restored in the Resident Athlete Program.

442.    She suffered personal humiliation from the team coach and USA TKD, when they refused to coach Heidi at the 2002 Pan-Am Games in Ecuador, a USOC sanctioned event.

443.    Heidi's fear of retaliation from the Lopez brothers, the USOC, and USA TKD

(along with the threats they made to her) prevented her from reporting Jean's sexual assaults to law enforcement officials.

444.    Heidi believes that if she had reported Jean's sexual assaults to USA TKD prior to 2015, the USOC would have taken no action against Jean Lopez.

445.    Heidi believes that if she had reported Jean's conduct to the USOC prior to 2015, USA Taekwondo would not have taken any action against Jean.

446.    If Heidi had complained to the USOC or USA Taekwondo about Jean Lopez, her complaints would have been ignored—just as Mandy Meloon's were.

447.    Heidi reported her abuse to Donald Alperstein in 2015 as part of a SafeSport (or SafeSport predecessor) investigation.

448.    Heidi participated in an investigation of Jean Lopez, but USA TKD and USOC jointly worked to halt this investigation in order to permit Jean to coach at the 2016 Olympic Games in Rio.

449.    By doing so, USA TKD and the USOC knowingly and willfully prolonged the exposure of Team USA's taekwondo athletes to two different sexual predators who were clothed with the full authority of Team USA and were in a position of extreme power, trust, and influence over Team USA athletes.

450.    Heidi is currently a taekwondo coach in California.

451.    Heidi originally filed this action on April 25, 2018, asserting for the first time publicly her claims against Jean Lopez.

452.     On April 30, 2018, in retaliation, an "anonymous" party filed a SafeSport complaint against Heidi.

453.    The allegations contained in this anonymous complaint are baseless, and their sole

purpose is to harass, intimidate, and threaten Heidi and her family, to retaliate against Heidi, and to interfere and obstruct the justice sought in this action.

**Sexual Abuse, Exploitation, and Trafficking of Gabriela (Gaby) Joslin**

454. Gabriela Joslin grew up in Houston, Texas, where the Lopez brothers operated a taekwondo training club called Elite Taekwondo.

455. Gaby had known the Lopez brothers since she was a young child.

456. Along with the other Plaintiffs, Gaby relied on the authority bestowed upon the Lopez brothers by the USOC and USA TKD to believe the Lopez brothers were credible, safe, responsible, and trustworthy.

457. In 2006, Jean Lopez became Gaby's coach.

458. Gaby planned to attend the 2006 German Open in Bonn, Germany, as an Olympic hopeful.

459. At the request of Jean Lopez, Gaby lost 20 pounds to fight in the bantam weight class at the German Open in Bonn, instead of a heavier weight class, where Jean and Steven's sister Diana fought.

460. At the last minute, Jean informed Gaby that he could not go with her to Bonn.

461. Thus, in Bonn, Gaby would not have a coach.

462. Gaby nevertheless planned attended the tournament in Bonn in April 2006 to gather the experience needed to make the USOC's 2008 Olympic team.

463. Steven Lopez offered to coach Gaby her during her matches in Bonn.

464. Steven Lopez attended the tournament in Bonn as well, as a USA TKD athlete and

a coach.[64]

465.   USA TKD sponsored Steven, funded his trip, paid per diem, and paid his flight, hotel and other expenses related to the competition in Bonn, Germany.

466.   Numerous times prior to the competition in Bonn, Gaby attempted to have conversations with Steven about her upcoming matches, particularly because these were some of Gaby's first bouts in her new bantam weight class.

467.   A few days before her first match, Steven Lopez pushed Gaby against the wall of the hotel elevator, and while pinning her against the wall with his hands on her hips, he told her how good she felt as a bantam.

468.   The night before Gaby's first match in Bonn, Steven Lopez knocked on Gaby's hotel room door, saying he wanted to discuss her match the next day.

469.   Steven entered Gaby's hotel room, sat down on the bed, turned on the television, and flipped through channels, settling on a graphic pornographic movie.

470.   He did not discuss the upcoming match. Instead, Steven told Gaby she was "too tense"; he grabbed her hips from the front, turned her around and began rubbing her glutes while she was standing up.

471.   Steven then pinned Gaby to the bed, face down, pulled down her pants and mounted her, while he continued rubbing her glutes.

472.   It was clear to Gaby that Steven required sex before he would address his responsibilities as her coach.

473.   Steven penetrated Gaby, ejaculated inside her, and left the room.

---

[64] Upon information and belief, this 2006 competition was not a Sports Act-protected competition: the team was sent by USA TKD and not the USOC.

474.    Gaby then continued to allow Steven to have sexual intercourse with her for the remainder of her career in taekwondo, out of fear of the Lopez brothers and in particular, to Jean, who made it clear to her that she was to "cater to Steven."

475.    Gaby was groomed, conditioned, and trained to trust her coaches and, in particular, Steven Lopez, who was a "demigod" in taekwondo; Gaby felt she could "not say 'no' to him."

476.    Gaby last had sex with Steven in 2010.

477.    After retiring from fighting, Gaby began teaching taekwondo in Texas.

478.    As Gaby began establishing herself as a coach, Jean Lopez began a sexual relationship with her.

479.    Jean was married at the time, although he told Gaby that he was separated and in the process of getting a divorce.

480.    Gaby believed that Jean was her exclusive boyfriend.

481.    Gaby paid for furnishings for Jean's apartment, as well as some of his business and travel expenses.

482.    In late 2011, Jean violently raped Gaby.

483.    Gaby became pregnant as a result of Jean's rape.

484.    Gaby's pregnancy was an ectopic pregnancy.

485.    Gaby had to have an abortion as a result.

486.    Jean's 2011 rape of Gaby was her last sexual contact with Jean Lopez.

487.    Gaby has suffered a variety of physical and mental symptoms as a result of the personal injuries caused by the Lopez brothers, the USOC, and USA TKD.

488.    She reported her sexual abuse to Donald Alperstein in 2015 as part of a SafeSport (or SafeSport predecessor) investigation.

489.    But USA TKD and USOC jointly worked to suspend this investigation in order to permit Jean to coach and Steven to compete at the 2016 Olympic Games in Brazil.

**Sexual Abuse, Exploitation, and Trafficking of Amber Means**

490.    Amber Means grew up in Spokane, Washington.

491.    Amber first met Jean Lopez and Steven Lopez when she attended one of their taekwondo camps at the University of Houston in 2003.

492.    Along with the other Plaintiffs, Amber relied on the authority bestowed upon the Lopez brothers by the USOC and USA TKD to believe the Lopez brothers were credible, safe, responsible, and trustworthy.

493.    Steven Lopez took a special interest in Amber at the 2003 camp; he asked her how old she was and said she'd be tall when she grew up.

494.    Amber was 13 years old.

495.    After camp, Amber returned to Washington State.

496.    Jean Lopez contacted Amber's parents and told them that their daughter had tremendous potential in taekwondo.

497.    Jean convinced Amber's parents to move from Washington to Texas so that Amber could train at the Lopez's Elite Taekwondo school in Houston.

498.    Before leaving Washington, Amber recalls being warned by her coaches in Washington that the Lopez brothers were known to take a sexual interest in the children they coached.

499.    Amber began training at Elite Taekwondo in Houston, Texas, in 2004.

500.    Amber was 14.

501.    Amber's parents heeded the warning they had heard in Washington and never left

Amber alone with the Lopez brothers.

502.     As a result, through 2007, while being watched, the Lopez brothers did nothing inappropriate toward Amber.

503.     It was common knowledge to Amber and the rest of the United States Taekwondo community that Jean and Steven Lopez would have sex with young girls from other countries' national teams who visited the Lopez's Elite Taekwondo School in Houston.

504.     Jean Lopez was Amber's primary coach at Elite Taekwondo.

505.     Jean would have his male athletes beat Amber until she had bruises and black eyes.

506.     Jean would force Amber to fight male athletes without protective gear.

507.     This was inappropriate and retaliatory; Amber had never fought males without protective gear while training in Washington.

508.     Steven and Amber attended the 2006 USA TKD Nationals in Cleveland, Ohio, where Steven did press-related events and Amber competed.

509.     At this USA TKD-hosted tournament, Steven engaged in grooming behaviors: brushing against Amber, rubbing her arms, isolating her, giving Amber attention and making her feel special.

510.     Sometime in 2007, when Amber was 17, Steven, then 28 or 29, began taking Amber on "dates."

511.     Steven first kissed Amber after taking her to see a movie in 2007.

512.     Sometime in late 2007, Steven Lopez warned Amber that there were complaints circulating in the Taekwondo community about the nature of Amber's friendship with Peter Lopez.

513.     Steven warned Amber that a parent had made a "complaint" about her and Peter's friendship.

514.    Peter Lopez and Amber met to discuss this "complaint."

515.    During this "meeting," Peter Lopez pressured Amber to perform oral sex on him.

516.    Amber texted Steven Lopez while with Peter. Steven called Peter, and Peter stopped trying to receive oral sex from Amber.

517.    After this incident, Steven and Amber went on a date.

518.    On this "date," Amber performed oral sex on Steven; she was 17 years old.

519.    In February 2008, when Amber was 17, Steven Lopez had vaginal sex with Amber (she lost her virginity to him) at a Houston area rental property owned by Steven Lopez.

520.    Steven and Amber began having an open sexual relationship in March 2008, when Amber was 17 years old.[65]

521.     In 2008, it was common knowledge that Steven was also having a sexual relationship with at least two other teenage athletes, N. Doe[66] and C. Doe.

522.    Steven Lopez had sexual relations with underage athletes at various tournaments around the world, including at the 2008 Olympic Games.

523.    While attending USOC and USA TKD sponsored events in 2008, Steven Lopez had sex with Amber in several states and countries.

524.    It was possible for Steven was able to have sex with Amber at tournaments because he could isolate Amber and keep her away from the watchful eye and protection of her parents.

525.    In Texas, Amber had to avoid her parents in order to see Steven.

526.    In June 2008, Steven invited Amber to a party at a friend's condo in Houston,

---

[65] Plaintiffs are in no way implying that a minor can consent to be in a sexual relationship with 29- or 30-year-old man.

[66] The identity of N. Doe is known to Plaintiffs, all Defendants, and is common knowledge in the Taekwondo and USOC community.

Texas.

527.     Amber remembers drinking a Gatorade and vodka, then blacking out.

528.     Amber's next memory was waking up in the bed of the owner of the condo after he had raped her.

529.     The owner of the condo told Amber that Steven had raped her while she was passed out.

530.     Steven Lopez had put a drug in Amber's drink that caused her to pass out so he could rape her.

531.     Jean Lopez was the USOC Taekwondo coach at the 2008 Olympic Games in Beijing, China, and Steven Lopez was competing in the Olympic Games.

532.     Both Lopez brothers were receiving financial compensation from USOC and USA TKD.

533.     Although Amber had not been selected for the team, Amber traveled to Beijing.

534.     In 2008, 2009, and 2010, Jean Lopez was the USOC's Taekwondo coach.

535.     Jean Lopez received financial compensation for coaching taekwondo from the USOC during these years.

536.     In 2008, Jean's wife Tabitha became suspicious that Jean was cheating on her with a young female athlete.

537.     Tabitha believed that Amber was having sex with Jean in 2008.

538.     In reality, Jean was having sex with a different minor female athlete, C. Doe.[67]

539.     Around 2010, Jean had Amber disqualified from a tournament.

---

[67] The identity of Ms. Doe is known to Plaintiffs' counsel and this affair is common knowledge in the Taekwondo and USOC community.

540.    Jean refused to let Amber fight in the same weight division as his sister, USOC Olympian Diana Lopez.

541.    Amber last competed in April 2011 at the Collegiate National Championships, where she won the silver medal; but for another coach stepping in at the last minute, she competed without a coach because Jean had ceased communications with her.

542.    At a party in February 2013, Steven Lopez again drugged Amber and also a friend of hers; he pinned her to a wall and tried to kiss her but she evaded him. Steven became angry and left, and Amber and her friend were able to escape.

543.    Like the other Plaintiffs, Amber felt that if she angered the Lopez brothers, she would face retaliation.

544.    When Amber rebuffed the sexual advances of Steven Lopez, she did face retaliation and ultimately her fighting career ended as a result of Jean's control over the placement of athletes on competitive teams.

545.    Amber has suffered a variety of mental and physical symptoms as a result of the personal injuries caused by the Lopez brothers, the USOC, and USA TKD.

546.    Amber first reported her abuse to Donald Alperstein in 2015 as part of a SafeSport (or SafeSport predecessor) investigation.

547.    But USA TKD and USOC jointly worked to suspend this investigation in order to permit Jean to coach and Steven to compete at the 2016 Olympic Games.

# CLASS ACTION ALLEGATIONS

548.    Plaintiffs bring this action individually and pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) or (c)(4) on behalf of themselves and the following "Nationwide Classes":

(b)(2) Injunction Class

All USOC-governed female athletes (subject to the USOC's "commercial terms" page or any other contract).

(b)(3) and/or (c)(4) Damage Class

All USOC-governed female athlete (subject to the USOC's "commercial terms" page or any other contract and who (1) participated in taekwondo from 1997 to present and (2) traveled or trained with either Steven Lopez or Jean Lopez.

549.    The Classes consists of hundreds, if not thousands, of women throughout the U.S., making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by the USOC, USA TKD (and its predecessors), the U.S. Center for Safe Sport, the Lopez brothers, and their training facility, Elite Taekwondo, and others.

550.    The claims of Plaintiffs are typical of the Classes. The claims of the Plaintiff and the Classes are based on the same legal theories and arise from the same unlawful pattern and practice of sexual abuse, exploitation, and trafficking of female taekwondo and other athletes; the promotion and cover-up of this misconduct; and the commercial benefits Defendants received engaging in this misconduct.

551.    There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2), (b)(3), and (c)(4).

552.    Common questions of fact or common questions of law affecting members of the

Classes include, but are not limited to, the following:

a. Whether Defendants owed a legal duty to the members of the Class under federal and/or state law?

b. Whether Defendants' violations of the TVPA were knowing?

c. Whether the Defendants engaged in commercial sex trafficking?

d. Whether the Defendants engaged in forced labor or services?

e. Whether the Lopez brothers engaged in a pattern of sexual abuse and exploitation (sexual and physical misconduct)?

f. Whether the Lopez brothers' pattern of sexual abuse and exploitation was committed within the scope of their commercial arrangements/agency/employment with USOC and/or USA TKD?

g. Whether USOC and/or USA TKD had knowledge or was willfully blind of the Lopez brothers' sexual and physical misconduct?

h. Whether USOC and/or USA TKD facilitated the sexual misconduct?

i. Whether USOC and/or USA TKD acted in reckless disregard of the sexual and physical misconduct committed by the Lopez brothers?

j. Whether USOC and/or USA TKD engaged in conduct designed to suppress, cover-up, or "in any way interfere with" complaints or reports regarding the sexual and physical misconduct of the Lopez brothers?

k. Whether USOC and/or USA TKD negligently hired, retained, or supervised Jean Lopez?

l. Whether USOC and/or USA TKD negligently hired, retained, or supervised Steven Lopez?

553. Absent a class action, most of the members of the Classes would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to liability, in that it conserves the resources of the courts and the litigants and promotes the consistency and efficiency of adjudication.

554.     Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, and who have expertise in prosecuting personal injury, sexual abuse, and civil rights cases on behalf of vulnerable victims.

555.     Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members, and they have the financial resources and experience in handling sex abuse cases to do so.

556.     Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Classes.

557.     Plaintiffs and the Class will have personal injury damages that are individualized, but those can be managed separately.

## CLAIMS FOR RELIEF

558.     The Sports Abuse Act of 2017 specifically amends the civil remedy provision in 18 U.S.C. § 2255, which incorporates the Trafficking Victims Protection Act ("TVPA") and a multitude of criminal sexual abuse statutes, with explicit concerns about sex trafficking.

559.     Section 2255 was enacted to allow victims of sex trafficking and sexual abuse to file a civil lawsuit in federal district court and seek a wide range of remedies. Section 2255 imposes civil liability against those who commit or benefit from sex trafficking and trafficking-related offenses, especially if those actions include sexual abuse.

560.     The Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589-96, creates civil liability for those who commit or benefit from forced labor or services or sex trafficking and trafficking-related offenses, including those offenses enumerated in 18 U.S.C. §§ 1589, 1590, and 1591.  Violations of the TVPA include: forcing someone into labor or sexual

services; knowingly benefitting from such forced labor or services; recruiting or transporting a person for labor or services against their will, especially if those actions include sexual abuse; attempting to commit these trafficking offenses; conspiring to commit these trafficking offenses; obstructing or interfering with efforts to enforce the TVPA; and benefitting financially from these offenses.

561.     The TVPA expressly authorizes civil remedies against both the perpetrator and others who knowingly benefit from violations of the TVPA.  *See* 18 U.S.C. § 1595(a).

562.     Each of the Defendants benefitted financially and/or received something of value from the exploitation, forced sexual acts, and forced labor of the Plaintiffs.  Under both the TVPA and Section 2255, the Defendants are liable for the following federal causes of action, as well as the state law claims alleged below.

**Counts of MANDY MELOON for Violations of Federal Law**

**COUNT I**

**Forced Labor in Violation of 18 U.S.C. § 1589(a), § 1595(a), § 2255**

*By Mandy Meloon against Jean Lopez and Steven Lopez*

563.     Mandy realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

564.     Mandy is authorized to bring this civil claim against Defendants pursuant to the civil remedies provisions of 18 U.S.C. § 1595(a) and § 2255.

565.     In violation of 18 U.S.C. §§ 1589(a) and 1595(a), Defendant Jean Lopez knowingly obtained forced sexual services from Mandy by means of serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2), and through a scheme, plan, or pattern, he

intended to cause Mandy to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4).

566.     In violation of 18 U.S.C. §§ 1589(a) and 1595(a), Defendant Steven Lopez knowingly obtained forced sexual services from Mandy by means of serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2), and through a scheme, plan, or pattern, he intended to cause Mandy to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4).

567.     As a direct and proximate result of the actions of the Defendants, Mandy has suffered personal injuries, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.

568.     Mandy claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 2
### Forced Labor in Violation of 18 U.S.C. § 1589(b), § 1595(a), § 2255
*By Mandy Meloon against USOC and USA TKD*

569.     Mandy realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

570.     Mandy is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

571.     In violation of 18 U.S.C. §§ 1589 and 1595(a), the USOC and USA TKD, through their agent, Defendant Jean Lopez, knowingly benefitted from participation in a venture with Jean Lopez, knowing or in reckless disregard of the fact that the venture was engaged in the providing or obtaining of Mandy's labor or services by means of force, threats of force, physical restraint, threats of physical restraint, serious harm or threats of serious harm, and/or a scheme,

plan, or pattern intended to cause Mandy to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint.

572. Defendants also knowingly benefitted from participating in a venture with Defendant Jean Lopez, which they knew or should have known was engaging in violations of the TVPA.

573. The USOC and USA TKD, through their agent, Jean Lopez, knew or recklessly disregarded the fact that Jean Lopez was obtaining Mandy's forced labor and sexual services.

574. They housed Mandy at their facilities, paid her a stipend, observed her performance in competitions, and Mandy reported—verbally and in formal written complaints—Defendant Jean Lopez's abuse.

575. Defendants USOC and USA TKD knew or should have known the conditions under which Jean Lopez was "coaching" Mandy.

576. The USOC and USA TKD knowingly or recklessly participated in Jean Lopez's scheme to force Mandy into forced sexual acts.

577. In addition, the USOC and USA TKD aided and abetted Jean Lopez's violations of 18 U.S.C. § 1589(a) by providing knowing and substantial assistance to him when they knew or should have known that Mandy was being subject to forced sexual acts against her will through means of actual force and threats of force, and that she was being abused and raped.

578. The USOC and USA TKD benefitted (financially and otherwise) from Jean Lopez's actions including by collecting money through sponsorships, licensing, grants, publicity, for medals achieved at competitions, and for his recruitment and training of other elite taekwondo athletes, despite knowing that Mandy was being repeatedly sexually abused and raped.

579.     As a direct and proximate result of the actions of the Defendants, Mandy has

suffered personal injuries, including severe emotional distress, physical injuries, and economic

losses, and these injuries continue.

580.     Mandy claims damages in an amount to be proven at trial, including attorneys'

fees, injunctive relief, and other relief that the Court may deem proper.

### COUNT 3

### Trafficking with Respect to Forced Labor

### in Violation of 18 U.S.C. § 1590(a), § 1595(a), § 2255

*By Mandy Meloon against Jean Lopez, USOC and USA TKD*

581.     Mandy realleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

582.     Mandy is authorized to bring this civil claim against Defendants pursuant to the

civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

583.     In violation of 18 U.S.C. §§ 1590(a) and 1595(a), Jean Lopez knowingly

recruited, enticed, harbored, transported, and/or obtained Mandy for labor or services.

584.     Jean Lopez knowingly recruited and fraudulently enticed Mandy to come to

Colorado Springs, Colorado, twice to Korea, to Manila, Philippines, and to Cairo, Egypt, with

the intention of forcing her into sexual labor and services for him.

585.     Jean Lopez knowingly benefitted (financially and otherwise) from his

recruitment, enticement, harboring, transport, and obtaining of Mandy. He received free sexual

services and labor from Mandy.

586.     In violation of 18 U.S.C. §§ 1590(a) and 1595(a), the USOC and USA TKD,

through their agent, Jean Lopez, knowingly transported Mandy to Colorado Springs, Colorado,

twice to Korea, to Manila Philippines, and to Cairo, Egypt, and to various tournaments and training centers.

587.    They also knowingly benefitted from participating in a venture with Jean Lopez, which they knew or should have known was engaging in violations of the TVPA.

588.    In addition, the USOC and USA TKD, promoted and directly joined Jean Lopez's violations of 18 U.S.C. § 1590(a) by providing knowing and substantial assistance to him when they knew or should have known that Mandy had been recruited, transported, or obtained by any means for labor or services.

589.    USOC and USA TKD benefitted (financially and otherwise) from Jean Lopez's actions including by collecting money through sponsorships, licensing, grants, publicity, and for medals achieved at competitions, and for his recruitment and training of other elite taekwondo athletes, despite knowing that Mandy was being repeatedly sexually abused and raped.

590.    As a direct and proximate result of the actions of the Defendants, Mandy has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

591.    Mandy claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

**COUNT 4**

**Obstruction, Attempted Obstruction, Interference with Enforcement
in Violation of 18 U.S.C. § 1590(b), § 1595(a), and § 2255**

*By Mandy Meloon against Steven Lopez, Jean Lopez, USOC and USA TKD*

592.    Mandy realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

593.    Mandy is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

594.    In violation of 18 U.S.C. §§ 1590(b) and 1595(a), Defendants USOC and USA TKD obstructed, attempted to obstruct, interfered, and or prevented the enforcement of this section by:

      a.   ignoring verbal and written complaints of sexual abuse;

      b.   dismissing complaints of sexual abuse;

      c.   refusing to act on reports of sexual abuse;

      d.   advising athletes to withdraw complaints of sexual abuse when they knew the complaints were truthful;

      e.   offering to put athletes back on team rosters only if they withdrew truthful complaints of sexual abuse;

      f.   threatening athletes with consequences for failure to withdraw complaints;

      g.   making false statements about athletes;

      h.   suspending ongoing sexual misconduct investigations of defendants Jean and Steven Lopez so that the Lopez brothers could compete in the Olympics and deliver more "medals and money" to Team USA;

      i.   feeding false information to investigators and the media about Mandy;

      j.   frustrating the SafeSport investigation of the Lopez brothers;

      k.   dragging out and delaying the SafeSport investigation of Steven Lopez so that he could deliver more "medals and money" to Team USA; and

      l.   retaliating against athletes who complained by suspending them or removing them from the team roster,

among other conduct detailed in the preceding allegations.

    595.    As a direct and proximate result of the actions of the Defendants, Mandy has suffered severe emotional distress, physical injuries, and economic losses.

    596.    Mandy claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

**COUNT 5**

**Sex Trafficking of Children, or by Force Fraud or Coercion,
in Violation of 18 U.S.C. § 1591(a)(1), § 1595(a), and § 2255**

*By Mandy Meloon against Jean Lopez, USOC and USA TKD*

    597.    Mandy realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

    598.    Mandy is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

    599.    In violation of 18 U.S.C. §§ 1591(a)(1), 1595(a), and 2255, Jean Lopez knowingly and fraudulently recruited, enticed, harbored, transported, and/or obtained Mandy, and benefitted from her labor and services, knowing that Mandy had not attained the age of 18 years and would be caused to engage in commercial sex acts.[68] Jean Lopez's acts towards Mandy were in or affecting interstate and/or foreign commerce, including by his including or placing Mandy on the team or roster for travel from Colorado Springs, Colorado to Korea, to Manila,

---

[68] Under 18 U.S.C. § 1591(e)(3), the term "commercial sex act" means "any sex act on account of which anything of value is given to or received by any person."

Philippines, to Cairo, Egypt, and to various tournaments and training centers. Furthermore, Jean Lopez benefitted through his actions against Mandy.

600.    In violation of 18 U.S.C. §§ 1591(a)(1) and 1595(a), Jean Lopez knowingly and fraudulently recruited, enticed, harbored, transported, and/or obtained Mandy, and benefitted from her labor and services, knowing that means of force, fraud, coercion, and the combination of such means would be used to force Mandy to engage in commercial sex acts. Jean Lopez's acts towards Mandy were in or affecting interstate and/or foreign commerce, including by his including or placing Mandy on the team or roster for travel from Colorado Springs, Colorado to Korea, to Manila, Philippines, to Cairo, Egypt, and to various tournaments and training centers. Furthermore, Jean Lopez benefitted through his actions against Mandy.

601.    In violation of 18 U.S.C. § 1591(a)(1), 1595(a), and § 2255, the USOC and USA TKD, through its agent Jean Lopez, knowingly recruited, enticed, and transported Mandy to Colorado Springs, Colorado, twice to Korea, to Manila Philippines, and to Cairo, Egypt, and to various tournaments and training centers, in interstate and foreign commerce, and benefited from her labor and services, knowing or in reckless disregard of the fact that she had not attained the age of 18 and that means of force, fraud, coercion, and the combination of such means would be used to force Mandy to engage in commercial sex acts.

602.    In addition, the USOC and USA TKD, aided and abetted Jean Lopez's violations of 18 U.S.C. § 1591(a) by providing knowing and substantial assistance to him when they knew or should have known that Mandy had been recruited, transported, or obtained by any means for labor or services.

603.    The USOC and USA TKD benefitted (financially and otherwise) from Jean Lopez's actions including by collecting money through sponsorships, licensing, grants, publicity,

and for medals achieved at competitions, and for his recruitment and training of other elite taekwondo athletes, despite knowing that Mandy was being repeatedly sexually abused and raped.

604.    As a direct and proximate result of the actions of the Defendants, Mandy has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

605.    Mandy claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 6

### Benefitting from a Venture that Sex Trafficks Children, or by Force Fraud or Coercion in Violation of 18 U.S.C. § 1591(a)(2), § 1595(a), and § 2255

*By Mandy Meloon against USOC and USA TKD*

606.    Mandy realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

607.    Mandy is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

608.    In violation of 18 U.S.C. § 1591(a)(2), § 1595(a), and § 2255, the USOC and USA TKD  knowingly benefitted from participation in a venture with Jean Lopez engaged in a violation of 18 U.S.C. § 1591(a)(1), knowing or in reckless disregard of the fact that Mandy had not attained the age of 18 and would be caused to engage in a commercial sex act, and/or knowing or in reckless disregard of the fact that means of force, threats of force, fraud, and/or coercion would be used to cause Mandy to engage in a commercial sex act.

609.     The USO and USA TKD also knowingly benefitted (financially and otherwise) from participation in a venture with Jean Lopez which they knew or should have known was engaging in acts violating the TVPA.

610.     In addition, the USOC and USA TKD aided and abetted Jean Lopez's violations of 18 U.S.C. § 1591(a) by providing knowing and substantial assistance to him when they knew or should have known that Mandy had been recruited, transported, or obtained by any means for labor or services.

611.     USOC and USA TKD benefitted (financially and otherwise) from Jean Lopez's actions including by collecting money through sponsorships, licensing, grants, publicity, and for medals achieved at competitions, and for his recruitment and training of other elite taekwondo athletes, despite knowing that Mandy was being repeatedly sexually abused and raped.

612.     As a direct and proximate result of the actions of the Defendants, Mandy has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

613.     Mandy claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 7

**Obstruction, Attempted Obstruction, Interference with Enforcement in violation of 18 U.S.C. § 1591(d), § 1595(a), § 2255**

*By Mandy Meloon against USOC and USA TKD*

614.     Mandy realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

615.     Mandy is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a), § 2255.

616.    In violation of 18 U.S.C. §§ 1591(d) and 1595(a), Defendants USOC and USA

TKD obstructed, attempted to obstruct, interfered, and or prevented the enforcement of this

section by:

a.  ignoring verbal and written complaints of sexual abuse;

b.  dismissing complaints of sexual abuse;

c.  refusing to act on reports of sexual abuse;

d.  advising athletes to withdraw complaints of sexual abuse when they knew the complaints were truthful;

e.  offering to put athletes back on team rosters only if they withdrew truthful complaints of sexual abuse;

f.  threatening athletes with consequences for failure to withdraw complaints;

g.  making false statements about athletes;

h.  suspending ongoing sexual misconduct investigations of defendants Jean and Steven Lopez so that the Lopez brothers could compete in the Olympics and deliver more "medals and money" to Team USA;

i.  feeding false information to investigators and the media about Mandy;

j.  frustrating the SafeSport investigation of the Lopez brothers;

k.  dragging out and delaying the SafeSport investigation of Steven Lopez so that he could deliver more "medals and money" to Team USA; and

l.  retaliating against athletes who complained by suspending them or removing them from the team roster,

among other conduct detailed in the preceding allegations.

617.    As a direct and proximate result of the actions of the Defendants, Mandy has

suffered severe emotional distress, physical injuries, and economic losses, and these injuries

continue.

618.     Mandy claims damages in an amount to be proven at trial, including attorneys'

fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 8

**Sexual Exploitation, Transportation, and Illegal Sexual Activity in Violation of 18 U.S.C. §§ 2241(c), 2243, 2421, 2422, 2423(a), 2423(b), 2423(c), and 2255**

*By Mandy Meloon against Steven Lopez and Jean Lopez*

619.     Mandy realleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

620.     Mandy is authorized to bring this civil claim against Defendants pursuant to the

civil remedies provision of 18 U.S.C. § 2255.

621.     In violation of 18 U.S.C. §§ 2241(c), Defendant did or attempted to cross state

lines with the intent to engage in a sex act or attempted to engage in a sexual act with a child age

12-16 by use of force.

622.     In violation of 18 U.S.C. §2242(a)(2), Defendant knowingly caused or attempted

to cause Mandy to engage in a sexual act with Mandy while she was incapable of appraising the

nature of the conduct and/or physically incapable of declining participation in, or communicating

unwillingness to engage in, that sexual act by providing her drinks that had been drugged so that

she could be raped and sexually assaulted.

623.     In violation of 18 U.S.C. §2243, Defendant Jean Lopez knowingly engaged in a

sexual act with Mandy, age 15, when he was age 24, at a competition.

624.     In violation of 18 U.S.C. §2421, Defendant knowingly transported or attempted to

transport Mandy in interstate and/or foreign commerce with the intent that she engage in sexual

activity for which he could be charged with a criminal offense under, e.g., 18 U.S.C. §§ 1589,

1590, 1591, 2241(c), 2242, 2243, 2422, 2423(a), 2423(b), 2423(c), or other applicable law.

625. In violation of 18 U.S.C. §2422, Defendant knowingly persuaded, induced, enticed, or coerced Mandy to travel in interstate and/or foreign commerce with the intent that she engage in a sex act for which a person could be charged with a criminal offense sexual activity for which he could be charged with a criminal offense under, e.g., 18 U.S.C. §§ 1589, 1590, 1591, 2241(c), 2243, 2421, 2422, 2423(a), 2423(b), 2423(c), or other applicable law.

626. In violation of 18 U.S.C. §2423(a), Defendant knowingly transported Mandy, and/or attempted to or conspired to transport Mandy, who had not yet attained the age of 18 years, in interstate and/or foreign commerce with the intent that she engage in a sex act for which a person could be charged with a criminal offense under, e.g., 18 U.S.C. §§ 1589, 1590, 1591, 2241(c), 2242, 2243, 2421, 2422, 2423(b), 2423(c), or other applicable law.

627. In violation of 18 U.S.C. §2423(b), Defendant traveled in interstate commerce for the purpose of engaging in illicit sexual conduct with Mandy, a person under 18 years of age.

628. In violation of 18 U.S.C. §2423(c), Defendant traveled in foreign commerce and engaged in illicit sexual conduct with Mandy, a person under 18 years of age.

629. As a direct and proximate result of the actions of the Defendants, Mandy has suffered severe emotional distress, physical injuries, and economic losses, and these damages are continuing.

630. Mandy claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

**COUNT 9**

**Transportation of Minors, Ancillary Offenses, Attempt and Conspiracy
in Violation of 18 U.S.C. §§ 2423(d), 2423(e) and 2255**

*By Mandy Meloon against USOC and USA TKD*

631.    Mandy realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

632.    Mandy is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 2255.

633.    In violation of 18 U.S.C. §2423(c), Defendant USOC, for the purpose of commercial advantage or private financial gain, arranged, procured and facilitated the travel of Plaintiff Mandy Meloon, Jean Lopez and Steven Lopez, knowing that Jean and Steven Lopez were traveling in interstate or foreign commerce for the purpose of engaging in illicit sexual conduct with Mandy.

634.    The USOC and USA TKD had received numerous complaints of sexual abuse and sexual assault committed by the Lopez brothers, who were adults, but they allowed Mandy to be raped and sexually assaulted by the Lopez brothers because doing so further incentivized the Lopez brothers to deliver "medals and money" Team USA.

635.    In violation of 18 U.S.C. §2423(c), Defendant USA TKD, for the purpose of commercial advantage or private financial gain, arranged procured and facilitated the travel of Plaintiff Mandy Meloon, Jean Lopez, and Steven Lopez, knowing that Jean and Steven Lopez were traveling in interstate or foreign commerce for the purpose of engaging in illicit sexual conduct.

636.    In violation of 18 U.S.C. § 2423(e), Defendant USOC attempted or conspired with Defendant Jean Lopez to transport Mandy, who had not yet attained the age of 18 years, in

interstate and/or foreign commerce with the intent that she engage in a sex act for which a person could be charged with a criminal offense under, e.g., 18 U.S.C. §§ 1589, 1590, 1591, 2241(c), 2242, 2243, 2421, 2422, 2423(b), 2423(c), or other applicable law, constituting a violation of 18 U.S.C. §2423(a).

637. In violation of 18 U.S.C. § 2423(e), Defendants USOC attempted or conspired with Defendant Jean Lopez to travel in in interstate commerce for the purpose of engaging in illicit sexual conduct with Mandy, a person under 18 years of age, in violation of 18 U.S.C. §2423(b).

638. In violation of 18 U.S.C. § 2423(e), Defendant USOC attempted or conspired with Defendant Jean Lopez to travel in in foreign commerce and engaged in illicit sexual conduct with Mandy, a person under 18 years of age, in violation of 18 U.S.C. §2423(c).

639. In violation of 18 U.S.C. § 2423(e), Defendant USA TKD attempted or conspired with Defendant Jean Lopez to transport Mandy, who had not yet attained the age of 18 years, in interstate and/or foreign commerce with the intent that she engage in a sex act for which a person could be charged with a criminal offense under, e.g., 18 U.S.C. §§ 1589, 1590, 1591, 2241(c), 2242, 2243, 2421, 2422, 2423(b), 2423(c), or other applicable law, constituting a violation of 18 U.S.C. §2423(a).

640. In violation of 18 U.S.C. § 2423(e), Defendants USA TKD attempted or conspired with Defendant Jean Lopez to travel in in interstate commerce for the purpose of engaging in illicit sexual conduct with Mandy, a person under 18 years of age, in violation of 18 U.S.C. §2423(b).

641.     In violation of 18 U.S.C. § 2423(e), Defendant USA TKD attempted or conspired with Defendant Jean Lopez to travel in in foreign commerce and engaged in illicit sexual conduct with Mandy, a person under 18 years of age, in violation of 18 U.S.C. §2423(c).

642.     As a direct and proximate result of the actions of the Defendants, Mandy has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

643.     Mandy claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 10

### Transportation in Violation of 18 U.S.C. § 2421, 2255

*By Mandy Meloon against USOC and USA TKD*

644.     Mandy realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

645.     Mandy is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 2255.

646.     In violation of 18 U.S.C. § 2421, Defendants USOC and USA TKD knowingly transported Mandy in interstate and foreign commerce with the intent that she engage in sexual activity for which a person could be charged with a criminal offense under, *e.g*., 18 U.S.C. §§ 1589, 1590, 1591, 2241(c), 2242, 2243, 2421, 2422, 2423(b), 2423(c), or other applicable law, constituting a violation of 18 U.S.C. §2423(a).

647.     As a direct and proximate result of the actions of the Defendants, Mandy has suffered severe emotional distress, physical injuries, and economic losses.

648.     Mandy claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

**Counts of Heidi Gilbert for Violations of Federal Law**

## COUNT 11

### Forced Labor in Violation of 18 U.S.C. § 1589(a), § 1595(a), and § 2255

*By Heidi Gilbert against Jean Lopez and Steven Lopez*

649.    Heidi realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

650.    Heidi is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

651.    In violation of 18 U.S.C. §§ 1589(a) and 1595(a), Defendant Jean Lopez knowingly obtained forced sexual services from Heidi by means of serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2), and through a scheme, plan, or pattern he intended to cause Heidi to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4).

652.    In violation of 18 U.S.C. §§ 1589(a) and 1595(a), Defendant Steven Lopez knowingly obtained forced sexual services from Heidi by means of serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2), and through a scheme, plan, or pattern he intended to cause Heidi to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4).

653.    As a direct and proximate result of the actions of the Defendants, Heidi has suffered personal injuries, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.

654.    Heidi claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 12

### Forced Labor in Violation of 18 U.S.C. § 1589(b), § 1595(a), and § 2255

*By Heidi Gilbert against USOC and USA TKD*

655.     Heidi realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

656.     Heidi is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

657.     In violation of 18 U.S.C. §§ 1589 and 1595(a), the USOC and USA TKD, through their agent, Defendant Jean Lopez, knowingly benefitted from participation in a venture with Jean Lopez, knowing or in reckless disregard of the fact that the venture was engaged in the providing or obtaining of Heidi's labor or services by means of force, threats of force, physical restraint, threats of physical restraint, serious harm or threats of serious harm, and/or a scheme, plan, or pattern intended to cause Heidi to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint.

658.     Defendants also knowingly benefitted from participating in a venture with Defendant Jean Lopez which they knew or should have known was engaging in violations of the TVPA.

659.     The USOC and USA TKD, through their agent, Jean Lopez, knew, or recklessly disregarded the fact that Jean Lopez was obtaining Heidi's forced labor and sexual services.

660.     They housed Heidi at their facilities, paid her a stipend, observed her performance in competitions, and Heidi reported Defendant Jean Lopez's abuse.

661.     Defendants USOC and USA TKD knew or should have known the conditions under which Jean Lopez was "coaching" Heidi.

662.     The USOC and USA TKD knowingly or recklessly participated in Jean Lopez's scheme to force Heidi into forced sexual acts. In addition, the USOC and USA TKD, aided and abetted Jean Lopez's violations of 18 U.S.C. § 1589(a) by providing knowing and substantial assistance to him when they knew or should have known that Heidi was being subject to forced sexual acts against her will through means of actual force and threats of force, and that she was being abused and raped.

663.     The USOC and USA TKD benefitted (financially and otherwise) from Jean Lopez's actions including by collecting money through sponsorships, licensing, grants, publicity, for medals achieved at competitions, and for his recruitment and training of other elite taekwondo athletes, despite knowing that Heidi was being repeatedly sexually abused and raped.

664.     As a direct and proximate result of the actions of the Defendants, Heidi has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

665.     Heidi claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

### COUNT 13

### Trafficking with Respect to Forced Labor
### in Violation of 18 U.S.C. § 1590(a), 1595(a), and § 2255

*By Heidi Gilbert against Jean Lopez, USOC and USA TKD*

666.     Heidi realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

667.     Heidi is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

668. In violation of 18 U.S.C. §§ 1590(a) and 1595(a), Jean Lopez knowingly recruited, enticed, harbored, transported, and/or obtained Heidi for labor or services. Jean Lopez knowingly recruited and fraudulently enticed Heidi to come to Ecuador and to Garmisch-Partenkirchen, Germany, with the intention of forcing her into sexual labor and services for him.

669. Jean Lopez knowingly benefitted (financially and otherwise) from his recruitment, enticement, harboring, transport, and obtaining of Heidi. He received free sexual services and labor from Heidi.

670. In violation of 18 U.S.C. §§ 1590(a) and 1595(a), the USOC and USA TKD, through their agent, Jean Lopez, knowingly transported Heidi to Ecuador and to Garmisch-Partenkirchen, Germany, and to various tournaments and training centers. They also knowingly benefitted from participating in a venture with Jean Lopez which they knew or should have known was engaging in violations of the TVPA.

671. In addition, the USOC and USA TKD, promoted and directly joined Jean Lopez's violations of 18 U.S.C. § 1590(a) by providing knowing and substantial assistance to him when they knew or should have known that Heidi had been recruited, transported, or obtained by any means for labor or services.

672. The USOC and USA TKD benefitted (financially and otherwise) from Jean Lopez's actions including by collecting money through sponsorships, licensing, grants, publicity, and for medals achieved at competitions, and for his recruitment and training of other elite taekwondo athletes, despite knowing that Heidi was being repeatedly sexually abused and raped.

673. As a direct and proximate result of the actions of the Defendants, Heidi has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

674.     Heidi claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 14

### Obstruction, Attempted Obstruction, Interference with Enforcement in violation of 18 U.S.C. §§ 1590(b), 1595(a)

*By Heidi Gilbert against Steven Lopez, Jean Lopez, USOC and USA TKD*

675.     Heidi realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

676.     Heidi is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

677.     In violation of 18 U.S.C. §§ 1590(b) and 1595(a), Defendants obstructed, attempted to obstruct, interfered, and or prevented the enforcement of this section by:

    a.   ignoring verbal and written complaints of sexual abuse;

    b.   dismissing complaints of sexual abuse;

    c.   refusing to act on reports of sexual abuse;

    d.   advising athletes to withdraw complaints of sexual abuse when they knew the complaints were truthful;

    e.   offering to put athletes back on team rosters only if they withdrew truthful complaints of sexual abuse;

    f.   threatening athletes with consequences for failure to withdraw complaints;

    g.   making false statements about athletes;

    h.   suspending ongoing sexual misconduct investigations of defendants Jean and Steven Lopez so that the Lopez brothers could compete in the Olympics and deliver more "medals and money" to Team USA;

    i.   feeding false information to investigators and the media;

j.   frustrating the SafeSport investigation of the Lopez brothers;

k.   dragging out and delaying the SafeSport investigation of Steven Lopez so that he could deliver more "medals and money" to Team USA;

l.   retaliating against athletes who complained by suspending them or removing them from the team roster,

among other conduct detailed in the preceding allegations.

678.   As a direct and proximate result of the actions of the Defendants, Heidi has suffered severe emotional distress, physical injuries, and economic losses.

679.   Heidi claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 15

### Sex Trafficking of Children, or by Force Fraud or Coercion in Violation of 18 U.S.C. § 1591(a)(1), § 1595(a)

*By Heidi Gilbert against Jean Lopez, USOC and USA TKD*

680.   Heidi realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

681.   Heidi is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

682.   In violation of 18 U.S.C. §§ 1591(a)(1), 1595(a), Jean Lopez knowingly and fraudulently recruited, enticed, harbored, transported, and/or obtained Heidi, and benefitted from her labor and services, knowing that means of force, fraud, coercion, and the combination of such means would be used to force Heidi to engage in commercial sex acts. Jean Lopez's acts towards Heidi were in or affecting interstate and/or foreign commerce, including by his including or placing Heidi on the team or roster for travel from to Ecuador and to Garmisch-Partenkirchen,

Germany, and to various tournaments and training centers. Furthermore, Jean Lopez benefitted through his actions against Heidi.

683.     In violation of 18 U.S.C. §§ 1591(a)(1), and 1595(a), the USOC and USA TKD, through their agent Jean Lopez, knowingly recruited, enticed, and transported Heidi to Ecuador and to Garmisch-Partenkirchen, Germany, and to various tournaments and training centers, in interstate and foreign commerce, and benefited from her labor and services, knowing or in reckless disregard of the fact that means of force, fraud, coercion, and the combination of such means would be used to force Heidi to engage in commercial sex acts.

684.     The USOC and USA TKD benefitted (financially and otherwise) from Jean Lopez's actions including by collecting money through sponsorships, licensing, grants, publicity, and for medals achieved at competitions, and for his recruitment and training of other elite taekwondo athletes, despite knowing that Heidi was being repeatedly sexually abused and raped.

685.     As a direct and proximate result of the actions of the Defendants, Heidi has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

686.     Heidi claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 16

### Benefitting from a Venture that Sex Traffics Children, or by Force Fraud or Coercion in Violation of 18 U.S.C. § 1591(a)(2), § 1595(a)

*By Heidi Gilbert against USOC and USA TKD*

687.     Heidi realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

688.     Heidi is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

689.     In violation of 18 U.S.C. § 1591(a)(2), § 1595(a), the USOC and USA TKD knowingly benefitted from participation in a venture with Jean Lopez engaged in a violation of 18 U.S.C. § 1591(a)(1), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, and/or coercion would be used to cause Heidi to engage in a commercial sex act.

690.     The USO and USA TKD also knowingly benefitted (financially and otherwise) from participation in a venture with Jean Lopez which they knew or should have known was engaging in acts violating the TVPA.

691.     In addition, the USOC and USA TKD aided and abetted Jean Lopez's violations of 18 U.S.C. § 1591(a) by providing knowing and substantial assistance to him when they knew or should have known that Heidi had been recruited, transported, or obtained by any means for labor or services.

692.     The USOC and USA TKD benefitted (financially and otherwise) from Jean Lopez's actions including by collecting money through sponsorships, licensing, grants, publicity, and for medals achieved at competitions, and for his recruitment and training of other elite taekwondo athletes, despite knowing that Heidi was being repeatedly sexually abused and raped.

693.     As a direct and proximate result of the actions of the Defendants, Heidi has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

694.     Heidi claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

# COUNT 17

## Obstruction, Attempted Obstruction, Interference with Enforcement in violation of 18 U.S.C. §§ 1591(d), 1595(a)

### *By Heidi Gilbert against USOC and USA TKD*

695.     Heidi realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

696.     Heidi is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

697.     In violation of 18 U.S.C. §§ 1591(d) and 1595(a), Defendants obstructed, attempted to obstruct, interfered, and or prevented the enforcement of this section by:

a.   ignoring verbal and written complaints of sexual abuse;

b.   dismissing complaints of sexual abuse;

c.   refusing to act on reports of sexual abuse;

d.   advising athletes to withdraw complaints of sexual abuse when they knew the complaints were truthful;

e.   offering to put athletes back on team rosters only if they withdrew truthful complaints of sexual abuse;

f.   threatening athletes with consequences for failure to withdraw complaints;

g.   making false statements about athletes;

h.   suspending ongoing sexual misconduct investigations of defendants Jean and Steven Lopez so that the Lopez brothers could compete in the Olympics and deliver more "medals and money" to Team USA;

i.   feeding false information to investigators and the media;

j.   frustrating the SafeSport investigation of the Lopez brothers;

k.   dragging out and delaying the SafeSport investigation of Steven Lopez so that he could deliver more "medals and money" to Team USA;

l. retaliating against athletes who complained by suspending them or removing them from the team roster,

among other conduct detailed in the preceding allegations.

698.     As a direct and proximate result of the actions of the Defendants, Heidi has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

699.     Heidi claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

**Counts of Gaby Joslin for Violations of Federal Law**

## COUNT 18

### Forced Labor in Violation of 18 U.S.C. § 1589(a), § 1595(a)

*By Gaby Joslin against Steven Lopez*

700.     Gaby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

701.     Gaby is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

702.     In violation of 18 U.S.C. §§ 1589(a) and 1595(a), Defendant Steven Lopez knowingly obtained forced sexual services from Gaby by means of serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2), and through a scheme, plan, or pattern intended to cause Gaby to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4).

703. As a direct and proximate result of the actions of the Defendants, Gaby has suffered personal injuries, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.

704. Gaby claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 19

### Forced Labor in Violation of 18 U.S.C. § 1589(b), § 1595(a)

*By Gaby Joslin against USA TKD*

705. Gaby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

706. Gaby is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

707. In violation of 18 U.S.C. §§ 1589 and 1595(a), USA TKD knowingly benefitted from participation in a venture with Steven Lopez, knowing or in reckless disregard of the fact that the venture was engaged in the providing or obtaining of Gaby's labor or services by means of force, threats of force, physical restraint, threats of physical restraint, serious harm or threats of serious harm, and/or a scheme, plan, or pattern intended to cause Gaby to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint. Defendant also knowingly benefitted from participating in a venture with Jean Lopez which it knew or should have known was engaging in violations of the TVPA.

708. USA TKD knew or recklessly disregarded the fact that Steven Lopez was obtaining Gaby's forced labor and sexual services. USA TKD paid her a stipend, observed her performance in competitions, and Gaby reported Defendant Steven Lopez's abuse.

709. Defendant USA TKD knew or should have known the conditions under which Steven Lopez was "coaching" Gaby. USA TKD knowingly or recklessly participated in Steven Lopez's scheme to force Gaby into forced sexual acts. In addition, USA TKD aided and abetted Steven Lopez's violations of 18 U.S.C. § 1589(a) by providing knowing and substantial assistance to him when they knew or should have known that Gaby was being subject to forced sexual acts against her will through means of actual force and threats of force, and that she was being abused and raped. USA TKD benefitted from Steven Lopez's actions including by collecting money through sponsorships, grants, and for medals achieved at competitions, for his recruitment and training of other elite taekwondo athletes, despite indications Gaby was being abused and raped.

710. As a direct and proximate result of the actions of the Defendants, Gaby has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

711. Gaby claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 20

**Trafficking with Respect to Forced Labor
in Violation of 18 U.S.C. § 1590(a), § 1595(a)**

*By Gaby Joslin against Steven Lopez and USA TKD*

712. Gaby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

713. Gaby is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

714.     In violation of 18 U.S.C. §§ 1590(a) and 1595(a), Steven Lopez knowingly recruited, enticed, harbored, transported, and/or obtained Gaby for labor or services. Steven Lopez knowingly recruited and fraudulently enticed Gaby to come to Bonn, Germany, with the intention of forcing her into sexual labor and services for him.

715.     Steven Lopez knowingly benefitted financially from his recruitment, enticement, harboring, transport, and obtaining of Gaby. He received free sexual services and labor from Gaby.

716.     On information and belief, and in violation of 18 U.S.C. §§ 1590(a) and 1595(a), USA TKD, through their agent, Steven Lopez, knowingly transported Gaby to Bonn, Germany, and to various tournaments and training centers. They also knowingly benefitted from participating in a venture with Steven Lopez which they knew or should have known was engaging in violations of the TVPA. In addition, USA TKD aided and abetted Steven Lopez's violations of 18 U.S.C. § 1590(a) by providing knowing and substantial assistance to him when they knew or should have known that Gaby had been recruited, transported, or obtained by any means for labor or services. USA TKD benefitted from Steven Lopez's actions, including by collecting money through sponsorships, grants, and for medals achieved at competitions, for his recruitment and training of other elite taekwondo athletes, despite knowing that Gaby was being abused and raped.

717.     As a direct and proximate result of the actions of the Defendants, Gaby has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

718.     Gaby claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

# COUNT 21

## Obstruction, Attempted Obstruction, Interference with Enforcement in violation of 18 U.S.C. §§ 1590(b), 1595(a)

*By Gaby Joslin against Steven Lopez, Jean Lopez, USOC and USA TKD*

719.    Gaby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

720.    Gaby is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

721.    In violation of 18 U.S.C. §§ 1590(b) and 1595(a), Defendants obstructed, attempted to obstruct, interfered, and or prevented the enforcement of this section by:

    a.    ignoring verbal and written complaints of sexual abuse;

    b.    dismissing complaints of sexual abuse;

    c.    refusing to act on reports of sexual abuse;

    d.    advising athletes to withdraw complaints of sexual abuse when they knew the complaints were truthful;

    e.    offering to put athletes back on team rosters only if they withdrew truthful complaints of sexual abuse;

    f.    threatening athletes with consequences for failure to withdraw complaints;

    g.    making false statements about athletes;

    h.    suspending ongoing sexual misconduct investigations of defendants Jean and Steven Lopez so that the Lopez brothers could compete in the Olympics and deliver more "medals and money" to Team USA;

    i.    feeding false information to investigators and the media;

    j.    frustrating the SafeSport investigation of the Lopez brothers;

    k.    dragging out and delaying the SafeSport investigation of Steven Lopez so that he could deliver more "medals and money" to Team USA; and

l.      retaliating against athletes who complained by suspending them or removing them from the team roster,

among other conduct detailed in the preceding allegations.

722.    As a direct and proximate result of the actions of the Defendants, Gaby has suffered severe emotional distress, physical injuries, and economic losses.

723.    Gaby claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 22

### Sex Trafficking of Children, or by Force Fraud or Coercion in Violation of 18 U.S.C. § 1591(a)(1), § 1595(a)

*By Gaby Joslin against Steven Lopez and USA TKD*

724.    Gaby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

725.    Gaby is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

726.    In violation of 18 U.S.C. §§ 1591(a)(1) and 1595(a), Steven Lopez knowingly and fraudulently recruited, enticed, harbored, transported, and/or obtained Gaby, and benefitted from her labor and services, knowing that means of force, fraud, coercion, and the combination of such means would be used to force Gaby to engage in commercial sex acts. Steven Lopez's acts towards Gaby were in or affecting interstate and/or foreign commerce, including by his including or placing Gaby on the team or roster for travel to Bonn, Germany, and to various tournaments and training centers. Furthermore, Steven Lopez benefitted through his actions against Gaby.

727.    In violation of 18 U.S.C. §§ 1591(a)(1), and 1595(a), USA TKD, through its agent Steven Lopez, knowingly recruited, enticed, and transported Gaby to Bonn, Germany, and

to various tournaments and training centers, in interstate and foreign commerce, and benefited from her labor and services, knowing or in reckless disregard of the fact that means of force, fraud, coercion, and the combination of such means would be used to force Gaby to engage in commercial sex acts.

728.    In addition, USA TKD aided and abetted Steven Lopez's violations of 18 U.S.C. § 1591(a) by providing knowing and substantial assistance to him when they knew or should have known that Gaby had been recruited, transported, or obtained by any means for labor or services. USA TKD benefitted (financially and otherwise) from Steven Lopez's actions including by collecting money through sponsorships, licensing, grants, publicity, and for medals achieved at competitions, and for his recruitment and training of other elite taekwondo athletes, despite knowing that Gaby was being repeatedly sexually abused and raped.

729.    As a direct and proximate result of the actions of the Defendants, Gaby has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

730.    Gaby claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 23

**Benefitting from a Venture that Sex Trafficks Children, or by Force Fraud or Coercion in Violation of 18 U.S.C. §§ 1591(a)(2), 1595(a)**

*By Gaby Joslin against USA TKD*

731.    Gaby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

732.    Gaby is authorized to bring this civil claim against Defendant pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

733.    In violation of 18 U.S.C. §§ 1591(a)(2), and 1595(a), USA TKD knowingly

benefitted from participation in a venture with Steven Lopez engaged in a violation of 18 U.S.C.

§ 1591(a)(1), knowing or in reckless disregard of the fact that means of force, threats of force,

fraud, and/or coercion would be used to cause Gaby to engage in a commercial sex act.

734.    USA TKD also knowingly benefitted from participation in a venture with Steven

Lopez which it knew or should have known was engaging in acts violating the TVPA. In

addition, USA TKD aided and abetted Steven Lopez's violations of 18 U.S.C. § 1591(a) by

providing knowing and substantial assistance to him when they knew or should have known that

Gaby had been recruited, transported, or obtained by any means for labor or services.

735.    USA TKD benefitted (financially and otherwise) from Steven Lopez's actions

including by collecting money through sponsorships, licensing, grants, publicity, and for medals

achieved at competitions, and for his recruitment and training of other elite taekwondo athletes,

despite knowing that Gaby was being repeatedly sexually abused and raped.

736.    As a direct and proximate result of the actions of the Defendant, Gaby has

suffered severe emotional distress, physical injuries, and economic losses, and these injuries

continue.

737.    Gaby claims damages in an amount to be proven at trial, including attorneys' fees,

injunctive relief, and other relief that the Court may deem proper.

**COUNT 24**

**Obstruction, Attempted Obstruction, Interference with Enforcement in violation of 18
U.S.C. §§ 1591(d), 1595(a)**

*By Gaby Joslin against Steven Lopez and USA TKD*

738.    Gaby realleges and incorporates by reference each and every allegation contained

in the preceding paragraphs as if fully set forth herein.

739.     Gaby is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

740.     In violation of 18 U.S.C. §§ 1591(d) and 1595(a), Defendants obstructed, attempted to obstruct, interfered, and or prevented the enforcement of this section by:

      a.    ignoring verbal and written complaints of sexual abuse;

      b.    dismissing complaints of sexual abuse;

      c.    refusing to act on reports of sexual abuse;

      d.    advising athletes to withdraw complaints of sexual abuse when they knew the complaints were truthful;

      e.    offering to put athletes back on team rosters only if they withdrew truthful complaints of sexual abuse;

      f.    threatening athletes with consequences for failure to withdraw complaints;

      g.    making false statements about athletes;

      h.    suspending ongoing sexual misconduct investigations of defendants Jean and Steven Lopez so that the Lopez brothers could compete in the Olympics and deliver more "medals and money" to Team USA;

      i.    feeding false information to investigators and the media;

      j.    frustrating the SafeSport investigation of the Lopez brothers;

      k.    dragging out and delaying the SafeSport investigation of Steven Lopez so that he could deliver more "medals and money" to Team USA; and

      l.    retaliating against athletes who complained by suspending them or removing them from the team roster,

among other conduct detailed in the preceding allegations.

741.     As a direct and proximate result of the actions of the Defendants, Gaby has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

742.     Gaby claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

**Counts of Amber Means for Violations of Federal Law**

**COUNT 25**

**Forced Labor in Violation of 18 U.S.C. § 1589(a), § 1595(a), § 2255**

*By Amber Means against Steven Lopez*

743.     Amber realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

744.     Amber is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

745.     In violation of 18 U.S.C. §§ 1589(a) and 1595(a), Defendant Steven Lopez knowingly obtained forced sexual services from Amber by means of serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2); and a scheme, plan, or pattern intended to cause Amber to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4).

746.     As a direct and proximate result of the actions of the Defendants, Amber has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

747.     Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 26

### Forced Labor in Violation of 18 U.S.C. § 1589(b), § 1595(a), § 2255

*By Amber Means against USOC and USA TKD*

748.    Amber realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

749.    Amber is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

750.    In violation of 18 U.S.C. §§ 1589 and 1595(a), the USOC and USA TKD knowingly benefitted from participation in a venture with the Lopez brothers, knowing or in reckless disregard of the fact that the venture was engaged in the providing or obtaining of Amber's labor or services by means of force, threats of force, physical restraint, threats of physical restraint, serious harm or threats of serious harm, and/or a scheme, plan, or pattern intended to cause Amber to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint.

751.    Defendants also knowingly benefitted from participating in a venture with the Lopez brothers which they knew or should have known was engaging in violations of the TVPA.

752.    The USOC and USA TKD knew, or recklessly disregarded the fact that Steven Lopez was obtaining Amber's forced labor and sexual services.

753.    They housed Amber at their facilities, paid her a stipend, observed her performance in competitions, and Amber reported—verbally and in formal written complaints—Defendant Steven Lopez's abuse.

754.    Defendants USOC and USA TKD knew or should have known the conditions under which Steven Lopez was "coaching" Amber.

755.     The USOC and USA TKD knowingly or recklessly participated in Steven Lopez's scheme to force Amber into forced sexual acts.

756.     In addition, the USOC and USA TKD, aided and abetted Steven Lopez's violations of 18 U.S.C. § 1589(a) by providing knowing and substantial assistance to him when they knew or should have known that Amber was being subject to forced sexual acts against her will through means of actual force and threats of force, and that she was being abused and raped.

757.     The USOC and USA TKD benefitted (financially and otherwise) from Steven Lopez's actions including by collecting money through sponsorships, licensing, grants, publicity, for medals achieved at competitions, and for his recruitment and training of other elite taekwondo athletes, despite knowing that Amber was being repeatedly sexually abused and raped.

758.     As a direct and proximate result of the actions of the Defendants, Amber has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

759.     Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

### COUNT 27

**Trafficking with Respect to Forced Labor
in Violation of 18 U.S.C. § 1590(a), § 1595(a), § 2255**

*By Amber Means against Steven Lopez, Jean Lopez, USOC and USA TKD*

760.     Amber realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

761.     Amber is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

762.     In violation of 18 U.S.C. §§ 1590(a) and 1595(a), Defendants knowingly recruited, enticed, harbored, transported, and/or obtained Amber for labor or services. The Lopez brothers knowingly recruited and fraudulently enticed Amber to come from Washington State to Houston, Texas, to Cleveland, Ohio, to Colorado Springs, Colorado, to Sugar Land, Texas, to Des Moines, Iowa, to Beijing, China, and to various other cities and countries with the intention of forcing her into sexual labor and services for him.

763.     The Lopez brothers knowingly benefitted financially from their recruitment, enticement, harboring, transport, and obtaining of Amber. Steven Lopez received free sexual services and labor from Amber.

764.     In violation of 18 U.S.C. §§ 1590(a) and 1595(a), the USOC and USA TKD, through their agents, the Lopez brothers, knowingly transported Amber to Houston, Texas, to Cleveland, Ohio, to Colorado Springs, Colorado, to Sugar Land, Texas, to Des Moines, Iowa, to Beijing, China, to Las Vegas, Nevada, and to various tournaments and training centers. They also knowingly benefitted from participating in a venture with the Lopez brothers which they knew or should have known was engaging in violations of the TVPA.

765.     In addition, the USOC and USA TKD, aided and abetted Steven Lopez's violations of 18 U.S.C. § 1590(a) by providing knowing and substantial assistance to him when they knew or should have known that Amber had been recruited, transported, or obtained by any means for labor or services. The USOC and USA TKD benefitted from the Lopez brothers' actions, including by collecting money through sponsorships, grants, and for medals achieved at competitions, for his recruitment and training of other elite taekwondo athletes, despite knowing that Amber was being abused and raped.

766.    As a direct and proximate result of the actions of the Defendants, Amber has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

767.    Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 28

### Obstruction, Attempted Obstruction, Interference with Enforcement in Violation of 18 U.S.C. § 1590(b), § 1595(a), and § 2255

*By Amber Means against Steven Lopez, Jean Lopez, USOC and USA TKD*

768.    Amber realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

769.    Amber is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

770.    In violation of 18 U.S.C. §§ 1590(b) and 1595(a), Defendants USOC and USA TKD obstructed, attempted to obstruct, interfered, and or prevented the enforcement of this section by:

    a.  ignoring verbal and written complaints of sexual abuse;

    b.  dismissing complaints of sexual abuse;

    c.  refusing to act on reports of sexual abuse;

    d.  advising athletes to withdraw complaints of sexual abuse when they knew the complaints were truthful;

    e.  offering to put athletes back on team rosters only if they withdrew truthful complaints of sexual abuse;

    f.  threatening athletes with consequences for failure to withdraw complaints;

    g.  making false statements about athletes;

h. suspending ongoing sexual misconduct investigations of defendants Jean and Steven Lopez so that the Lopez brothers could compete in the Olympics and deliver more "medals and money" to Team USA;

i. feeding false information to investigators and the media;

j. frustrating the SafeSport investigation of the Lopez brothers;

k. dragging out and delaying the SafeSport investigation of Steven Lopez so that he could deliver more "medals and money" to Team USA; and

l. retaliating against athletes who complained by suspending them or removing them from the team roster,

among other conduct detailed in the preceding allegations.

771. As a direct and proximate result of the actions of the Defendants, Amber has suffered severe emotional distress, physical injuries, and economic losses.

772. Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 29

### Sex Trafficking of Children, or by Force Fraud or Coercion in Violation of 18 U.S.C. § 1591(a)(1), § 1595(a), and § 2255

*By Amber Means against Steve and Jean Lopez, USOC and USA TKD*

773. Amber realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

774. Amber is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

775. In violation of 18 U.S.C. §§ 1591(a)(1), 1595(a), and 2255, the Lopez brothers knowingly and fraudulently recruited, enticed, harbored, transported, and/or obtained Amber, and benefitted from her labor and services, knowing that Amber had not attained the age of 18

years and would be caused to engage in commercial sex acts. The Lopez's acts towards Amber were in or affecting interstate and/or foreign commerce, including by Jean Lopez's including or placing Amber on the team or roster for travel to various tournaments and training centers. Furthermore, the Lopez brothers benefitted through their actions against Amber.

776.    In violation of 18 U.S.C. §§ 1591(a)(1) and 1595(a), the Lopez brothers knowingly and fraudulently recruited, enticed, harbored, transported, and/or obtained Amber, and benefitted from her labor and services, knowing that means of force, fraud, coercion, and the combination of such means would be used to force Amber to engage in commercial sex acts. The Lopez's acts towards Amber were in or affecting interstate and/or foreign commerce, including by his including or placing Amber on the team or roster for travel to various tournaments and training centers. Furthermore, the Lopez brothers benefitted through his actions against Amber.

777.    In violation of 18 U.S.C. §§ 1591(a)(1), 1595(a), and 2255, the USOC and USA TKD, through their agents, the Lopez brothers, knowingly recruited, enticed, and transported Amber to various tournaments and training centers, in interstate and foreign commerce, and benefited from her labor and services, knowing or in reckless disregard of the fact that she had not attained the age of 18 and that means of force, fraud, coercion, and the combination of such means would be used to force Amber to engage in commercial sex acts.  In addition, the USOC and USA TKD, aided and abetted the Lopez's violations of 18 U.S.C. § 1591(a) by providing knowing and substantial assistance to him when they knew or should have known that Amber had been recruited, transported, or obtained by any means for labor or services. The USOC and USA TKD benefitted from the Lopez brothers' actions, including by collecting money through sponsorships, grants, and for medals achieved at competitions, for his recruitment and training of

other elite taekwondo athletes, despite indications Amber was being trafficked, abused and raped.

778.     As a direct and proximate result of the actions of the Defendants, Amber has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

779.     Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 30

### Benefitting from a Venture that Sex Traffics Children, or by Force Fraud or Coercion in Violation of 18 U.S.C. §§ 1591(a)(2), 1595(a), and 2255

*By Amber Means against USOC and USA TKD*

780.     Amber realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

781.     Amber is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

782.     In violation of 18 U.S.C. § 1591(a)(2), § 1595(a), and § 2255, the USOC and USA TKD  knowingly benefitted from participation in a venture with the Lopez brothers that engaged in a violation of 18 U.S.C. § 1591(a)(1), knowing or in reckless disregard of the fact that Amber had not attained the age of 18 and would be caused to engage in a commercial sex act, and/or knowing or in reckless disregard of the fact that means of force, threats of force, fraud, and/or coercion would be used to cause Amber to engage in a commercial sex act.  The USOC and USA TKD also knowingly benefitted from participation in a venture with the Lopez brothers which they knew or should have known was engaging in acts violating the TVPA. In addition, the USOC and USA TKD aided and abetted the Lopez brothers' violations of 18 U.S.C. §

1591(a) by providing knowing and substantial assistance to him when they knew or should have known that Amber had been recruited, transported, or obtained by any means for labor or services. The USOC and USA TKD benefitted from the Lopez brothers' actions, including by collecting money through sponsorships, grants, and for medals achieved at competitions, for his recruitment and training of other elite taekwondo athletes, despite indications Amber was being trafficked, abused and raped.

783.     As a direct and proximate result of the actions of the Defendants, Amber has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

784.     Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 31
### Obstruction, Attempted Obstruction, Interference with Enforcement in violation of 18 U.S.C. §§ 1591(d), 1595(a)

*By Amber Means against USOC and USA TKD*

785.     Amber realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

786.     Amber is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

787.     In violation of 18 U.S.C. §§ 1591(d) and 1595(a), Defendants USOC and USA TKD obstructed, attempted to obstruct, interfered, and or prevented the enforcement of this section by:

    a.   ignoring verbal and written complaints of sexual abuse;

    b.   dismissing complaints of sexual abuse;

c.   refusing to act on reports of sexual abuse;

d.   advising athletes to withdraw complaints of sexual abuse when they knew the complaints were truthful;

e.   offering to put athletes back on team rosters only if they withdrew truthful complaints of sexual abuse;

f.   threatening athletes with consequences for failure to withdraw complaints;

g.   making false statements about athletes;

h.   suspending ongoing sexual misconduct investigations of defendants Jean and Steven Lopez so that the Lopez brothers could compete in the Olympics and deliver more "medals and money" to Team USA;

i.   feeding false information to investigators and the media;

j.   frustrating the SafeSport investigation of the Lopez brothers;

k.   dragging out and delaying the SafeSport investigation of Steven Lopez so that he could deliver more "medals and money" to Team USA; and

l.   retaliating against athletes who complained by suspending them or removing them from the team roster,

among other conduct detailed in the preceding allegations.

788.   As a direct and proximate result of the actions of the Defendants, Amber has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

789.   Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 32

**Sexual Exploitation, Transportation, and Illegal Sexual Activity in Violation of 18 U.S.C. §§ 2242, 2243, 2421, 2422, 2423(a), 2423(b), 2423(c), and 2255**

*By Amber Means against Steven Lopez and Jean Lopez*

790.    Amber realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

791.    Amber is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 2255.

792.    In violation of 18 U.S.C. §2243, Defendant Steven Lopez knowingly engaged in a sexual act with Amber, age 17, when he was age 29 or 30, in Des Moines, Iowa.

793.    In violation of 18 U.S.C. §2421, Defendants knowingly transported or attempted to transport Amber in interstate and/or foreign commerce with the intent that she engage in sexual activity for which one or both of them could be charged with a criminal offense under, *e.g.*, 18 U.S.C. §§ 1589, 1590, 1591, 2242, 2243, 2422, 2423(a), 2423(b), 2423(c), or other applicable law.

794.    In violation of 18 U.S.C. §2422, Defendants knowingly persuaded, induced, enticed, or coerced Amber to travel in interstate and/or foreign commerce with the intent that she engage in a sex act for which a person could be charged with a criminal offense sexual activity for which he could be charged with a criminal offense under, e.g., 18 U.S.C. §§ 1589, 1590, 1591, 2243, 2421, 2422, 2423(a), 2423(b), 2423(c), or other applicable law.

795.    In violation of 18 U.S.C. §2423(a), Defendants knowingly transported Amber, and/or attempted to or conspired to transport Amber, who had not yet attained the age of 18 years, in interstate and/or foreign commerce with the intent that she engage in a sex act for which

a person could be charged with a criminal offense under, e.g., 18 U.S.C. §§ 1589, 1590, 1591, 2242, 2243, 2421, 2422, 2423(b), 2423(c), or other applicable law.

796.    In violation of 18 U.S.C. §2423(b), Defendant traveled in interstate commerce for the purpose of engaging in illicit sexual conduct with Amber, a person under 18 years of age.

797.    In violation of 18 U.S.C. §2423(c), Defendant traveled in foreign commerce and engaged in illicit sexual conduct with Amber, a person under 18 years of age.

798.    As a direct and proximate result of the actions of the Defendants, Amber has suffered severe emotional distress, physical injuries, and economic losses.

799.    Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 33

### Transportation of Minors, Ancillary Offenses, Attempt and Conspiracy in Violation of 18 U.S.C. §§ 2423(d), 2423(e) and 2255

*By Amber Means against USOC and USA TKD*

800.    Amber realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

801.    Amber is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 2255.

802.    In violation of 18 U.S.C. §2423(c), Defendant USOC, for the purpose of commercial advantage or private financial gain, arranged, procured and facilitated the travel of Plaintiff, Jean Lopez, and Steven Lopez, knowing that Jean and Steven Lopez were traveling in interstate or foreign commerce for the purpose of engaging in illicit sexual conduct.

803.    The USOC and USA TKD had received numerous complaints of sexual abuse and sexual assault committed by the Lopez brothers, who were adults, but they allowed Amber to be

raped and sexually assaulted by the Lopez brothers because doing so further incentivized the Lopez brothers to deliver "medals and money" Team USA.

804.    In violation of 18 U.S.C. §2423(c), Defendant USA TKD, for the purpose of commercial advantage or private financial gain, arranged procured and facilitated the travel of Plaintiff, Jean Lopez, and Steven Lopez, knowing that Jean and Steven Lopez were traveling in interstate or foreign commerce for the purpose of engaging in illicit sexual conduct.

805.    In violation of 18 U.S.C. § 2423(e), Defendant USOC attempted or conspired with one or more Defendants (Steven and Jean Lopez) to transport Amber, who had not yet attained the age of 18 years, in interstate and/or foreign commerce with the intent that she engage in a sex act for which a person could be charged with a criminal offense under, e.g., 18 U.S.C. §§ 1589, 1590, 1591, 2242, 2243, 2421, 2422, 2423(b), 2423(c), or other applicable law, constituting a violation of 18 U.S.C. §2423(a).

806.    In violation of 18 U.S.C. § 2423(e), Defendants USOC attempted or conspired with one or more defendants to travel in in interstate commerce for the purpose of engaging in illicit sexual conduct with Amber, a person under 18 years of age, in violation of 18 U.S.C. §2423(b).

807.    In violation of 18 U.S.C. § 2423(e), Defendant USOC attempted or conspired with Defendant Jean Lopez to travel in in foreign commerce and engaged in illicit sexual conduct with Amber, a person under 18 years of age, in violation of 18 U.S.C. §2423(c).

808.    In violation of 18 U.S.C. § 2423(e), Defendant USA TKD attempted or conspired with one or more defendants to transport Amber, who had not yet attained the age of 18 years, in interstate and/or foreign commerce with the intent that she engage in a sex act for which a person could be charged with a criminal offense under, e.g., 18 U.S.C. §§ 1589, 1590, 1591, 2242, 2243,

2421, 2422, 2423(b), 2423(c), or other applicable law, constituting a violation of 18 U.S.C. §2423(a).

809.     In violation of 18 U.S.C. § 2423(e), Defendants USA TKD attempted or conspired with one of more Defendants to travel in in interstate commerce for the purpose of engaging in illicit sexual conduct with Amber, a person under 18 years of age, in violation of 18 U.S.C. §2423(b).

810.     In violation of 18 U.S.C. § 2423(e), Defendant USA TKD attempted or conspired with one or more Defendants to travel in in foreign commerce and engaged in illicit sexual conduct with Amber, a person under 18 years of age, in violation of 18 U.S.C. §2423(c).

811.     As a direct and proximate result of the actions of the Defendants, Amber has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

812.     Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 34

### Transportation in Violation of 18 U.S.C. §§ 2421, 2255

*By Amber Means against USOC and USA TKD*

813.     Amber realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

814.     Amber is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 2255.

815.     In violation of 18 U.S.C. § 2421, Defendants USOC and USA TKD knowingly transported Amber in interstate and foreign commerce with the intent that she engage in sexual

activity for which a person could be charged with a criminal offense under, e.g., 18 U.S.C. §§ 1589, 1590, 1591, 2242, 2243, 2421, 2422, 2423(b), 2423(c), or other applicable law, constituting a violation of 18 U.S.C. §2423(a).

816.     As a direct and proximate result of the actions of the Defendants, Amber has suffered severe emotional distress, physical injuries, and economic losses.

817.     Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

**Counts of All Plaintiffs for Violations of State Law**

## COUNT 35

### Negligent Supervision

*By all Plaintiffs against USOC and USA TKD*

818.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

819.     Defendants USOC and USA TKD had a duty to protect Plaintiffs from the sexual abuse, harassment, and exploitation of the Lopez brothers. Not only were Plaintiffs underage minors during much of the time period above, but Plaintiffs were subject to "Commercial Terms" and other contractual provisions with the USOC.

820.     This duty has already been admitted: the USOC and USA TKD have repeatedly stated publicly and on their own websites that they are "responsible" for the protection of Team USA's athletes, and the USOC has apologized for "failing" Team USA's athletes by failing to protect them from sexual predators.

821.    At least as early as 2006, and certainly by 2015, Defendants USOC and USA TKD had notice of Defendants Jean Lopez's sexual abuse of Plaintiffs Mandy Meloon, Kay Poe, Heidi Gilbert, and Gaby Joslin, among others.

822.    At least as early as 2006, and certainly by 2015, Defendants USOC and USA TKD had notice of Defendant Steven Lopez's sexual abuse of Plaintiffs Amber Means, Gaby Joslin, and Mandy Meloon, among others.

823.    Defendants USOC and USA TKD knew or should have known that Jean and Steven Lopez's conduct, agency, and/or employment would subject third parties to an unreasonable risk of harm.

824.    Defendants USOC and USA TKD improperly supervised Jean Lopez by failing to monitor his actions and by acting to obstruct or interfere with investigations of Jean Lopez's sexual assaults of Team USA's athletes. By doing so, they signaled to female athletes that their complaints of sexual assault were futile and that Jean Lopez was above the law in the eyes of the USOC and USA TKD.

825.    Defendant USOC improperly supervised Jean Lopez by appointing him to coach Team USA repeatedly, over multiple years, in taekwondo competitions. By doing so, they clothed him the authority of Team USA and signaled to female athletes that they had to submit to his sexual demands.

826.    Defendants USOC and USA TKD willingly allowed the sexual assaults committed by Jean Lopez and Steven Lopez to continue because the Lopez brothers delivered the "medals and money" to Team USA's balance sheet and brought financial success to the USOC by generating more sponsorships, revenues, licensing deals, and publicity.

827.    As a direct and proximate result of the actions of the Defendants' actions, Plaintiffs suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

828.    Plaintiffs claim damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 36

### Negligent Retention

*By all Plaintiffs against USOC and USA TKD*

829.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

830.    Defendants USOC and USA TKD had a duty to protect Plaintiffs from the sexual abuse, harassment, and exploitation of the Lopez brothers. Not only were Plaintiffs underage minors during much of the time period above, but Plaintiffs were subject to "Commercial Terms" and other contractual provisions with the USOC.

831.    This duty has already been admitted: the USOC and USA TKD have repeatedly stated publicly and on their own websites that they are "responsible" for the protection of Team USA's athletes, and the USOC has apologized for "failing" Team USA's athletes by failing to protect them from sexual predators.

832.    At least as early as 2006, and certainly by 2015, Defendants USOC and USA TKD had notice of Defendants Jean Lopez's sexual abuse of Plaintiffs Mandy Meloon, Kay Poe, Heidi Gilbert, and Gaby Joslin, among others.

833. At least as early as 2006, and certainly by 2015, Defendants USOC and USA TKD had notice of Defendant Steven Lopez's sexual abuse of Plaintiffs Amber Means, Gaby Joslin, and Mandy Meloon, among others.

834. Defendants USOC and USA TKD knew or should have known that Jean and Steven Lopez's conduct, agency, and/or employment would subject third parties to an unreasonable risk of harm.

835. At least as early as 2006, and certainly by 2015, Defendants USOC and USA TKD had notice of Defendants Jean Lopez's sexual abuse of Plaintiffs Mandy Meloon, Kay Poe, Heidi Gilbert, and Gaby Joslin, among others.

836. At least as early as 2006, and certainly by 2015, Defendants USOC and USA TKD had notice of Defendant Steven Lopez's sexual abuse of Plaintiffs Amber Means, Gaby Joslin, and Mandy Meloon, among others.

837. Defendants USOC and USA TKD knew or should have known that Jean and Steven Lopez were dangerous and were unfit to be employees or agents of USA TKD and the USOC.

838. Defendants USOC and USA TKD retained Jean and Steven Lopez despite their knowledge of the risks that they posed to Plaintiffs and third parties.

839. By funding and promoting the travel, training, and competitive events at which the Lopez brothers acted as Defendants' agents, Defendants continued to create unreasonable risks to Plaintiffs and others.

840. Defendants USOC and USA TKD willingly allowed the sexual assaults committed by Jean Lopez and Steven Lopez to continue because the Lopez brothers delivered

the "medals and money" to Team USA's balance sheet and brought financial success to the USOC by generating more sponsorships, revenues, licensing deals, and publicity.

841.    As a direct and proximate result of the actions of the Defendant, Plaintiffs suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

842.    Plaintiffs claim damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 37

### Defamation

*By all Plaintiffs against USA TKD, Steven Lopez, and Jean Lopez*

843.    At all relevant times, Plaintiffs enjoyed the respect, confidence, and esteem of their neighbors, as well as others in their communities.

844.    USA TKD is liable for the conduct of its former CEO, David Askinas, by virtue of respondeat superior.

845.    USA TKD's statements, by and through its former CEO Askinas, acting within the scope of his employment with and representation of USA TKD, given to the *Colorado Gazette* on or about August 19, 2007, and given to and/or republished by *USA Today* on or about June 8, 2017, were each defamatory.

846.    At the time USA TKD's statements were originally published in 2007, it was reasonably foreseeable that the statements would be republished by third-party news media as part of news accounts of Mandy's repeated allegations, such as by *USA Today* in 2017.

847. Each statement was false when made, in that Mandy's allegations of sexual assault by Jean Lopez prior to 2007 and USOC and/or USA TKD's failure to investigate were true, and there was no basis to publicly claim that Mandy was lying or was a liar.

848. USA TKD's statements, in 2007 and 2017, were not privileged.

849. Askinas, within the course and scope of his employment and/or agency with USA TKD, gave each false statement intentionally, with knowledge of its falsity; with reckless disregard of the truth; with negligent disregard of the truth; and/or with actual malice toward Plaintiffs, intending to injure Plaintiffs and to deprive them of their good names and reputations.

850. USA TKD knew or should have known that each of Askinas's statements was false at the time of the publications.

851. Askins made his each of his statements at the direction of USA TKD and/or within the course and scope of his employment and/or agency with USA TKD.

852. USA TKD ratified Askinas' statements by not forcing him to withdraw them, by leaving Steven and Jean Lopez in place, and by rehiring and promoting Jean Lopez and Steven Lopez as the faces of USA Taekwondo.

853. Each of the statements of USA TKD, by and through Askinas, was printed, published, circulated, and distributed by news outlets, and was widely read by Plaintiffs' families, neighbors, friends, and other persons.

854. On or about August 19, 2007, the *Colorado Gazette* published statements from Mandy detailing Jean Lopez's sexual assault of her in 1997 while they were at a competition in Egypt.

855. Along with those statements, the *Colorado Gazette* published a response from Askinas. In an effort to publicly brand Mandy as a liar, Askinas stated that a three-month investigation in 2006 concluded that Mandy's allegations "weren't credible."

856. Askinas's response on or about August 19, 2007, to the *Colorado Gazette* was false because Mandy was in fact sexually assaulted by Jean Lopez prior to 2007 and neither the USOC nor USA TKD investigated Meloon's allegations. Also, Mandy had passed a polygraph, which determined that her allegations were "truthful."

857. Askinas' response on or about August 19, 2007, stated explicitly, stated in effect, stated by innuendo, implied, and/or insinuated that an investigation revealed that Jean Lopez never sexually assaulted Mandy, and therefore that Mandy lied and was a liar.

858. At the time Askinas made these statements to the *Colorado Gazette* in 2007, Askinas was the chief executive of USA TKD, and acted as an agent, authorized representative, servant, and/or employee of USA TKD, acting within the course and scope of his employment and/or agency.

859. On or about June 8, 2017, *USA Today* published an interview with Mandy retelling the same allegations of sexual assault by Jean Lopez prior to 2007.

860. Along with Mandy's statements, USA Today republished Askinas's response, which had been originally published by the *Colorado Gazette* in 2007.

861. In an effort to continue the public branding of Mandy as a liar, Askinas reiterated the statements he provided to the *Colorado Gazette* in 2007 that Mandy's allegations "weren't credible" based on investigations by USA TKD and USOC.

862.    Askinas's statements on or about June 8, 2017 to *USA Today* were false because Mandy was in fact sexually assaulted by Jean Lopez prior to 2007 and neither the USOC nor USA TKD investigated Meloon's allegations of sexual assault by Jean Lopez prior to 2007.

863.    Askinas' response on or about June 8, 2017, stated explicitly, stated in effect, stated by innuendo, implied, and/or insinuated that an investigation revealed that Jean Lopez never sexually assaulted Mandy, and therefore that Mandy lied and was a liar.

864.    Askinas' statements in 2007 were made with the expectation and intent that the statements would be republished by news outlets in the event Mandy should repeat her allegations and/or should those allegations be reported again on a later date. Thus, it was reasonably foreseeably at that time that the statement would be republished by third-party new media as party of news accounts on Mandy's repeated allegations, such as by *USA Today* in 2017.

865.    USA TKD has known that Mandy's allegations are true and that Askinas's statements are false.

866.    USA TKD's statements, by and through Askinas, were published nationwide, not just through the *Colorado Gazette* and *USA Today*, but through other publications that repeated the statements.

867.    In addition, Askinas made false statements to *USA Today* in 2017 when interviewed about the allegations made by Plaintiffs and that form the basis of this action.

868.    In 2017, Askinsas falsely told *USA Today* that, "I never asked Ms. Gilbert to keep quiet about anything."

869.    In 2017, Askinsas falsely claimed that he had ever told Mandy that he knew Mandy was lying.

870.    In 2017, Steven Lopez falsely denied to *USA Today* that he had punched Mandy in the nose, despite knowing that he had in fact punched Mandy in the nose.

871.    Similarly, Steven Lopez also denied assaulting and raping Mandy despite knowing that he had in fact assaulted and raped Mandy.

872.    Steven Lopez denied to *USA Today* in 2017 that he had ever drugged and raped Amber, despite knowing that he had in fact drugged and raped Amber.

873.    In 2017, *USA Today* reported:

In separate interviews, Steven and Jean Lopez denied allegations of sexual assault made by four women to USA TODAY Sports and investigators.

"I've never been inappropriate with anyone," Jean Lopez said.

Steven Lopez said he was told in January 2016 that there was a complaint against him with USA Taekwondo. But he said he was not given any details of the allegations, nor was he interviewed by Alperstein or anyone else.

Lopez says he was told in a letter last month that the complaint was being transferred to the U.S. Center for SafeSport. The independent agency, which became fully operational in March, was created by the USOC to handle abuse allegations for national governing bodies.

"I've never — nothing, nothing at all," Steven Lopez said when asked if he's ever sexually assaulted or committed any kind of inappropriate behavior with any woman. "Nothing like that. Nothing close to that."[69]

874.    Thus, Jean and Steven Lopez falsely claimed or insinuated that the four Plaintiffs were lying about the sexual assaults committed by Jean and Steven Lopez against them.

---

[69] Nancy Armour & Rachel Axon, *Lopez brothers, Olympic taekwondo royalty, hit with sex abuse allegations*, USA TODAY (June 8, 2017), https://www.usatoday.com/story/sports/olympics/2017/06/08/lopez-brothers-olympic-taekwondo-royalty-hit-sex-abuse-allegations/102630358/

875.     In half-page photograph that includes a quote from Steven Lopez (in the same

USA Today story), Steven Lopez falsely claimed that Plaintiffs are lying about his sexual abuse:



876.     USA TKD's statements, by and through Askinas, each on its face impugned

Plaintiffs' reputation, and tended to expose Plaintiffs to public contempt, ridicule, aversion or

disgrace, to induce an evil opinion of them in the minds of right-thinking persons, to cause them

to be shunned or avoided, and/or to injure them in occupation, good name, character, and

reputation.

877.    Steven Lopez's statements impugned Plaintiffs' reputation, and tended to expose Plaintiffs to public contempt, ridicule, aversion or disgrace, to induce an evil opinion of them in the minds of right-thinking persons, to cause them to be shunned or avoided, and/or to injure them in occupation, good name, character, and reputation.

878.    Jean Lopez's statements impugned Plaintiffs' reputation, and tended to expose Plaintiffs to public contempt, ridicule, aversion or disgrace, to induce an evil opinion of them in the minds of right-thinking persons, to cause them to be shunned or avoided, and/or to injure them in occupation, good name, character, and reputation.

879.    As a direct and proximate result of the actions of Defendant USA TKD's, Defendant Steven Lopez's, and Defendant Jean Lopez's statements, Plaintiffs suffered damage by virtue of their loss of reputation, shame, mortification, hurt feelings, and/or damage to her property, business, trade, profession, and/or occupation.

880.    Plaintiffs claim damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs are entitled to and hereby demand a jury trial in this matter.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully requests that this Court will:

a.    Enter judgment against Defendants, jointly and severally, in such amounts as will fully and adequately compensate Plaintiffs for the damages they have suffered, in an amount to be determined at trial;

b.    Award Plaintiffs punitive damages against Defendants, jointly and severally, in an amount to be determined by the jury for Defendants' violations of federal law;

c.　　　Award Plaintiffs pre-judgment and post-judgment interest;

d.　　　Award Plaintiffs their actual expenses of litigation, including reasonable attorney's fees;

e.　　　Award Plaintiffs injunctive relief that requires the USOC and USA TKD to put in place (and fund) supervision and compliance protocols that actually prevent, uncover, and stop the sexual abuse, exploitation, and trafficking of Team USA's athletes;

f.　　　Appoint Plaintiffs as class representatives;

g.　　　Appoint Plaintiffs' counsel as counsel for the class;

h.　　　Award Plaintiffs such other and further relief as the Court deems just and proper.

Dated: May 4, 2018                    Respectfully Submitted,

/s/ Daniel A. Lipman
Daniel A. Lipman
Parker Lipman LLP
2300 15th Street, Suite 200
Denver, CO 80202
720-638-9424
303-964-1900 (fax)
dan@parkerlipman.com
www.parkerlipman.com


Rex A. Sharp
Ryan C. Hudson
Larkin E. Walsh
Sharp Law | Rex A. Sharp, P.A.
5301 W. 75th St.
Prairie Village, KS 66208
913.901.0505
913.901.0419 (fax)
rsharp@midwest-law.com
rhudson@midwest-law.com
lwalsh@midwest-law.com
www.midwest-law.com

Jonathan Little
Saeed and Little, LLP
1433 N. Meridian Street
Indianapolis, IN 46202
317-721-9214
jon@sllawfirm.com
www.sllawfirm.com