IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00981-CMA-MEH

HEIDI GILBERT,
AMBER MEANS,
MANDY MELOON,
GABRIELA JOSLIN,
KAY POE, and
JANE DOES 6–50,

       Plaintiffs,

v.

UNITED STATES OLYMPIC COMMITTEE,
USA TAEKWONDO, INC.,
U.S. CENTER FOR SAFESPORT,
STEVEN LOPEZ,
JEAN LOPEZ, and
JOHN DOES 1–5,

       Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**Michael E. Hegarty, United States Magistrate Judge**.

       Plaintiffs assert twenty-one claims against the various Defendants. *See* Second Amended Complaint, ECF No. 68 ("SAC"). Defendants United States Olympic Committee ("USOC"), USA Taekwondo, Inc. ("USAT"), and Jean and Steven Lopez (collectively, the "Lopez Defendants") have filed separate Motions to Dismiss seeking to dismiss the claims in their entirety. Additionally, the USOC moves under Fed. R. Civ. P. 12(f) to strike Plaintiffs' class action allegations.[1] As set forth below, I respectfully recommend that all motions be **granted in part** and **denied in part**.

---

[1] Defendant U.S. Center for SafeSport ("SafeSport") has also filed a Motion to Dismiss, which I will address in a separate recommendation.

<u>**BACKGROUND**</u>

Plaintiffs in this lawsuit are female taekwondo athletes who sought to compete for Team USA. Plaintiffs allege that during the time they participated and competed in the USAT system, they were sexually abused, assaulted, and raped by the Lopez Defendants, who Plaintiffs claim are prominent members of the United States taekwondo community. Plaintiffs' allegations in this lawsuit constitute three components. First, Plaintiffs allege coerced sexual conduct and sexual assault perpetrated by the Lopez Defendants. Second, Plaintiffs allege the USOC and USAT ignored and discredited their reports of such conduct in the years following the assaults. Finally, Plaintiffs allege that executives of the USOC and USAT lied to Congress in an attempt to divert blame and prevent institutional reform. In the interests of judicial economy and efficiency, many allegations from the 200-page SAC are omitted or significantly condensed in the following background section. Where those facts become relevant to resolution of the present motions, I discuss them at the appropriate juncture. Plaintiffs factual allegations are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## I.     **The Defendants**

Defendant USOC is the federally chartered institution that exercises "exclusive jurisdiction" over "all matters pertaining to United States participation in the Olympic Games, the Paralympic Games, and the Pan-American Games . . . ." 36 U.S.C. § 220503(3)(A). The USOC's jurisdiction includes the responsibility to "organize, finance, and control the representation of the United States in the competitions and events of the Olympic Games . . . ." § 220505(c)(3). Congress also empowered the USOC to "recognize eligible amateur sports organizations as national governing bodies [("NGBs")] for any sport that is included on the program of the Olympic Games . . . ." § 220505(c)(4).

Defendant USAT is the NGB recognized by the USOC to govern the United States' participation in taekwondo. *See* SAC ¶ 98. Thus, USAT has the responsibility to select the athletes, officials, and coaches who will represent the United States in taekwondo in Olympic competitions. *See id.* ¶ 95. Defendant Jean Lopez was the head coach of the USAT team at the 2004, 2008, 2012, and 2016 Olympics. *Id.* ¶ 139. Jean's brother, Defendant Steven Lopez, is a well-known athlete on the taekwondo team who won gold medals at the 2000 and 2004 games and a bronze medal in 2008. *Id.* ¶ 24. The two are part of a family that carries the moniker the "first family" of taekwondo. *See id.* ¶¶ 23–25.

Plaintiffs allege that during the time they participated in the USAT system, they were victims of sexual abuse, assault, and rape by Jean and Steven Lopez and by other members of the taekwondo community who are not defendants here. *See id.* ¶¶ 362–722.

## II. Plaintiffs' Allegations of Sexual Assault

### A. Mandy Meloon

Ms. Meloon was born in Germany in 1981. *Id.* ¶ 362. At the age of thirteen, she moved to the Olympic training center in Colorado Springs to train full-time in taekwondo. *Id.* ¶¶ 363–67. Soon after moving to the center, she was befriended by Jean Lopez. *Id.* ¶¶ 368–69. Ms. Meloon asserts that Jean Lopez engaged in sexual conversations with her and referred to her as his girlfriend. *Id.* ¶ 370. She alleges that Danny Kim, an adult member of the taekwondo national team, raped Ms. Meloon in her room at the training center in 1996. *Id.* ¶ 391. For approximately another year, while Ms. Meloon was still living at the training center, Mr. Kim continued to have sex with Ms. Meloon. *See id.* ¶¶ 392–97. Ms. Meloon made oral complaints about Mr. Kim in 1997 and a written complaint in 2006. *Id.* ¶ 398.

In 1995, at the age of fourteen, Ms. Meloon made the USAT senior national team. *Id.* ¶ 375. She was still on that team in 1997 when it traveled to Cairo, Egypt, to compete in the World Cup. *Id.* ¶¶ 399–402. During the trip, Ms. Meloon shared a hotel room with Plaintiff Kay Poe. *Id.* ¶ 402. Ms. Meloon claims that, one night while both girls were asleep, Jean Lopez entered the girls' room, climbed into Ms. Meloon's bed, and digitally penetrated her vagina for approximately five minutes. *Id.* ¶¶ 404–07. Ms. Meloon pretended she was asleep during this assault. *Id.* ¶ 408.

Ms. Meloon left the Olympic training center in 1998 and soon thereafter moved to Texas to train at Jean Lopez's gym. *Id.* ¶ 421. In 2000, when Ms. Meloon was eighteen, she began to have a sexual relationship with Steven Lopez. *Id.* ¶ 422. Ms. Meloon asserts that Steven soon became physically abusive. *Id.* ¶ 426. In 2002, he allegedly punched Ms. Meloon in the face. *Id.* ¶ 427. USOC and USAT officials "were aware" of this. *Id.* ¶ 428. Ms. Meloon also alleges that in 2004, Steven broke into her house, beat and raped her, then beat and raped her again in 2005. *Id.* ¶¶ 429–30. Later that year, at the World Championships in Madrid, Spain, Steven purportedly physically assaulted Ms. Meloon in their hotel, breaking her ribs. *Id.* ¶ 431. Ms. Meloon claims that, because she began to see other men after the Madrid incident, Coach Jean Lopez dropped Ms. Meloon from the national team. *Id.* ¶¶ 433–34.

B.    Kay Poe

In 1996, at the age of fourteen, Ms. Poe became the youngest-ever member of the United States national taekwondo team. *Id.* ¶ 487. By 1997, Ms. Poe was having a sexual relationship with a twenty-two-year-old member of the team; the USOC allegedly had knowledge of this sexual relationship. *Id.* ¶¶ 491–93. Ms. Poe asserts that Jean Lopez "forced a sexual relationship" with her "while she was still a minor." *Id.* ¶ 497. She also contends that, by 1999 when Ms. Poe was seventeen years old, Jean was having full sexual intercourse with her. *Id.* ¶¶ 498–502. This sexual

relationship continued through the 2000 Olympic games in Sydney, when she was a competitor on the team and Jean was the coach. *Id.* ¶ 507. Ms. Poe asserts she was able to stop Jean from forcing sex on her shortly after those games. *Id.* ¶ 508. But at the 2002 U.S. Open, Ms. Poe alleges Jean followed her to her hotel room and "dry humped" her until he ejaculated in his pants. *Id.* ¶¶ 508–09. Ms. Poe left the sport of taekwondo after she failed to make the 2008 Olympic team. *Id.* ¶ 512.

C.    <u>Heidi Gilbert</u>

Ms. Gilbert was a member of the USAT team at the 2002 Pan-Am Championships in Ecuador. *Id.* ¶ 523. She alleges that one night, while she was celebrating with Diana Lopez (the Lopez Defendants' sister) in Jean's hotel room, Jean entered the room and wrestled Ms. Gilbert onto the bed. Jean pinned her down and "dry humped" her until he ejaculated in his pants. *Id.* ¶¶ 528–34. A year later, after a competition in Germany, Ms. Gilbert and Jean (among others) attended a party. *Id.* ¶ 542. Ms. Gilbert claims that Jean was sexually aggressive with her by initiating physical contact and eventually gave her a drink that had been drugged. *Id.* ¶¶ 543–44. The drink caused her to "almost pass out," and she felt she could not move. *Id.* ¶¶ 545–46. She contends that Jean put her in a taxi, where he felt her breasts and vagina over her clothes. *Id.* ¶ 547. Ms. Gilbert also alleges that, when they reached the hotel, Jean dragged her to the back of a lobby area and digitally penetrated her and performed oral sex on her. *Id.* ¶¶ 548–51.

D.    <u>Gabriela Joslin</u>

Ms. Joslin was born on March 14, 1983, and grew up in Texas. Pls.' Statement Non-Opp'n to Def. Jean & Steven Lopez's Req. Judicial Notice 2, ECF No. 122; SAC ¶ 602. She had known the Lopez brothers since she was a young child. SAC ¶ 603. Jean Lopez became her taekwondo coach in 2006. *Id.* ¶ 605. That same year, Ms. Joslin planned to compete in the German Open to

gain experience to compete for the Olympic team but, at the last minute, Jean informed her that he would not travel to the competition. *Id.* ¶¶ 606–10. However, Steven Lopez was attending the event as a USAT athlete and coach and offered to serve as Ms. Joslin's coach. *Id.* ¶¶ 611–12.

The night before Ms. Joslin's first match, Steven went to her hotel room and said he wanted to discuss her upcoming match. *Id.* ¶ 616. Ms. Joslin asserts that, once in the room, Steven turned on the television and changed the channel to a pornographic movie. *Id.* ¶ 617. He then grabbed Ms. Joslin, pinned her to the bed, and began rubbing her buttocks. *Id.* ¶¶ 618–19. Ms. Joslin states, "[i]t was clear to [her] that Steven required sex before he would address his responsibilities as coach." *Id.* ¶ 620. The two then had sex, and Ms. Joslin continued to allow Steven to have sex with her for the remainder of her taekwondo career. *Id.* ¶¶ 621–22. She last had sex with Steven in 2010. *Id.* ¶ 624. She states she did this out of fear of Jean Lopez, who she alleges "made it clear . . . she was to cater to Steven." *Id.* ¶ 622 (quotation omitted).

After retiring as an athlete, Ms. Joslin began a career in Texas as a taekwondo coach. *Id.* ¶ 625. Around the same time, "Jean Lopez began a sexual relationship with her." *Id.* ¶ 626. Ms. Joslin alleges that in late 2011, Jean violently raped her. *Id.* ¶ 630. She contends that she became pregnant by the rape and had an abortion. *Id.* ¶ 631.

E.    Amber Means

Ms. Means was born on May 7, 1990, and grew up in Spokane, Washington. Pls.' Statement Non-Opp'n to Def. Jean & Steven Lopez's Req. Judicial Notice 2; SAC ¶ 655. She first met the Lopez Defendants at a taekwondo camp in Houston in 2003. SAC ¶ 656. After the camp, Jean Lopez told Ms. Means' parents she had tremendous potential in taekwondo. *Id.* ¶ 661. By 2004, Jean persuaded the Meanses to move to Texas so Amber could train at the Lopez' taekwondo studio. *Id.* ¶ 662. In 2007, when Ms. Means was 17, she and Steven Lopez began going on dates.

*Id.* ¶ 675.  Steven first kissed her after the two saw a movie that year.  *Id.* ¶ 767.  Ms. Means asserts that by 2008, when she was still seventeen, the two had started a sexual relationship, which they continued at competitions throughout 2008.  *Id.* ¶¶ 685, 688.  She alleges that in June 2008, Steven drugged and raped her at a private party.  *Id.* ¶¶ 691–95.

## III.    Reports of Sexual Assault

Both Ms. Meloon and Ms. Gilbert allege they reported their allegations of sexual assault by Jean Lopez in approximately 2006 to 2008.  Ms. Meloon alleges she personally handed her written complaint to executives at the USOC and USAT, including David Askinas, Chief Executive Officer ("CEO") at USAT.  *Id.* ¶¶ 189–91.  She claims that Mr. Askinas later called Ms. Meloon's report of rape a "mischaracterization."  *Id.* ¶ 187.

In 2006, Ms. Gilbert received a call from Mr. Askinas, asking whether she intended to file a complaint against Jean for his alleged rape in 2003.  *Id.* ¶ 195.  In 2008, Mr. Askinas allegedly told Ms. Meloon she could have a spot on the Olympic team, but she would have to withdraw her complaint against Jean and "sign a statement confessing that she was mentally ill and had fabricated her allegations . . . ."  *Id.* ¶ 200.  Ms. Meloon declined to retract her statement.  *Id.* ¶ 201.

In March 2015, USAT hired Donald Alperstein specifically to investigate allegations about the Lopez Defendants.  *Id.* ¶ 269.  USAT declared that Mr. Alperstein had "unfettered ability to carry out his task," and that any evidence he uncovered would be submitted to law enforcement agencies.  *Id.* ¶ 219.  However, Plaintiffs allege that the "USOC and USAT secretly worked together, behind closed doors, to make sure that the investigation against the Lopez brothers was delayed and obstructed," because the organizations wanted them to participate and compete in the 2016 Olympics.  *Id.* ¶¶ 225–26.  After the games concluded, Mr. Alperstein sent Ms. Gilbert an

email stating, "Now that the Olympics are over and things are settling down, I want to get moving again on the Steven Lopez disciplinary case[.]" *Id.* ¶ 235 (alteration in original).

## IV.    USOC's and USAT's Testimony before Congress

Plaintiffs also allege that executives at the USOC and USAT have recently testified falsely before Congress.  Plaintiffs allege Scott Blackmun, former USOC CEO, falsely testified that some NGBs have bigger budgets than the USOC, and he inaccurately stated the percentage of USOC's budget that is spent on overhead. *Id.* ¶ 171.  Plaintiffs also allege Steve McNally, USAT Executive Director, testified before the Oversight and Investigations Subcommittee that Mr. Alperstein "operated without any limitation on its budget, with no control by USA Taekwondo as to who he should or should not pursue . . . ." *Id.* ¶ 220 (quoting *Examining the Olympic Community's Ability to Protect Athletes from Sexual Abuse: Hearing Before the H. Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 115th Cong. 36 (2018) (statement of Steve McNally, Executive Director of USAT) (unofficial transcript).  Plaintiffs allege these statements were false. *Id.* ¶ 220.

## V.    Medals and Money

Plaintiffs allege generally that the USOC and USAT sought to shield the Lopez Defendants, because the institutions were fixated on "medals and money." *Id.* ¶ 6.  In 2014, Mr. Blackmun purportedly stated, "For us, it's all about medals[,]" and "[h]ow do we help American athletes get medals put around their necks?  We have a line of sight between every decision we make and the impact on how many Americans will win medals." *Id.* (alterations in original) (quoting Sally Jenkins, *The USOC Needs a New Leader Who Cares About Athletes More Than Expense Accounts*, Wash. Post (July 3, 2018)).  Plaintiffs allege "[a]nything or anyone that gets in

the way of the USOC's commercial quest for 'medals and money' is silenced, obstructed, defamed, or intimidated into keeping quiet." *Id.* ¶ 17.

Plaintiffs characterize the Olympics as "big business." *Id.* ¶ 103. The USOC has the exclusive rights to trademark everything related to the Olympics. *Id.* ¶ 109. It purportedly generates about $230 million per year, largely from marketing and sponsorships. *Id.* Thus, according to Plaintiffs, the USOC "generate[s] hundreds of millions of dollars of additional revenue off the backs and labor of the athletes who wear Team USA uniforms." *Id.* ¶ 111. From this revenue, 129 USOC employees make six figure salaries. *Id.* ¶ 176. Plaintiffs allege, "Because the Lopez brothers were generating medals and money for the USOC and USAT, . . . the USOC purposefully chose to discredit [Ms. Meloon's reports of misconduct] and leave Jean and Steven Lopez in their positions, which would bring further revenue (money and medals) to the USOC." *Id.* ¶ 192.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* *Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations that are legal conclusions, bare assertions, or merely conclusory. *Id.* at 678–80. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief."

*Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id*. (quotation marks and citation omitted).

Plaintiffs' SAC asserts twenty-one claims against the various Defendants. However, Plaintiffs have voluntarily withdrawn seven of those claims (claims 1–2, 6–7, 11–12, and 18) in the briefing for the present motions. *See* Resp. 3, ECF No. 139. Thus, fourteen claims remain, which fall into three broad categories: (1) claims by individual Plaintiffs under federal sex trafficking and forced labor laws; (2) a RICO claim; and (3) state law claims.

Collectively, Defendants argue each claim should be dismissed, because the claim is barred by the statute of limitations, the Plaintiffs fail to plausibly state the claim, or both. *See* Lopez Defs.' Mot. Dismiss, ECF No. 106; USOC's Mot. Dismiss, ECF No. 108; USAT's Mot. Dismiss, ECF No. 109. Plaintiffs filed an omnibus Response on November 1, 2018, and the Defendants filed Replies to each motion on November 15, 2018. *See* ECF No. 139; USOC's Reply, ECF No. 155; Lopez Defs.' Reply, ECF No. 157; USAT's Reply, ECF No. 158.

## I. Alleged Violations of Federal Sex Trafficking and Forced Labor Law

Plaintiffs bring the majority of their claims under the Trafficking Victims Protection Act ("TVPA"). Within these claims, the parties raise several disputes that are best resolved as preliminary matters. First, the parties vigorously dispute the statute of limitations that is applicable to the claims, since the TVPA (including its limitation provision) has been amended during the period in which the underlying sexual abuse has allegedly occurred. Second, the parties dispute the definitions of key terms in the TVPA. Specifically, the parties dispute whether the alleged sexual acts fall within the definition of "services" in 18 U.S.C. § 1589(a), and they disagree on the proper definition of "venture" in § 1589(b). The latter issue leads to the question of the elements necessary to state a claim under § 1589(b), which I will also address as a preliminary matter. After resolving these issues, I will address each claim individually.

A.    <u>Preliminary Matters</u>

*1.    Applicable Statute of Limitations*

Plaintiffs and Defendants (particularly the Lopez Defendants) first dispute the applicable statute of limitations. The Lopez Defendants argue that the proper limitations period is that which existed at the time of the underlying conduct; in other words, since the TVPA carried a four-year statute of limitations in 2006, any claim for a TVPA violation regarding conduct that occurred on January 1, 2006 expired on January 1, 2010. Defendants contend that this result should persist even if Congress later added a longer limitations period.

Plaintiffs counter that the applicable statute of limitations is found in the present amended statute, and any claim based on conduct that occurred within that limitations period is timely. However, Plaintiffs acknowledge this position contains an exception: if at any time a claim would have been barred under a previously existing limitations period, that claim would be barred.

Most (but not all) of this dispute plays out in the context of Plaintiffs' TVPA claims. Congress originally passed the Victims of Trafficking and Violence Protection Act in 2000. Pub. L. No. 106-386, 114 Stat. 1464. This Act created only criminal penalties for conduct currently prohibited in 18 U.S.C. §§ 1589 and 1590. Trafficking Victims Protection Act § 112(a)(2), 114 Stat. at 1486–87. In 2003, Congress amended the Act to add a private right of action for victims of violations of §§ 1589, 1590, or 1591 at § 1595. Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193 § 4(a)(4)(A), 117 Stat. 2875, 2878. At the time, the statute carried a four-year limitations period for filing civil actions. *Cruz v. Maypa*, 773 F.3d 138, 143–44 (4th Cir. 2014) (citing 28 U.S.C. § 1658(a)). Congress amended the TVPA's limitations period to ten years on December 23, 2008. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457 § 221(2)(B), 122 Stat. 5044, 5067.

Defendants argue that since most of the alleged sexual abuse occurred when the statute carried a four-year limitations period (i.e., before December 23, 2008), any claim based on conduct that occurred during that time period has expired, because the SAC was filed in 2018, significantly more than four years after 2008. Plaintiffs respond that the existing ten-year statute of limitations applies, even to claims based on conduct that occurred when the TVPA carried a four-year limitations period, so long as a claim had never expired. Notably, if the ten-year period were to apply here, then claims based on conduct that occurred after May 4, 2008 (ten years before Plaintiffs filed the First Amended Complaint) are timely. However, because the ten-year limitations period did not commence until December 23, 2008, I must determine whether a claim based on conduct that occurred between May 4, 2008, and December 22, 2008, is timely.

In *Cruz*, the Fourth Circuit addressed this precise question in the context of the TVPA amendments at issue here. The plaintiff in *Cruz* alleged that the defendant transported her from the Philippines to serve as a domestic employee at the defendant's residence, where he forced her to work grueling hours and isolated her from contacting her family. *Id.* at 141–43. Eventually, the plaintiff brought a lawsuit against the defendant for violations of the TVPA. *Id.* at 143–44. The conduct alleged by Cruz occurred at a time when the TVPA carried the four-year limitation period for filing a civil action. *Id.* at 143. But, by the time the plaintiff filed her suit, her claims would have been time barred if they were subject to the four-year limitation. *See id.* (recounting that the district court dismissed the plaintiff's TVPA claims, because they were barred by the four-year statute of limitations). However, the plaintiff argued her claims were subject to the ten-year statute of limitations created by the 2008 amendment. *Id.* Ultimately, the Fourth Circuit held that the ten-year limitations period applied to claims that were unexpired at the time of the 2008

13

amendment, finding that its conclusion did not amount to imposing an impermissible retroactive effect. *Id.*

In reaching its decision, the Fourth Circuit followed the Supreme Court's framework in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), for determining whether a statute applies retrospectively. *See Cruz*, 773 F.3d at 144–45. In *Landgraf*, the Court recognized that "the presumption against retroactive legislation is deeply rooted in our jurisprudence," 511 U.S. at 265, "but it also noted that '[a] statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment,'" *Cruz*, 773 F.3d at 144 (alteration in original) (quoting *Landgraf*, 511 U.S. at 269). *Landgraf* provides a three-step analysis to determine whether a statute applies to conduct that occurred prior to the enactment of the statute. First, a court must "determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at 280. If so, Congress' intent is given effect. *Id.* But second, if the statute does not contain such a command, "the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* Third, if the statute would have retroactive effect, the Supreme Court's "traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Id.*

Here—as in *Cruz*—Congress has not expressly prescribed the current statute of limitation's proper reach, so I must determine whether applying it in this case would have retroactive effect. In *Cruz*, the court determined that it would not for two reasons. First, the court found that "applying a new limitations period to unexpired claims does not 'attach[] new legal consequences to events completed before its enactment.'" *Id.* at 145 (alteration in original)

14

(quoting *Landgraf*, 511 U.S. at 270). It found that, as long as a claim was unexpired at the time Congress extended the relevant statute of limitations, applying that statute "does not 'increase a party's liability for past conduct[.]'" *Id.* (quoting *Landgraf*, 511 U.S. at 280). Second, the Fourth Circuit noted "in the criminal context, there is a consensus that extending a limitations period before prosecution is time-barred does not run afoul of the Ex Post Facto Clause of the Constitution." *Id.* (collecting cases). I agree with the Fourth Circuit's analysis. Any of Plaintiffs' TVPA claims that were unexpired when Congress amended the Act to include a ten-year limitations period are timely to the extent they fall within ten years of the filing the First Amended Complaint. In this case, any claim based on conduct that occurred between May 4, 2008, and December 22, 2008 (the disputed period), was within the then-existing four-year limitations period when Congress amended the TVPA on December 23, 2008. As such, those claims were never expired and, therefore, they are timely asserted in this case. *See also Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS (NLS), 2018 WL 2193644, at *12 (S.D. Cal. May 14, 2018) (noting *Cruz* strongly supports the conclusion that the current ten-year statute of limitations applies to TVPA claims).

The Lopez Defendants oppose this conclusion and cite to *Abarca v. Little*, 54 F. Supp. 3d 1064 (D. Minn. 2014) for support. Lopez Defs.' Reply 4. To be sure, that court was presented with the same question and arrived at a different conclusion, but I am not persuaded by its reasoning. The court in *Abarca* decided against applying the ten-year limitations period to conduct that occurred before its enactment, concluding it "would have impermissible retroactive effect because it significantly broadens the basis for civil liability under the [TVPA]." 54 F. Supp. 3d at 1069. However, if "significantly broadening the basis" for liability in the criminal context does not implicate retroactivity, I see no reason (and *Abarca* does not explain) why retroactivity would

be implicated in the civil context.  *See Cruz*, 773 F.3d at 145 ("[I]n the criminal context, there is a consensus that extending a limitations period before prosecution is time-barred does not run afoul of the Ex Post Facto Clause of the Constitution.").  More critically, the plaintiff in *Abarca* brought his claims under sections of the TVPA that, at the time of the conduct, only provided for *criminal* liability.  *See* 54 F. Supp. 3d at 1069 ("[The plaintiff] brings civil claims under [TVPA] provisions that previously only imposed criminal liability . . . .").  Thus, the court there correctly noted that "[r]etroactively applying the amendment would subject defendants to increased liability not contemplated when they engaged in the alleged conduct."  *Id.*  Applying the civil remedy provision to conduct statutorily prohibited as "criminal" would certainly run afoul of *Landgraf*'s prohibition on applying a statute that would "increase a party's liability for past conduct."  511 U.S. at 280. Even so, the *Abarca* court's concern with "significantly broaden[ing] the basis for civil liability" suggests it may have ruled that applying the amended statute of limitations would have an impermissible retroactive effect, 54 F. Supp. 3d at 1069, but I find the reasoning of the Fourth Circuit in *Cruz* more sound.  Plaintiffs' TVPA claims that are within the present ten-year statute of limitations are timely asserted in this case.  At the same time, Plaintiff's claims based on conduct that occurred outside the limitations period, as described here, are barred.

### 2.      Definition of "Services" in 18 U.S.C. §§ 1589(a), 1590(a)

The parties also dispute whether coerced (but purportedly consensual) sexual acts fall within the definition of "labor" or "services" in the TVPA.  Defendants argue that the sexual conduct alleged in the SAC does not fall within the statutory definition.  The Lopez Defendants make this argument most clearly when they assert the "sexual services" alleged in the SAC are not within the "plain meaning" of the terms "labor" or "services" in 18 U.S.C. § 1589(a).  *See* Lopez Defs.' Mot. Dismiss 9.  But the Tenth Circuit has embraced definitions of those terms that are

broader than the Lopez Defendants propose, in a context that is analogous to the allegations in the SAC.

In *United States v. Kaufman*, 546 F.3d 1242 (10th Cir. 2008), federal prosecutors brought charges under § 1589 against a married couple who operated an "unlicensed group home for the mentally ill" and who persuaded, coerced, or forced the home's residents to perform a variety of bizarre sexually explicit acts. *See id.* at 1246–50. For example, the couple forced the mentally ill patients to perform for pornographic videos. *Id.* at 1248. Other videos showed the husband touching the patients' genitals. *Id.* at 1249. At trial, the jury was given instructions that defined "labor" as "the expenditure of physical or mental effort" and "services" as "conduct or performance that assists or benefits someone or something." *Id.* at 1260. The defendants appealed, objecting to these instructions and arguing that the statute applied only to "labor or services" that constitute "work in an economic sense." *Id.* The Tenth Circuit rejected this argument.

First, the court noted that the definitions used by the district court were "the ordinary meaning of those terms." *Id.* at 1261 (citing 8 Oxford English Dictionary 559 (2d ed. 1989); 15 Oxford English Dictionary 34, 36 (2d ed. 1989)). Second, it found that the purpose of the TVPA is to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Id.* (citing 22 U.S.C. § 7101(a)). Finally, the court drew upon the Fourth Circuit's decision in *United States v. Udeozor*, 515 F.3d 260, 266 (4th Cir. 2008), in which the court noted that sexual abuse has been "a badge and incident of servitude which is distressingly common, not just historically, but for young women who find themselves in coercive circumstances today." The Tenth Circuit concluded this statement "suggests that sexual acts that

17

have been *coerced by other means* are covered by the involuntary servitude statute." *Kaufman*, 546 F.3d at 1262 (emphasis added).

In this case, Plaintiffs allege the Lopez Defendants used their positions as influential members of USAT to coerce them to perform or submit to engaging in various sexual acts. SAC ¶ 708. The Plaintiffs all felt their ability to compete required a "pay-to-play," and they could not refuse the Lopez Defendants' requirements in "order to compete in USA Taekwondo and reach the Olympics." *Id.* Ms. Joslin alleges, "out of fear of the Lopez brothers," she permitted Steven to have sex with her for the remainder of her taekwondo career after they first had sex when he offered to be her coach. *Id.* ¶¶ 620–24. Likewise, Ms. Means alleges she had sex with Steven Lopez in 2008 as they traveled to taekwondo events worldwide. *Id.* ¶ 688. "[S]exual acts that have been coerced by other means are covered by the involuntary servitude statute." *Kaufman*, 546 F.3d at 1262. In light of *Kaufman*, I conclude that the pay-to-play sexual acts alleged in the SAC are "labor" or "services" as those terms exist in the TVPA.

### 3. Definition of "Venture" in 18 U.S.C. § 1589(b)

The parties next dispute the definition of the term "venture" in § 1589(b). This term also appears in § 1595(a), which provides the civil remedy that permits Plaintiffs to assert their claims in the SAC. Those two sections provide, respectively:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a *venture* which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the *venture* has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

§ 1589(b) (emphasis added).

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving

anything of value from participation in a *venture* which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys['] fees.

§ 1595(a) (emphasis added).

I begin by addressing the definition the USOC encourages me to adopt. The USOC argues that "venture" is defined as a "sex trafficking venture." USOC's Mot. Dismiss 9. To illustrate its position, the USOC modified Plaintiffs' allegation to incorporate its definition. *See id.* ("Count 9 alleges that the USOC knew or recklessly disregarded 'the fact that the [sex trafficking] venture was engaged in the providing or obtaining of Amber's labor or services by means of force.'") (alteration added by the USOC) (quoting SAC ¶ 796).

The USOC relies on two cases to support its argument that "venture" means "sex trafficking venture": *United States v. Afyare*, 632 F. App'x 272 (6th Cir. 2016) and *Noble v. Weinstein*, 335 F. Supp. 3d 504 (S.D.N.Y. 2018), which relies on *Afyare*. At the outset, it is critical to note that both cases involve claims brought under § 1591, which also potentially creates liability against those who "participat[e] in a venture" when the venture is engaged in sex trafficking. *See* § 1591(a)(2). Neither case involves a claim under § 1589(b), and there are persuasive reasons to conclude (as at least one other court has) that the term "venture" is defined differently in § 1591(a)(2) than it is in § 1589(b).

But I will first address the USOC's reliance on the holding in *Afyare* for its definition of "venture." Section 1591 provides as follows:

**(a)** Whoever knowingly—

**(1)** in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

**(2)** benefits, financially or by receiving anything of value, from participation in a *venture* which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

§ 1591(a) (emphasis added). Notably, the term, "venture," is explicitly defined in § 1591(e)(6):

**(e)** In this section:

. . .

**(6)** The term "venture" means any group of two or more individuals associated in fact, whether or not a legal entity.

§ 1591(e)(6). Also of note, Congress appears to have confined this definition only to § 1591. *See id.* ("*In this section* . . . [t]he term 'venture' means any group of two or more individuals associated in fact, whether or not a legal entity." (emphasis added)). In fact, neither §§ 1589 nor 1595 define "venture." In *Afyare*, the Sixth Circuit concluded that the appropriate definition of "venture" was not provided solely by § 1591(e)(6), or by the common definition of "venture" in Black's Law or Random House Webster's Unabridged dictionaries. 632 F. App'x at 279, 284. Instead, the court concluded that "venture" in § 1591 is defined as a "sex-trafficking venture." *Id.* at 285. To arrive at this definition, the court drew upon a principle of statutory interpretation that "when interpreting a statute, [a court will] 'consider not only the bare meaning of the critical word or phrase but also its placement and purpose in the statutory scheme.'" *Id.* at 284 (quoting *Holloway v. United States*, 526 U.S. 1, 6 (1999)). Applying this principle, the Sixth Circuit concluded that it must consider not only the definition in § 1591(e)(6), but also the "context of § 1591(a)(2), which specifies 'a

venture which has engaged in an act described in violation of paragraph (1),' i.e., sex trafficking." *Id.* at 284–85 (quoting § 1591(a)(2)). Thus, the court found "its 'placement and purpose' in § 1591(a)(2) modify its 'bare meaning' in § 1591(e)([6])," which led the court to conclude that the proper definition is limited to a "sex-trafficking venture." *Id.*

The USOC takes two approaches to incorporating *Afyare*'s definition into this case. It first suggests "venture" in §§ 1589(b) and 1595(a) means a "sex-trafficking venture," just as the *Afyare* court held it does in § 1591. USOC's Mot. Dismiss 9. But I do not find this argument persuasive. The *Afyare* court's conclusion that "venture" in § 1591(a)(2) means "sex-trafficking venture" was founded on its "placement and purpose" in § 1591—the section creating liability for acts of sex trafficking. Here, Plaintiffs' claims are brought under § 1589, which does not prohibit sex trafficking. Rather, it creates liability for "[w]hoever knowingly provides or obtains the labor or services of a person" by certain enumerated means (discussed later in this Recommendation). § 1589(a). Thus, the Sixth Circuit's rationale for its definition of a "venture" in § 1591 cannot be reasonably applied to the definition in § 1589(b), which significantly differs from § 1591.

The USOC's second approach, proposed only by inference, is to suggest that "venture" in § 1589(b) means a "forced labor venture." *See* USOC's Reply 2 ("The theory of knowingly benefiting from participation in a *forced labor* venture also fails." (emphasis added)). The USOC's logic for proposing this definition is self-apparent: since the *Afyare* court concluded "venture" in § 1591(a)(2) must mean "sex trafficking venture" due to its placement in a section that prohibits sex trafficking, 632 F. App'x at 284–85, the term "venture" in a section prohibiting forced labor (among other things) must mean the "venture" in that section is defined as a "forced labor venture." However, no court of which I am aware has endorsed this definition, and the USOC cites to none.

Determining whether I should apply the USOC's proposed definition requires an analysis of § 1589(b). That subsection creates liability for "[w]hoever knowingly . . . benefits . . . from participation in a venture" which has obtained forced labor or services in violation of § 1589(a). § 1589(b). Under the USOC's definition, § 1589(b) creates liability only if a party knowingly benefits from participation in a forced labor (or presumably, forced services) venture. The USOC argues that "the element of 'participation[]' . . . requires allegations of 'specific conduct that further[s]' the purported forced labor venture." USOC's Reply 3. It cites to four cases to support its position, but these cases are distinguishable in that they resolve claims under § 1589(a), which creates liability for the party that obtains forced labor or services, not § 1589(b), which creates liability for a party that knowingly participates in a venture.

The USOC relies on the following cases: (1) *Menocal v. GEO Group, Inc.*, 113 F. Supp. 3d 1125 (D. Colo. 2015); (2) *Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS (NLS), 2018 WL 2193644 (S.D. Cal. May 14, 2018); (3) *Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674 (S.D. Tex. 2009); and (4) *Nunag-Tanedo v. East Baton Rouge Parish School Board*, 790 F. Supp. 2d 1134 (C.D. Cal. 2011). USOC's Reply 3. Two of these cases (*Menocal* and *Nunag-Tanedo*) do not involve claims brought under § 1589(b), but consider only claims for direct liability under § 1589(a). *See Menocal*, 113 F. Supp. 3d at 1131–33; *Nunag-Tanedo*, 790 F. Supp. 2d at 1143– 46. The other cases (*Owino* and *Adhikari*) include claims brought under § 1589(a) and the "knowingly benefit" provision, but neither court found it necessary to perform an analysis of the sufficiency of the pleadings solely under the "benefit from participation in a venture" provision. *See Owino*, 2018 WL 2193644, at *13 (stating that the plaintiffs "utilize" the benefit prong of § 1595(a)); *Adhikari*, 697 F. Supp. 2d at 684–85 (concluding that the plaintiffs alleged the defendant "actively participated in and knowingly benefited from a venture that involved forced

labor and trafficking").  The USOC proffers these opinions for support of its argument that, for it

to be liable under § 1589(b), Plaintiffs must allege it engaged in conduct that would also make it

liable *as the principal* under § 1589(a).  USOC's Reply 3 ("The SAC includes no comparable

allegations [to the four cited cases] as to the USOC.").  But this interpretation would render

§ 1589(b) redundant, and courts should not interpret a statute so as to make an entire provision

redundant.  *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 209 (1997) ("Statutes must be

interpreted, if possible, to give each word some operative effect."); *Kungys v. United States*, 485

U.S. 759, 778 (1988) (noting the "cardinal rule of statutory interpretation that no provision should

be construed to be entirely redundant").  I decline to adopt the USOC's proposed definition.

When faced with interpreting a statutory term the legislature has not defined, the Tenth

Circuit instructs that courts "begin by looking to the language of the statute and giv[ing] the words

used 'their ordinary meaning.'"  *U.S. v. Markey*, 393 F.3d 1132, 1136 (10th Cir. 2004) (quoting

*United States v. Plotts*, 347 F.3d 873, 876 (10th Cir. 2003)).  Accordingly, I find it proper here to

adopt the common definition of "venture."  Notably, in interpreting § 1589(b), at least one other

court has adopted the definition of "venture" from Black's Law Dictionary: "'an undertaking that

involves risk,' and is typically associated with 'a speculative commercial enterprise.'"  *Bistline v.

Jeffs*, No. 2:16-CV-788 TS, 2017 WL 108039, at *10 (D. Utah Jan. 11, 2017) (citing Black's Law

Dictionary (10th ed. 2014)).  In *Bistline*, the court concluded that an alleged relationship between

a defendant and a law firm that provided the defendant legal services was insufficient to allege

that a venture existed under § 1589(b).  *Id.* at *9–10.  In so concluding, the court found that

"[n]either 'participation' nor 'venture' has been defined in the context of 18 U.S.C. § 1589(b)."

*Id.* at *10.  Interestingly, the court came to its conclusion after the Sixth Circuit decided *Afyare*,

but neither adopted its definition nor cited to the case. Rather, in the absence of controlling law, the court resorted to the term's common definition as instructed by the Tenth Circuit.

In this case, I am faced with a term that has not been defined by Congress or the Tenth Circuit and, thus, I will give the word its ordinary meaning: "[a]n undertaking that involves risk," especially "a speculative commercial enterprise." Black's Law Dictionary (10th ed. 2014).

### 4. Elements of a Civil Claim under 18 U.S.C. §§ 1589(b) & 1595(a)

Intertwined with the question of the definition of "venture" in § 1589(b) is the question of the elements to state a claim under that subsection. To most effectively articulate my resolution of the question, I find it helpful to compare the provision to § 1589(a). Those two subsections provide in relevant part:

> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

§ 1589(a).

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

§ 1589(b).

As I will discuss below, I find the following are the elements necessary to establish a violation of § 1589(b) of the TVPA:

> (1) the party knowingly participated in a venture;

> (2) the party knowingly benefitted from the venture;

> (3) the venture has engaged in the providing or obtaining of labor or services in violation of the TVPA; and

(4) the party knew or recklessly disregarded the fact that the venture has engaged in the providing or obtaining of such labor or services.

The simplest form of this claim would involve two individuals: Person A and Person B. These two people enter into a venture—a speculative commercial enterprise. The venture does well and Person A benefits financially from it. During this time, Person B uses the venture to obtain the services of Person C by threat of force, in violation of the TVPA. Person A knows of Person B's conduct. Nevertheless, Person A continues to participate in—and benefit from—the venture.

At this point there are only two possible results from this example. Either Person A is already liable for violating § 1589(b)—and is civilly liable to Person C through § 1595—or he is not. If not, then some further conduct by Person A is necessary to be liable under the TVPA's forced labor statute.

By the definition the USOC suggests, Person A is not liable under the scenario without some further conduct. The USOC would argue that Person A is not liable until he engages in "specific conduct that furthers" the forced labor aspect of the venture, which is required in subsection (a). USOC's Reply 3 (alteration omitted). To the extent he engages in such "specific conduct," he would be directly liable under § 1589(a), just as *Menocal*, *Owino*, *Adhikari*, and *Nunag-Tanedo* demonstrate. As I discussed above, I will not read § 1589(b) to be redundant of § 1589(a), and the elements of a § 1589(b) claim are those I just identified above.

B.    Plaintiffs' Claims

Having addressed preliminary matters raised by the present motions, I now address Defendants' arguments that each claim fails under Rule 12(b)(6). For each claim, I will identify the time period in which such claim is available, if it is plausibly stated.

1.      *Claim 3: Gabriela Joslin against Steven Lopez*

**Claim would be valid:** May 4, 2008 – May 4, 2018

Gabriela Joslin asserts the third claim against Steven Lopez pursuant to 18 U.S.C. §§ 1589(a) and 1595(a).  SAC ¶¶ 756–60.  Section 1589(a) provides:

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
>
>> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>>
>> (2) by means of serious harm or threats of serious harm to that person or another person;
>>
>> (3) by means of the abuse or threatened abuse of law or legal process; or
>>
>> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,
>
> shall be punished as provided under subsection (d).

§ 1589(a).  Section 1595(a) provides the civil remedy.

To state this claim, Ms. Joslin must allege Steven Lopez "knowingly obtained" her "services" by a prohibited means.  § 1589(a).  The Lopez Defendants argue the SAC does not allege anyone forced Ms. Joslin to compete on the taekwondo team.  Lopez Defs.' Mot. Dismiss 9.  However, this argument misunderstands the nature of Plaintiffs' forced services claims. Nowhere in the SAC do Plaintiffs allege they were forced to compete or participate in taekwondo training or competitions.  Plaintiffs' forced services claims derive from the (coerced or physically forced) sexual services the Lopez Defendants allegedly obtained from Plaintiffs.  *See* Resp. 20.

The question presented by Ms. Joslin's allegations is whether Steven obtained her sexual services in a manner that violates the TVPA.  Ms. Joslin alleges "it was clear to [her]" at a

tournament in Germany in 2006 that Steven would not agree to be her coach unless she had sex with him. *See* SAC ¶¶ 610–22. She alleges she continued to "allow Steven to have sexual intercourse with her for the remainder of her career in taekwondo," *id.* ¶ 622, which ended in 2010, *id.* ¶ 624. As I have already discussed, this purportedly consensual sexual intercourse is plausibly alleged to be a "service" as that term is defined in the TVPA and 18 U.S.C. § 1589(a). *See supra* Section I.A.2. Further, the SAC alleges timely claims, because some of the alleged sexual conduct occurred after May 4, 2008.

The remaining issue is whether the SAC plausibly alleges Steven obtained Ms. Joslin's services via means prohibited in § 1589(a)(1)–(4). Those subsections prohibit obtaining services by "force" or "threat of force," § 1589(a)(1), "by means of serious harm or threats of serious harm," § 1589(a)(2), by "threatened abuse of law or legal process," § 1589(a)(3), or "means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint," § 1589(a)(4). Of those, the only subsection that could potentially support Ms. Joslin's claim is by means of "serious harm." That term is defined in § 1589(c)(2):

> The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

§ 1589(c)(2).

Under § 1589(a)(2), "the threat of harm must be *serious*." *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) (emphasis added). "Section 1589 is 'intended to address *serious* trafficking, or cases where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence.'"

*Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir.) (quoting *Dann*, 652 F.3d at 1170), *cert. denied*, 138 S. Ct. 448 (2017). Congress intended § 1589 to address "not only where . . . victims are kept in service through overt beatings, but also . . . [through] more subtle means . . . ." H.R. Rep. No. 106-939, at 101 (2000) (Conf. Rep.). For example, if "a nanny is led to believe that children in her care will be harmed if she leaves the home" or "where children . . . face extreme nonviolent and psychological coercion (e.g. isolation, denial of sleep, and other punishments)." *Id.*

Here, Plaintiffs argue Ms. Joslin has satisfied her pleading burden to support a § 1589(a) claim by alleging she acquiesced to performing sexual services for the Lopez Defendants, because she feared "serious harm." Resp. 18–19. Plaintiffs allege they are "young and vulnerable" athletes with Olympic aspirations who are "isolated from their homes, their parents, their friends, [and] their famil[ies]." SAC ¶ 126. "[Ms. Joslin] alleges that she initially acquiesced to Steven's demand for sexual services because he required sex before he would act as her coach." Resp. 19 (citing SAC ¶ 620). She further alleges Steven was a "demigod" in the taekwondo community. SAC ¶ 623. Finally, she characterizes the harm she would incur if she refused to have sex with Steven as "serious reputational harm." Resp. 19.

These allegations do not closely mirror the harms Congress stated it sought to address or to those opinions finding factual disputes about whether the plaintiffs actually feared serious harm. *See, e.g.*, *Guobadia v. Irowa*, 103 F. Supp. 3d 325, 336 (E.D.N.Y. 2015) (finding a factual dispute as to whether a plaintiff "understood that she had an option to leave the home and/or believed that she had to work for the [d]efendants or she would be deported or subject to various forms of abuse"); *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 529 (D. Md. 2014) (finding a sufficient dispute of material fact as to whether the "[p]laintiff remained with [d]efendants voluntarily"). Still, no Defendant in this case argues that the alleged "serious harm" is insufficient as a matter of law to

support a claim under the TVPA. Further, I am not presented with (nor have I found) binding law identifying the "minimum for conduct that is actionable under the [TVPA]." *Id.* at 525. As such, I find that Ms. Joslin plausibly alleges her claim against Steven Lopez. Therefore, I respectfully recommend the Lopez Defendants' Motion to Dismiss Claim 3 be **denied**.

### 2. *Claim 4: Gabriela Joslin against USAT*

**Claim would be valid:**       December 23, 2008 – May 4, 2018

Ms. Joslin asserts the fourth claim against USAT under 18 U.S.C. §§ 1589(b) and 1595(a). SAC ¶¶ 761–67. As I identified in Section I.A.4 *supra*, the elements to state this claim are:

> (1) USAT knowingly participated in a venture;

> (2) USAT knowingly benefitted from the venture;

> (3) the venture has engaged in the providing or obtaining of labor or services in violation of the TVPA; and

> (4) USAT knew or recklessly disregarded the fact that the venture has engaged in the providing or obtaining of such labor or services.

USAT does not dispute that the SAC alleges its relationship with Steven Lopez (a USAT athlete through the relevant periods alleged in this case) is a venture, and the heart of the allegations in the SAC is that the nature of the relationship among athletes, the NGBs, and the USOC is a venture. Taking the Plaintiffs' allegations as true, for the athlete, participation in the Olympic venture can mean direct "funding, health insurance, tuition grants, media and marketing opportunities, career services and performance-based monetary rewards." SAC ¶ 106 (quoting United States Olympic Committee, TEAMUSA.org, https://www.teamusa.org/About-the-USOC (last visited February 15, 2019)). For the USOC, the amateur athletic industry is "big business." *Id.* ¶ 103. It begins with the corporate sponsorships that generate "hundreds of millions of dollars of additional revenue" for the USOC. *Id.* ¶ 111. "The USOC does nothing to earn any of the

revenue that flows into its bank accounts every year. Without Team USA's Olympic athletes competing for the United States, the USOC would not earn any revenue . . . ." *Id.* ¶ 113. Much of the USOC's revenue goes toward funding NGBs, which use the funds for operational budgets and the salaries of their employees. *Id.* ¶ 175 (citing Eli Bremer et al., Reducing Financial Waste & Improving Governance: Proposed Reforms to the U.S. Olympic Committee 12 (2018)). "Olympic athletes and coaches are involved in a commercial industry that is constantly infused and commingled with money, contracts, and terms. Every participant (athletes, coaches, USAT, and the USOC) is a commercial actor bound by contracts and agreements." *Id.* ¶ 104. Thus, both parties assume risk in this enterprise. The athlete takes the risk of competing to obtain the direct funding and health insurance that can accompany a spot on Team USA, not to mention the endorsements that may follow. The institutions invest in an athlete with the risk that he or she may not generate the corporate sponsorships that serve as part of their funding. SAC ¶ 109 ("The USOC receives no federal funding but averages $230 million in annual income derived largely from marketing and sponsorships, as it holds exclusive rights to the Olympic mark and related symbols in the United States."). I conclude these allegations plausibly establish that the relationship between Steven Lopez and USAT is a venture.

Second, USAT does not dispute that it knowingly benefitted from its relationship with Steven Lopez. The allegations reflect that Steven competed for USAT in the 2016 Olympic games and 2017 World Championships. *Id.* ¶¶ 232, 252. Thus, USAT benefitted from this relationship well within the period that the claim is available. Third, I find that the SAC plausibly alleges the venture engaged in obtaining Ms. Joslin's labor or services. As I discussed in Claim 3, the SAC plausibly alleges Steven obtained Ms. Joslin's services in violation of the TVPA. When he did

so, he was acting on behalf of the venture. That is, but for the venture, Steven would not have obtained—nor have been able to obtain—Ms. Joslin's sexual services.

Finally, the SAC plausibly alleges USAT knew or recklessly disregarded that Steven had obtained the services of Plaintiffs before it benefitted from the venture in 2016. The SAC alleges "USAT began an investigation of the Lopez brothers in 2014," SAC ¶ 217, and "USAT hired an investigator [Mr. Alperstein] in March 2015 specifically to focus on the Lopez brothers," *id.* ¶ 269. Admittedly, these allegations support a conclusion that USAT gained knowledge that Steven obtained sexual services well after his conduct occurred. But, the fact that USAT may not have known about Steven's conduct until long after it had ceased does not protect USAT from the reach of the TVPA. *See Nunag-Tanedo*, 790 F. Supp. 2d at 1147 (noting the "broad reach of the TVPA and the broad class of individuals whom it protects"). The statute does not require that "whoever knowingly benefits" from a venture have knowledge shortly after the alleged abuse occurs, or even of the specific victim of the abuse. It creates liability simply for knowingly benefitting from a venture "which that person knew or should have known has engaged in an act in violation of [the TVPA]." § 1595(a). Thus, Ms. Joslin has plausibly stated a claim against USAT under § 1589(b), and I respectfully recommend that USAT's Motion to Dismiss Claim 4 be **denied**.

### 3. Claim 5: Gabriela Joslin against Steven Lopez and USAT

**Claim would be valid:** May 4, 2008 – May 4, 2018

Ms. Joslin asserts the fifth claim against Steven Lopez and USAT under 18 U.S.C. §§ 1590(a) and 1595(a). SAC ¶¶ 756–60. Section 1590 prohibits trafficking with respect to forced labor:

> Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both.

§ 1590(a).  Section 1595(a) provides the civil remedy.

The critical dispute among the parties centers on the word "for" in § 1590(a), which creates liability only if a party knowingly recruits, harbors, transports, provides, or obtains a person *for* her forced labor or services.  The Lopez Defendants argue that nothing in the SAC suggests the Plaintiffs were transported *for* the alleged sexual services.  Instead, they argue that they were recruited and transported "to train, improve their skill sets, and compete in Taekwondo tournaments . . . ."  Lopez Defs.' Mot. Dismiss 14.  Plaintiffs, at least partially, concede this point.  They recognize that, "[y]es, Plaintiffs joined USAT and worked with the Lopez brothers to train, improve their skills, and compete in taekwondo tournaments."  Resp. 23.  Still, they argue that while "there may have been other purposes for the Lopezes recruiting Plaintiffs, i.e., to train and coach them to win competitions, Plaintiffs[] were also recruited specifically so they could and would provide sexual services."  *Id.*  In pertinent part, Black's Law Dictionary defines "for" as "for benefit of."  Black's Law Dictionary (10th ed. 2014).  Therefore, Plaintiffs' § 1590(a) claim will proceed if they allege a Defendant recruited, harbored, transported, provided, or obtained Ms. Joslin "for benefit of" her coerced sexual services.

i.      Steven Lopez

First, Plaintiffs argue that Steven "recruited" her when he offered to coach her at the event in Germany.  Resp. 22.  Even if true, however, the conduct occurred in 2006, which is outside the statutory period.

Alternatively, Plaintiffs argue the claim against Steven survives, because he trafficked Ms. Joslin as he "continued . . . [to] transport[] her for continuing to provide sexual services."  *Id.*  After the 2006 incident in Germany, the SAC's remaining allegations of sexual conduct between

the two state: "[Ms. Joslin] continued to allow Steven to have sexual intercourse with her for the remainder of her career in taekwondo . . . . [Ms. Joslin] last had sex with Steven in 2010." SAC ¶¶ 622–24. Additionally, Plaintiffs allege Steven "transported [Ms. Joslin] to . . . various tournaments and training centers between 2006 and 2010." *Id.* ¶ 772. Taking Plaintiffs' allegations as true, I am persuaded that they plausibly allege Steven "recruit[ed], harbor[ed], transport[ed], provide[d], or obtain[ed] by any means, [Ms. Joslin] for labor or services . . . ." § 1590(a). Whether Steven transported Ms. Joslin for her sexual services or for other reasons is a question for a jury, but the allegations in the SAC plausibly state the claim. Therefore, I find this claim survives, and I respectfully recommend the Lopez Defendants' Motion to Dismiss Claim 5 be **denied**.

ii.     USAT

Plaintiffs argue USAT is "guilty as a *principal* for the trafficking of [Ms. Joslin] from late 2008 until 2010, as it provided her to Steven and transported her to various training centers and tournaments knowing or in reckless disregard of the fact that he would continue to use her for her sexual services." Resp. 22 (emphasis added). However, this argument includes inferences that are not present in the SAC. As just discussed, the allegations of sexual contact between Ms. Joslin and Steven after 2006 are limited to the following, quoted in their entirety:

> 622. [Ms. Joslin] then continued to allow Steven to have sexual intercourse with her for the remainder of her career in taekwondo, out of fear of the Lopez brothers and in particular, to Jean, who made it clear to her that she was to "cater to Steven."
>
> . . .
>
> 624. [Ms. Joslin] last had sex with Steven in 2010.

SAC ¶¶ 622–24.

In the entirety of the SAC, I see no allegation that USAT (as the principal) transported Ms. Joslin *for* Steven to obtain sexual services from her. It simply does not allege that USAT sent Ms. Joslin to taekwondo events "for" her to perform sexual services for Steven Lopez. Plaintiffs argue that USAT knew "of the fact that [Steven] would continue to use her for her sexual services." But the statute makes clear that liability as a principal requires that USAT "knowingly" transported Ms. Joslin "for" forced labor or services. § 1590(a). There is no such allegation in the SAC. Therefore, I respectfully recommend USAT's Motion to Dismiss Claim 5 against it be **granted**.

### 4. Claim 8: Amber Means against Steven Lopez

**TVPA Claim would be valid**: May 4, 2008 – May 4, 2018

**18 U.S.C. § 2255 Claim**: February 14, 2008 – May 4, 2018 (discussed below)

Ms. Means asserts the eighth claim against Steven Lopez under 18 U.S.C. §§ 1589(a), 1595(a), and 2255. SAC ¶¶ 789–93. I will first address the sufficiency of her TVPA claim, then address the timeliness of her § 2255(a) claim.

#### i. 18 U.S.C. § 1589(a)

To support the § 1589(a) claim, Ms. Means must allege Steven Lopez obtained her services by threat of serious harm within the statutory period. The allegations of sexual services within the SAC as they pertain to Ms. Means include that "Steven Lopez had vaginal sex with [her] (she lost her virginity to him), in February 2008, when she was seventeen." SAC ¶ 684. In addition, the two began "having an open sexual relationship in March 2008," when she was still seventeen. *Id.* ¶ 685. Further, "[w]hile attending USOC and USAT sponsored events in 2008, Steven had sex with [Ms. Means] in several states and countries." *Id.* ¶ 688. Also, at a private party in June 2008, Steven allegedly put a drug in Ms. Means' drink that caused her to pass out. *Id.* ¶¶ 691–95. Ms. Means alleges he raped her while she was unconscious. *Id.* ¶ 695.

34

As I have already discussed, such allegations of sexual conduct are within the definition of "services" in the TVPA. *See supra* Section I.A.2. Second, the threat of serious harm that Plaintiffs allege they perceived applies equally to all Plaintiffs. *See* SAC ¶ 708 ("Like the other Plaintiffs, [Ms. Means] felt that if she angered the Lopez brothers, she would face retaliation . . . ."). Thus, the SAC at least plausibly alleges that Steven obtained sexual services by threat of "serious harm" necessary to support a claim under § 1589(a)(2). *See supra* Section I.B.1. As such, any portion of the claim asserting violative conduct before May 4, 2008, is time-barred, but the claim based on conduct after May 4, 2008 will survive, and I respectfully recommend the Lopez Defendants' Motion to Dismiss Claim 8, to the extent it is asserted under § 1589(a), be **denied**.

        ii.        18. US.S.C § 2255(a)

Claim 8 also seeks recovery based on a violation of § 1589(a) under § 2255(a). That section provides:

> Any person who, *while a minor*, was a victim of a violation of section 1589 . . . of this title and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000 . . . .

§ 2255(a) (emphasis added).

A minor is defined as "any person under the age of eighteen years[.]" § 2256(1). Ms. Means argues that § 2255 permits her to bring claims for violations that occurred while she was a minor. Specifically, she alleges Steven had sex with her in 2008 while she was a minor. Ms. Means' birthday is May 7, 1990. Pls.' Statement Non-Opp'n to Def. Jean & Steven Lopez's Req. Judicial Notice 2. Thus, Ms. Means turned eighteen on May 7, 2008.

As I previously discussed, the applicable statute of limitations is the present statute of limitations, and claims are timely under that statute so long as they were never expired under a

previously existing limitations period.  *See supra* Section I.A.1.  The present statute of limitations

for a § 2255 claim is:

> Statute of limitations.-- Any action commenced under this section shall be barred
> unless the complaint is filed—
>
> . . .
>
> **(2)** not later than 10 years after the date on which the victim reaches 18
> years of age.

§ 2255(b).  Plaintiffs filed the FAC on May 4, 2018.  Therefore, Ms. Means asserted her claims

for conduct that occurred while was a minor within ten years of the date she reached eighteen, and

her claims are timely under the present statute of limitations.  The question becomes whether those

claims were ever expired.

According to the SAC, all allegations of sexual conduct between Steven and Ms. Means,

while she was a minor, occurred in "late 2007" and early 2008.  She alleges that "after" an incident

in "late 2007," she "performed oral sex on" Steven.  SAC ¶¶ 677–83.  Ms. Means also alleges, "In

February 2008, . . . Steven Lopez had vaginal sex with Amber (she lost her virginity to him) . . .,"

SAC ¶ 684, and they "began having an open sexual relationship in March 2008 . . .," *id.* ¶ 685.

In 2007 and 2008, § 2255 carried a six-year limitations period.  Act of Oct. 18, 1986, Pub.

L. No. 99-500, § 703(a), 100 Stat. 1783, 1783–74 to 1783–75.  That limitations period existed

until March 7, 2013, when Congress amended it to a ten-year limitations period.  Violence Against

Women Reauthorization Act of 2013, Pub. L. No. 113-4, § 1212(a)(2), 127 Stat. 54, 143.  On

March 7, 2013 (the date of the amendment), Ms. Means' claims based on conduct that occurred in

late 2007 and early 2008 were still timely under the previous six-year limitations period.  Congress

amended the limitations period again on February 14, 2018,[2] to add a provision allowing an individual to bring a claim for violations of the statute while a minor "not later than 10 years after the date on which the victim reaches 18 years of age."  Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017, Pub. L. No. 115-126, sec. 102, § 2, 132 Stat. 318, 320.  On February 14, 2018, it appears portions of Ms. Means' claim had expired.  For example, any conduct that occurred in "late 2007" would have been expired on February 14, 2018, under the ten-year limitations period.  However, any conduct that occurred after February 14, 2008, would now still be timely, because the conduct occurred while Ms. Means was a minor, and she had brought her claim within ten years after her eighteenth birthday.  Therefore, some of these claims are timely as well.

While factual disputes exist as to when the conduct specifically occurred in February 2008, and portions of the claim are time-barred, it is not proper to dismiss the entire claim when it is not plain from the face of the complaint that the claim is expired.  *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980) (noting that a claim may be dismissed based on the statute of limitation in a Rule 12(b) motion "when the dates given in the complaint make clear that the right sued upon has been extinguished").  Therefore, I respectfully recommend the Lopez Defendants' Motion to Dismiss Claim 8 under § 2255 be **denied**.

---

[2] Plaintiffs twice make the argument that § 2255's statute of limitations was amended in 2015. First Plaintiffs argue, "By 2015, the statute made clear that the limitations period was the later of ten years from the date of discovery of injury or ten years after the age of majority."  Resp. 12 n.68 (citing Ex. 2).  Plaintiffs repeat this argument a page later when they state, "By 2015, while her claim was still unexpired, the period was extended to its present ten years after the age of majority . . . ."  *Id.* at 13.  However, § 2255 was not amended in 2015.  Plaintiffs' own exhibit to the Response reflects this.  It shows that § 2255 maintained the same limitations period from March 7, 2013, to February 13, 2018.  *See* Resp. Ex. 2 at 5, ECF No. 139-2.

### 5. Claim 9: Amber Means against USOC and USAT

**Claim would be valid:** December 23, 2008 – May 4, 2018

Ms. Means asserts the ninth claim against the USOC and USAT under 18 U.S.C. §§ 1589(b) and 1595(a), alleging they benefitted from participation in a venture with the Lopez Defendants. SAC ¶¶ 794–805. As I discussed in Section I.A.4, the elements to state this claim are:

> (1) the institution knowingly participated in a venture with Steven Lopez;

> (2) the institution knowingly benefitted from the venture;

> (3) the venture has engaged in the providing or obtaining of labor or services in violation of the TVPA; and

> (4) the institution knew or recklessly disregarded the fact that the venture has engaged in the providing or obtaining of such labor or services.

First, as I have already discussed, the SAC plausibly states that a relationship between an athlete and the USAT is a venture. I arrive at the same conclusion when analyzing the relationship between an athlete and the USOC. *See* SAC ¶ 105 ("Each Olympic athlete has a direct commercial relationship with the USOC, which imposes a list of commercial terms' upon each athlete as a precondition for participating." (footnote omitted)). Second, each institution knowingly benefitted from the venture; Steven participated in the 2016 Olympics in taekwondo. *Id.* ¶ 232. Third, Ms. Means plausibly alleges the venture obtained her services in violation of the TVPA. As I already discussed, the allegations reflect that Steven obtained her sexual services in violation of the TVPA. When he did so, he was acting as a part of the venture; that is, but for the venture, Steven could not have obtained sexual services from Ms. Means. *See supra* Section I.B.2. This conclusion applies equally for the venture involving the USOC and USAT.

Finally, I have already discussed that Plaintiffs plausibly allege the USOC and USAT knew or recklessly disregarded that the Lopez Defendants were impermissibly obtaining these sexual services. SAC ¶ 188 ("In 2006, Plaintiff [Ms. Meloon] reported to the USOC her physical abuse by Steven Lopez and sexual assault by Jean Lopez at a Team USA event in Cairo, Egypt."); *id.* ¶ 191 ("In 2006, [Ms. Meloon] personally handed her written complaint to USOC employee Gary Johansen."). Plaintiffs also allege "[USOC board member and eventual interim CEO] Susanne Lyons had knowledge of the numerous complaints of rape and sexual assault made by female taekwondo athletes against both Lopez brothers." *Id.* ¶ 292; *see Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003) ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability . . . .").

The arguments by the USOC and USAT for dismissing the § 1589(b) claims are based on a misunderstanding of this point. That is, the USOC argues "the SAC lacks any allegations tying those purported 'benefits' to any alleged forced labor." USOC's Reply 3. But this argument misses the issue. Civil liability attaches when a party "knowingly benefits . . . from participation in a venture . . . ." § 1595(a). Nothing in § 1595(a) requires the party to benefit from the labor or services for liability to attach.

The USOC also argues that the "only allegations post-dating 2008 (that Jean Lopez disqualified Plaintiff Means from a non-USOC tournament in 2010 and Steven Lopez assaulted her at a private party in 2013) in no way involve the USOC." USOC's Reply 3–4. This argument, again, misunderstands the prohibited conduct under the TVPA. The USOC need not be "involved" in obtaining forced labor or services to be civilly liable to a plaintiff claiming a TVPA violation. As I just discussed, liability attaches when, under the proper circumstances, the party "knowingly benefits" from participation in a venture. The SAC alleges the USOC benefitted from a venture

39

with Steven in 2016, when he competed in the Rio games. For these reasons, I respectfully recommend the USOC's and USAT's Motions to Dismiss Claim 9 be **denied**.

6.      *Claim 10: Amber Means against Steven Lopez*

**TVPA Claim would be valid**: May 4, 2008 – May 4, 2018

**18 U.S.C. § 2255 Claim**: February 14, 2008 – May 4, 2018

Amber Means asserts the tenth claim against Steven Lopez under 18 U.S.C. §§ 1590(a), 1595(a) and 2255. SAC ¶¶ 806–811. This claim requires Ms. Means to allege Steven "knowingly recruit[ed] harbor[ed], transport[ed], provide[d], or obtain[ed] by any means, any person for labor or services . . . ." Section 2255 provides a remedy for violations of § 1590(a) while the victim was a minor.

First, Plaintiffs allege Steven recruited Ms. Means from her home in Washington for sexual services in 2003, when she was thirteen. The SAC alleges, "Amber first met Jean Lopez and Steven Lopez when she attended one of their taekwondo camps at the University of Houston in 2003." SAC ¶ 656. It alleges "Steven Lopez took a special interest in Amber at the 2003 camp; he asked her how old she was and said she'd be tall when she grew up." *Id.* ¶ 658. Later, "Jean convinced Amber's parents to move from Washington to Texas so that Amber could train at the Lopez's Elite Taekwondo school in Houston." *Id.* ¶ 662.

To the extent Plaintiffs rely on these allegations to demonstrate Steven "recruited" Ms. Means in violation of § 1590(a), the events are alleged to have occurred in 2003, which is well outside the window for timely claims under either § 1590 or § 2255, and any claim based on these allegations must be dismissed.

Otherwise, Plaintiffs allege, "While attending USOC and USAT sponsored events in 2008, Steven Lopez had sex with [Ms. Means] in several states and countries." SAC ¶ 688. Plaintiffs

continue, "Steven Lopez knowingly recruited . . . [Ms. Means] to Houston, Texas, to Cleveland, Ohio, to Colorado Springs, Colorado, to Sugar Land, Texas, to Des Moines, Iowa, to Beijing, China, and to various other cities and countries with the intention of forcing her into sexual labor and services . . . ." *Id.* ¶ 808. And, the allegation that Steven raped Ms. Means after putting a drug in her drink happened in June 2008. *Id.* ¶¶ 691–95. As already discussed, I find that any claim based on conduct that occurred after May 4, 2008, is timely under the TVPA. Furthermore, conduct that occurred after February 14, 2008, while Ms. Means was a minor is timely under § 2255. Therefore, I respectfully recommend the Lopez Defendants' Motion to Dismiss Claim 10 be **denied**.

### 7. *Claim 13: Amber Means against Steven Lopez*

**Claim would be valid:** February 14, 2008 through May 6, 2008 (date of unexpired claims until Ms. Means reached the age of eighteen)

Ms. Means asserts the thirteenth claim against Steven Lopez under 18 U.S.C. §§ 2242, 2421, 2422, 2423(a), 2423(b), 2423(c), and 2255. SAC ¶¶ 824–33. Section 2255 provides a civil remedy for "[a]ny person who, while a minor, was a victim of a violation" of the sections under which this claim is asserted.

Steven Lopez challenges this claim on statute of limitations grounds only. *See* Lopez Defs.' Mot. Dismiss 3–6, 11; Lopez Defs.' Reply 6–7. I have already addressed this argument in Section I.B.4.ii: the present statute of limitations on a § 2255(a) claim provides that Ms. Means may bring a claim based on conduct that occurred while she was a minor, so long as she brings the claim "not later than 10 years after the date on which the victim reaches 18 years of age." § 2255(b)(2). Since Ms. Means asserted this claim within ten years of her eighteenth birthday, she has timely brought the claim. However, any portion of her claim based on conduct that occurred

before February 14, 2008 expired under the previously existing statute, so she may not assert those portions of the claim here. *See supra* Section I.B.4.ii.

Ms. Means alleges that sexual conduct with Steven occurred from "late 2007" until at least June 2008. SAC ¶¶ 677–85. In this suit, she may assert claims based on conduct that occurred from February 14, 2008 until she turned eighteen on May 7, 2008. Pls.' Statement Non-Opp'n to Def. Jean & Steven Lopez's Req. Judicial Notice 2. Therefore, I respectfully recommend the Motion to Dismiss this claim be **denied**.

8. *Claim 14: All Plaintiffs against USOC and USAT*

**Claim would be valid:** April 25, 2008 – April 25, 2018 (filing of original Complaint)

All Plaintiffs assert the fourteenth claim against USOC and USAT under 18 U.S.C. §§ 1590(b), 1591(d), 1595(a), and 2255. SAC ¶¶ 834–38. Section 1590(b) provides:

> Whoever *obstructs*, *attempts to obstruct*, or in any way interferes with or prevents the enforcement of this section, shall be subject to the penalties under section . . . .

§ 1590(b) (emphasis added). The obstruction provision in § 1591(d) is identical in the relevant part. Section 1595 provides the civil remedy.

To state a claim under the obstruction provisions, Plaintiffs must allege the institutional Defendants "obstruct[ed], attempt[ed] to obstruct, or in any way interfere[d] with" the "enforcement" of §§ 1590(b) or 1591(d). The parties' first dispute concerning this claim is whether the "obstruct[ion]" of "enforcement of this section" must be performed by a government actor. Plaintiffs argue that such requirement is not necessary, and "the plain, unambiguous statutory language—applying to 'whoever obstructs'—does not contain any such qualification." Resp. 31. In support of this argument, Plaintiffs cite to *Doe v. Howard*, No. 1:11CV1105 LO/TRJ, 2012 WL 3834930, at *2 (E.D. Va. Aug. 7, 2012). But that case does not support their position,

because the defendant in that case was found to obstruct a "federal investigation" performed by a government actor. *Doe v. Howard*, No. 1:11-cv-1105, 2012 WL 3834867, at *1 (E.D. Va. Sept. 4, 2012) (finding a violation of 18 U.S.C. § 1590(b)).

Defendants argue that the obstruction sections apply only to official government investigations. Indeed, at least one other court has found that obstruction of a *private investigation* does not violate § 1591(d). *See Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276, 287–88 (D. Conn. 2013) (finding conduct taken to prevent "Board members" from discovering alleged sexual abuse insufficient to state a claim under § 1591(d)). The USOC also cites to *Martinez v. Calimlim*, 651 F. Supp. 2d 852 (E.D. Wis. 2009), which determined that a § 1590(b) violation has been plausibly alleged when an individual obstructed a federal investigation. *See id.* at 864 (finding an allegation that a defendant lied to a federal agent to prevent him from locating a victim of trafficking sufficient to state a claim under § 1590). I have not located, and Plaintiffs do not cite to, a single case finding a violation of the TVPA for obstruction of anything other than a government investigation. Equally problematical, Plaintiffs' position contains no limiting principle. They do not attempt to define what "obstruct[ion]" of "enforcement" means in § 1590(b) if it is not obstruction of a government investigation. I find the opinion in *Jean-Charles* persuasive. Obstruction of a private investigation is insufficient to state a claim of either §§ 1590(b) or 1591(d).

USAT also argues that Plaintiffs' 1590(b) and § 1591(d) claims are subject to the heightened requirement in Rule 9(b) that a claim be plead with "particularity." However, to support this argument, USAT cites to a string of cases that are decided on grounds unrelated to the TVPA. USAT cites to no authority to suggest claims brought under §§ 1590(b) and 1591(d) are

subject to Rule 9(b), and it does not pursue this argument in its Reply brief. *See* USAT's Reply

12–13. For these reasons, USAT's argument is unpersuasive.

Finally, with respect to the merits of the claims, Plaintiffs must allege the USOC and USAT

obstructed a government investigation of a TVPA violation.

i.      USOC

Plaintiffs suggest that the following arguments support their claim against the USOC:

> Despite having received written complaints that he had raped at least two taekwondo athletes, USOC approved the submission, and in turn submitted Jean Lopez's name to the International Olympic Committee as the head coach for the 2008 Olympics.

Resp. 34 (citing SAC ¶ 211).

> USAT and USOC had no intention of turning over the Lopez brothers to law enforcement or removing them from the sport. Together, they purposefully drew out [USAT's] investigation from 2014 to 2018. This delay contravened USAT's own bylaws.

*Id.* at 35 (footnotes omitted) (citing SAC ¶¶ 218, 222, 224).

> USAT and the USOC worked together to obstruct, prevent and interfere with [the] investigation of the Lopez brothers and enforcement of prohibitions on their pay-to-play forced sexual services structure. The defendants went so far as to suspend the investigation so that the Lopez brothers could compete and coach at the 2016 Olympics in Rio and at the National Championships in 2017.

*Id.* (footnote omitted) (citing SAC ¶¶ 209, 222, 225–27).

> USAT and USOC sheltered the Lopez brothers from discipline and prosecution for years, despite knowing of the criminal conduct they had been engaging in.

*Id.* (citing SAC ¶ 225).

Lacking in any of these allegations is a factual assertion that the USOC took any steps to

obstruct a governmental investigation of anything, let alone conduct that violated either § 1590 or

44

§ 1591. Indeed, no governmental actor is present in Plaintiffs' allegations.[3]  To the extent that Plaintiffs allege the USOC delayed or even interfered with USAT's private investigation of the Lopez Defendants, this is simply insufficient to state a claim under the obstruction statutes.  *Jean-Charles*, 937 F. Supp. 2d at 287–88 (finding it "implausible that [the defendants] knowingly sought to obstruct enforcement of the federal statute criminalizing the commercial sex trafficking" where allegations asserted that the defendants took steps to conceal evidence from a private investigation).  Therefore, I respectfully recommend that the USOC's Motion to Dismiss it from Claim 14 be **granted**.

ii.     USAT

Analysis of the allegations against USAT leads me to a different conclusion.  These allegations pertain specifically to the investigation by Mr. Alperstein.  The SAC alleges USAT hired Mr. Alperstein in March 2015 to pursue allegations of sexual abuse and the Lopez Defendants.  SAC ¶¶ 217–219.  Plaintiffs allege the Executive Director of USAT testified before the Oversight and Investigations Subcommittee that Mr. Alperstein "operated without any limitation on its budget, with no control by USA Taekwondo as to who he should or should not pursue . . . ." SAC ¶ 220 (quoting *Examining the Olympic Community's Ability to Protect Athletes from Sexual Abuse: Hearing Before the H. Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 115th Cong. 36 (2018) (statement of Steve McNally, Executive Director of USAT) (unofficial transcript).  Plaintiffs allege these statements were false, SAC ¶ 220, and provide factual allegations to support the conclusion; they claim USAT secretly worked behind closed doors "to make sure that the investigation against the Lopez [Defendants] was

_____

[3] The Court understands that the USOC is a private entity based upon information presented by its attorneys and its own website.

delayed and obstructed because of their key roles in the 2016 Olympics . . . ." SAC ¶ 226. Further, Plaintiffs assert that after the 2016 Olympics, Mr. Alperstein wrote an email to Ms. Gilbert stating, "Now that the Olympics are over and things are settling down, I want to get moving again on the Steven Lopez disciplinary case[.]" SAC ¶ 235 (alteration in original). This plausibly suggests that Mr. McNally's statement to Congress that Mr. Alperstein's investigation was free from control by USAT was false. I find that Congress is a government actor, and false statements to obstruct an investigation plausibly allege a § 1590(b) violation. *Martinez*, 651 F. Supp. 2d at 864 (E.D. Wis. 2009) (finding allegations that an individual "lied to a federal agent" sufficient to state a claim under § 1590). Therefore, I respectfully recommend that USAT's Motion to Dismiss Claim 14 be **denied**.

## II.     RICO Claim

Plaintiffs assert their civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claim against all Defendants under 18 U.S.C. §§ 1962(c) and 1962(d). Subsection 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Subsection 1962(d) states "[i]t shall be unlawful for any person to conspire to violate" § 1962(c). Plaintiffs bring this claim under § 1964(c), which provides a civil remedy for "[a]ny person injured in his business or property by reason of a violation of section 1962 . . . ."

### A.     Claim Under § 1962(c)

The foundation of Plaintiffs' RICO claim is their allegation that "[a]t all relevant times, the Defendants operated as an association-in-fact enterprise, which was formed for the purpose of

stopping, hindering, and delaying all investigations of and enforcement actions against the Lopez brothers . . . ." SAC ¶ 846. Plaintiffs allege Defendants accomplished this by "making false and corrupting statements that concealed the true nature of the sex abuse and exploitation committed by the Lopez brothers and facilitated and promoted by the USOC[] [and] [USAT] . . . ." *Id.* Plaintiffs further allege "[t]he Lopez Obstruction Enterprise formed in late 2014 or early 2015 as [USAT] began to 'investigate' the sex abuse of the Lopez brothers." *Id.* ¶ 847.

RICO provides a private right of action for individuals injured in their business or property through a pattern of racketing activity. *Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1274 (10th Cir. 2014). "'RICO is to be read broadly[]' and is to 'be liberally construed to effectuate its remedial purposes.'" *Plains Res., Inc. v. Gable*, 782 F.2d 883, 887 (10th Cir. 1986) (citation omitted) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98 (1985)). "The elements of a civil RICO claim are (1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity." *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006).

However, a plaintiff may not bring a civil RICO claim unless it has proper standing required by the statute. "[RICO] also presents substantial hurdles for plaintiffs to overcome to establish a proper claim." *Deck v. Engineered Laminates*, 349 F.3d 1253, 1255 (10th Cir. 2003). Specifically, "a plaintiff has standing to bring a RICO claim only if he was injured in his business or property by reason of the defendant's violation of § 1962." *Id.* at 1257. Standing has two elements: (1) an injury to business or property, and (2) the injury was caused by the underlying predicate violations. S*ee Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) ("[T]he plaintiff only has standing if . . . he has been injured in his business or property by the conduct constituting the violation."). "Any recoverable damages occurring by reason of a violation of § 1962(c) will

flow from the commission of the predicate acts." *Id.* at 497. Defendants argue that Plaintiffs' RICO claim fails, because they have not alleged they have standing to bring the claim. I agree.

Before reaching the question of whether Plaintiffs have alleged RICO standing, they first argue they need not allege an injury to "business or property," because those terms are "found in § 1964(c) but not in § 1964(a), which broadly authorizes injunctive and other forms of equitable relief." Resp. 39. I disagree. The civil remedy provision of RICO exists in § 1964(c), not § 1964(a), and the Supreme Court has not even reached the question of whether injunctive relief is available to a civil RICO plaintiff. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2111 n.13 (2016) ("This Court has never decided whether equitable relief is available to private RICO plaintiffs . . . ."). Still, in *RJR Nabisco*, the Court noted that any claim for equitable relief would require a showing of injury to "business or property" in § 1964(c). *Id.* ("[A]ny claim for equitable relief under RICO . . . is necessarily foreclosed by our holding that § 1964(c)'s cause of action requires a domestic injury to business or property."). Thus, Plaintiffs cannot avoid the requirement of alleging an injury to business or property simply by seeking equitable relief.

Alternatively, Plaintiffs argue they have sufficiently alleged an injury to "business or property" for the claim to survive. Resp. 40. Plaintiffs identify three harms they contend are sufficient: (1) damage to reputation—potentially causing lost income to those Plaintiffs who currently work as taekwondo coaches; (2) $50 in "money damages" each Plaintiff paid in membership dues to USAT; and (3) the destruction of Plaintiffs' taekwondo careers. *Id.* at 40–41. As I will discuss below, none of these injuries sufficiently create standing to bring a civil RICO claim.

First, reputational harms, even those that may cause a loss of income, are not cognizable "business or property" damages under § 1964(c). "Section 1964(c)'s 'reference to injury to

48

"business or property" . . . cabin[s] RICO's private cause of action to particular kinds of injury—excluding, for example, personal injuries—[by which] Congress signaled that the civil remedy is not coextensive with § 1962's substantive [criminal] prohibitions . . . .'" *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 885 (10th Cir. 2017) (last alteration added) (quoting *RJR Nabisco*, 136 S. Ct. at 2108). "[I]njury to . . . reputation, dignity and emotional damages are not the type of injuries redressable by . . . RICO which are expressly limited to injuries to 'business or property.'" *Tal*, 453 F.3d at 1254. Conversely, a plaintiff alleging she incurred an injury that "interfere[d] directly with [her] promised or contracted-for work . . . may have . . . allege[d] an injury that meets the § 1964(c) 'business or property' requirement." *Santana v. Cook Cty. Bd. of Review*, 679 F.3d 614, 623 (7th Cir. 2012).

In *Santana*, the plaintiff, a "self-described tax consultant," alleged that a county review board injured his reputation by purportedly defaming him through television media, and he allegedly lost income as a result. *See id.* at 617–19, 623. However, the Seventh Circuit found the plaintiff had not alleged an injury to "business or property" sufficient to have standing to bring a civil RICO claim, because "his alleged reputational injury is personal, and that is true even if it could result in a loss of income." *Id.* at 623. The court noted that he could have standing to bring a claim if the defendants interfered with his "promised or contracted-for work as a consultant," but this was not something he alleged. The Seventh Circuit's conclusion is consistent with the Tenth Circuit's finding in *Tal* that "injur[ies] to . . . reputation, dignity and emotional damages are not the type of injuries redressable by . . . RICO." 453 F.3d at 1254.

The Tenth Circuit's decision in *Deck* also aligns with *Tal*. There, the court found that the plaintiff's allegation he was fraudulently induced into entering into a settlement agreement that "limit[ed] the extent to which he could compete with" his former employer plausibly alleged an

injury to his "business" as defined in RICO. 349 F.3d at 1259. Other courts have arrived at the same conclusion. *See, e.g.*, *Evans v. City of Chicago*, 434 F.3d 916, 928 (7th Cir. 2006) ("Where an employee is able to establish that he has been unlawfully deprived of a property right in promised or contracted for wages, the courts have been amenable to classifying the loss of those wages as injury to 'business or property.'"), *overruled on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

Here, Ms. Gilbert and Ms. Joslin both allege they are currently taekwondo coaches. Ms. Gilbert alleges her "profession and business depend on her reputation in the taekwondo community." SAC ¶ 595. She also alleges the "denials of the Lopez brothers, which effectively call her a liar, have directly harmed her business." *Id.* Similarly, Ms. Joslin alleges the "lack of action by the USOC, USAT, and [SafeSport] caused further damage to [her] reputation and harmed her business and professional reputation." *Id.* ¶ 648. However, neither Plaintiff alleges she lost "promised or contracted-for work." As such, it is irrelevant whether Plaintiffs "provide expert testimony that the damages inflicted by these Defendants resulting from their pattern of racketeering activity has harmed Plaintiffs and led to depressed wages from coaching and money damages." Resp. 42. The damages Plaintiffs allege are "injur[ies] to [their] reputation" which "are not the type of injuries redressable by . . . RICO . . . ." *Tal*, 453 F.3d at 1254. Among the "substantial hurdles for plaintiffs to overcome to establish a proper claim" is a requirement that "the plaintiff has suffered injury to his business or property . . . ." *Deck*, 349 F.3d at 1255. The harms to reputation the Plaintiffs allege are not harms to "business or property" as required by § 1964(c). Therefore, any claim based on this injury must fail.

Plaintiffs also argue the $50 annual membership fee each Plaintiff allegedly paid USAT supports standing for the RICO claim. However, this claim also fails, because Plaintiffs do not

allege they paid the dues as a result of the underlying predicate acts. One of the "substantial hurdles" that a plaintiff must clear to state a RICO claim involves pleading she "has suffered injury to [her] business or property as a result of th[e] predicate acts." *Deck*, 349 F.3d at 1255. "'[T]o establish the requisite element of causation' to maintain a § 1964(c) claim, a plaintiff must plausibly plead 'that the defendant's violation not only was a but for cause of his injury, but was the proximate cause as well . . . .'" *Safe Streets*, 859 F.3d at 889 (alterations in original) (quoting *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 654 (2008)). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). The Supreme Court has stated "[t]here is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly." *Id.* at 460.

While a proximate cause analysis may occasionally be a "complex" question in which a court must consider "external factors," *Safe Streets*, 859 F.3d at 891, no daunting task is presented here. The SAC alleges, "In order to participate in USAT-sanctioned events, it is necessary to be a USAT member. To be a member, an individual athlete must pay dues to USAT." SAC ¶¶ 333–34. Thus, the SAC alleges Plaintiffs paid $50 in dues to be members of USAT, not "as a result of th[e] predicate acts." *Deck*, 349 F.3d at 1255.

Plaintiffs argue "causation cannot be decided at the 12(b)(6) stage because it is a factual issue." Resp. 48. But they cite to no authority for this assertion under the circumstances of this case. Further, the Supreme Court dismissed a RICO claim under Rule 12(b)(6) when the alleged harm was not the proximate cause of the predicate acts. *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 18 (2010) (finding a civil RICO claim must be dismissed, because the alleged injuries "were not caused directly by the alleged fraud, and thus were not caused 'by reason of' it").

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Here, Plaintiffs do not allege that they paid a $50 membership fee because Defendants entered into an enterprise to obstruct any investigation of the Lopez Defendants. Instead, they paid the fee "[i]n order to participate in USAT-sanctioned events." SAC ¶ 333. Therefore, any claim based on this injury must fail.

Third, Plaintiffs argue they have standing because "[d]amage to 'business or property' also includes the destruction of Plaintiffs' taekwondo careers." Resp. 40. They argue "but for the illegal actions of Defendants, including their sidelining of Plaintiffs once they refused to engage in sexual services, Plaintiffs would still be competing in taekwondo and earning revenue." *Id.* at 40–41. However, this claim fails also, because the SAC does not plausibly allege these injuries were caused by the predicate acts of the obstruction enterprise; rather, the alleged injuries (cessation of Plaintiffs' taekwondo careers) occurred before the predicate events.

Specifically, the SAC alleges USAT expelled Ms. Meloon in 2008. SAC ¶ 444. It does not allege she competed in taekwondo after that time. *See id.* ¶¶ 445–86. Ms. Poe left taekwondo in 2008 after failing to make the Olympic team. *Id.* ¶ 512. Ms. Poe is last alleged to have participated in taekwondo in 2003. *See id.* ¶ 562. Ms. Joslin's taekwondo career ended in 2010. *See id.* ¶¶ 622–24. Finally, Ms. Means last competed in taekwondo in 2011. *Id.* ¶ 706. All of these events occurred before they allege Defendants entered into the purported enterprise. "Defendants operated as an association-in-fact enterprise, which was formed for the purpose of stopping, hindering, and delaying all investigations of and enforcement actions against the Lopez brothers . . . ." *Id.* ¶ 846. Plaintiffs allege "[t]he Lopez Obstruction Enterprise formed in late 2014 or early 2015 as [USAT] began to 'investigate' the sex abuse of the Lopez brothers." *Id.* ¶ 847.

Thus, it is not plausible that the predicate events caused Plaintiffs to end their taekwondo careers. *Azim v. Tortoise Capital Advisors, LLC*, No. 13-2267-KHV, 2014 WL 707235, at *5 (D. Kan. Feb. 24, 2014) (finding a plaintiff did not have standing to bring a RICO claim when the alleged predicate events occurred "after" he incurred the supporting injury). Plaintiffs fail to allege standing based on this injury.

Finally, Plaintiffs argue that in the absence of controlling circuit law, I should look to Colorado state law for guidance on whether the alleged damage to their reputations amounts to an injury to property for RICO standing. Resp. 42. Plaintiffs cite to *Amaya v. Bregman*, 149 F. Supp. 3d 1312, 1321 (D.N.M. 2015) for this proposition. However, given the Tenth Circuit's finding in *Tal*, I am not persuaded that I should resort to state law in this case. *See* 453 F.3d at 1254 ("[I]njury to . . . reputation, dignity and emotional damages are not the type of injuries redressable by . . . RICO which are expressly limited to injuries to 'business or property.'"). Regardless, "[a]lthough RICO is to be read broadly, '[t]he phrase "business or property" also retains restrictive significance.'" *Ivar v. Elk River Partners, LLC*, 705 F. Supp. 2d 1220, 1232 (D. Colo. 2010) (quoting *Sedima*, 473 U.S. at 497). This "restriction 'helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff.'" *Id.* (quoting *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000)). Therefore, I decline Plaintiffs' invitation to look to state law to expand the requirement that a civil RICO plaintiff first establish injury to "business or property." Plaintiffs have not alleged that specific injury here. Therefore, they do not have standing to bring their civil RICO claim, and it must fail.

B.     Claim Under § 1962(d)

Plaintiffs' claim under 1962(d) fails, because they do not plausibly allege their claim under § 1962(c). "If a plaintiff has no viable claim under § 1962(a), (b), or (c), then its subsection (d)

conspiracy claim fails as a matter of law." *Tal*, 453 F.3d at 1270. Therefore, I respectfully recommend all Defendants' Motions to Dismiss Claim 15 be **granted**.

### III. State Law Claims

Plaintiffs bring state law claims for negligent supervision, negligent retention, negligence, gross negligence, and outrageous conduct. Of these, the negligent supervision and retention claims are substantively identical. Further, none of the Defendants make an argument that addresses the negligence and gross negligence claims differently.

#### A. Claim 16 Negligent Supervision

**Claim would be valid:** Under two-year statute of limitations.

All Plaintiffs assert a negligent supervision claim against the USOC and USAT. SAC ¶¶ 873–83. Colorado recognizes the tort of negligent supervision. *Keller v. Koca*, 111 P.3d 445, 448 (Colo. 2005) (citing *Destefano v. Grabrian*, 763 P.2d 275, 286–88 (Colo. 1988)). In Colorado, "[t]o establish a claim based on negligence, the plaintiff must show: (1) the existence of a legal duty to the plaintiff; (2) the defendant breached that duty; and (3) that the breach of the duty caused the harm resulting in damages to the plaintiff." *Id.* at 447. "To prove negligent supervision, a plaintiff must prove (1) the defendant owed the plaintiff a legal duty to supervise others; (2) the defendant breached that duty; and (3) the breach of the duty caused the harm that resulted in damages to the plaintiff." *Settle v. Basinger*, 411 P.3d 717, 723 (Colo. App. 2013). Further, "[n]egligent supervision is a direct tort. That is, it must be shown that the defendant had a duty and personally breached that duty, not merely that the agent or employee had and breached a duty, for which the principal or employer is vicariously liable." *Id.* (citation omitted).

In this case, Plaintiffs allege that the USOC and USAT failed to supervise the Lopez Defendants, who they argue were employees of those institutions. Liability of an employer "is

54

predicated on the employer's antecedent ability to recognize a potential employee's 'attribute[s] of character or prior conduct' which would create an undue risk of harm to those with whom the employee came in contact in executing his employment responsibilities." *Moses v. Diocese of Colo.*, 863 P.2d 310, 327 (Colo. 1993) (quoting *Connes v. Molalla Transp. Sys., Inc.*, 831 P.2d 1316, 1320 (Colo. 1992)). "An employer 'who knows or should have known that an employee's conduct would subject third parties to an unreasonable risk of harm may be directly liable to third parties for *harm proximately caused by his conduct*.'" *Keller*, 111 P.3d at 448 (emphasis added) (quoting *Destefano*, 763 P.2d at 288).

Plaintiffs, the USOC, and USAT vigorously dispute several elements of the merits of a negligent supervision claim. For instance, Plaintiffs and the USOC debate whether the SAC plausibly alleges the Lopez Defendants were employees of the USOC. *See* USOC's Mot. Dismiss 16–18; Resp. 53–55; USOC's Reply 9–10. "It is axiomatic that a prerequisite to establishing negligent hiring [and supervision] is an employment or agency relationship." *Moses*, 863 P.2d at 324. However, even assuming that the Lopez Defendants were employees of the USOC and USAT, I ultimately find Plaintiffs' claims must fail, because the SAC does not allege that the Lopez Defendants caused their alleged harms during the applicable limitations period.

Plaintiffs attempt to base liability under this claim on allegations that the USOC or USAT (negligently) supervised or retained the Lopez Defendants during the statutory period. *See, e.g.*, SAC ¶ 880 ("USOC improperly supervised Jean Lopez by appointing him to coach Team USA repeatedly, over multiple years, in taekwondo competitions."). However, a plaintiff cannot assert a negligent supervision claim simply because an employer supervised or retained the employee during the statutory period (even if the employer knew of the employee's dangerous propensities), without alleging the employee harmed the plaintiff during that period.

A negligent supervision claim accrues on the date of the underlying tort.[4] *Pichardo v. N.Y.C. Dep't of Educ.*, 953 N.Y.S.2d 31, 32 (N.Y. App. Div. 2012) ("[A] negligent supervision . . . claim[] accrue[s] on the date of the last alleged underlying act[.]"); *John Doe 1 v. Archdiocese of Milwaukee*, 734 N.W.2d 827, 838–39 (Wis. 2007) ("[C]laims of negligent supervision . . . accrued, as a matter of law, by the time of the last incident of sexual assault."); *see Locker v. City of St. Florian*, 989 So. 2d 546, 549 (Ala. Civ. App. 2008). Here, the last incident of alleged underlying abuse occurred in approximately 2011. *See* SAC ¶ 630. Therefore, all of Plaintiffs' negligent supervision claims expired, at the latest, in 2013. This is well before they brought this suit in 2018. Therefore, any negligent supervision claim is time barred.

As an alternative means of supporting their claims, Plaintiffs argue the same factual allegations that support the obstruction claims "will demonstrate the need for equitable tolling of the statutes of limitation on Plaintiffs' negligence claims because the [D]efendants have wrongfully obstructed the Plaintiffs' abilities to bring their claims." Resp. 15.

Whether the limitations period should be tolled is governed by state law. *Fratus v. DeLand*, 49 F.3d 673, 675 (10th Cir. 1995). Colorado law provides that "[o]nce the statute of limitations is raised as a defense[,] the burden of proof shifts to the party asserting that its application should be equitably tolled." *Sharp Bros. Contracting Co. & Sanders Co., Inc. v. Westvaco Corp.*, 878 P.2d 38, 44 (Colo. App. 1994). In Colorado, "[t]he doctrine of equitable tolling is limited to situations in which either the defendant's wrongful conduct prevented the plaintiff from asserting the claims in a timely manner or truly exceptional circumstances prevented

---

[4] The parties do not cite to, and I have not found, a Colorado court that precisely addresses the issue of when a negligent supervision claim accrues. However, Colorado cases that address negligent supervision claims are entirely consistent with this conclusion. *See Keller*, 111 P.3d at 447–51; *Moses*, 863 P.2d at 323–29.

the plaintiff from filing the claim despite diligent efforts." *Noel v. Hoover*, 12 P.3d 328, 330 (Colo. App. 2000). Plaintiffs do not argue that "truly exceptional circumstances" warrant tolling the statute here. Instead, they argue that Defendants' wrongful conduct prevented them from filing their claims within the deadline. Resp. 35.

"Generally, in order for a statute of limitations to be tolled because of equitable considerations, the party asserting the statute as a defense must be the party engaging in conduct that would make the application of the statute inequitable." *Sharp Bros.*, 878 P.2d at 44. A statute of limitations may be tolled if the defendants "engaged in any conduct which adversely affected the filing of [the plaintiff's] claims . . . ." *Id.* But here, nothing in the SAC alleges that any Defendant adversely affected any Plaintiff's ability to file her claims against Defendants.[5] *See Sharp Bros.*, 878 P.2d at 44. Therefore, I see no reason that warrants tolling the statute here. Ultimately, Plaintiffs' negligent supervision claims fail, and I respectfully recommend that the USOC's and USAT's Motions to Dismiss Claim 16 be **granted**.

B.      Claim 17 Negligent Retention

None of the parties, including Plaintiffs, argue there is a substantive difference between the negligent supervision and negligent retention claims, and Colorado appears to treat the claims as the same. *See Van Osdol v. Vogt*, 892 P.2d 402, 408 (Colo. App. 1994) ("An employer may be subject to liability for negligent supervision and retention if the employer knows or should have known that an employee's conduct would subject third parties to an unreasonable risk of harm.") *aff'd and remanded*, 908 P.2d 1122 (Colo. 1996); *see also* Resp. 13 (grouping the negligent

---

[5] This conclusion is not inconsistent with my recommendation that Plaintiffs' 18 U.S.C. § 1590(b) obstruction claims proceed against USAT. As I discussed, § 1590(b) requires obstruction of a governmental investigation, and Plaintiffs plausibly allege those violations.

supervision and negligent retention claims as substantively identical). Accordingly, this claim

fails for the same reason as the negligent supervision claim, as they are both barred by the statute

of limitations. I respectfully recommend that the USOC's and USAT's Motions to Dismiss Claim

17 be **granted**.

      C.     <u>Claim 19 Negligence</u>

**Claim would be valid:** Under two-year statute of limitations.

All Plaintiffs assert a negligence claim against the USOC and USAT. SAC ¶¶ 938–49. As

a preliminary matter in analyzing this claim, Plaintiffs do not suggest that their negligence claim

applies any differently against the USOC than against USAT. *See* Resp. 48–51. Therefore, I will

analyze both simultaneously.

The elements of a negligence claim are straightforward. "To establish a claim based on

negligence, the plaintiff must show: (1) the existence of a legal duty to the plaintiff; (2) the

defendant breached that duty; and (3) that the breach of the duty caused the harm resulting in

damages to the plaintiff." *Keller*, 111 P.2d at 447.

      1.     *Duty*

The threshold question to this claim is whether the USOC or USAT owed Plaintiffs a duty

of care. "Whether a particular defendant owes a legal duty to a particular plaintiff is a question of

law." *Univ. of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo. 1987); *HealthONE v. Rodriguez ex rel.

Rodriguez*, 50 P.3d 879, 888 (Colo. 2002) ("[T]he initial question in any negligence action is

whether the defendant owed a legal duty to protect the plaintiff against injury."). This is because

"[a] negligence claim must fail if based on circumstances for which the law imposes no duty of

care upon the defendant for the benefit of the plaintiff." *Whitlock*, 744 P.2d at 56. Both the USOC

and USAT argue that the negligence claim fails, because they did not owe legal duties to the Plaintiffs. USOC's Mot. Dismiss 22; USAT's Mot. Dismiss 21–23.

Plaintiffs assert that their negligence claim arises from a duty to reasonably investigate their complaints of misconduct by the Lopez Defendants. SAC ¶ 941 ("At all relevant times, USOC[] [and] USAT . . . had a duty to exercise reasonable care in investigating and pursuing complaints of criminal conduct, sexual misconduct, and violations of federal law against their member athletes, including Plaintiffs."). However, Plaintiffs cite to no authority supporting the existence of such a duty. Still, Plaintiffs argue that the duty is apparent after an evaluation of a number of factors. Resp. 51.

Indeed, Colorado courts consider several factors to determine whether a particular defendant owes a legal duty: "(1) the risk involved, (2) the foreseeability and likelihood of injury as weighed against the social utility of the [defendant's] conduct, (3) the magnitude of the burden of guarding against injury or harm, and (4) the consequences of placing the burden upon the [defendant]." *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo. 1987) (alterations in original) (numbering added) (quoting *Smith v. City & County of Denver*, 726 P.2d 1125, 1127 (Colo. 1986)). "No one factor is controlling, and the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty and agree that it exists." *Whitlock*, 744 P.2d at 57.

Before addressing these factors, I pause a moment to recognize an argument by USAT that, when determining whether it owed Plaintiffs a duty to reasonably investigate, it is appropriate to consider the Plaintiffs were *former* members of USAT during the statutory period. USAT's Mot. Dismiss 22–23. Although Plaintiffs dismiss the argument as "repugnant," Resp. 49, I agree the point is relevant to the issue presented. The allegations in the SAC state that Plaintiffs stopped

competing in taekwondo, at the latest, in approximately 2011. SAC ¶¶ 624–26 (Ms. Joslin), 706 (Ms. Means). By the time period actionable for this claim, Plaintiffs had not been members of USAT for a minimum of five years. Properly framed, the question presented is whether the USOC and USAT owed a duty to former members of USAT to reasonably investigate their complaints of sexual abuse. I am not aware of any case finding, or even addressing, whether an umbrella athletic organization owes such a duty, so I will begin my analysis with the *Taco Bell* factors.

First, the risk involved to a former athlete is low. The risk of harm that might result *to former athletes* of USAT if USAT or the USOC do not reasonably investigate their allegations of sexual assault is minimal. That is, the athletes have by definition left the organization and are no longer subject to a threat of the past harmful conduct. Presumably, they are no longer in frequent personal contact with the alleged abuser. The first factor weighs against finding a duty.

The second factor weighs in favor of finding a duty, although not as strongly as it might appear. The factor considers "the foreseeability and likelihood of injury as weighed against the social utility of the [defendant's] conduct . . . ." *Taco Bell*, 744 P.2d at 46. While it might be somewhat foreseeable that the former athlete could be harmed if an organization does not investigate her reports of past abuse, such injury is not likely to happen. Also, there is clearly little to no social utility in the USOC or USAT failing to reasonably investigate reports of abuse brought by former members.

The third factor considers the "magnitude of the burden of guarding against injury or harm." *Taco Bell*, 744 P.2d at 46. I find the magnitude of guarding against injury or harm to former members would be high. Such duty would effectively force NGBs to investigate former athletes' complaints merely to avoid liability to the former athlete, not necessarily to protect them from injury or harm. The third factor weighs against finding a duty.

60

The final factor considers the consequences of placing the burden upon a defendant. *Taco Bell*, 744 P.2d at 46. I find the consequences of burdening the USOC and/or NGBs with investigating former members' complaints of misconduct would be significant. Such a duty might require investigation into allegations of misconduct, even when such reports would not protect current athletes. Under Plaintiffs' theory, the institutions would have a duty to investigate their reports of abuse, even when the abuser was no longer associated with the institution, and was unlikely to prevent future injury to others. Seemingly, this duty would exist solely to avoid emotional harm to the former athlete who reported the abuse. "[W]hether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty and agree that it exists." *Whitlock*, 744 P.2d at 57. Here, the *Taco Bell* factors weigh decidedly against finding a duty to investigate allegations of misconduct by former members/athletes for purposes of attaching liability for negligence. Moreover, I have found, and Plaintiffs cite to, no law identifying such a proposed duty.

### 2. *Assumed a Duty*

Alternatively, Plaintiffs argue that the USOC assumed a duty to reasonably investigate "by intervening in the affairs of the NGBs . . . and inducing Plaintiffs' reliance on USOC's help." Resp. 50–51. "Under some circumstances, a party may assume duties of care by voluntarily undertaking to render a service, and negligent performance of that assumed duty may impose liability." *E. Meadows Co. v. Greeley Irrigation Co.*, 66 P.3d 214, 218 (Colo. App. 2003). "Under the 'assumed duty' or 'good samaritan' doctrine . . . the question of whether [a defendant] assumed duties to the [plaintiff] . . . is obviously not a purely legal question [and]. . . becomes a mixed question of law and fact . . . ." *Jefferson Cty. Sch. Dist. R-1 v. Justus ex rel. Justus*, 725 P.2d 767, 771 (Colo. 1986). Any argument that a defendant has assumed a duty "must be predicated on two

factual findings." *Id.* First, "[a] plaintiff must . . . show that the defendant, either through its affirmative acts or through a promise to act, undertook to render a service that was reasonably calculated to prevent the type of harm that befell the plaintiff." *Id.* "Second, a plaintiff must also show either that he relied on the defendant to perform the service or that defendant's undertaking increased plaintiff's risk." *Id.*

In *Jefferson Cty. Sch. Dist. R-1*, a first-grader was injured as he was riding his bicycle home from school. *Id.* at 768. Before the accident, the school district had distributed a handbook that stated only students in grades four through six could ride their bicycles to school. *Id.* Additionally, the school principal had assigned teachers to patrol the school grounds before and after the school day. *Id.* at 768–69.

Addressing the issue of whether the school owed the student a duty of care as he rode his bike home from school, the court recognized that "the common law custodial duty of a school towards its students only requires a school district to protect children against the foreseeable negligence of third parties while the children are in its charge." *Id.* at 770. While this duty of care would not have extended to the student as he rode his bike off school grounds, the court noted that "in addition to those duties imposed by law solely on the basis of the relationship between parties, a separate and distinct body of law holds that a party may assume duties of care by voluntarily undertaking to render a service." *Id.*

The court decided that the issue of whether the school assumed a duty of care was a highly fact-intensive question. It determined that the plaintiff "raised a genuine issue as to whether by distributing the handbook and by placing teachers at the front of the school, the school district undertook the task of enforcing a rule that students in the lower grades were not eligible to ride bicycles to and from school." *Id.* at 772. A plaintiff need only to "present[] some evidence of an

affirmative act or promise to act sufficient to create an inference that the defendant undertook a service that would have prevented plaintiff's injuries" to create a factual dispute about whether the defendant assumed a duty of care to the plaintiff. *Id.* The court made clear, the "determination that the school district has assumed a duty must be based on certain factual findings . . . ." *Id.*

Here, Plaintiffs argue that the USOC assumed a duty to reasonably investigate their complaints of sexual abuse by "intervening in the affairs of the NGBs and of Plaintiffs, setting up SafeSport, asking [Mr.] Alperstein to turn his investigation over to SafeSport (rather than actually pursuing action against the Lopezes), and inducing Plaintiffs' reliance on USOC's help." Resp. 50–51. Plaintiffs allege "[t]he USOC created SafeSport in response to overwhelming allegations of sex crimes. SafeSport was devised by the USOC as the entity that was supposed to protect athletes from sex crimes and exploitation." SAC ¶¶ 69–70. They also allege "SafeSport is not independent from the USOC, has been plagued by the USOC's meddling, has been left grossly understaffed and underfunded . . . ." *Id.* ¶ 71. Plaintiffs allege the USOC launched SafeSport in March 2017, *id.* ¶ 280, within the statutory period for this claim. It further alleges that SafeSport was not fully operational in 2017. *Id.* ¶ 281. The USOC funds SafeSport and, in 2018, the USOC increased SafeSport's funding to $3.1 million. *Id.* ¶ 275. I find the Plaintiffs have "present[ed] some evidence of an affirmative act" sufficient to create an inference that the USOC undertook a service that would have prevented Plaintiffs' injuries. *See Jefferson Cty. Sch. Dist. R-1*, 725 P.2d at 772. Therefore, dismissing the claim at this juncture is not proper.

Finally, USOC argues that Plaintiffs' negligence claim must fail, because they do not allege physical damages. USOC's Mot. Dismiss 23. Colorado has "never recognized a cause of action for emotional distress grounded in negligence without proof that the plaintiff sustained physical injury . . . ." *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 880 n.3 (Colo. 1994). But,

Plaintiffs allege physical injuries in addition to emotional distress. *See, e.g.*, SAC ¶¶ 485 (mental and physical symptoms), 486 (reputational harm), 522 (harm to reputation, career, and profession), 586 (relationships and business). Therefore, Plaintiffs have alleged damages that are cognizable for stating a negligence claim in Colorado.

Accordingly, I respectfully recommend the USOC's Motion to Dismiss Claim 19 be **denied** and USAT's Motion to Dismiss Claim 19 be **granted**.

D.      Claim 20 Gross Negligence

The USOC makes no argument that Plaintiffs' gross negligence claims should be dismissed on any ground different from those argued to dismiss the ordinary negligence claim. *See* USOC's Mot. Dismiss 22–24 (addressing the negligence claim and gross negligence claim identically); USOC's Reply 14 ("[T]he SAC's gross negligence claim fails for the same reasons as the claim for negligence."). Therefore, I reach the same conclusions for this claim as Claim 19. I respectfully recommend the USOC's Motion to Dismiss Claim 20 be **denied**, and USAT's Motion to Dismiss Claim 20 be **granted**.

E.      Claim 21 Outrageous Conduct

**Claim would be valid:** Under two-year statute of limitations.

All Plaintiffs assert an outrageous conduct claim against the USOC. SAC ¶¶ 960–66. The USOC argues that dismissal of this claim is warranted, because the "claim fails to meet the bar for outrageous conduct." USOC's Mot. Dismiss 24.

To prove outrageous conduct under Colorado law, a plaintiff must demonstrate: (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in the conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the plaintiff

64

incurred severe emotional distress which was caused by the defendant's conduct. *Culpepper*, 877

P.2d at 882 (Colo. 1994). The defendant's actions must be

> so outrageous in character, and so extreme in degree, as to go beyond all possible
> bounds of decency, and to be regarded as atrocious, and utterly intolerable in a
> civilized community.  Generally, the case is one in which the recitation of the facts
> to an average member of the community would arouse his resentment against the
> actor, and lead him to exclaim, "Outrageous!"

*Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988) (citing *Rugg v. McCarty*, 476

P.2d 753, 756 (1970)). "Proof of the tort of outrageous conduct must consist of either an extreme

act, both in character and degree, or a pattern of conduct from which the ineluctable conclusion is

the infliction of severe mental suffering was calculated or recklessly and callously inflicted." *Gard*

*v. Teletronics Pacing Sys., Inc.*, 859 F. Supp. 1349, 1354 (D. Colo. 1994).  Although "the question

of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the

responsibility of a court to determine whether reasonable persons could differ on the question."

*Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (quoting *Culpepper*, 877 P.2d at

883).

Plaintiffs primarily base this claim on SafeSport's decision to reinstate Jean Lopez after it

initially banned him for life.  Resp. 62 ("Defendants . . . acted ruthlessly against [Plaintiffs] by

first demanding that they testify live at [Jean Lopez's] appeal and then, when they did not, by

lifting [his] lifetime ban in violation of their own procedures and any legitimate rule of law." ).

However, the SAC alleges SafeSport, not the USOC, is responsible for this decision.  *See id.* ¶ 20

("[SafeSport's] decision to reinstate Jean Lopez was reckless and haphazard.").

As this claim is asserted against the USOC, Plaintiffs argue that its decision to "[c]ontinu[e]

to support and clothe Steven and Jean Lopez with the legitimacy and authority of Team USA

despite having actual and constructive knowledge of their decades long pattern of serial sexual

predation" supports the claim. *Id.* ¶ 963(a). Specifically, Plaintiffs allege "[a]ll five Plaintiffs were contacted or were in contact with SafeSport or [Mr.] Alperstein between 2015 and 2017." *Id.* ¶ 245. But the SAC alleges "USOC and USAT secretly worked together, behind closed doors, to make sure that the investigation against the Lopez brothers was delayed and obstructed because of their key roles in the 2016 Olympics[.]" *Id.* ¶ 226. Jean coached in the 2016 Olympics. *Id.* ¶ 233. Steven competed in the 2016 Olympics. *Id.* ¶ 232. The SAC further alleges the "USOC allowed Steven Lopez to compete in the 2017 World Championships, and even paid for his first-class travel." *Id.* ¶ 252. I find that there are sufficient allegations that could lead a jury to conclude that "the defendants acted recklessly with the knowledge that there was a substantial probability that their conduct would cause severe emotional distress." *Id.* As such, I respectfully recommend the USOC's Motion to Dismiss Claim 21 be **denied**.

## IV.     USOC's Rule 12(f) Motion to Strike Class Action Allegations

Finally, the USOC argues that Plaintiffs' class action allegations should be stricken. Plaintiffs purport to bring their claims on behalf of two "nationwide classes": (1) a Rule 23(b)(2) Injunction Class, defined as:

> All USOC-governed female athletes (subject to the USOC's "commercial terms" page or any other contract);

SAC ¶ 723, and (2) a Rule 23(b)(3) and/or (c)(4) Damages Class, defined as:

> All USOC-governed female athlete[s] (subject to the USOC's "commercial terms" page or any other contract) and who (1) participated in taekwondo from 2003 to present and (2) traveled or trained with Jean Lopez, Peter Lopez, or Steven Lopez.

SAC ¶ 723.

The USOC argues that these allegations should be stricken under Rule 12(f), because they are "facially overbroad." USOC's Mot. Dismiss 25. Specifically, the USOC argues that the

injunction class is overbroad because it includes "[a]ll USOC-governed female athletes," regardless of whether they competed in taekwondo. *Id.* Second, the damages class would necessarily "sweep in untimely claims against the USOC." *Id.* Finally, "neither the injunction class nor the '[d]amages' class is limited to athletes who suffered an alleged injury—i.e., athletes who were allegedly abused by the Lopez brothers." *Id.* The USOC argues that it is appropriate to strike class allegations when the putative class "include[s] class members 'regardless of whether [they were] ever injured' by the alleged conduct." *Id.* (alteration in original) (quoting *Edwards v. Zenimax Media Inc.*, No. 12-cv-00411-WYD-KLM, 2012 WL 4378219, at *5 (D. Colo. Sept. 25, 2012)).

A.    Damages Class

With respect to the damages class definition, Plaintiffs make a number of arguments in an attempt to rebut the USOC's position. First, Plaintiffs argue that the USOC's citation to *Edwards* is inapt, because *Edwards* (they say) was decided on a motion for class certification. Resp. 62 ("*Edwards* was decided in opposition to a motion for class certification, not a motion to dismiss." (parentheses omitted)). However, as the USOC argues, *Edwards* was decided on a motion to strike class allegations, albeit under Rule 23(d)(1)(D). *See* 2012 WL 4378219, at *2. That Rule permits a court to "issue orders that . . . require that the pleadings be amended to eliminate allegations about representation of absent persons . . . ." Fed. R. Civ. P. 23(d)(1)(D). Other courts have found no significance to the distinction and decided to strike class action allegations under Rule 12(f) and Rule 23(d)(1)(D). *See, e.g.*, *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1145–47 (N.D. Cal. 2010); *Hovsepian v. Apple, Inc.*, No. 08–5788 JF (PVT), 2009 WL 5069144, at *6 (N.D. Cal. Dec. 17, 2009) (granting a motion to strike under Rule 12(f)). Further, *Tietsworth* and *Hovsepian* were

both decided in an identical posture to this Motion—a simultaneous motion to dismiss and motion to strike. *See Tietsworth*, 720 F. Supp. 2d at 1127–28; *Hovsepian*, 2009 WL 5069144, at *1.

In *Edwards*, the court decided to grant the motion to strike class action allegations, because it found the "definition [wa]s inadequate because it [wa]s overbroad and include[d] [potential class members] . . . regardless of whether he or she was ever injured . . . ." *Id.* at *5. This is the precise basis on which the USOC relies for its argument that Plaintiffs' allegations should be stricken here, and other courts have arrived at the same conclusion. *See, e.g.*, *Rasmussen v. Apple Inc.*, 27 F. Supp. 3d 1027, 1045–46 (N.D. Cal. 2014) (granting a motion to strike, because "the [class] definition is overbroad as it includes within the class individuals who have not experienced any issue or defect" with the litigated product); *Tietsworth*, 720 F. Supp. 2d at 1146 (granting a motion to strike class action allegations when the proposed class definition "include[s] members who have not experienced any problems with" the allegedly defective product).

Plaintiffs do not dispute that the definition includes individuals whose claims would be barred by the statute of limitations. *See* Resp. 62. However, they respond to this argument by asserting that the fact that the class definition would include uninjured class members or individuals whose claim would be time-barred "is immaterial," because "the possibility or even inevitability that the class will include members not injured by the defendant's conduct does not preclude class certification." Resp. 62–63 (quoting *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2016 WL 5371856, at *4 (D. Kan. Sept. 26, 2016)). However, the fact that a class may inevitably include members who did not incur an injury is a different question than whether a class includes persons who could not have suffered an injury—the latter definition is overbroad. The case to which Plaintiffs cite, *In re Syngenta*, recognized this very principle. 2016 WL 5371856, at *4 ("[I]f 'a class is defined so broadly as to include a great number of members

68

who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.'" (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012)). The case on which it relied did so as well. *See Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) ("[I]f the class definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad.").

Plaintiffs also argue it is inappropriate to address the issue at this time, because "it requires factual assessments that can't be made at the 12(b)(6) stage." Resp. 63. But the USOC's Motion to Strike is filed under Rule 12(f), not Rule 12(b)(6). *Edwards* demonstrates that it is proper for a court to strike class allegations when the proposed class definition is overbroad. Therefore, I respectfully recommend USOC's Motion to Strike be **granted** as to the damages class.[6]

B.    Injunction Class

With regard to Plaintiffs' proposed injunctive class definition, I arrive at a different conclusion. Plaintiffs argue that the injunctive class should proceed regardless of whether it contains uninjured class members. In *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195 (10th Cir. 2010), the Tenth Circuit declined to consider an argument that the definition of an injunctive class was overbroad. However, it did reach a related issue of whether every class member must prove he or she "is under a threat of harm to satisfy Rule 23(a)'s requirements of commonality and typicality . . . ." *Id.* Conveniently, the question was presented in a highly analogous context.

In *Devaughn*, the nine named plaintiffs were foster children under the care of Oklahoma Department of Human Services, and they brought their case alleging "the policies and practices

---

[6] I note that some of the cases I relied on for this conclusion, which granted motions to strike class allegations, permitted the plaintiffs leave to amend the proposed class definition.

[of the department] expose[d] all class members to an impermissible risk of harm . . . ." *Id.* at 1192. Generally, the plaintiffs alleged that the policies of the department exposed them to abuse or neglect by both the foster families and their biological parents, and the department inadequately monitored the children. *Id.* at 1193. The plaintiffs sought to represent a class of approximately 10,000 children in the department's custody and sought injunctive relief that would require the department to alter certain policies. *Id.* 1194–95.

In addressing the defendants' arguments that the class did not meet Rule 23's requirements of commonality or typicality, the court noted the plaintiffs alleged that all of the class members "are allegedly exposed to the same unreasonable risk of harm as a result of [d]efendants' unlawful practices. Though each class member may not have actually suffered abuse, neglect, or the risk of such harm, [d]efendants' conduct allegedly poses a risk of impermissible harm to all children in [department] custody." Further, the court noted that "Rule 23's certification requirements neither require all class members to suffer harm or threat of immediate harm nor [n]amed [p]laintiffs to prove class members have suffered such harm." *Id.* at 1197. Moreover, "[t]he Advisory Committee's Note to Rule 23 explains certification is appropriate even if the defendants['] action or inaction 'has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.'" *Id.* at 1198.

To be sure, the *Devaughn* court declined to address the precise argument USOC makes here—that the proposed class is overbroad. *Id.* at 1195. Still, using the decision as guidance, I find that this purported defect does not warrant striking the allegations. Plaintiffs are athletes who sought to compete for Team USA, and they allege the USOC subjected them to an unreasonable risk of harm by coaches or athletes within the system. *See* SAC ¶ 727(i). Plaintiffs allege their claims are typical of the class. *Id.* ¶ 725. In accord with *Devaughn*, I find that Plaintiffs' class

allegations are appropriate, despite the USOC's argument that the purported class contains individuals who have not been harmed by the alleged unreasonable risk of harm. Therefore, I respectfully recommend USOC's Motion to Strike be **denied** as to the injunctive class.

## CONCLUSION

Accordingly, for the foregoing reasons, I respectfully recommend that Judge Arguello permit the following claims to proceed in this case:

- Claim 3 against Steven Lopez;

- Claim 4 against USAT;

- Claim 5 against Steven Lopez;

- Claim 8 against Steven Lopez;

- Claim 9 against USOC and USAT;

- Claim 10 against Steven Lopez;

- Claim 13 against Steven Lopez;

- Claim 14 against USAT;

- Claim 19 against USOC;

- Claim 20 against USOC;

- Claim 21 against USOC.

In addition, I recommend that Judge Arguello dismiss the following claims:

- Claim 5 against USAT;

- Claim 14 against USOC;

- Claim 15 against USOC, USAT, and the Lopez Defendants;

- Claim 16 against USOC and USAT;

- Claim 17 against USOC and USAT;

- Claim 19 against USAT;

- Claim 20 against USAT.

Finally, as Plaintiffs withdrew the majority of their claims against Jean Lopez and I have recommended dismissing the RICO claim against him, I also recommend dismissing Jean Lopez as a Defendant in this case.

THEREFORE, I respectfully RECOMMEND that Defendants' Motions to Dismiss and USOC's Motion to Strike [filed September 24, 2019; ECF Nos. 106, 108 & 109] be **GRANTED IN PART** and **DENIED IN PART** as set forth herein.[7]

Respectfully submitted this 6th day of March, 2019, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

---

[7] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual and legal findings of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).