# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1: 18-cv-00981-CMA-MEH

(1) Heidi Gilbert,
(2) Amber Means,
(3) Mandy Meloon,
(4) Gabriela Joslin, and
(5) Kay Poe,

      Plaintiffs,

vs.

(1) U.S.A. Taekwondo, Inc. and
(2) Steven Lopez,

      Defendants.

---

## THIRD AMENDED COMPLAINT

---

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

PARTIES .......................................................................................................................... 11

    A.  The Plaintiffs ......................................................................................................... 11

    B.  The Defendants ..................................................................................................... 12

        USA Taekwondo ("USAT") ...................................................................... 12

        Steven Lopez .......................................................................................... 13

JURISDICTION ................................................................................................................ 13

FACTS COMMON TO ALL COUNTS ............................................................................ 13

    A.  Corporate Structure: Anatomy of the USOC, USAT, and the Other NGBs .............. 13

    B.  Forced Labor and Services: USAT Knowingly Benefits from the Medals and Money Delivered by the Lopez Brothers .......................................................................... 15

    C.  Legal Duty: USAT IS Required to Protect Athletes from Sex Crimes ...................... 22

    D.  Defendants Engage in Corrupting and False Testimony to Congress and Obstruct and Interfere with the Investigations of the Lopez Brothers by Law Enforcement and Congress ............................................................................................................. 24

        2006-2008: Obstruction Regarding Mandy Meloon and Heidi Gilbert ...................... 24

        2014-2018: the Lopez Obstruction Against All Plaintiffs .......................................... 29

    E.  Negligence and Gross Negligence: USAT Ignores Sexual Abuse for Decades ....... 41

    F.  Congress Steps In: The 2017 Sports Abuse Act ..................................................... 50

PLAINTIFF-SPECIFIC ALLEGATIONS ........................................................................... 51

    A.  Sexual Abuse, Exploitation, and Trafficking of Mandy Meloon ................................ 51

    B.  Sexual Abuse, Exploitation, and Trafficking of Kay Poe ........................................... 63

    C.  Sexual Abuse, Exploitation, and Trafficking of Heidi Gilbert ..................................... 66

    D.  Sexual Abuse, Exploitation, and Trafficking of Gabriela (Gaby) Joslin ..................... 73

    E.  Sexual Abuse, Exploitation, and Trafficking of Amber Means ................................... 78

CLAIMS FOR RELIEF ..................................................................................................... 84

    A.  Counts of GABY JOSLIN for Violations of Federal Law .......................................... 86

        COUNT 1 ................................................................................................ 86

        COUNT 2 ................................................................................................ 86

        COUNT 3 ................................................................................................ 88

    B.  Counts of AMBER MEANS for Violations of Federal Law ....................................... 89

        COUNT 4 ................................................................................................ 89

COUNT 5.......................................................................................................... 90

COUNT 6.......................................................................................................... 92

COUNT 7 ......................................................................................................... 93

C.  Counts of All PLAINTIFFS for Violations of Federal Law..........................................94

COUNT 8 ......................................................................................................... 94

D.  Counts of PLAINTIFFS for Violations of State Law ..................................................96

COUNT 9 ......................................................................................................... 96

COUNT 10....................................................................................................... 119

COUNT 11....................................................................................................... 138

COUNT 12 ...................................................................................................... 160

DEMAND FOR JURY TRIAL........................................................................................ 179

PRAYER FOR RELIEF.................................................................................................. 179

APPENDIX OF SECONDARY SOURCES ................................................................... 181

## INTRODUCTION

1.      Sunlight, it has been said, is the best of disinfectants.[1] When it comes to misconduct, there is no better disinfectant than repeated Congressional hearings on the same subject. In 2018, subcommittees in both the U.S. House and Senate have held multiple hearings targeting the intentional, reckless, and negligent acts committed by the United States Olympic Committee ("USOC") and its National Governing Bodies ("NGBs"), including USA Taekwondo ("USAT"), toward their own athletes.

2.      At a May 23, 2018, hearing held by a committee of the U.S. House of Representatives, Rep. Harper (R-Miss.) outlined the broad duties owed by the USOC and its NGBs to protect their athletes from sexual predators:

> We are here because recent events have highlighted a very troubling and concerning pattern of sexual misconduct within the U.S. Olympic Committee -- community, pardon me. There has been a systemic failure in the system to protect athletes, including in how allegations of sexual misconduct have been handled, or should I say not handled, by the national governing bodies -- the groups that run individual sports -- and the U.S. Olympic Committee.
> …
> The USOC and NGBs play a role in keeping millions of American athletes safe from harm.
> …
> Sadly, we've seen what can happen when athlete safety is not a priority. Too often it seems that -- that the USOC and NGBs haven't acted until they are publicly pressured to do so. When you have survivors saying that they were asked to stay silent, felt that they weren't heard, and didn't feel safe, there is something horribly wrong with the system.
>
> Sexual abuse is a problem that our society must confront. According to the CDC's statistics on sexual violence, one in three women and one in sex men experience sexual violence involving physical contact during their lifetimes.
>
> While such focus has been on USA Gymnastics team doctor Larry Nassar, gymnastics is not the only NGB that has had its challenges. Recent public reports also include the Lopez brothers in taekwondo, Rick Butler in volleyball, and the multiple accusations that have come from the swimming community, as well as

---

[1] Louis Brandeis, OTHER PEOPLE'S MONEY 62 (1933).

reports in many other NGBs not before us today.[2]

3.     This case involves the "the Lopez brothers in taekwondo" and the forced labor and services, sex trafficking, and other travesties inflicted upon America's Olympic-hopeful taekwondo athletes by the USOC, USA Taekwondo, and the U.S. Center for SafeSport— the very Olympic entities, officials, coaches, and mentors who were paid and entrusted to protect them from harm.

4.     The alarming facts set forth in this pleading have already been verified and, for the most part, are quoted or paraphrased from dozens of articles published in *USA Today*, the *Washington Post*, the *New York Times*, the *Wall Street Journal*, the *Houston Chronicle*, and NPR, as well as extensive Congressional testimony before the U.S. House and Senate in 2018. These sources are frequently block quoted (and highlighted in yellow for emphasis) herein, as well listed in Plaintiffs' Appendix of Secondary Sources, which follows the signature block at the end of this pleading.

5.      On July 24, 2018, the U.S. Senate held a hearing to confront the rampant sex abuse of athletes in Olympic and amateur sports. As Sen. Blumenthal (D-Conn.) testified, the USOC has "prioritized medals and money over athlete safety. They concealed the shocking pervasiveness of abuse across many sports as well as their own woefully inadequate systems to address and prevent it."[3] Sen. Feinstein (D-Calif.) added that "these institutions undertook massive public relations campaigns to preserve

---

[2] Testimony of Rep. Gregg Harper, U.S. House Energy and Commerce Committee, Oversight and Investigations Subcommittee, *Hearing on the Olympic Community's Ability to Protect Athletes from Sexual Abuse*, CQ-ROLLCALL, 2018 WLNR 16155107 (May 25, 2018).

[3] Testimony of Sen. Richard Blumenthal, U.S. Senate Commerce, Science and Transportation Committee, Subcommittee on Consumer Protection, Product Safety, Insurance, and Data Security, *Hearing on Protecting Amateur Athletes*, CQ-ROLLCALL, 2018 WLNR 22755090 (July 26, 2018).

themselves" and that "there have been disturbing revelations of cover-up and trying to silence vulnerable victims."[4]

6.      The USOC has affirmed its fixation on "medals and money." In 2014, Scott Blackmun (the longtime CEO and General Counsel of the USOC) boasted: "For us, it's all about medals[,]" and "[h]ow do we help American athletes get medals put around their necks? We have a line of sight between every decision we make and the impact on how many Americans will win medals."[5]

7.      The USOC was dependent upon successful results in order to secure funding for itself and the executives it employed, so it was willing to sacrifice the safety and security of its young athletes. Their sexual abuse, exploitation, and trafficking were simply collateral damage on the quest for Olympic—and, in turn, commercial—success and spoils.

8.      As to this lawsuit, the primary perpetrators are the head coach of Team USA's Olympic taekwondo team, Jean Lopez, and Olympic taekwondo superstar Steven Lopez, his younger brother.

9.      Both Lopez brothers have raped numerous female taekwondo athletes. But rather than being suspended and prosecuted, each was facilitated in their rampant sex crimes and protected from law enforcement and suspension from Team USA by the USOC and USAT.

10.      There are approximately 47 NGBs (one for each Olympic sport), ranging from USA Archery to USA Wrestling. As the *Washington Post* has observed:

---

[4] *Id.* (Testimony of Sen. Dianne Feinstein).

[5] Sally Jenkins, *The USOC Needs a New Leader Who Cares About Athletes More Than Expense Accounts*, WASH. POST (July 3, 2018).

> The bureaucracy that oversees Olympic sports in the United States is, essentially, a pyramid.
> At the top sits the USOC, headquartered in Colorado Springs with average annual revenue of about $230 million.
> Underneath the USOC are 47 Olympic and Pan American national governing bodies – one for each sport, Olympic insiders call them "NGBs"[.][6]

11.    The Center for SafeSport ("SafeSport") in April 2018 banned Jean Lopez from United States Taekwondo. In doing so, SafeSport found the allegations of sexual abuse and exploitation made by all Plaintiffs against Jean Lopez to be true by a preponderance of the evidence.[7]

12.    The ban was based on conclusive evidence of Jean's "decades long pattern" of sexual abuse and exploitation of the Olympic-hopeful athletes he was paid and entrusted to coach and mentor:

> Jean Lopez, the older brother and longtime coach of two-time Olympic taekwondo champion Steven Lopez, has been declared permanently ineligible after the U.S. Center for SafeSport found him guilty of sexual misconduct and sexual misconduct involving a minor.
> The decision reached Tuesday brings resolution to an investigation that began with USA Taekwondo three years ago and was turned over to SafeSport when it opened in March 2017. Three women who spoke with USA TODAY Sports have described sexual misconduct by Jean Lopez dating back to 1997, and one of those women filed a complaint with USA Taekwondo in 2006.
> "This matter concerns a decades long pattern of sexual misconduct by an older athlete/coach abusing his power to groom, manipulate and, ultimately, sexually abuse younger female athletes," SafeSport said in its decision obtained by USA TODAY Sports.
> "Given the number of incidents reported over a span of several years and by multiple reporting parties, most of whom have no reasonable motive to fabricate an allegation – much less multiple, distinct incidents – of misconduct, the totality of the circumstances clearly shows a recurrent pattern of behavior on the part of Jean."[8]

---

[6] Will Hobson and Steven Rich, *Every Six Weeks for More Than 36 Years*, WASH. POST (Nov. 17, 2017).

[7] *See, e.g.*, David Barron, *Former U.S. Taekwondo Coach Jean Lopez Banned from Olympic Sports in U.S.*, HOUSTON CHRON. (Apr. 4, 2018).

[8] Nancy Armour & Rachel Axon, *Olympic Coach Banned for Sexual Misconduct*, USA TODAY (Apr. 5, 2018).

13.     Investigators described Jean Lopez as "an older athlete/coach abusing his power to groom, manipulate and, ultimately, sexually abuse younger female athletes."[9]

14.     The April 2018 ban of Jean Lopez followed several years of obstruction from the time Mandy Meloon reported in writing in 2006 that she had been raped.

15.     Two periods of time are at issue: *first*, the underlying forced labor and services and sex trafficking of Plaintiffs and the Class from 1997 to 2010 ("Part 1"—the underlying events), and *second*, the cover-up of this misconduct, which included fraudulent concealment, obstruction, interference, and corrupting and false statements made to Congress ("Part 2"—the cover-up), which occurred from 2006 to 2008 and then from 2015 to 2018.

16.     As the *Washington Post* has explained, the prevalence of sex crimes committed against athletes in Olympics sports is an epidemic directly caused by the insatiable lust for "medals and money":

> While the Nassar case has captured public attention because of the renown of a few of his accusers, it is far from an isolated instance. The problem of sexual abuse in Olympic sports organizations extends well beyond the confines of one sport, or one executive.
> More than 290 coaches and officials associated with the United States' Olympic sports organizations have been publicly accused of sexual misconduct since 1982, according to a Washington Post review of sport governing body banned lists, news clips and court records in several states. The figure spans parts of 15 sports and amounts to an average of eight adults connected to an Olympic organization accused of sexual misconduct every year — or about one every six weeks — for more than 36 years.
> …
> Why does this keep happening? Interviews with dozens of officials in Olympic sports and a review of thousands of pages of records produced in lawsuits filed by abuse victims highlight a culture in which limiting legal risk and preserving gold-

---

[9] David Barron, *Former U.S. Taekwondo Coach Jean Lopez Banned from Olympic Sports in U.S.*, Houston Chron. (Apr. 4, 2018).

medal chances have been given priority over safeguarding children.[10]

17.     USAT has sheltered coach Jean Lopez from suspension and prosecution because he and his brother, superstar Olympic taekwondo athlete Steven Lopez, have delivered "medals and money" at the Olympics and other competitions around the globe.

18.     Throughout the 2000s, the Lopez brothers (Jean and Steven) and their siblings (two of whom are also taekwondo Olympic medalists) were known in the United States as the "First Family" of taekwondo.

19.     Steven Lopez, now age 39, was "taekwondo's biggest star and the most decorated athlete in that sport. He is a five-time Olympian with gold medals in 2000 and 2004 and a bronze in 2008, as well as five world titles."[11]

20.     Steven Lopez was frequently trotted around the globe to showcase the return on investment he delivers to Team USA. Here, he's pictured alongside his sister (also part of the "First Family") with now-President Trump:

---

[10] Will Hobson and Steven Rich, *Every Six Weeks for More Than 36 Years*, WASH. POST (Nov. 17, 2017); *see also* Will Hobson and Steven Rich, *Road to Gold, Littered with Victims*, WASH. POST (Nov. 19, 2017).

[11] Nancy Armour & Rachel Axon, *Lopez brothers, Olympic Taekwondo Royalty, Hit with Sex Abuse Allegations*, USA TODAY (June 8, 2017).



**Team USA Road to London 100 Days Out Celebration**

In This Photo: **Donald Trump**, **Steven Lopez**, **Diana Lopez**, **Tim Morehouse**

Donald Trump poses for a photo with Taekwondo athletes Steven Lopez (L), Diana Lopez and fencer Tim Morehouse (R) during the Team USA Road to London 100 Days Out Celebration in Times Square on April 18, 2012 in New York City.

(April 17, 2012 - Source: Chris Trotman/Getty Images North America) **more pics from this album »**

21.     Over a decade ago, on the eve of the 2008 Summer Olympics in Beijing,

the *New York Times* observed that the Lopez brothers present a golden opportunity for

commercial gain:

> As the United States Olympic Committee tries to capitalize on its good fortune —
> how often do three superb athletes, bilingual and photogenic and first-generation
> Americans, come along to raise the profile of a niche sport? — the Lopezes are
> being counted on to win more than just medals. More and more, they are
> entering the mainstream, having appeared two months ago on "The Tonight
> Show With Jay Leno," while Steven's face is all over your local grocery store, on
> Minute Maid juice cartons and Coca-Cola packages.[12]

22.     The Twitter profiles of Jean Lopez and Steven Lopez trumpet their

celebrity status as Team USA Olympic taekwondo champions who "produce"

substantial medals and money to the USOC and USA Taekwondo:

---

[12] Ben Shpigel, *Three Siblings Headed to Beijing in Taekwondo*, N.Y. TIMES (June 21, 2008).



23.     Choosing "medals and money" over its athletes, USAT has tried to conceal that its Olympic poster boy, Steven Lopez, is a serial rapist of young athletes.

24.     As NPR reported, it was only the filing of the First Amended Complaint in this lawsuit on May 4, 2018, (in addition to the account of a 14-year-old victim who is not a named plaintiff in this case) that finally shamed USAT into temporarily suspending Steven Lopez only three days later, on May 7, 2018.[13]

25.     Although the investigation of Steven Lopez began in 2014, the decision to suspend him did not occur until mid-2018.

---

[13] Alexandra Starr, *Decorated Taekwondo Athlete Steven Lopez Temporarily Barred Amid Assault Claims*, NPR (May 7, 2018) ("Steven Lopez's suspension comes just days after four former elite taekwondo athletes filed suit in the U.S. District Court for Colorado alleging that the Lopez brothers had sexually assaulted them. They are not the only people accusing the Lopezes of misconduct. As NPR reported last Friday, Nina Zampetti — who started training with Steven Lopez when she was 8 years old — says that when she was 14, and Lopez 22, he had her perform oral sex on him.").

26.     Jean Lopez could not have sustained his "decades long pattern of sexual misconduct" without help from officials in high places. Nor could Steven. Jean's and Steven's long list of rapes were facilitated by several officials at the highest levels of USAT. Rather than upholding the values and spirit of Team USA, these bad actors manipulated the trust placed in them, abused the power and legitimacy bestowed upon them, shattered the innocence and dreams of numerous young athletes, and violated numerous federal and state laws.

27.     Once they were exposed by the national news media, USAT tried to deny its liability, cover up itscrimes, lie to Congress, and obstruct and interfere with several investigations to hold the USAT accountable for letting the Lopez brothers prey on Team USA's athletes.

28.     The misconduct in trying to conceal their misdeeds is as transparent as it is despicable, as the *Washington Post* has pointed out when discussing this lawsuit:

> The lawsuit should be read carefully by members of Congress, who are prepping to interview Olympic officials May 23 about how an epidemic of sex abuse has flourished across multiple sports. It contains a vital timeline and vivid blueprint of the USOC's appallingly evasive standard operating procedures, and purposeful liability-dodging, and lip-service sanctimony. You know when the USOC received the first complaint about the Lopez brothers messing with a young girl? In 2006. Only last month did the USOC's newly established Center for SafeSport ban Jean Lopez for life for sexual misconduct with a minor, a decision he is appealing. Only this week did USA Taekwondo declare Steve Lopez temporarily suspended while it investigates him for similar alleged misconduct.
>
> Twelve years ago. That's when Mandy Meloon, one of four plaintiffs, first handed a written complaint against the Lopez brothers to officials at the USOC and USA Taekwondo.[14]

---

[14] Sally Jenkins, *USOC Can't Just Look Ahead to Better Sex Abuse Prevention*, WASH. POST (May 11, 2018).

29.     Because of the repeated sex crimes occurring within Olympic sports, Congress enacted the *Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017* ("The 2017 Sports Abuse Act"). The 2017 Sports Abuse Act was passed in direct response to "allegations of sexual abuse made against personnel involved with USA Gymnastics, USA Swimming, and USA Taekwondo and follows hearings [in 2017] before the Senate Judiciary Committee and the Senate Commerce Committee on athlete safety issues."[15]

30.     Architected by Senators Dianne Feinstein (D-Calif.) and Susan Collins (R-Maine), the 2017 Sports Abuse Act was introduced with the broad support of "Republican and Democratic members from both the House and the Senate, and four former Olympic gymnasts."[16]

31.     In testimony on the floor of the Senate, Senator Feinstein emphasized that the 2017 Sports Abuse Act "strengthens the law that allows victims of sex abuse to file suits against those who abused them to commit crimes such as sex trafficking" and that punitive damages are now expressly provided by statute "due to the heinous nature of the crimes."[17]

32.     Senator Feinstein further condemned the commercial obsession with pursuing "medals and money" over the safety of America's young athletes:

> One of the common themes I heard from their stories was not just the predatory behavior of the perpetrators, but also how the USA Gymnastics institution failed to

---

[15] Senator Susan Collins, *At Press Conference with Former Olympic Gymnasts, Senator Collins Urges Colleagues to Support Legislation She Introduced with Senator Feinstein to Protect Athletes from Sexual Abuse*, COLLINS.SENATE.GOV (Jan. 30, 2018), https://www.collins.senate.gov/newsroom/press-conference-former-olympic-gymnasts-senator-collins-urges-colleagues-support

[16] *Id.*

[17] Testimony of Sen. Feinstein, 164 CONG. REC. S589-02, 2018 WL 636521 (Jan. 30, 2018).

protect them. One of the women told me how she heard USA Gymnastics officials say at one point that ==it was their top priority to obtain "medals and money" and that a "reputation of a coach" should not be tarnished by an allegation raised by a victim==.[18]

33.     This Congressional action sought to remedy decades of flagrant and knowing sexual abuse at the highest levels of Team USA, across nearly all of the Olympic sports.

34.     Fortunately, Congress created not only the USOC, but also a list of federal statutes (including the 2017 Sports Abuse Act) with severe civil remedy provisions specifically crafted to punish and deter the very criminal conduct that was knowingly committed in this case.

35.     Through this lawsuit, Plaintiffs shine a light on  USAT. Plaintiffs declare that enough is enough, that no other athletes should have to endure the "disgusting and unnecessary"[19] exploitation, abuse, forced labor and services, and trafficking they have experienced at the hands of the Team USA rapists and traffickers who stood at the apex—and served as the gatekeepers—of USAT.

## PARTIES

**The Plaintiffs**

36.     Plaintiff Mandy Meloon ("Mandy") is a citizen of Texas.

37.     Mandy was born in 1981.

38.     Mandy can be served via her undersigned counsel.

---

[18] Testimony of Sen. Feinstein, 163 CONG. REC. S1634-01, 2017 WL 900895 (Mar. 7, 2017) (emphasis added).

[19] Tom Schad, *Lawsuit Claims USA Gymnastics Paid to Quiet Olympic Gold Medalist McKayla Maroney,* USA TODAY (Dec. 20, 2017) (quoting McKayla Moroney's tweet from October 2017 under hashtag #MeToo).

39.     Plaintiff Heidi Gilbert ("Heidi") is a citizen of California.

40.     Heidi was born in 1982.

41.     Heidi can be served via her undersigned counsel.

42.     Plaintiff Gabriela Joslin ("Gaby") is a citizen of Texas.

43.     Gaby was born in 1983.

44.     Gaby can be served via her undersigned counsel.

45.     Plaintiff Amber Means ("Amber") is a citizen of California.

46.     Amber was born in 1990.

47.     Amber can be served via her undersigned counsel.

48.     Kay Poe ("Kay") is a citizen of Texas.

49.     Kay can be served via her undersigned counsel.

**The Defendants**

### *USA Taekwondo*

50.     The Ted Stevens Amateur Sports Act ("The Sports Act") gives the USOC the express authority to authorize National Governing Bodies ("NGBs") in all Olympic Sports.

51.     Defendant USA Taekwondo ("USAT") is the USOC-recognized and USOC-regulated NGB for the sport of taekwondo.

52.     USAT was at all times herein mentioned and still is a Colorado Corporation with its principal place of business in the city of Colorado Springs.

53.     USAT can be served at One Olympic Plaza Colorado Springs, Colorado 80909.

***Steven Lopez***

54.     Defendant Steven Lopez is a citizen of Texas.

55.     Steven Lopez was born in 1978.

56.     Steven Lopez lives in his parents' house in Texas.

57.     Steven is a three-time Olympic medalist, having won two gold medals and one bronze medal.

58.     Steven Lopez has been an athlete and a coach on numerous USOC teams and has appeared at Sports Act-protected competitions around the world.

59.     Sports Act-protected competitions include the World Championships, World Cup, Pan Am, and Olympic Games.

60.     At these protected competitions, while competing for the USOC's "Team USA," Steven Lopez has received financial and other benefits in the form of, among other things, significant compensation from the USOC.

## JURISDICTION

61.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367 for the state law claims alleged.

62.     Venue is appropriate in this district because USAT has its corporate headquarters in this district and there is a substantial connection to this district because a substantial number of the relevant events occurred here.

## FACTS COMMON TO ALL COUNTS

**A.     Corporate Structure: Anatomy of the USOC, USAT, and the Other NGBs**

63.     Congress originally chartered the United States Olympic Association in 1950 to organize and promote the United States' participation in international Olympic

competition. This spun into the United States Olympic Committee (the "USOC") in 1964.

64.     In 1978, concerned with "the disorganization and the serious factional disputes that seemed to plague amateur sports in the United States," Congress enacted the Ted Stevens Olympic and Amateur Sports Act ("the Sports Act"), P.L. 95–606 (now codified at 36 U.S.C. § 220501, *et seq.*), to codify the purpose and powers of the USOC, and to create NGBs for each Olympic sport.

65.     Thus, the Sports Act created and controls the USOC.[20]

66.     The USOC fulfills its statutory "exclusive jurisdiction" by recognizing, for each of the various sports represented in the Games, one eligible amateur sports organization as an NGB for that sport, and the USOC provides financial assistance to them.[21]

67.     Each NGB is charged with promoting competition in its respective sports.

68.     Each NGB is charged with selecting the athletes, officials, and coaches for its sport at the Pan Am Games, World Championships, World Cups, and Olympic Games.

69.     The Pan Am Games, World Championships, World Cups, and Olympic Games are "protected competitions" under the Sports Act.

70.     The USOC approves the submissions of the coaches, athletes and officials by each NGB for participation in protected competitions.

---

[20] Title 36 U.S. Code, chapter 2205 organizes and defines the USOC as a "federally chartered corporation." 36 U.S.C. §§ 220501(b)(6); 220502(a).

[21] 36 U.S.C. § 220505(c)(4), (6).

71.     USAT is one of forty-seven NGBs recognized by the USOC under the Act that sponsors or arranges amateur athletic competition.[22]

72.     Proving that the USOC has the power to regulate the daily affairs of each NGB, the USOC has placed USAT on probation more than once. The USOC last placed USAT on probation throughout 2013.[23] When doing so, the USOC intervened and directly ran the day to day affairs of USAT. According to the USOC, USAT was placed on probation for "not meeting its National Governing Body ('NGB') requirements and obligations as set forth in the Ted Stevens Olympic and Amateur Sports Act (the 'Act') and the USOC Bylaws' in a Section 10 Complaint."[24]

73.     The USOC has repeatedly exercised control and forced NGBs to act in a certain way. For example, in 1999, the USOC required all NGBs to purchase insurance to specifically cover the sexual assaults of any minor. If NGBs did not purchase sexual abuse insurance, their members would not be permitted to use the USOC training centers in Chula Vista, California; Lake Placid, New York; Marquette, Michigan; or Colorado Springs, Colorado.

## B.     Forced Labor and Services and Trafficking: USAT Knowingly Benefits from the Medals and Money Delivered by the Lopez Brothers

74.     The USOC and its NGBs (including USAT) have a monopoly on the Olympics: if an American athlete wants to compete at the Olympics, her only option is to be chosen and placed on Team USA. Simply put, the only passport that allows entry

---

[22] 36 U.S.C. § 220501(b)(3), (8).

[23] *USOC Board of Directors Lifts USA Taekwondo Probation*, TEAMUSA (Oct. 11, 2013), https://www.teamusa.org/USA-Taekwondo/Features/2013/October/11/USOC-decision

[24] *Id.*

to Team USA for the Olympics is to be on the official team. Here, for taekwondo, that was USAT.

75.     This pure monopoly situation creates an extraordinary imbalance of power between the laborer (athlete) and the employer (the USOC, including its NGBs—like USAT—and the coaches—like Jean Lopez). As the Chair of the US Olympic Committee Athletes' Advisory Council testified:

> Individual athletes have almost no power in our system, instead the USOC and National Governing Bodies hold the dreams of our athletes in their hands and athletes fear these coaches and administrators, armed with congressionally granted monopoly power will retaliate if they protest or dissent.[25]

76.     As Sen. Moran (R-Kan.) rephrased this testimony at the hearing on July 24, 2018, "part of that significant problem is the monopolistic nature of the U.S. Olympic Committee. So…the structure is flawed. The problem is the relationship between athletes and the U.S. Olympic Committee, which is their only option to compete and to perform."[26]

77.     This power imbalance emboldens adult coaches and athletes to continue and proliferate their sexual exploitation without any fear of prosecution or financial penalty, which causes the toxic culture to metastasize.

78.     The vulnerability of young athletes aspiring to be Olympians has been widely documented. According to Jamie Dantzscher, an Olympic bronze medalist, the

---

[25] Testimony of Han Xiao, U.S. Senate Commerce, Science and Transportation Committee, Subcommittee on Consumer Protection, Product Safety, Insurance, and Data Security, *Hearing on Protecting Amateur Athletes*, CQ-ROLLCALL, 2018 WLNR 22755090 (July 26, 2018).

[26] Testimony of Sen. Jerry Moran, U.S. Senate Commerce, Science and Transportation Committee, Subcommittee on Consumer Protection, Product Safety, Insurance, and Data Security, *Hearing on Protecting Amateur Athletes*, CQ-ROLLCALL, 2018 WLNR 22755090 (July 26, 2018).

USOC fosters "a culture of fear in which child athletes are conditioned to never question adults. 'If we didn't weigh what they wanted, eat what they wanted, look the way they wanted, then they could take our spot away….We were kids. That's all we knew. We didn't know it could be any different[.]'"[27]

79.     Similarly, in one of the many taekwondo sex abuse cases that have plagued USAT, a young victim wrote to her coach: "At the time, I didn't know what you were doing to me was sexual abuse. I craved your attention, and I wanted to please you….Sex in exchange for becoming a world-class athlete seemed like a fair trade."[28]

80.     In this case, if Plaintiffs, and other taekwondo athletes, refused to provide the sexual services demanded on command by Jean Lopez and Steven Lopez, they were benched, suspended, or kicked off Team USA by the Lopez brothers and USAT.

81.     Hopeful athletes are "willing to do anything" to make it on Team USA and "anyone who complains or tries to reform is ostracized, unfunded or left off the team":

> The "Olympic movement" is a misnomer: The only thing moving in it is the cash from one suit pocket to another. While Congress is in the midst of investigating the United States Olympic Committee's inaction on sexual abuse of hundreds of athletes, it should also demand a financial audit. The receipts would show the fraud and underlying root rot inside the USOC that has caused the current crisis: Officials are feeding on filet mignon while ignoring athletes who are abused and on food stamps. That's no exaggeration.
> The chronic sex abuse of our gold medalist athletes in multiple sports is the direct result of a structure with zero accountability. Make no mistake, the two are related: The USOC is a nest of self-dealing in which athletes are expected to pick up the tab for official excesses and stay silent for fear of losing funding. "Athletes are starving and hungry, and this is their dream. They'll be willing to do anything to get there, including take any amount of abuse," says Ben Barger, a former Olympic sailor who has tried to confront the USOC on its fiscal habits.
> Thanks to a lack of any oversight, the USOC turned itself into a glorified first-class travel agency for its execs while ducking its duty of care and, worse, fostering an anti-whistle-blower culture in which anyone who complains or tries to reform is

---

[27] Will Hobson, *USOC Apologizes to Abuse Victims*, Wash. Post (Mar. 29, 2017).

[28] Will Hobson & Steven Rich, *An Athlete Accused Her Coach of Sex Abuse. Olympic Officials Stayed on the Sideline*, Wash Post. (Feb. 14, 2017).

ostracized, unfunded or left off the team. "There is suppression," Barger says. That suppression has shown up in my email queue in the form of people who want to talk openly but can't. There is the former USOC employee who wants to tell me about the "obscene" expense account abuses they allegedly witnessed at USOC headquarters in Colorado Springs, who shows me copies of receipts for $300 dinners for two with $150 bottles of wine on them but won't go public "because I have to raise kids in this town." There is the winter sports athlete who wants to talk about their anger over training debts while watching officials collect $800,000 salaries but requests anonymity because "the retaliation could be career-ending."[29]

82.     The unique dangers of the monopoly and monopsony (a market situation in which there is only one buyer) situation of the U.S. Olympic structure have been identified in a white paper by several experts as the cause of the "sexual, physical, emotional, and financial abuse" suffered by the Olympic-hopeful athletes trapped in (and trafficked as result of) this power imbalance:

> In contrast, the USOC's monopsony on Olympic athlete labor and services emerged only after the repeal of the amateur rule in 1986, and individual athletes have unfortunately borne its most egregious harms. With total control over the market for access to Olympic competition, the USOC and NGBs hold inordinate power over athletes, many of whom are particularly vulnerable due to the demands of elite-level competition. As recent events make plain, the power imbalance between American Olympic organizations and the athletes they are supposed to serve has resulted in exploitation that includes sexual, physical, emotional, and financial abuse. While athletes are ostensibly the true stakeholders of the Olympics, the USOC monopsony creates systemic opportunities for harm. Put simply, the institutions charged with supporting America's Olympic athletes have, over time, developed to take advantage of them.[30]

83.     The culture and geography of the Olympic sports system aggravates what is already a situation ripe for abuse and exploitation. "'Most Olympic sports are set up in a way that is not great for protecting children. You have people at the higher levels

---

[29] Sally Jenkins, *Congress Must Hold USOC Accountable for Its Spending*, WASH. POST (Mar. 28, 2018).

[30] Eli Bremer, et al., *Reducing Financial Waste & Improving Governance: Proposed Reforms to the U.S. Olympic Committee* (July 23, 2018).

who really, really want to win[.]' 'And then you have lots of young women spending lots of time with older men.'"[31]

84.     Not only are Olympic-hopefuls young and vulnerable, but they are also transported (trafficked) across the country—isolated from their homes, their parents, their friends, their family, and their support system—to train at Olympic facilities in Colorado, Texas, Michigan, and New York.

85.     They are then transported (trafficked) to competitions around the country and around the world, where they are even further isolated and more exposed to sexual predators.

86.     In the face of these power dynamics in a heavily titled labor market, at every turn, Olympic officials have sided with protecting themselves over protecting children from sex abuse—even taking the ridiculous position of refusing to implement "basic safety measures" that have been standard practice since the 1990s:

> While the 47 sport NGBs are diverse in many ways — USA Swimming annually brings in nearly $35 million and has 94 employees; USA Team Handball brings in about $500,000 and has four employees— many of them have one thing in common: their lawyers.
>
> The Olympic sports legal market is dominated by a small number of attorneys and firms in Colorado Springs and Indianapolis, where most of the governing bodies are clustered. Victims' advocates blame these lawyers and their emphasis on avoiding potential litigation, which repeatedly arises during discussions of abuse prevention in Olympic sports.
>
> In 2011, the USOC started discussing a sex abuse prevention handbook. Circulating education material is a basic safety measure experts have recommended since the 1990s; the Boy Scouts of America started doing it in 1986. As Olympic officials discussed their handbook in 2011, however, several mentioned a common concern: that the handbook could get them sued by victims, who would use it as evidence that Olympic officials knew abuse was a problem but weren't doing enough to stop it.
>
> "While several NGBs expressed that the handbook sets the proper focus . . . there is also a perception that publishing the handbook will increase their risk of legal

---

[31] Will Hobson and Steven Rich, *Every Six Weeks for More Than 36 Years*, WASH. POST (Nov. 17, 2017).

liability," Malia Arrington, a USOC executive in charge of abuse prevention,[32] wrote Blackmun in a December 2011 memo made public by the USOC this year in communication with the Senate. Child protection experts expressed bewilderment that, in 2011, organizations working with children would debate the legal risks associated with abuse prevention material.[33]

87.     When young athletes do report sexual abuse to Olympic officials, they are often met with obstruction, denials, and cover-ups. These denials instill in Team USA's young athletes the hopeless reality that their complaints and reports of sexual abuse are unimportant and that athletes are merely fungible commodities that can be trained and trafficked to competitions for the sexual gratification and commercial benefit of their coaches and other employees and executives of Team USA.

88.     From 2006-2007 (involving Plaintiff Mandy's complaints and arbitration hearing before USAT) until the Lopez brothers were both suspended in 2018, Defendants USAT knowingly participated in a venture to transport and traffic Plaintiffs and numerous other unknown other young female USA Taekwondo athletes around the globe to be used for the sexual benefit of Defendants Jean and Steven Lopez, among other coaches and athletes.

89.     USAT participated in this venture by acting as the travel agent and commercial funder for the Lopez brothers in the domestic and international sexual

---

[32] Malia Arrington was later named the head of SafeSport, as discussed below, which helps explain why it has been structurally flawed from inception. *See* Diana Moskovitz*, SafeSport, The USOC's Attempt to Stop Child Abuse, Is Set Up to Fail—Just Like It Was Supposed To*, DEADSPIN (July 24, 2018) ("Among them was current SafeSport chief operating officer Malia Arrington, who once said in a deposition that she had no authority to make USA Taekwondo ban a coach despite evidence of sexual abuse. She was, while on the USOC's payroll, SafeSport's acting CEO for most of 2016, the key person leading the board through questions about how the center would work and what its priorities would be. She's still there, as SafeSport's COO.").

[33] Will Hobson and Steven Rich, *Every Six Weeks for More Than 36 Years*, WASH. POST (Nov. 17, 2017).

exploitation of young female athletes wearing Team USA on their uniforms but carrying an awful secret about the coaches and mentors they were required to call "Master," bow to, and obey.

90.     If these athletes wanted to stay on Team USA and fulfill their childhood dreams to compete as Olympians for the United States, they had no choice but to submit to the Lopez brothers' sexual demands. It was pay-to-play, and the plaintiffs were required to pay with sexual services. If they ever wanted to be Olympians (or stay Olympians), they were forced to provide sexual services to the head coach of Team USA's taekwondo team (Jean) and his superstar brother (Steven).

91.     USAT knowingly benefited from the exchange of the "medals and money" delivered by the Lopez brothers and the "First Family" of taekwondo at Olympic competitions.

92.     As *USA Today* reported, the Lopez family's "celebrity status, along with the priority the USOC puts on winning medals," signaled to Plaintiffs Mandy Meloon and Heidi Gilbert (among others) that "officials with USA Taekwondo and the USOC [were] not eager to pursue sexual misconduct allegations."[34]

93.     The commercial benefits delivered by the Lopez family to USAT (medals and money) were more important than the safety and wellbeing of Plaintiffs.

94.     In the minds of USAT, if they had removed Jean Lopez, they would have risked losing the entire "First Family" of the taekwondo, which, in turn, would have jeopardized the "medals and money" that the "First Family" was delivering. These commercial benefits trumped the repeated reports of rape and sexual exploitation

---

[34] *Id.*

made by young athletes, who were fungible commodities that could easily be disposed of and replaced with other, more willing athletes on the Team USA roster.

**C.      Legal Duty: USAT Is Required to Protect Athletes from Sex Crimes**

95.      The USOC and USAT have long owed broad duties to regulate, supervise, and police the conduct of Jean Lopez and Steven Lopez.

96.      Jean was the USOC Taekwondo coach at the 2001 World Championships in Jeju, South Korea.

97.      Jean Lopez was the USOC head coach for the USA Olympic Taekwondo team in the 2004, 2008, 2012, and 2016 Olympics.

98.      In his capacity as the head coach of the 2004, 2008, 2012, 2016 USA Olympic taekwondo teams, Jean had the actual and apparent authority to select or influence the selection of Olympic team members.

99.      Jean was cloaked (and literally clothed) with the full authority, legitimacy, and trustworthiness of Team USA and to lead Team USA's Taekwondo team, and the athletes who competed in taekwondo had no alternative but to submit to his sexual demands.

100.      In 2015, Jean Lopez was the USOC coach at several Sports Act-protected competitions, including the World Championships in Russia and Pan Am Games in Toronto, Canada.

101.      From at least 2004 to April 2018, USAT knowingly promoted, empowered, and clothed Jean Lopez with the authority, legitimacy, and trustworthiness of being the official coach of Team USA's taekwondo team and his brother, Steven, with being the superstar of USA Taekwondo-- and marketed them as such.

102.    In doing so, they exposed hundreds of young female athletes to two known adult sexual predators: the coach of USA Taekwondo and his brother, whom he was paid and entrusted to monitor and supervise.

103.    By leaving Jean in place as the head coach (and repeatedly rehiring him as the head coach) with knowledge he is a serial rapist, USAT further ensconced Jean's status, reputation, legitimacy, and trustworthiness among Team USA and all current, future, and former female taekwondo athletes.

104.    But for Jean's status as the head coach of Team USA's taekwondo team, in which he was clothed with the authority, legitimacy, and trustworthiness of Team USA (and literally clothed in Team USA's head coach uniform), he never could have gained access or power over the countless female athletes he victimized.

105.    By hiring and then rehiring Jean as the head coach of Team USA to compete at tournaments around the world, including the 2004, 2008, 2012, and 2016 Olympics, and by shielding Jean while simultaneously attacking his victims in public, USAT ratified Jean's criminal acts and signaled to all female athletes that the rape culture of Team USA was acceptable behavior to which all female athletes had to submit in order to become part of—and stay a part of—Team USA.

106.    Because he was the head coach and the ultimate decider of Team USA's roster and therefore controlled all aspects of taekwondo for Team USA, Jean was able to sexually abuse and exploit female athletes around the world with impunity.

107.    As the head coach of Team USA, Jean personified and was the face of USAT. His actions were taken directly on their behalf, such that when he was raping and exploiting athletes traveling to and at tournaments, he was doing so in his capacity

23

as the official head coach of Team USA's Taekwondo team, with the USOC's and

USAT's knowledge that multiple young women had complained to them that Jean

Lopez was raping athletes.

**D.     Defendants Engage in Corrupting and False Testimony to Congress and Obstruct and Interfere with the Investigations of the Lopez Brothers by Law Enforcement and Congress**

108.    USAT engaged in corrupt testimony to Congress and obstruction of the

enforcement of the Trafficking Victims Protection Act to cover-up and interfere with the

investigation of the Lopez brothers by law enforcement, the FBI and Congress.

**2006-2008: USAT's Obstruction Regarding Mandy Meloon, and Heidi Gilbert**

109.    Plaintiff Mandy Meloon ("Mandy") sought to be on the Team USA roster

for the 2007 Taekwondo World Championships.

110.    But at the time, she had recently submitted a grievance with USAT

detailing the decade-long pattern of physical and sexual abuse she had suffered at the

hands of Defendants Jean and Steven Lopez.[35]

111.    In 2006 and 2007, Mandy provided her allegations of rape to numerous

officials in writing. There is no dispute that officials at both the USOC and USAT were

aware of her allegations of being raped.

112.    Upon hearing these complaints of sexual abuse against the Lopez

brothers, USAT chose to actively discredit Mandy, not only so that her complaint would

---

[35] Jonathan Allen, *Former U.S. Taekwondo Star Waits a Decade for Her #MeToo Moment*, REUTERS (Apr. 21, 2018) ("It has taken a decade, but Mandy Meloon, a two-time taekwondo world champion thrown off the U.S. national team in 2007 after accusing her coach of molesting her at age 16, has won a measure of vindication.").

not succeed, but also to stop other victims from hearing her story and becoming emboldened to speak up.

113.    USAT had a lot at stake—the commercial success of Team USA hinged on the "First Family" of taekwondo continuing to deliver "medals and money" for the USOC and USAT.

114.    To destroy Mandy's reputation, USAT's then-CEO David Askinas declared that Mandy's allegations "weren't credible," and there was no reason to protect her from coach Jean Lopez—or to interfere in his decision to keep Mandy off the team.

115.    Askinas' comments were knowingly false or showed a reckless disregard for the truth. In fact, a polygraph test administered by the USOC tested and verified that Mandy's allegations were "truthful."

116.    Askinas later admitted in a deposition (for the sexual abuse of yet another taekwondo athlete who was abused on his watch, during which he joked about pedophiles and made light of the allegations of abuse within USAT) that Mandy's arbitration "hearing" was conducted entirely over the telephone.

117.    When Mandy pursued arbitration to be reinstated to the national team (a forum obviously tilted in favor of the USOC, which controls it), the USOC's own arbitrator issued the following warning regarding the sexual abuse and exploitation of young, female athletes:

> She was, in essence, raised by the USOC and is a product of their system. Ms. Meloon's core message went to the protection of the young girls in the Olympic movement who could be exposed to situations that are inappropriate and potentially damaging….One would hope that this message is not lost and young children are properly supervised, protected and educated. One would hope that the USOC takes a serious look at the level of social interaction between its coaches and athletes and underage drinking by its athletes. One would hope that the circumstances leading to the suspension of Ms. Meloon will not re-occur in the life

of another young Olympic hopeful. Although Ms. Meloon must be held accountable for her actions, one must wonder about the culpability of the system as a whole.[36]

118. In response, USAT scurried to silence Mandy's allegations. Among other things, Askinas labeled Mandy's accusations of rape by Jean Lopez (her coach) a "misrepresentation."

119. In 2006, Plaintiff Mandy Meloon reported to the USOC her physical abuse by Steven Lopez and sexual assault by Jean Lopez at a Team USA event in Cairo, Egypt.[37]

120. In 2006, Mandy personally handed her written complaint to David Askinas, then-CEO of USA Taekwondo.

121. Because the Lopez brothers were generating medals and money for the USOC and USAT, however, defendants purposefully chose to discredit Mandy and leave Jean and Steven Lopez in their positions, which would bring further revenue (money and medals) to the USOC.

122. Although USAT nominally ordered Jean Lopez to stay away from Mandy following the submission of her complaints against Jean, USAT took no action whatsoever to enforce this order.

123. Likewise, USAT took no action to protect other female athletes from Jean Lopez, even though it was aware of allegations that Jean Lopez was a serial sexual predator who had preyed on numerous female athletes, not just Mandy.

---

[36] Brian Gomez, *Cloud over Taekwondo: Allegation of Underage Drinking, Sexual Harassment Emerge from Some Athletes,* COLO. SPRINGS GAZETTE (Aug. 18, 2007) (quoting comments by arbitrator Larry Saichek).

[37] Nancy Armour & Rachel Axon, *Allegations Hit Lopez Brothers*, USA TODAY (June 9, 2017).

124.    In fact, in 2006, Plaintiff Heidi Gilbert received a call from then-CEO of USAT, David Askinas, "asking if she was going to file a complaint" against Jean Lopez, based on his rape of her in Germany in 2003. "If not, Gilbert says Askinas told her, she needed to keep quiet. 'He was basically calling me to tell me to shut up,' Gilbert said. 'These are really big allegations against Jean and could really affect his career and family life.'"[38]

125.    As a result of being intimidated, Plaintiff Heidi Gilbert did not file a police report or file a complaint against Jean Lopez. She had seen what had happened to Mandy Meloon and realized that USAT and the USOC had decided to favor the Lopez brothers over the fungible, female athletes who were being raped by them.

126.    Heidi's allegations against Jean were also relayed to John Ruger at the USOC by Mandy in 2007.

127.    In 2007, Mandy did not file a police report in Colorado Springs, Colorado, against Jean Lopez "because David Askinas, the then-CEO of USA Taekwondo, told her too much time had passed."[39]

128.    This statement by Askinas on behalf of USAT was knowingly false and reflected the scienter of USAT to obstruct and prevent investigation and prosecution of Jean Lopez.

129.    In 2008, then-CEO of USAT, David Askinas, told Mandy she could be a member of the 2008 Olympic team for the Beijing Olympics in China—but only if she

---

[38] Nancy Armour & Rachel Axon, *Allegations Hit Lopez Brothers*, USA TODAY (June 9, 2017).
[39] *Id.*

dropped her complaint against Jean Lopez and agreed to sign a statement confessing that she was mentally ill and had fabricated her allegations against Jean Lopez.

130.    Mandy refused USA Taekwondo's attempt to cover-up and conceal her abuse and declined to retract her truthful allegations.

131.    Despite being the ones saying Mandy was mentally ill, the USOC and USAT withdrew her health insurance coverage in 2008, even though they knew she needed mental health care for the harm they had inflicted.  Lacking any health coverage or the ability to purchase medication, this infirmity resulted in her suffering significant pain and suffering and mental health issues from 2008 to present.

132.    On behalf of USAT, Askinas designated Jean Lopez as the coach for Team USA's taekwondo team for the 2008 Olympics in Beijing, China.

133.    Jean Lopez, as coach of the USOC's Olympic Team, was an executive and exercised significant discretion and control in selecting the members of the USOC Olympic Taekwondo Team.

134.    Jean selected his brother, Steven, to the team.

135.    Jean selected his sister, Diana, to the team.

136.    Jean selected his brother, Mark, to the team.

137.    Jean Lopez and David Askinas kept Mandy off of the 2008 Olympic Team in favor of Charlotte Craig, a minor athlete who had begun training with Jean Lopez.

138.    One or more of the Lopez brothers had engaged in a sexual relationship with Charlotte Craig before the 2008 Olympics, which was inappropriate, and confirmed the pay-to-play forced sexual services structure of USA Taekwondo.

139.    Ms. Craig was a minor in 2008.

140.    Despite having received written complaints of rapes from at least two athletes against Jean Lopez, the USOC submitted Jean Lopez's name to the International Olympic Committee as the head coach of Team USA's 2008 Taekwondo team.

141.    The USOC and USAT financially compensated Jean Lopez for his coaching services in Beijing.

142.    Shortly after USAT submitted its proposed athletes to the USOC for the 2008 Olympics, USAT suspended Mandy from USA Taekwondo.

143.    Jean Lopez has considerable influence over who the USOC selects for its Olympic, Pan Am, World Cup, and World Championship teams.

144.    Jean Lopez was able to influence the judging and scoring of taekwondo events.

145.    David Askinas and USAT submitted the names of athletes to the USOC for spots on the roster of the USOC teams for Olympic, Pan American, World Cup, and World Championship rosters.

## 2014-2018: USAT's Later Obstruction

146.    After suppressing allegations of rape made by Mandy and Heidi in 2006-2008, USAT began an investigation of the Lopez brothers in 2014:

> In a deposition from the lawsuit brought by women who were abused by Gitelman against USA Taekwondo, Devin Johnson, then chairman of the board, said he first heard of sexual misconduct allegations against Jean Lopez in the spring of 2014.
>
> In May 2014, the USA Taekwondo board unanimously voted to hire separate counsel as part of its implementation of SafeSport policies required by the USOC. After Meloon and Christina Johnson, another former taekwondo athlete, posted online allegations of being abused, mentioning several coaches and athletes by name including the Lopez

29

brothers, USA Taekwondo hired [outside lawyer Donald] Alperstein in March 2015.[40]

147.    In other words, USAT waited ten months (from May 2014 to March 2015) to even hire Alperstein—let alone for him to begin his investigation. This delay was unreasonable.

148.    Publicly, USAT has proclaimed how Donald Alperstein was given full authority and resources to pursue the Lopez brothers and bring them to justice:

> USA Taekwondo told USA TODAY Sports it does not discuss ongoing investigations. But in a statement, the federation said it "places tremendous importance on protecting and preserving the safety of our athletes."
>
> "USA Taekwondo gave Mr. Alperstein a broad charge and unfettered ability to carry out his task -- to expeditiously chase down every complaint, talk to every witness, gather hard actionable evidence and prosecute fully any violations, no matter where the evidence led," USA Taekwondo said.
>
> "Additionally, as he uncovered evidence USA Taekwondo has diligently provided any and all information to relevant law enforcement agencies, including local police and the FBI."[41]

149.    In sworn testimony, the Executive Director of USAT, Steve McNally, falsely and corruptly testified to Congress that there had been no obstruction of Alperstein's investigation into sex crimes committed by Jean Lopez or any other taekwondo coach:

> In 2015, following allegations by an athlete of sexual assault at the hands of the USAT coaches, USA Taekwondo immediately retained Denver attorney Donald Alperstein from a firm specializing in amateur sports law since 1985, to serve as an independent outside counsel. From this point forward USA Taekwondo has relied on its outside counsel to investigate all of the USAT history in an effort to uncover any previously unreported incidents of sexual assault, misconduct, and to pursue sanctions against offenders.

---

[40] Nancy Armour & Rachel Axon, *Allegations Hit Lopez Brothers*, USA TODAY (June 9, 2017).

[41] *Id.*

> Outside counsel operated without any limitation on its budget, with no control by USA Taekwondo as to who he should or should not pursue, and with only rudimentary intermittent reporting requirements to USA Taekwondo.[42]

150.    In reality, these statements are deliberately false. USAT intentionally lied to Congress in order to stop Congress from implementing further reforms. These false statements were material and were made for the purpose of shielding USAT from scrutiny by Congress and the public.

151.    As *USA Today* exposed in a cascade of articles issued in the past two years, USAT had no intention of turning over the Lopez brothers to prosecutors or removing them from the sport. To the contrary, USAT worked to obstruct the investigation of the Lopez brothers so they could compete and coach at the 2016 Olympics in Rio and at the National Championships in 2017.

152.    It was only after the filing of this lawsuit and the Congressional fury directed at the USOC and USAT in 2017 and 2018 that the Lopez brothers were finally suspended—a decision that was reversed again in August 2018 when Jean Lopez was reinstated by SafeSport after it abandoned the case.

153.    As *USA Today* reported in April 2018, "USA Taekwondo never held a hearing on the allegations against either Lopez, as would have been required by the organization's bylaws at the time[.]"[43] Indeed, by dragging out the investigations of the Lopezes from 2015 to 2018, the USAT violated its own bylaws:

---

[42] Testimony of Steve McNally, U.S. House Energy and Commerce Committee, Oversight and Investigations Subcommittee, *Hearing on the Olympic Community's Ability to Protect Athletes from Sexual Abuse*, CQ-ROLLCALL, 2018 WLNR 16155107 (May 25, 2018).

[43] Nancy Armour & Rachel Axon, *Lopez Investigation Enters 14th Month*, USA TODAY (April 18, 2018).

**Section 15.8 Administration**. The Judicial Committee and Ethics Committee shall generally administer and oversee all administrative grievances, right to compete, and ethics complaints filed with USAT. The Judicial Committee and Ethics Committee shall be responsible to ensure that all complaints are heard in a timely, fair and impartial manner under such procedural rules as each may promulgate.

154.    The Lopez brothers were sheltered from suspension and prosecution

because USAT wanted them to compete at the 2016 Olympics in Rio. As *USA Today*

reported, USAT worked to secretly interfere with the investigations and make sure the

Lopezes were not prosecuted or suspended:

Steven and Jean Lopez, brothers in what is often called the "First Family of Taekwondo," were allowed to participate in last summer's Rio Games even though they were being investigated for sexual misconduct, and the allegations against them have since drawn the interest of the FBI.

USA Taekwondo began investigating the Lopezes more than two years ago after receiving complaints that they had allegedly sexually assaulted multiple women. No hearings were held and USA Taekwondo, after consulting with the U.S. Olympic Committee agreed to put the inquiries on hold before the Rio Games, meaning two-time Olympic champion Steven and longtime coach Jean were free to represent the United States. [44]

155.    *USA Today* confirmed, with confidential reports from top officials who

acted as sources, the USOC and USAT secretly worked together, behind closed doors,

to make sure that the investigation against the Lopez brothers was delayed and

obstructed because of their key roles in the 2016 Olympics:

The USOC has been criticized for not taking a more proactive role in addressing sexual abuse allegations within the national governing bodies that oversee each sport, with scandals over the past decade involving USA Gymnastics, USA Swimming and US Speedskating.

USA Taekwondo consulted with the USOC on the Lopez investigations before the decision was made to allow them to go to Rio, according to a former federation official who was told by the organization's executive director, Keith Ferguson. The official spoke to USA TODAY Sports on condition of anonymity because of the sensitive nature of the allegations. [45]

---

[44] Nancy Armour & Rachel Axon, *Allegations Hit Lopez Brothers*, USA TODAY (June 9, 2017).

[45] *Id.*

156.    The parallels are palpable between this case and the case involving Larry Nassar. In fact, the USOC and USA Gymnastics followed the same path in 2015 (the same year that the FBI was notified of the Lopezes) when they merely "notified" the FBI, without doing anything further to remove Nassar or to protect athletes from him:

> Two U.S. senators called for U.S. Olympic Committee chief executive Scott Blackmun to resign Friday over the Larry Nassar sex abuse scandal.
>
> Sens. Jeanne Shaheen (D-N.H.) and Joni Ernst (R-Iowa) released a joint statement calling for Blackmun to step down in response to a Wall Street Journal report Thursday that Blackmun was informed in July 2015 by then-USA Gymnastics chief executive Steve Penny of sexual assault allegations against Nassar, the former longtime physician for Team USA women's gymnasts. Penny contacted Blackmun, according to the Journal, shortly before he reported Nassar to the FBI.
>
> This timeline has been established since December, when the USOC acknowledged in response to a lawsuit that it knew of allegations against Nassar in 2015, when USA Gymnastics reported Nassar to the FBI, but Shaheen and Ernst termed Thursday's report "deeply disturbing."
>
> "If these reports are true, this goes far beyond negligence and raises serious questions of culpability at USOC, in which the most appropriate action would be for Scott Blackmun to resign," the senators wrote in a joint statement.
>
> After Penny reported Nassar to the FBI's Indianapolis office in July 2015, USA Gymnastics quietly separated from Nassar, who served as a volunteer while working full time at Michigan State. The FBI's investigation languished, for reasons the bureau has never publicly disclosed, and Nassar continued to treat — and assault — his patients under the guise of pain therapy until August 2016, when a woman filed a complaint with Michigan State police and told her story to the Indianapolis Star.[46]

157.    Likewise, the investigation in this case was a hollow gesture by Alperstein and USAT for several reasons:

---

[46] Will Hobson, *Senators Call for USOC Head to Resign*, WASH. POST, (Feb. 3, 2018); *see also* Rebecca O'Brien & Louise Radnofsky, *FBI Interviews Top U.S. Gymnasts in Intensifying Sexual-Abuse Investigation*, WALL ST. JOURNAL (Feb. 16, 2017) (revealing that USA Gymnastics "didn't report [Nassar] to law enforcement for at least five weeks, and the FBI didn't launch a formal investigation for nine months after being notified, according to people familiar with the probe. The timing of those actions hasn't previously been reported.").

a. USA Taekwondo delayed and obstructed the Lopez investigation for ten months before it even hired Alperstein and his investigation began in March 2015.

b. Discovery in this case establishes that, in November of 2016 – after the Olympic Games – Alperstein was under pressure to report Jean Lopez.

c. Alperstein did not, in fact, make or file a police report with the police department in Sugar Land, Texas. Although Alperstein told Plaintiff Heidi Gilbert on a telephone call shortly before November 2, 2016, that he had filed a police report on her behalf, this statement was false. Any reasonable investigator or lawyer would have known that the victim must file the report herself, and Alperstein should have advised Heidi to file a police report. By proceeding as he did, he obstructed the investigation and delayed the filing of a police report by Heidi. [47]

d. On July 13, 2018, the Sugar Land Police Department Records Division advised Plaintiffs' counsel that no reports of possible sexual assaults had been filed on behalf of any Plaintiff. In a July 19, 2018, email, Records Analyst Rhonda Hensley stated that the Sugar Land police have no responsive records regarding a "sexual assault case" for involving any Plaintiff and Defendant Steven or Jean Lopez. And on July 16, 2018, Sgt. Matt Levan with the Sugar Land police department confirmed to an investigator for Plaintiffs that there were no reports on file with Sugar Land police department involving any Plaintiff and either Steven or Jean Lopez. Thus, Alperstein's alleged "report" to the Sugar Land police department was a fabrication.

e. It was not until March of 2017, just days before SafeSport took over USAT's investigation of the Lopezes, that Alperstein reached out to the FBI -- at USAT's request.

f. Given that USAT's investigation started in early 2015, it appears that Alperstein delayed his reporting for years. In comparison, USA Gymnastics followed the same path with Larry Nassar and had its entire board of directors forcibly removed by the USOC when it delayed contacting the FBI for five weeks.

g. It is unknown in what manner Alperstein contacted the FBI.

h. It is unknown how much detail or how many documents or materials he provided.

---

[47] Discovery suggests that Alperstein sent a letter to the Sugar Land Police Department regarding the Lopez brothers, but only after they had been sent to compete and participate in the 2016 Olympic Games in Rio, and apparently no report was created.

    i.    It is unknown who at the FBI Alperstein contacted, although Alperstein shared with Plaintiff Mandy in February 2018 the name and contact information of an agent with whom he and Mandy purportedly spoke.

    j.    It is unknown if Alperstein followed up to make sure the FBI was acting.

    k.    It is unsurprising that the FBI did not take the notice seriously given that neither the USOC nor USAT took any action against either Jean or Steven Lopez. To the contrary, they halted their own investigation so the Lopezes could compete at the 2016 Olympics.

    l.    Neither Lopez brother was even interviewed by Alperstein, USAT, "or anyone else[,]" which confirms there was never any sincere interest in sidelining them or prosecuting them.[48]

158.    In sworn testimony to Congress on May 23, 2018, the Executive Director of USAT, Steve McNally, misleadingly testified to Congress that:

> The committee has expressed an interest in Steven and Jean Lopez. To summarize, a lifetime ban has been imposed on Jean Lopez, and Steven Lopez is under a temporary suspension pending disposition of his case by SafeSport.

> I do want to emphasize USA Taekwondo submitted evidence gathered concerning these allegations to the FBI, the Sugarland Texas Police Department, the Fort Bend County Texas Sheriff's Office, and the Colorado Springs Police Department. With the creation of SafeSport in March 2017, all cases still pending in outside counsel's investigation were transferred.[49]

159.    Based on the falsities uncovered regarding USA Taekwondo's and Alperstein's "reports" made to the police (set forth above), further discovery is needed to confirm whether and when, in fact, USAT turned over any "evidence" to the law enforcement entities listed by Mr. McNally.

---

[48] Nancy Armour & Rachel Axon, *Allegations Hit Lopez Brothers*, USA TODAY (June 9, 2017) ("Steven Lopez said he was told in January 2016 that there was a complaint against him with USA Taekwondo. But he said he was not given any details of the allegations, nor was he interviewed by Alperstein or anyone else.").

[49] Testimony of Steve McNally, U.S. House Energy and Commerce Committee, Oversight and Investigations Subcommittee, *Hearing on the Olympic Community's Ability to Protect Athletes from Sexual Abuse*, CQ-ROLLCALL, 2018 WLNR 16155107 (May 25, 2018).

160.    USAT wanted Steven Lopez to compete—and he did compete—in the 2016 Olympics in Rio, Brazil.

161.    USAT wanted Jean to coach—and he did coach—his brother Steven, along with the other Team USA taekwondo athletes, including numerous female athletes that were exposed to his and Steven's sexual predation.

162.    USAT then permitted the investigation to resume, but only after the Olympics were over[50]—i.e., only after the "medals and money" had been obtained and delivered into the clutching hands of USAT.

163.    *USA Today* quoted an email from Donald Alperstein to Heidi Gilbert in which he wrote: "Now that the Olympics are over and things are settling down, I want to get moving again on the Steven Lopez disciplinary case[.]"[51] This was a flat-out admission that the Steven Lopez investigation was resumed only after the 2016 Olympics were "over"—and the Olympic medals and money were safely in hand.

164.    Once USAT turned over its investigation to SafeSport, the SafeSport investigation of Steven Lopez dragged on from March 2017 until the filing of the First Amended Complaint in this lawsuit in May 2018—or 14 months longer than the average

---

[50] Nancy Armour & Rachel Axon, *Lopez brothers, Olympic taekwondo royalty, hit with sex abuse allegations*, USA TODAY (June 8, 2017) ("Steven and Jean Lopez, brothers in what is often called the 'First Family of Taekwondo,' were allowed to participate in last summer's Rio Games even though they were being investigated for sexual misconduct, and the allegations against them have since drawn the interest of the FBI. USA Taekwondo began investigating the Lopezes more than two years ago after receiving complaints that they had allegedly sexually assaulted multiple women. No hearings were held and USA Taekwondo, after consulting with the U.S. Olympic Committee agreed to put the inquiries on hold before the Rio Games, meaning two-time Olympic champion Steven and longtime coach Jean were free to represent the United States.").

[51] *Id.*

SafeSport investigation of "63 days"—according to *USA Today*[52] and the head of SafeSport in a 2018 congressional hearing.[53]

165.    Steven Lopez was abruptly suspended by USAT on May 7, 2018.

166.    As *USA Today* explained, the pretextual defenses given by USAT do not survive even minimal scrutiny. "SafeSport has shown that an investigation is not necessary to take action, and it has done so quickly in other cases. Figure skating coach Richard Callaghan was temporarily suspended on March 6, five weeks after SafeSport was made aware that Callaghan had been accused of sexual misconduct 19 years ago."[54]

167.    The delays involving the Lopez brothers cannot be explained as anything other than obstruction by USAT:

> "If you look at (the Lopezes') Facebook page, they are making a mint out of doing what I call human trophy work," [said Nancy Hogshead-Makar, an Olympic gold medalist in swimming and civil rights attorney]. "They go from club to club to club, and they are Olympians. They give lessons. They have access to kids and young women. If you want to prioritize, which ones do you go after first, I would say they're right up there."
>
> Despite the number of reports, the Lopez case provided a potential leg up because Alperstein had already been investigating.[55]

168.    In fact, the SafeSport investigation would have continued dragging along had USAT not suspended Steven Lopez. To be clear, Steven Lopez was not

---

[52] Nancy Armour & Rachel Axon, *Lopez Investigation Enters 14th Month*, USA TODAY (April 18, 2018).

[53] Testimony of Shellie Pfohl, U.S. House Energy and Commerce Committee, Oversight and Investigations Subcommittee, *Hearing on the Olympic Community's Ability to Protect Athletes from Sexual Abuse*, CQ-ROLLCALL, 2018 WLNR 16155107 (May 25, 2018).

[54] Nancy Armour & Rachel Axon, *Lopez Investigation Enters 14th Month*, USA TODAY (April 18, 2018).

[55] Nancy Armour & Rachel Axon, *Lopez Investigation Enters 14th Month*, USA TODAY (April 18, 2018).

suspended by SafeSport before he was suspended by USAT, nor did SafeSport

conduct any hearing related to Steven Lopez.

169.   The contrast between the suspensions of Jean Lopez (by SafeSport and

USAT) and Steven Lopez (by USAT only), as listed on USAT's Suspension List page,[56]

vividly show that USAT did not act based on any actions of SafeSport:



170.   That USAT suspended Steven Lopez while SafeSport was still

investigating him shatters the fraudulent pretext given by USAT that it was turning over

the investigation to SafeSport and that USAT could not act on its own.

171.   Had USAT followed its own bylaws, USAT could have suspended Steven

Lopez at any point from May 2014 onward, when it began its investigation.

---

[56] USAT Suspension List, https://www.teamusa.org/usa-taekwondo/v2-resources/legal/usat-suspension-list

172.    As *USA Today* reported, the Alperstein investigation was intentionally and willfully designed and implemented as a delay tactic. Despite spending over three years investigating the Lopez brothers, Alperstein never interviewed either Jean Lopez or Steven Lopez, never conducted any hearing to have them suspended, and never did anything other than deceive Plaintiffs and others into believing he was going to do something to remove the Lopez brothers from taekwondo:

> According to seven of the people who have knowledge of the investigations, Alperstein gave the impression the intent was to conclude the case with an ethics hearing.
>
> That would be consistent with how other cases were resolved during the time the Lopez investigations have been ongoing. USA Taekwondo's bylaws require the ethics committee, which is responsible for handling alleged violations of the code of ethics and SafeSport policies, "to ensure that all complaints are heard in a timely, fair and impartial manner."
>
> Since Alperstein was given broad authority to pursue abuse cases in March 2015, USA Taekwondo has suspended six people. It would not disclose how many total hearings have been held, saying it does not discuss cases that don't result in discipline.
>
> Steven Lopez said it wasn't until last month that he was told the complaint had been transferred to the Center for SafeSport.
>
> "So this thing was like looming over me, right? I'm like trying to solve it or resolve it some way, like figure out, 'Well who's saying this?'" said Steven Lopez. "Basically, nothing happened. Nothing happened. I mean, I went to the Olympics. I'm like this is weird, why are they bringing this up right before the Olympic Games?"
>
> Jean Lopez said he has not been contacted by USA Taekwondo, SafeSport or law enforcement regarding any allegations against him either before or since the Olympics.
>
> Alperstein emailed Gilbert on Sept. 15 to update her on the status of the case against Steven Lopez and to check on her availability to possibly testify.
>
> "Now that the Olympics are over and things are settling down, I want to get moving again on the Steven Lopez disciplinary case," Alperstein wrote.
>
> But in a March 22 letter to Meloon, Alperstein indicated that procedural issues had made holding hearings difficult, if not impossible.[57]

173.    All five Plaintiffs were contacted or were in contact with SafeSport or Alperstein between 2015 and 2017.

---

[57] Nancy Armour & Rachel Axon, *Allegations Hit Lopez Brothers*, USA TODAY (June 9, 2017).

174.   By engaging Alperstein to conduct an "independent" investigation and by contacting Plaintiffs, USAT assumed a duty to act honestly and in good faith.

175.   Amidst the Alperstein investigation from 2015-2018, USAT continued to employ Jean Lopez and let him coach, along with letting Steven Lopez compete.

176.   At the 2016 Olympic Games, Jean Lopez had long been under investigation by USA Taekwondo's SafeSport program.

177.   Even so, Jean Lopez attended the Rio Olympics in 2016 and received thousands of dollars in per diem from the USOC.

178.   Steven Lopez financially benefited from his participation in the 2016 Summer Olympics.

179.   As *USA Today* explained, allowing Steven Lopez to compete at the 2017 World Championships confirmed that USAT was never serious about suspending him or turning him over to law enforcement officials:

> This Saturday, Steven Lopez, Olympic gold medalist and alleged sexual predator, will board a plane to South Korea to represent the United States at the upcoming taekwondo world championships.
> Someone needs to stop him.
> …
> Even though USA Taekwondo, the national governing body for the sport in the United States, was investigating the brothers last year, they still were allowed to participate in the 2016 Rio Olympic Games. The investigations are continuing. The allegations have since drawn the attention of the FBI.
> It is time for someone to step in. The U.S. Center for SafeSport, which became fully operational in March, was designed for just this purpose. So far, it shockingly has done nothing publicly except say it can't comment.
> The U.S. Olympic Committee created SafeSport to try to show how serious it is about sexual assault after scandals over the past decade involving USA Gymnastics, USA Swimming and US Speedskating. Yet it allowed both Lopez brothers to go to Rio even after being consulted by USA Taekwondo about the allegations.
> The USOC said in a statement last week that it takes "preventing and responding to sexual abuse ... incredibly seriously." Yet it has done nothing, not even commenting about sending these two men to Rio.
> USA Taekwondo says it "places tremendous importance on protecting and preserving the safety of our athletes." Yet it failed to hold a hearing about the

Lopezes, which is the least that should have been done before they were allowed the privilege of representing their country at another Olympics.

The World Taekwondo Federation called the allegations "very, very serious," but said "it is too early to take a position."

You get the idea. Everyone is very concerned. Yet no one is stopping Steven Lopez from going to the world championships, where he will be on a 16-person U.S. team, including three women who are still teenagers.

This is an appalling dereliction of duty by the people who have been given the great responsibility of running our nation's Olympic program and protecting the children and young adults who are a part of it.

How can they possibly look at the USA TODAY Sports report and not step in immediately?

With the creation of SafeSport, they've given themselves the wherewithal to do just that. Within the organization's rules, there is this:

"Interim measures may also be appropriate where an allegation against the Responding Party is sufficiently serious that the Responding Party's continued participation could be detrimental to sport or its reputation. Nothing in these Procedures prevents … taking appropriate interim measures upon notice of an imminent threat of harm."[58]

180.    In reality, Steven Lopez was not suspended or disciplined by either SafeSport or USAT until May 7, 2018.

**E.    Negligence and Gross Negligence: USAT Ignores Sexual Abuse**

181.    In the face of a clear legal duty to protect its own athletes, USATengaged in negligence and gross negligence by failing to protect them or to investigate the sexual predators who abuse and exploit them.

182.    USA Taekwondo is one of the 47 NGBs created by the USOC, and it has been clear that USAT has serial problems with sexual abuse and that monitoring and supervision is needed.

183.    USAT has had a "tumultuous history, twice going on probation since 2004."[59]

---

[58] Christine Brennan, *Lopez Cannot Be Allowed to Compete*, USA TODAY (June 14, 2017).

[59] Nancy Armour & Rachel Axon, *Executive Director Moves on From USA Taekwondo*, USA TODAY (Sept. 6, 2017).

184.   In September 2017, USAT's executive director, Keith Ferguson, resigned from USAT "after a series of revelations about the handling of misconduct of cases during his tenure."[60]

185.   According to *USA Today*, USAT has been plagued by three recent actions that demonstrate the gross negligence of its leadership, including Keith Ferguson, in allowing sexual predators to run rampant so long as they help deliver "medals and money" to USAT:

> [First]: In June, USA TODAY Sports reported that two-time Olympic champion Steven Lopez and his older brother Jean, who is also his coach, were allowed to go to last summer's Rio Games despite being under investigation for sexual misconduct for more than two years. USA Taekwondo never held hearings on complaints against either brother, even though its bylaws require the ethics committee "to ensure that all complaints are heard in a timely, fair and impartial manner."
> …
> [Second]: Ferguson intervened in a disciplinary matter, lifting the temporary suspension of an athlete who is a twice-convicted felon.
>
> In July, USA TODAY Sports reported on emails that showed Ferguson reinstated Para athlete David Metz a month earlier, allowing Metz to compete at the national championships.
>
> Under USA Taekwondo's bylaws and code of ethics, Ferguson does not have the authority to lift a suspension. Ferguson had initially turned the report of Metz's convictions over to the ethics committee in March before intervening.
> …
> [Third]: In a third case, which USA TODAY Sports reported last month, USA Taekwondo failed to notify the USOC of a ban imposed against an athlete for sexual misconduct, allowing him to access the USOC training center at the Rio Olympics.
>
> Peter Lopez was in Rio as the sparring partner for Steven Lopez; the two are not related but have trained together for years, including in the lead-up to the Games.
>
> In February 2016, a USA Taekwondo ethics panel found Peter Lopez had committed sexual misconduct and the organization's board of directors affirmed that decision on July 25, 2016. He was suspended for at least five years.
>
> USA Taekwondo did not notify the USOC of that decision before the start of the Rio Olympics in August.

---

[60] *Id.*

The USOC learned Peter Lopez had been suspended after a staff member at the training facility sent an email [on] Aug. 8, 2016. Lopez's access was revoked the same day. He was never issued an Olympic credential.

A former USA Taekwondo official told USA TODAY Sports that Ferguson was told before the Olympics that the USOC needed to be alerted to Peter Lopez's suspension because Steven Lopez had requested him as his sparring partner. Ferguson said he would take care of it, the official said.

The official spoke on condition of anonymity because of the sensitivity of the matter.[61]

186.   In the third case discussed above by *USA Today*, which involved Peter Lopez, USAT continued to try and evade responsibility even after *USA Today* had exposed its gross negligence and demonstrated that the USOC had disproven USAT's cover-up:

USA Taekwondo failed to notify either the U.S. Olympic Committee or World Taekwondo that it had suspended an athlete for sexual misconduct, and he subsequently was able to attend the Rio Olympics as a U.S. sparring partner and participated in the world championships this summer as a member of another country's coaching staff.

A USA Taekwondo ethics panel revoked the membership of Peter Lopez in February 2016 for at least five years for sexual misconduct, a decision that was affirmed by the organization's board of directors last summer and by an arbitrator last week.

In a statement to USA TODAY Sports, USA Taekwondo said "appropriate people within the taekwondo world and Olympic communities were kept informed throughout." It also noted that Peter Lopez's name is included on a "Suspension List" published on USA Taekwondo's web site. As is the case with several other U.S. sports federations, however, the list is neither prominently displayed nor easily accessible.

---

[61] Nancy Armour & Rachel Axon, *Executive Director Moves on From USA Taekwondo*, USA TODAY (Sept. 6, 2017); *see also* Nancy Armour & Rachel Axon, *USA Taekwondo Ignored Rules, Let Felon Compete*, USA TODAY (July 12, 2017) ("The executive director of USA Taekwondo circumvented the governing body's rules for handling disciplinary matters, lifting the temporary suspension of an athlete who is a twice-convicted felon….Ferguson's decision to intervene, along with USA Taekwondo's failure to schedule a hearing nearly four months after it was first alerted to Metz's criminal history, raises further questions about whether USA Taekwondo is following its own rules when it comes to ethics complaints.")

43

USA Taekwondo's statement also contradicts what the USOC and World Taekwondo told USA TODAY Sports about when and how they learned of the ban, which stemmed from an incident at the 2015 world championships.

The USOC said it did not know of Peter Lopez's sanction until Aug. 8, 2016, nearly two weeks after USA Taekwondo's board upheld his ban and after he had arrived at the U.S. training center in Rio. Peter Lopez was in Rio as the sparring partner for two-time Olympic champion Steven Lopez; the two are not related but had trained together for years, including in the lead-up to the Games.

…

USA TODAY Sports twice asked USA Taekwondo for clarification of the discrepancies between its statement and what the USOC and World Taekwondo said. USA Taekwondo said Wednesday that it stood by its original statement.[62]

187.   In that same story, *USA Today* further reported on the broader pattern of USAT brushing aside reports of sexual misconduct, including the Lopez brothers and also Marc Gitelman, who was allowed to coach and given a second ethics hearing after being shown to be a sexual predator, and then "not banned until he was criminally convicted":

That the USOC and World Taekwondo did not know Lopez was suspended raises further questions about USA Taekwondo's diligence in its handling of sexual misconduct complaints.

In June, USA TODAY Sports reported that USA Taekwondo had investigated sexual misconduct allegations against two-time Olympic champion Steven Lopez and his older brother Jean, who is also his coach, for more than two years. No ethics hearing was held for either brother, and the cases were turned over to the U.S. Center for SafeSport in March.

Steven and Jean Lopez denied the allegations against them in separate interviews with USA TODAY Sports. "I've never — nothing, nothing at all," Steven Lopez told USA TODAY Sports when asked if he's ever sexually assaulted or committed any kind of inappropriate behavior with any woman. "Nothing like that. Nothing close to that."

Earlier this month, a taekwondo coach, Marc Gitelman, was ordered to pay $60 million in a civil suit brought by three former students who said he sexually abused them. Gitelman was convicted in 2015 of abusing two of the women and sentenced to more than four years in prison.

---

[62] Nancy Armour & Rachel Axon, *Athlete Barred For Sexual Misconduct Went to Rio, USA Taekwondo's Failure to Notify USOC Allowed Him Access to Training Facility*, USA TODAY (Aug. 18, 2017).

A year before Gitelman was convicted in Los Angeles Superior Court, a USA Taekwondo ethics panel unanimously decided to ban the coach indefinitely based on evidence that included admissions by the coach. But USA Taekwondo's lawyer felt a procedural issue during the hearing could be grounds for a lawsuit and recommended that the ethics panel conduct a second hearing.

The women declined to participate, and Gitelman was not banned until after he was convicted. In the interim, he was able to go to a competition where one of the women who'd accused him of abuse was present.[63]

188.    The *Washington Post* detailed the incompetence regarding USAT's handling of the Gitelman case,[64] including an email from Gary Johansen (Associate General Counsel of the USOC) that admitted the USAT had issued a "temporary suspension, but never enforced it" and "there is no reason why an allegation of this sort should take six months to prosecute":

---

[63] *Id.*; *see also* Will Hobson and Steven Rich, *Every Six Weeks for More Than 36 Years*, WASH. POST (Nov. 17, 2017) ("In 2014, a USA Taekwondo disciplinary panel recommended an immediate lifetime ban of Las Vegas coach Marc Gitelman after three women came forward accusing Gitelman of abuse. USA Taekwondo leaders ignored the recommendation….USA Taekwondo banned Gitelman in 2015 after he was convicted of three sex crimes in California, in connection with the same allegations.").

[64] Will Hobson & Steven Rich, *An Athlete Accused Her Coach of Sex Abuse. Olympic Officials Stayed on the Sideline*, WASH POST. (Feb. 14, 2017).

-------- Original message --------
From: Gary Johansen
Date:03/13/2014 11:03 PM (GMT+04:00)
To: Malia Arrington ,John Ruger ,Sara Clark
Subject: USAT Allegations

My understanding is that USAT issued a temporary suspension, but never enforced it.  Also, there is no reason why an allegation of this sort should take six months to prosecute, without some sort of temporary suspension being issued and enforced.



Gary Johansen | Assoc. General. Counsel, NGB Governance/Ath. Affairs
United States Olympic Committee
1 Olympic Plaza
Colorado Springs, Colorado 80909

This e-mail is sent by an attorney or his/her agent and is intended only for the addressee's use and may contain confidential and privileged information. If you are not the intended recipient, you are hereby notified that any retention, dissemination, reproduction, or use of the information contained in this e-mail is strictly prohibited. If you have received this e-mail by error, please delete it and immediately notify the sender. Thank you for your cooperation.

189.    Of course, in comparison, it took more than four years (2014-2018) to suspend the Lopez brothers, even though there were multiple reports and USAT hired an investigator (Alperstein) in March 2015 specifically to focus on the Lopez brothers.

190.    By 2006, USA Taekwondo had received written and verbal complaints that Jean Lopez and Steven Lopez were routinely sexually exploiting, assaulting, and raping multiple female athletes that were entrusted into the protection (and bound by the commercial terms of) the USOC and USAT.[65]

191.    At all relevant times, from the 2000s to 2018, both Lopez brothers were the agents, servants, and/or employees of USAT because they coached the taekwondo team.

192.    At all relevant times, from the 2000s to 2018, both Lopez brothers were cloaked with actual and apparent authority to represent the USAT.

---

[65] For purposes of this Complaint, "rape" means any non-consensual sexual activity, that would be considered criminal, including the sexual touching of minors.

193.   USAT knew or was willfully blind that the Lopez brothers presented a clear and present danger to young female athletes.

194.   Indeed, by the early 1990s, following numerous sexual assaults of minor athletes at USOC training Centers, USOC was concerned about the safety of minor athletes at its facilities.

195.   The USOC ordered USA Taekwondo hire an adult male monitor to ensure to help protect minor female athletes.

196.   If USAT failed to get a monitor, promising minor athletes USAT like Plaintiffs Kay, Mandy, and Amber would not be permitted to live at the USOC's training centers, including the training center in Colorado Springs.

197.   By the late 1990s (when Kay and Mandy started at the training center), however, the USOC stopped enforcing the monitor requirement on USAT. This was a knowing disregard of the safety of Team USA's athletes.

198.   Sexual relationships between adult male coaches and teenage athletes is an inappropriate, unacceptable, and yet a common part of the Olympic Sports culture in the United States.

199.   USAT was aware of other young female athletes who had been raped by their coaches prior to 2007.

200.   USA Taekwondo took no action to stop, nor conducted any investigation into allegations of, coaches and officials raping young female athletes prior to 2007.

201.   In order to participate in USAT-sanctioned events, it is necessary to be a USAT member.

202.   To be a member, an individual athlete must pay dues to USAT.

47

203.    Part of the dues paid by Plaintiffs went towards the financial grants awarded to the Lopez brothers by Defendants USOC and USAT.

204.    Similarly, for a taekwondo club to be considered a USAT member club, the club must pay dues, and meet certain minimum standards set out by USAT including purchasing required sexual abuse insurance.

205.    And if the member club seeks to hold a USAT sanctioned event at the club, it must pay a fee.

206.    All those who seek to coach, judge, or participate in USAT-sanctioned events must also pay a membership fee.

207.    Part of each membership fee is used to purchase specific sexual abuse insurance.

208.    Each NGB is mandated to carry specific sexual abuse insurance coverage by the USOC.

209.    The exchange of money for membership creates a fiduciary relationship and a duty between USAT and its members, athletes, and coaches.

210.    Even so, USAT took no action to protect its athletes from sexual predators, like the Lopez brothers, who were well known to prey on young athletes. Despite having actual knowledge of the need to do so, USAT failed to adopt any policies, rules, or procedures to keep athletes safe from sexual abuse.

211.    In addition to funding USAT, the USOC provided funding to the Lopez brothers in the form of, among other things, high performance grants.

212.    USAT also provided funding to the Lopez brothers.

213.    On numerous occasions, the USOC has employed Jean Lopez as its taekwondo coach at the Pan Games, World Cup, World Championships, and Olympic Games.

214.    Indeed, Jean Lopez was the USAT coach at the 2004, 2008, 2012, and 2016 Olympic Games.

215.    In traditional taekwondo competitions, there are eight weight classes for men and women; at the Olympics, these classes are compressed to four.

216.    Jean Lopez, along with fellow coach Juan Moreno, former USAT Director of High Performance Meredith Miller, and former USAT CEO David Askinas, devised the procedure to select the weight divisions for the USOC Olympic teams.

217.    Rigging the system, Jean Lopez devised a selection process that artificially favored his family members (who were competing as taekwondo athletes) and those female athletes who submitted to his sexual demands.

218.    Steven Lopez was on the USAT team at the 2000, 2004, 2008, 2012, and 2016 Olympics, and was paid for his performance in the form of, among other things, a per diem and performance-based bonus.

219.    However, despite media protest, allegations of sexual misconduct, the pendency of the SafeSport investigation, and related "restrictions," Steven Lopez was permitted to compete in the taekwondo world championships in South Korea in June 2017.[66]

220.    On the team were 15 athletes, including three teenage female athletes, who

---

[66] Christine Brennan, *Don't Allow U.S. Taekwondo Star Steven Lopez to Go to World Championships*, USA TODAY (June 13, 2017).

were forced to be in his presence.[67]

221.    Additional factual allegations regarding USAT's negligence and voluntary assumption of a duty are set forth in paragraphs 640-874.

**F.    Congress Steps In: The 2017 Sports Abuse Act**

222.    In the face of the overwhelming reports of Olympic sex abuse that emerged in 2017, Congress decided to act. It passed the 2017 Sports Abuse Act, which was overwhelmingly popular and bipartisan.

223.    The 2017 Sports Abuse Act sailed through the House (406-3), was approved by the Senate unanimously, was quickly signed by the President, and took effect in February 2018.

224.    At the time, Senator Nelson said: "It's a stain on our country that many of our own young Olympic athletes were sexually abused for years by the very adults they entrusted to train them and keep them safe." Senator Nelson continued: "No aspiring athlete deserves to have their dream or moment of Olympic gold stolen from them by the actions of a sexual predator. These heinous crimes and the culture that allowed them to go undetected for so long must come to an immediate end."

225.    Senator Donnelly said: "Amateur athletics governing bodies like USA Gymnastics have an obligation to athletes, parents, and the sport to ensure that athletes are safe[.]"[68]

---

[67] *Id.*

[68] Senator Dianne Feinstein, *Senate Passes Bill Requiring U.S. Amateur Athletic Organizations to Report Sexual Abuse*, FEINSTEIN.SENATE.GOV (Nov. 14, 2017), https://www.feinstein.senate.gov/public/index.cfm/press-releases?ID=2BEC8C16-43E4-412A-8660-3E7EC73104F9.

226.    In announcing the 2017 Sports Abuse Act, Senator Collins applauded the multitude of Olympic sex abuse victims who spoke out in the face of retaliation by Team USA, and she criticized the "corrupt system" that had allowed sexual abuse to fester in USA Taekwondo (and nearly all of the other Team USA sports) for decades.[69]

227.    Senator Collins explained that the 2017 Act "reform[s] the law that allows victims to sue sex-crime perpetrators by extending the statute of limitations because it's often difficult for children to recognize that they have had crimes committed against them until much later on into adulthood."[70]

228.    Senator Feinstein (co-author of the law) pointed out that the 2017 Sports Abuse Act "extends the statute of limitations so that victims can sue their abusers 10 years after they become aware of their abuse. This is important because, tragically, survivors often do not fully become aware of their abuse until later in life."[71]

229.    As part of the 2017 Sports Abuse Act, Congress clarified that an Olympic "event" is more than just the moment of competition; Congress defined the term "event" such that it "includes travel, lodging, practice, competition, and health or medical treatment."[72]

## PLAINTIFF-SPECIFIC ALLEGATIONS

**Sexual Abuse, Exploitation, and Trafficking of Mandy Meloon**

230.    Mandy Meloon was born in Germany in 1981 to a German mother and an American father.

---

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] 34 U.S.C. § 20341(10).

231.   The USOC offered to make Mandy a member of its own residency program for athletes at the USOC owned Olympic Training Center in Colorado Springs.

232.   Based on the promises made to her by the USOC and USAT, Mandy elected to compete internationally for the USOC's Team USA, not for Germany's team.

233.   Partially as a result of her decision to compete for the USOC instead of the German National Olympic Committee, Mandy had to give up her German citizenship.

234.   In 1994, at the age of 13, Mandy moved into the Olympic Training Center in Colorado Springs, so she could train full time.

235.   Mandy and her family relied on the USOC's representations that she would be safe at the USOC facility in Colorado Springs.

236.   Jean Lopez was an employee of the USOC and/or USAT when Mandy moved into the USOC's Colorado Springs Training Center.

237.   In 1994, Jean Lopez befriended the 13-year-old Mandy.

238.   Jean Lopez would engage in sexual conversations with Mandy. He would tell her about his sex life and ask her about hers. He referred to Mandy in front of others as his "girlfriend."

239.   Jean offered to adopt Mandy or become her guardian.

240.   In the fall of 1994, while Jean Lopez was captain of the Men's National taekwondo team, he traveled with Mandy and the team to Korea.

241.   The USOC and USAT sponsored the athletes and coaches, funded their trip, paid per diem, and paid their flight, hotel and other expenses related to the competition.

242.   On this trip, Jean insisted Mandy sit with him, sit on his lap, give him

massages; he would massage her and referred to her as his "girlfriend" in front of members of the National team; he told other team members that Mandy was pregnant with his baby.

243.    Mandy became the youngest member of the USOC's Junior National Team in 1995.

244.    In June 1995, at age 14, Mandy made the USAT Senior National Team.

245.    As a result, Mandy began training full time at the USOC's Training Center in Colorado Springs.

246.    At the time, Jean Lopez was openly having sex with a different minor female member of the USOC's National Taekwondo Team at the Olympic Training Center.

247.    In November 1995, Mandy traveled to the Philippines with the USAT senior national team.

248.    Jean Lopez was the U.S. National team coach for these World Championships in Manila, held on November 17-21, 1995.

249.    Mandy was 14 years old and was left completely unsupervised on this trip.

250.    In March 1996, Mandy was a member of the USOC's Team USA for the World Cup in Brazil.

251.    Also in 1996, Mandy and other minor athletes traveled without chaperons to Korea for a two-week USOC/USAT exchange trip in 1996.

252.    This trip was organized, facilitated, and paid for by USOC and USAT.

253.    Jean Lopez was also on this trip to Korea.

254.    On the trip to Korea, male members of the senior team had sex with female members of the junior team (i.e., adult male athletes had sex with minor female athletes).

255.    USAT and the USOC were aware that adult senior athletes were engaging in sexual contact with minor junior athletes on their trips.

256.    The USOC and USAT took no action whatsoever to prevent sexual contact between minor junior and adult senior athletes.

257.    In 1996, adult males residing at the USOC's Olympic Training Center in Colorado Springs were having open sexual relationships with minor residents of the training center.

258.    The USOC took no action whatsoever to stop these illegal relationships.

259.    Specifically, in 1996, at age 15, Mandy was vaginally raped in her room at the training center by an adult taekwondo national team member, Danny Kim.

260.    Throughout 1996, while Mandy was 15 and while she lived at the USOC's training center, Kim would come to Mandy's room and "teach" her things about sex.

261.    When Kim would give Mandy rides to school between December 1996 to April 1997, he would often force her to perform oral sex on him.

262.    At least twice in 1997, while Mandy was 16, and while they were both living at the USOC training center, Kim filmed Mandy and himself having sex.

263.    Kim had sexual intercourse with Mandy in a hotel room in Oakland, California while they were attending the 1997 Senior U.S. Nationals, sponsored by USAT.

264.    The USOC and USAT sponsored the athletes and coaches, funded their trip, paid per diem, and paid their flight, hotel and other expenses related to the competition in Oakland, California.

265.    Ultimately, in the winter of 1997-1998, when Mandy was 17, she became

54

pregnant by Kim and went to Germany to have an abortion.

266.    Mandy made oral complaints about Kim beginning in 1997, and a written complaint against Kim in 2006, regarding the rape and Kim's ongoing, illegal sexual abuse.

267.    In January 1997, Mandy was again accepted as a member of the USOC's National Taekwondo team.

268.    Jean Lopez was a USOC-approved, USOC-sanctioned, and USOC-credentialed athlete for the 1997 World Cup, which took place in Cairo, Egypt in June 1997.

269.    The USOC and USAT sponsored the athletes and coaches, funded their trip, paid per diem, and paid their flight, hotel, and other expenses related to the competition in Cairo.

270.    At the 1997 World Cup in Cairo, Egypt, Mandy was assigned to a shared hotel room with Kay Poe.

271.    Kay and Mandy pushed their beds together before going to sleep.

272.    Sometime during the night while both girls were asleep, Jean Lopez entered Mandy and Kay's room.

273.    While Mandy was asleep, Jean climbed into the beds of Mandy and Kay.

274.    Jean digitally penetrated Mandy's vagina.

275.    Mandy estimates that Jean had his fingers inside of her vagina for 5 minutes or more.

276.    Mandy pretended to be sleeping while Jean Lopez assaulted her.

277.    Mandy was 15 years old.

278.    After her abortion in 1998, Mandy moved out of the Olympic Training Center.

279.    Shortly after moving out of the USOC's Olympic Training Center in Colorado Springs, Mandy moved to Texas to train with Jean Lopez at the Lopez' club, Elite Taekwondo, in Sugar Land, Texas.

280.    After moving to Texas, in approximately the year 2000 when Mandy was 18 and 19, Mandy began to have a sexual relationship with Jean's brother, Steven Lopez.

281.    During this time, USOC was paying Jean Lopez, Steven Lopez, and Mandy through grants, stipends, and other forms of financial compensation in exchange for their coaching, training and participation in competitions.

282.    In early 2002, Steven engaged in a sexual relationship with a high school student in Texas.

283.    Steven's sexual relationships with these and other underage girls strained his relationship with Mandy.

284.    Sometime during their relationship, Steven Lopez started to physically abuse Mandy.

285.    In January 2002, in Texas, Steven punched Mandy in the face.

286.    USOC and USAT staff and coaches (including Jean Lopez) were aware that Steven had punched Mandy in the face.

287.    In 2004, following Steven being detained for another beating of Mandy, Steven broke into the house Mandy was renting in Sugar Land, Texas, and he beat and raped Mandy.

288.    In 2005, Steven again beat and raped Mandy in her home; she ran from the

house in a state of undress and Steven chased her down the street.

289.   In April 2005, while Steven and Mandy were travelling as part of the USOC Taekwondo delegation at the World Championships in Madrid, Spain, Steven Lopez brutally assaulted and battered Mandy in their hotel, breaking her ribs.

290.   Jean Lopez, who was the USOC Coach, was aware of the incident.

291.   Shortly after being battered by Steven in Madrid, Mandy began to date other men.

292.   As a result, at the direction of Jean Lopez, Mandy was dropped from the national team.

293.   On May 5, 2006, the Sugar Land Police Department in Sugar Land, Texas, prepared an "Incident Report" based on a burglary committed by Steven Lopez at the residence of Mandy Meloon. The report documented that Steven Lopez had broken into her residence and awakened her by knocking on her bedroom door. She explained that she was "scared that he may return to her home" and that "he is upset that she has a new boyfriend."

294.   Mandy provided the case number of this Incident Report to David Askinas, then-CEO of USAT, and John Ruger, who was the USOC's athlete ombudsman from 1999-2014.

295.   In response, they did nothing.

296.   In 2006, Mandy submitted an official written grievance with the USOC and USAT detailing the range of physical and sexual abuse she had suffered at the hands of Steven Lopez and Jean Lopez. She provided this grievance to David Askinas, then-CEO of USAT.

57

297.   USA Taekwondo discredited and defamed Mandy: its then-CEO David Askinas concluded that Mandy's allegations "weren't credible," and there was no reason to fire Jean Lopez—or to interfere with his decision to keep Mandy off the team roster.

298.   Mandy pursued arbitration in order to be reinstated to the national team, but she was unsuccessful.

299.   As detailed above, USAT then-CEO David Askinas told Mandy she could be a member of the 2008 Olympic team for the Beijing Olympics in China if she withdrew her complaint against Jean Lopez and signed a statement admitting to fabricating allegations.

300.   Mandy refused USA Taekwondo's conditions and declined to retract her truthful allegations.

301.   In retaliation, Jean selected Charlotte Craig, a minor with whom one or more of the Lopez brothers was having sexual relation with, in place of Mandy Meloon to the USOC Taekwondo team in the 2008 Olympics in Beijing.

302.   Shortly after USAT submitted its proposed athletes to the USOC for the 2008 Olympics, USAT expelled Mandy from USA Taekwondo.

303.   After 2008, Mandy reached on several occasions to John Ruger at the USOC for help dealing with the fallout of her expulsion from Taekwondo.

304.   After 2008, Mandy on numerous occasions tried to get her health insurance reinstated by the USOC.

305.   Ruger demanded that in order for Mandy's health insurance to be restored, all of her therapy records would need to be turned over to the USOC and David Askinsas of USA Taekwondo.

306.   In addition to mental health treatment, Mandy needed treatment for broken bones in her face from being punched in the face by another female athlete at the direction of Jean Lopez.

307.   The USOC conditioned the restoration of Mandy's health care on her agreeing to recant her allegations against Jean and Steven.

308.   After 2008, Mandy complained to John Ruger that Steven Lopez was stalking her.

309.   On several occasions, Mandy observed Steven Lopez near domestic violence shelters, restaurants, and clubs when she was present.

310.   Sometime in 2009, Mandy gave up on trying to have her health insurance from the USOC restored. At this time, she was suffering severe mental health harms and experiencing PTSD from her repeated sexual abuse and exploitation by Defendants. The refusal of the USOC and USA Taekwondo to assist her with health insurance or counseling compounded her already-severe emotional and mental health injuries.

311.   USA Taekwondo CEO Keith Ferguson contacted Mandy in 2013.

312.   Ferguson wanted to talk to Mandy about her experiences with Jean Lopez. Ferguson was interested in speaking with Mandy because USA Taekwondo was seeking to suspend Jean Lopez from coaching.

313.   Mandy and Ferguson had at least one phone call in 2013. But Ferguson never followed up with Mandy after his call(s) with her in 2013.

314.   In 2015, while in prison, Mandy received a letter from Alperstein stating that Ferguson had made Mandy eligible for membership in USA Taekwondo.

315.   Alperstein told Mandy that he was investigating the Lopez brothers at the

request of USAT.

316.   Alperstein's communications with Mandy caused Mandy to believe that Alperstein was going to commence disciplinary proceedings within USAT to have the Lopez brothers banned from Taekwondo.

317.   From prison, Mandy told Alperstein her long history of abuse at the hands of the Lopez brothers.

318.   Mandy believed that Alperstein shared her desire to protect future generations of athletes from the rapes and physical abuse she had endured at the hands of the Lopez brothers.

319.   Mandy and Alperstein had frequent communication while she is in prison.[73]

320.   Mandy was not informed by Alperstein that his investigation was stayed so that the Lopez brothers could compete in the Rio Olympics.

321.   Mandy was shocked and upset that the Lopez brothers were allowed to compete in yet another Olympic Games.

322.   At the time, it was known throughout the taekwondo community that the Lopez brothers were being investigated for rapes and physical abuse of young women.

323.   It was known that Mandy was cooperating with that investigation.

324.   When the Lopez brothers were allowed to compete in the Rio Olympics, Mandy's allegations against the Lopez brothers were once again branded as untrue in the taekwondo community.

325.   Mandy's reputation suffered, and she suffered emotional distress.

326.   In late 2016 or early 2017, Mandy was once again contacted by Alperstein

---

[73] Mandy was released from prison in January 2018.

who wanted to resume his investigation now that the Olympics were over.

327.   Mandy again cooperated with Alperstein.

328.   Mandy was also contacted by Kathleen Smith from the US Center for Safe Sport.

329.   Mandy also cooperated with Ms. Smith.

330.   Mandy provided Ms. Smith with numerous detailed statements of her allegations against the Lopez brothers.

331.   Mandy believed that Mr. Alperstein, Ms. Smith, and the US Center for Safe Sport shared a good faith interest in having the Lopez brothers brought to justice and removed from taekwondo.

332.   In the summer of 2017, numerous media stories, in *USA Today* in particular, detailed the allegations of Mandy and numerous other young women against the Lopez brothers.

333.   Neither USAT, nor the US Center for Safe Sport, nor the USOC ever took any action against the Lopez brothers in 2017.

334.   Again, it was known in the Taekwondo community that Mandy was cooperating with the Alperstein and Safe Sport investigations.

335.   Again, since the USOC, USAT, and Safe Sport refused to take any meaningful action against the Lopez brothers, Mandy was called a liar and accused of defaming the Lopez brothers.

336.   In April 2018, based on evidence provided by Mandy and the other Plaintiffs, Jean Lopez was banned from taekwondo by Safe Sport.

337.   Mandy finally felt vindicated and relieved that Jean was finally disciplined

for his decades of raping, assaulting, and exploiting young female athletes.

338.   Mandy felt a sense of vindication from Safe Sports April 2018 actions.

339.   In August 2018, Safe Sport reversed itself and lifted the ban on Jean Lopez.

340.   Again Mandy and the other Plaintiffs' credibility and reputations were crushed in the taekwondo and Olympic communities. Taekwondo message boards called for retaliatory actions to be taken against Mandy and the other Plaintiffs.

341.   Mandy and the other Plaintiffs have now pieced together that all Defendants worked together to obstruct and delay the suspensions of both Lopez brothers, and to have Jean Lopez's suspension abandoned on appeal by SafeSport.

342.   Based on all of the above actions, Mandy has suffered extreme emotional distress caused by the bad faith investigations of the Lopez brothers, and in effect, the Defendants abandoning the case against Jean Lopez on appeal (after he was suspended in the underlying hearing). Taken together, this malfeasance has led Mandy to experience institutional abandonment and strong feelings of emotional distress.[74]

343.   Mandy has suffered a long list of mental and physical symptoms as a result of the personal and emotional injuries caused by the actions of the Lopez brothers, the USOC, USA Taekwondo, and SafeSport. Among other injuries she has suffered, in 2015 she was treated for the PTSD caused by the sexual trauma she endured at the hands of the Lopez brothers, the USOC, and USAT.

344.   Mandy also has been harmed in her reputation and has no long-term prospects for employment because of the obstruction of the USOC, USA Taekwondo,

---

[74] See Nancy Armour & Rachel Axon, *Athletes Outraged as Banned Taekwondo Coach Reinstated*, USA TODAY (Aug. 17, 2018) (quoting Mandy and discussing the "outrage" of Plaintiffs and the other victims of Jean Lopez after seeing him reinstated by SafeSport and the USOC).

SafeSport, and the Lopez brothers working to discredit her allegations. Her spiraling mental health problems were directly caused by the sexual abuse and exploitation of the Defendants, yet the USOC and USA Taekwondo have chosen to side with the Lopez brothers instead of her, the victim.

**Sexual Abuse, Exploitation, and Trafficking of Kay Poe**

345.    In 1996, at the age of 14, Kay became the youngest-ever member of the United States National Taekwondo team.

346.    In 1997, she participated in the World Championships in Cairo, Egypt.

347.    Defendant USAT or its predecessor, The United States Taekwondo Union, held a training camp in Colorado Springs for the 1997 World Championships.

348.    The training camp was held at the USOC's Olympic Training Center in Colorado Springs.

349.    At the training camp for the World Championships, a 22-year-old teammate began having a sexual relationship with Kay.

350.    Kay was only 15 years old.

351.    USAT was also aware of the illegal sexual conduct involving Kay.

352.    Like the USOC, USAT took no action when they learned of this illicit sexual relationship.

353.    Jean Lopez forced a sexual relationship with Kay while she was still a minor.

354.    By 1999, Jean Lopez was sexually exploiting Kay and engaging in full sexual intercourse with her.

355.    The sexual exploitation of Kay by Jean was not a secret and became common knowledge in the USAT community.

356.    In June 1999, Jean Lopez was the coach of the USA Taekwondo team at the World Championships, held in Edmonton, Alberta, Canada. This was a Sports Act-protected competition.

357.    The USOC and USAT sponsored the athletes and coaches, funded the trip, paid per diems, and paid for the travel, hotel and other expenses related to the World Championships in Canada.

358.    At this competition, Jean Lopez engaged in sexual intercourse with Kay, who was 17 years old.

359.    In July 1999, Jean Lopez was the coach of the USA Taekwondo team at the Olympic qualifications in Porec, Croatia. This was a Sports Act-protected competition.

360.    The USOC and USAT sponsored the athletes and coaches, funded their trip, paid per diem, and paid their flight, hotel and other expenses related to the Olympic qualifiers in Croatia.

361.    On the flight to Croatia, Jean received a "hand job" from Kay, and he engaged in sexual intercourse with Kay for the remainder of the trip.

362.    Kay was 17 years old.

363.    Jean continued having a sexual relationship with Kay when she turned 18 years old, including while he was the USOC Taekwondo Coach and Kay was an Olympic competitor at the 2000 Olympic Games in Sydney, Australia.

364.    Shortly after the 2000 Sydney Olympics, Kay was able to stop Jean Lopez from forcing sexual intercourse with her.

365.    At the 2002 U.S. Open in Orlando, Florida, Jean Lopez was the USOC Taekwondo Coach and Kay, then age 20, was a competitor.

366.    The USOC and USAT sponsored the athletes and coaches, funded the trip, paid per diems, and paid their flight, hotel and other expenses related to the competition in Orlando, Florida.

367.    Jean followed Kay to her hotel room and, despite her protestations, mounted her, pinned her, and "dry humped" her until he ejaculated in his pants.

368.    Kay left the sport of Taekwondo after failing to make the 2008 Olympic Team.

369.    Kay participated in the SafeSport investigation of the Lopez brothers in 2017-2018. Her written allegations were forwarded by Heidi Gilbert to Kathleen Smith at the US Center for Safe Sport in 2017.

370.    It was widely known in the Taekwondo community that Kay was cooperating with Safe Sport.

371.    Throughout 2017 Kay followed the media reports, particularly in *USA Today*, detailing the ongoing investigations by both Alperstein and Safe Sport into Jean and Steven Lopez.

372.    When the USOC and USAT refused to take any meaningful action against the Lopez brothers in 2017, Kay's credibility and reputation were assailed in the Taekwondo community.

373.    In April 2018, based on the statements of Kay and the other Plaintiffs, Safe Sport finally banned Jean Lopez.

374.    When Safe Sport finally banned Jean Lopez, Kay felt a sense of vindication.

375.    The banning of Jean Lopez gave a sense of relief that Jean would no longer

have unrestricted access to young taekwondo athletes.

376.   In August 2018, Safe Sport reversed itself and permitted Jean Lopez to begin coaching again Kay suffered emotional and mental distress.

377.   Kay's reputation and creditability were again crushed in the Taekwondo community.

378.   Kay is outraged and has suffered severe emotional distress over the handling of the sham Lopez investigations. She has experienced institutional abandonment at the hands of the Lopez brothers and has been harmed in her reputation, career, and profession by the obstruction of USA Taekwondoand the Lopez brothers working to discredit her allegations.

**Sexual Abuse, Exploitation, and Trafficking of Heidi Gilbert**

379.   In October of 2002, Heidi Gilbert was a member of the USOC's Taekwondo team in the Pan American (Pan-Am) Championships in Ecuador.

380.   Along with the other Plaintiffs, Heidi relied on the authority bestowed upon the Lopez brothers by the USOC and USAT to believe the Lopez brothers were credible, safe, responsible, and trustworthy.

381.   Jean Lopez was the Team USA Taekwondo coach at the 2002 Pan-Am Championships in Ecuador.

382.   Jean Lopez was financially compensated by USA Taekwondo in 2002.

383.   The USOC and USAT sponsored the athletes and coaches, funded their trip, paid per diem, and paid their flight, hotel and other expenses related to the competition in Ecuador.

384.   After winning a gold medal in the 2002 Pan-Am Championships, Heidi was

flexing in front of a mirror with Diana Lopez, who is Jean and Steven Lopez's sister;[75] Diana also competed as a member of the USOC's Taekwondo team at the 2002 Pan-Am Championships.

385.    Jean Lopez entered his room where Heidi and Diana were flexing in front of the mirror, celebrating their performances in the Pan-Am Championships.

386.    Diana left the hotel room shortly after Jean entered.

387.    Then Jean wrestled Heidi to the bed.

388.    Heidi initially believed Jean was "wrestling" with her, and she wanted to show Jean how strong she was.

389.    But Jean pinned Heidi in a fetal position on the hotel bed and began "dry humping" Heidi. Jean ejaculated in his pants. When Jean was finished, Heidi stood up and left the room.

390.    In 2003, to further her Taekwondo career and to achieve her dream of being an Olympian, Heidi moved from her home state to Texas to train with Jean Lopez.

391.    While in Texas, Heidi lived at a house owned by the Lopez brothers' parents.

392.    In 2003, Heidi was part of the United States Taekwondo national team.

393.    In September 2003, Heidi competed on the USA Taekwondo team at the World Championships in Garmisch-Partenkirchen, Germany.

394.    At this competition, Heidi received a stipend of approximately $2500.00 for making it to the quarter finals. She was also receiving $1,000.00 a month from USAT.

---

[75] Like her brothers, Mark, Jean, and Steven, Diana has received compensation from the USOC and USAT.

395.   USAT made all of the travel arrangements for competition in Germany, purchased the airplane tickets, paid for hotel rooms and paid for the meals of its athletes, coaches, and officials.

396.   USAT compensated Jean Lopez for his coaching services in 2003.

397.   After the 2003 competition in Germany, Jean, Heidi, Mandy, Peter Lopez,[76] and others attended a party in Germany.

398.   At the party, Jean was sexually aggressive with Heidi by grabbing her, grinding his body into hers, and making inappropriate sexual comments to her.

399.   At same point, Jean gave Heidi a drink that he had drugged.

400.   After consuming this drink, Heidi almost passed out.

401.   Heidi was aware of what was going on but could not move.

402.   Jean ended up putting Heidi in a taxi with himself as the only passengers, where he began to touch Heidi's breasts and vagina through her clothing.

403.   When they reached the hotel, Jean dragged Heidi's limp body inside to a lobby area in the back of the hotel and began slapping her face and choking her.

404.   Heidi was unable to respond physically.

405.   Heidi remembers Jean pulling down her pants and digitally penetrating her vagina.

406.   Heidi remembers Jean performing oral sex on her.

---

[76] Peter Lopez is a two time Olympian and Taekwondo coach and known rapist, but he is not related by blood or marriage to defendants Steven and Jean Lopez. Peter Lopez was banned from USA Taekwondo in 2014 for sexually assaulting various athletes; however, the USOC gave Peter Lopez credentials allowing him to enter the Olympic Village during the 2016 Rio Olympics. *See* Nancy Armour & Rachel Axon, *USA Taekwondo Athlete Allowed in Rio Olympics Training Gym After Ban for Sexual Misconduct*, USA TODAY (Aug. 17, 2017).

407.    Heidi passed out.

408.    Heidi woke up on the floor of a common area of the hotel in a state of undress; Jean had managed to pull up her jeans but they were unfastened.

409.    On the plane ride back to the United States, Jean told Heidi that he regretted marrying his wife and wanted to have "Olympic babies" with Heidi.

410.    In April 2003 When Heidi arrived at the airport in Houston from Seattle, Steven Lopez (then a USOC athlete) was there to pick her up.

411.    But Steven refused to drive her home until she gave him a blow job.

412.    Heidi had never had sex with Steven before.

413.    In October 2003, another USOC athlete Peter Lopez, who is not biologically related to Defendants Jean and Steven Lopez, came into Heidi's room at the home owned by Jean and Steven Lopez's parents where Heidi was living in Texas.

414.    Peter took his pants off and demanded that Heidi fellate him.

415.    Heidi immediately started to cry and told Peter to leave the room.

416.    Heidi decided that she should leave Texas.

417.    Heidi returned to Seattle in 2003 and continued participating in taekwondo.

418.    In 2006, as reported by USA Today, David Askinas (then-CEO of USA Taekwondo) and other employees threatened Heidi and warned her not to tell anyone about Jean's sexual assaults.

419.    Heidi has suffered a variety of physical and mental symptoms as a result of the personal injuries caused by Lopez brothers, the USOC, and USAT.

420.    In 2002, Heidi suffered retaliation from USAT and had to hire an attorney in order to be restored in the Resident Athlete Program.

421.   She suffered personal humiliation from the team coach and USAT, when they refused to coach Heidi at the 2002 Pan-Am Games in Ecuador, a USOC sanctioned event.

422.   Heidi's fear of retaliation from the Lopez brothers, the USOC, and USAT (along with the threats they made to her) prevented her from reporting Jean's sexual assaults to law enforcement officials.

423.   Heidi believes that if she had reported Jean's sexual assaults to USAT prior to 2015, the USOC would have taken no action against Jean Lopez.

424.   Heidi believes that if she had reported Jean's conduct to the USOC prior to 2015, USA Taekwondo would not have taken any action against Jean.

425.   If Heidi had complained to the USOC or USA Taekwondo about Jean Lopez, her complaints would have been ignored—just as Mandy Meloon's were.

426.   In 2011 USAT board member Brandon Meek reached out to Heidi by phone. Mr. Meek asked Heidi if the rumors he had heard about her being sexually assaulted by Jean Lopez were true. She confirmed they were not rumors and were true allegations.

427.   Mr. Meek wanted to know if Heidi would share her experiences with other members of the USAT board of directors. Heidi confirmed that, yes, she was willing to share her allegations with the USAT Board.

428.   In line with USA Taekwondo's gross negligence, Meek never followed up and nothing ever came of Heidi's contacts with Brandon Meek.

429.   Heidi reported her abuse to Donald Alperstein in 2015 as part of the USA Taekwondo investigation.

430.   Heidi and Alperstein were in frequent contact throughout 2015 and 2016.

431.   It was known throughout the Taekwondo community that Heidi was cooperating with the Alperstein investigation.

432.   When USAT took no action against Jean and Steven Lopez in 2015 and 2016, Heidi's reputation and credibility in the taekwondo community were assailed.

433.   In 2015, Alperstein told Heidi he would file a police report in Sugarland, Texas, on her behalf detailing her allegations against the Lopez brothers.

434.   Based on Alperstein's assurances that he would file a police report, Heidi did not file one.

435.   Heidi learned in the summer of 2018 that no police report was ever filed by Alperstein.

436.   When Jean and Steven coached and competed in the 2016 Rio Olympics, Heidi suffered further emotional and mental distress.

437.   Heidi participated in an investigation of Jean Lopez, but USAT and USOC jointly worked to halt this investigation in order to permit Jean to coach at the 2016 Olympic Games in Rio.

438.   By doing so, USAT and the USOC knowingly and willfully prolonged the exposure of Team USA's taekwondo athletes to two different sexual predators who were clothed with the full authority of Team USA and were in a position of extreme power, trust, and influence over Team USA athletes.

439.    While cooperating with Alperstein's investigation Heidi was (and still is) a successful taekwondo coach in California.

440.   Due to the Lopez brothers competing in the 2016 Olympics, Heidi endured harassment in the Taekwondo community, which harmed her business.

441.   This harassment became so severe that it seriously harmed Heidi's relationships and business.

442.   In late 2016, Alperstein told Heidi that he could begin his investigation again now that the Olympics were over.

443.   Throughout the remainder of 2016 and all of 2017, Heidi cooperated with Alperstein's investigation.

444.   In 2017, Heidi was contacted by Kathleen Smith from the Center for Safe Sport.

445.   Heidi provided numerous detailed written and oral statements to Ms. Smith and SafeSport, just as she had with Ms. Alperstein.

446.   Heidi provided information and facts to Ms. Smith several times in 2017 and 2018.

447.   Based on the information and statements provided by Heidi and the other Plaintiffs the US Center for Safe Sport banned Jean Lopez in April 2018.

448.   When Safe Sport finally banned Jean Lopez, Heidi felt a sense of vindication.

449.   The banning of Jean Lopez gave a sense of relief that Jean would no longer have unrestricted access to young taekwondo athletes.

450.   Heidi is currently a taekwondo coach in California, and her profession and business depend on her reputation in the taekwondo community. Thus, the denials of the Lopez brothers, which effectively call her a liar, have directly harmed her business.

451.   Heidi is outraged and has suffered severe emotional distress over the handling of the sham Lopez investigations. She has experienced institutional

abandonment at the hands of the Lopez brothers and has been harmed in her reputation, career, and profession by the obstruction of the USOC, USA Taekwondo, SafeSport, and the Lopez brothers working to discredit her allegations.

452.   In August 2018, Safe Sport reversed itself and permitted Jean Lopez to begin coaching again Heidi suffered emotional and mental distress.

453.   Heidi's reputation and creditability were again assailed in the Taekwondo community.

454.   Heidi has been further harmed by retaliation taken by the Lopez Obstruction Enterprise. Heidi originally filed this action on April 25, 2018, asserting for the first time publicly her claims against Jean Lopez.

455.   On April 30, 2018, in retaliation, an "anonymous" party filed a SafeSport complaint against Heidi.

456.   The allegations contained in this anonymous complaint are baseless, and their sole purpose is to harass, intimidate, and threaten Heidi and her family, to retaliate against Heidi, and to interfere with and obstruct the efforts to enforce federal and state laws against the Lopez brothers and the Lopez Obstruction Enterprise.

**Sexual Abuse, Exploitation, and Trafficking of Gabriela (Gaby) Joslin**

457.   Gabriela Joslin grew up in Houston, Texas, where the Lopez brothers operated a taekwondo training club called Elite Taekwondo.

458.   Gaby had known the Lopez brothers since she was a young child.

459.   Along with the other Plaintiffs, Gaby relied on the authority bestowed upon the Lopez brothers by the USOC and USAT to believe the Lopez brothers were credible, safe, responsible, and trustworthy.

73

460.    In 2006, Jean Lopez became Gaby's coach.

461.    Gaby planned to attend the 2006 German Open in Bonn, Germany, as an Olympic hopeful.

462.    At the request of Jean Lopez, Gaby lost 20 pounds to fight in the bantam weight class at the German Open in Bonn, instead of a heavier weight class, where Jean and Steven's sister Diana fought.

463.    At the last minute, Jean informed Gaby that he could not go with her to Bonn.

464.    Thus, in Bonn, Gaby would not have a coach.

465.    Gaby nevertheless planned attended the tournament in Bonn in April 2006 to gather the experience needed to make the USOC's 2008 Olympic team.

466.    Steven Lopez offered to coach Gaby her during her matches in Bonn.

467.    Steven Lopez attended the tournament in Bonn as well, as a USAT athlete and a coach.

468.    USAT sponsored Steven, funded his trip, paid per diem, and paid his flight, hotel and other expenses related to the competition in Bonn, Germany.

469.    Numerous times prior to the competition in Bonn, Gaby attempted to have conversations with Steven about her upcoming matches, particularly because these were some of Gaby's first bouts in her new bantam weight class.

470.    A few days before her first match, Steven Lopez pushed Gaby against the wall of the hotel elevator, and while pinning her against the wall with his hands on her hips, he told her how good she felt as a bantam.

471.    The night before Gaby's first match in Bonn, Steven Lopez knocked on

74

Gaby's hotel room door, saying he wanted to discuss her match the next day.

472.   Steven entered Gaby's hotel room, sat down on the bed, turned on the television, and flipped through channels, settling on a graphic pornographic movie.

473.   He did not discuss the upcoming match. Instead, Steven told Gaby she was "too tense"; he grabbed her hips from the front, turned her around and began rubbing her glutes while she was standing up.

474.   Steven then pinned Gaby to the bed, face down, pulled down her pants and mounted her, while he continued rubbing her glutes.

475.   It was clear to Gaby that Steven required sex before he would address his responsibilities as her coach.

476.   Steven penetrated Gaby, ejaculated inside her, and left the room.

477.   Gaby then continued to allow Steven to have sexual intercourse with her for the remainder of her career in taekwondo, out of fear of the Lopez brothers and in particular, to Jean, who made it clear to her that she was to "cater to Steven."

478.   Gaby was groomed, conditioned, and trained to trust her coaches and, in particular, Steven Lopez, who was a "demigod" in taekwondo; Gaby felt she could "not say 'no' to him."

479.   Gaby last had sex with Steven in 2010.

480.   After retiring from fighting, Gaby began teaching taekwondo in Texas.

481.   As Gaby began establishing herself as a coach, Jean Lopez began a sexual relationship with her.

482.   Jean was married at the time, although he told Gaby that he was separated and in the process of getting a divorce.

483.    Gaby believed that Jean was her exclusive boyfriend.

484.    Gaby paid for furnishings for Jean's apartment, as well as some of his business and travel expenses.

485.    In late 2011, Jean violently raped Gaby.

486.    Gaby became pregnant as a result of Jean's rape. Gaby's pregnancy was an ectopic pregnancy. Gaby had to have an abortion as a result.

487.    Jean's 2011 rape of Gaby was her last sexual contact with Jean Lopez.

488.    Gaby was aware that many other victims in Taekwondo had been raped by their coaches.

489.    Gaby assumed that either the USOC or USA Taekwondo had programing or counseling available to help athlete rape victims.

490.    As such in 2012 Gaby contacted Herbert Perez[77] a USOC Board member and former taekwondo gold medalist.

491.    Gaby sought private and confidential help from either the USOC or USA Taekwondo for dealing with the trauma of Jean's rape and subsequent abortion. But Gaby's pleas for help went entirely ignored.

492.    In 2015 Alperstein contacted Gaby about her allegations against the Lopez brothers.

493.    Alperstein told Gaby that he would file a police report with the Sugarland, Texas, Police Department on her behalf.

494.    Due to Alperstein's representation that he would file a police report in Sugarland, Gaby did not file a police report of her own.

---

[77] https://www.fostercity.org/directory-listing/herb-perez

495.   In the summer of 2018, Gaby learned that Alperstein did not in fact file a police report detailing her allegations against the Lopez brothers in Sugarland, Texas.

496.   But USAT and USOC jointly worked to suspend this investigation in order to permit Jean to coach and Steven to compete at the 2016 Olympic Games in Brazil.

497.   It was known in the Hispanic community in the Houston area and the Taekwondo community generally that Gaby was cooperating with Alperstein.

498.   When the Lopez brothers were allowed to compete in the 2016 Olympics, Gaby's reputation and creditability were assailed in the Taekwondo and Houston communities.

499.   Following the Olympics, Gaby continued to cooperate with the Alperstein investigation.

500.   In 2017, Gaby provided detailed statements to Kathleen Smith from the Center for Safe Sport.

501.   In 2017 Gaby followed the media reports detailing the allegations she and the other Plaintiffs made against the Lopez brothers.

502.   Throughout 2017 the USOC, USAT, and the Center for Safe Sport continued to take no action against the Lopez brothers.

503.   The lack of action by the USOC, USAT, and the Center for Safe Sport caused further damage to Gaby's reputation and harmed her business and professional reputation.

504.   In 2018, based on the information and statements provided by Gaby and the other Plaintiffs, the US Center for Safe Sport finally banned Jean Lopez.

505.   When Safe Sport finally banned Jean Lopez, Gaby felt a sense of

vindication. The banning of Jean Lopez gave a sense of relief that Jean would no longer have unrestricted access to young taekwondo athletes.

506.   In August 2018, Safe Sport reversed itself and permitted Jean Lopez to begin coaching again Gaby suffered emotional and mental distress, particularly that other, young female athletes in Taekwondo will have the endure the rapes, exploitation, and abuse that she had suffered at the hands of the Lopez brothers, the USOC, and USAT.

507.   Gaby's reputation and creditability were again assailed in the Taekwondo community following the reversal of Jean's ban in August 2018.

508.   Gaby is outraged and has suffered severe emotional distress over the handling of the sham Lopez investigations. She has experienced institutional abandonment at the hands of the Lopez brothers and has been harmed in her reputation, career, and profession by the obstruction, negligence, and gross negligence of USA Taekwondo and the Lopez brothers working to discredit her allegations.

509.   Gaby has suffered a variety of physical and mental symptoms as a result of the personal and emotional injuries caused by the Lopez brothers and USAT.

**Sexual Abuse, Exploitation, and Trafficking of Amber Means**

510.   Amber Means grew up in Spokane, Washington.

511.   Amber first met Jean Lopez and Steven Lopez when she attended one of their taekwondo camps at the University of Houston in 2003.

512.   Along with the other Plaintiffs, Amber relied on the authority bestowed upon the Lopez brothers by the USOC and USAT to believe the Lopez brothers were credible, safe, responsible, and trustworthy.

513.    Steven Lopez took a special interest in Amber at the 2003 camp; he asked her how old she was and said she'd be tall when she grew up.

514.    Amber was 13 years old.

515.    After camp, Amber returned to Washington State.

516.    Jean Lopez contacted Amber's parents and told them that their daughter had tremendous potential in taekwondo.

517.    Jean convinced Amber's parents to move from Washington to Texas so that Amber could train at the Lopez's Elite Taekwondo school in Houston.

518.    Before leaving Washington, Amber recalls being warned by her coaches in Washington that the Lopez brothers were known to take a sexual interest in the children they coached.

519.    Amber began training at Elite Taekwondo in Houston, Texas, in 2004.

520.    Amber was 14.

521.    Amber's parents heeded the warning they had heard in Washington and never left Amber alone with the Lopez brothers.

522.    As a result, through 2007, while being watched, the Lopez brothers did nothing inappropriate toward Amber.

523.    It was common knowledge to Amber and the rest of the United States Taekwondo community that Jean and Steven Lopez would have sex with young girls from other countries' national teams who visited the Lopez's Elite Taekwondo School in Houston.

524.    Jean Lopez was Amber's primary coach at Elite Taekwondo.

525.    Jean would have his male athletes beat Amber until she had bruises and

black eyes.

526.   Jean would force Amber to fight male athletes without protective gear.

527.   This was inappropriate and retaliatory; Amber had never fought males without protective gear while training in Washington.

528.   Steven and Amber attended the 2006 USAT Nationals in Cleveland, Ohio, where Steven did press-related events and Amber competed.

529.   At this USAT-hosted tournament, Steven engaged in grooming behaviors: brushing against Amber, rubbing her arms, isolating her, giving Amber attention and making her feel special.

530.   Sometime in 2007, when Amber was 17, Steven, then 28 or 29, began taking Amber on "dates."

531.   Steven first kissed Amber after taking her to see a movie in 2007.

532.   Sometime in late 2007, Steven Lopez warned Amber that there were complaints circulating in the Taekwondo community about the nature of Amber's friendship with Peter Lopez.

533.   Steven warned Amber that a parent had made a "complaint" about her and Peter's friendship.

534.   Peter Lopez and Amber met to discuss this "complaint."

535.   During this "meeting," Peter Lopez pressured Amber to perform oral sex on him.

536.   Amber texted Steven Lopez while with Peter. Steven called Peter, and Peter stopped trying to receive oral sex from Amber.

537.   After this incident, Steven and Amber went on a date.

538.    On this "date," Amber performed oral sex on Steven; she was 17 years old.

539.    In February 2008, when Amber was 17, Steven Lopez had vaginal sex with Amber (she lost her virginity to him) at a Houston area rental property owned by Steven Lopez.

540.    Steven and Amber began having an open sexual relationship in March 2008, when Amber was 17 years old.[78]

541.    In 2008, it was common knowledge that Steven was also having a sexual relationship with at least two other teenage athletes, N. Doe[79] and C. Doe.

542.    Steven Lopez had sexual relations with underage athletes at various tournaments around the world, including at the 2008 Olympic Games.

543.    While attending USOC and USAT sponsored events in 2008, Steven Lopez had sex with Amber in several states and countries.

544.    It was possible for Steven was able to have sex with Amber at tournaments because he could isolate Amber and keep her away from the watchful eye and protection of her parents.

545.    In Texas, Amber had to avoid her parents in order to see Steven.

546.    In June 2008, Steven invited Amber to a party at a friend's condo in Houston, Texas.

547.    Amber remembers drinking a Gatorade and vodka, then blacking out.

548.    Amber's next memory was waking up in the bed of the owner of the condo

---

[78] Plaintiffs are in no way implying that a minor can consent to be in a sexual relationship with 29- or 30-year-old man.

[79] The identity of N. Doe is known to Plaintiffs, all Defendants, and is common knowledge in the Taekwondo and USOC community.

after he had raped her.

549.    The owner of the condo told Amber that Steven had raped her while she was passed out.

550.    Steven Lopez had put a drug in Amber's drink that caused her to pass out so he could rape her.

551.    Jean Lopez was the USOC Taekwondo coach at the 2008 Olympic Games in Beijing, China, and Steven Lopez was competing in the Olympic Games.

552.    Both Lopez brothers were receiving financial compensation from USOC and USAT.

553.    Although Amber had not been selected for the team, Amber traveled to Beijing.

554.    In 2008, 2009, and 2010, Jean Lopez was the USOC's Taekwondo coach.

555.    Jean Lopez received financial compensation for coaching taekwondo from the USOC during these years.

556.    In 2008, Jean's wife Tabitha became suspicious that Jean was cheating on her with a young female athlete.

557.    Tabitha believed that Amber was having sex with Jean in 2008.

558.    In reality, Jean was having sex with a different minor female athlete, C. Doe.[80]

559.    Around 2010,[81] Jean had Amber disqualified from a tournament.

---

[80] The identity of Ms. Doe is known to Plaintiffs' counsel and this affair is common knowledge in the Taekwondo and USOC community.

[81] In 2010 Steven Lopez and two other men drugged and then gang raped a Canadian taekwondo athlete at a hotel room in Dallas, Texas.

560.   Jean refused to let Amber fight in the same weight division as his sister, USOC Olympian Diana Lopez.

561.   Amber last competed in April 2011 at the Collegiate National Championships, where she won the silver medal. But for another coach stepping in at the last minute, she competed without a coach because Jean had ceased communications with her.

562.   At a party in February 2013, Steven Lopez again drugged Amber and also a friend of hers; he pinned her to a wall and tried to kiss her but she evaded him. Steven became angry and left, and Amber and her friend were able to escape.

563.   Like the other Plaintiffs, Amber felt that if she angered the Lopez brothers, she would face retaliation, and that it was pay-to-play and she had to service the Lopez brothers with her body in order to compete in USA Taekwondo and reach the Olympics.

564.   When Amber rebuffed the sexual advances of Steven Lopez, she did face retaliation and ultimately her fighting career ended as a result of Jean's control over the placement of athletes on competitive teams.

565.   Amber has suffered a variety of mental and physical symptoms as a result of the personal injuries caused by the Lopez brothers and USAT.

566.   Amber gave a detailed statement to Alperstein on the phone.

567.   Neither the USOC or USAT took any meaningful action against Steven Lopez or Jean Lopez in 2015 or 2016.

568.   It was known in the Taekwondo community that Amber was cooperating with Alperstein.

569.   Amber creditability and reputation were attacked because the USOC and

USAT failed to against Steven Lopez or Jean Lopez in 2015 and 2016.

570.    In the spring of 2017, Kathleen Smith from Safe Sport met with Amber and her mother at a restaurant near Amber's home. Amber gave Ms. Smith a detailed in person statement of her abuse at the hands of Steven Lopez and Jean Lopez.

571.    Amber also submitted a written statement to Safe Sport detailing her allegations.

572.    Based on the information and statements provided to Safe Sport by Amber and the other Plaintiffs, in April 2018 Safe Sport banned Jean Lopez.

573.    Amber, like the other Plaintiffs, felt that Safe Sport's banning of Jean Lopez vindicated them in the taekwondo and Olympic communities.

574.    Then, in August 2018, Safe Sport rescinded their ban of Jean Lopez.

575.    The rescission of Jean's ban has caused Amber reputation and character to be attacked and caused her emotional distress.

576.    Amber is outraged and has suffered severe emotional distress over the handling of the sham Lopez investigations.

577.    She has experienced institutional abandonment and betrayal at the hands of the Lopez brothers and has been harmed in her reputation, career, and profession by the obstruction, negligence, and gross negligence of USA Taekwondo and the Lopez brothers working to discredit her allegations.

## CLAIMS FOR RELIEF

578.    The Sports Abuse Act of 2017 specifically amends the civil remedy provision in 18 U.S.C. § 2255, which incorporates the Trafficking Victims Protection Act ("TVPA") and a multitude of criminal sexual abuse statutes, with explicit concerns about

sex trafficking.

579.   Section 2255 was enacted to allow minor victims of sex trafficking and sexual abuse to file a civil lawsuit in federal district court and seek a wide range of remedies. Section 2255 imposes civil liability against those who commit or benefit from the forced labor, trafficking, and exploitation of minors, especially if those actions include sexual abuse and exploitation.

580.   The Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589-96, creates civil liability for those who commit or benefit from forced labor or services or sex trafficking and trafficking-related offenses, including those offenses enumerated in 18 U.S.C. §§ 1589, 1590, and 1591. Violations of the TVPA include: forcing someone into labor or sexual services; knowingly benefitting from such forced labor or services; recruiting or transporting a person for labor or services against their will, especially if those actions include sexual abuse; attempting to commit these trafficking offenses; conspiring to commit these trafficking offenses; obstructing or interfering with efforts to enforce the TVPA; and benefitting financially from these offenses.

581.   The TVPA expressly authorizes civil remedies against both the perpetrator and others who knowingly benefit from violations of the TVPA. *See* 18 U.S.C. § 1595(a).

582.   Each of the Defendants benefitted financially and/or received something of value from the exploitation, forced labor and services, and sex trafficking of Plaintiffs. Under both the TVPA and Section 2255, the Defendants are liable for the following federal causes of action.

## Counts of Gaby Joslin for Violations of Federal Law

### COUNT 1

**Forced Labor in Violation of 18 U.S.C. § 1589(a), § 1595(a)**
*By Gaby Joslin against Steven Lopez*

583.    Gaby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

584.    Gaby is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

585.    In violation of 18 U.S.C. §§ 1589(a) and 1595(a), Defendant Steven Lopez knowingly obtained forced sexual services from Gaby by means of serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2), and through a scheme, plan, or pattern intended to cause Gaby to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4).

586.    As a direct and proximate result of the actions of the Defendants, Gaby has suffered personal injuries, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.

587.    Gaby claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

### COUNT 2

**Forced Labor in Violation of 18 U.S.C. § 1589(b), § 1595(a)**
*By Gaby Joslin against USAT*

588.    Gaby realleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

589.   Gaby is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

590.   In violation of 18 U.S.C. §§ 1589 and 1595(a), USAT knowingly benefitted from participation in a venture with Steven Lopez, knowing or in reckless disregard of the fact that the venture was engaged in the providing or obtaining of Gaby's labor or services by means of force, threats of force, physical restraint, threats of physical restraint, serious harm or threats of serious harm, and/or a scheme, plan, or pattern intended to cause Gaby to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint. Defendant also knowingly benefitted from participating in a venture with Jean Lopez which it knew or should have known was engaging in violations of the TVPA.

591.   USAT knew or recklessly disregarded the fact that Steven Lopez was obtaining Gaby's forced labor and sexual services. USAT paid her a stipend, observed her performance in competitions, and Gaby reported Defendant Steven Lopez's abuse.

592.   Defendant USAT knew or should have known the conditions under which Steven Lopez was "coaching" Gaby. USAT knowingly or recklessly participated in Steven Lopez's scheme to force Gaby into forced sexual acts. In addition, USAT aided and abetted Steven Lopez's violations of 18 U.S.C. § 1589(a) by providing knowing and substantial assistance to him when they knew or should have known that Gaby was being subject to forced sexual acts against her will through means of actual force and threats of force, and that she was being abused and raped. USAT benefitted from Steven Lopez's actions including by collecting money through sponsorships, grants, and for

medals achieved at competitions, for his recruitment and training of other elite taekwondo athletes, despite indications Gaby was being abused and raped.

593.    As a direct and proximate result of the actions of the Defendants, Gaby has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

594.    Gaby claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 3

### Trafficking with Respect to Forced Labor
### in Violation of 18 U.S.C. § 1590(a), § 1595(a)
*By Gaby Joslin against Steven Lopez and USAT*

595.    Gaby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

596.    Gaby is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

597.    In violation of 18 U.S.C. §§ 1590(a) and 1595(a), Steven Lopez knowingly recruited, enticed, harbored, transported, and/or obtained Gaby for labor or services. Steven Lopez knowingly recruited and fraudulently enticed Gaby to come to Bonn, Germany, with the intention of forcing her into sexual labor and services for him.

598.    Steven Lopez knowingly benefitted financially from his recruitment, enticement, harboring, transport, and obtaining of Gaby. He received free sexual services and labor from Gaby.

599.    On information and belief, and in violation of 18 U.S.C. §§ 1590(a) and 1595(a), USAT, through their agent, Steven Lopez, knowingly transported Gaby to Bonn,

Germany, and to various tournaments and training centers between 2006 and 2010. They also knowingly benefitted from participating in a venture with Steven Lopez which they knew or should have known was engaging in violations of the TVPA. In addition, USAT aided and abetted Steven Lopez's violations of 18 U.S.C. § 1590(a) by providing knowing and substantial assistance to him when they knew or should have known that Gaby had been recruited, transported, or obtained by any means for labor or services. USAT benefitted from Steven Lopez's actions, including by collecting money through sponsorships, grants, and for medals achieved at competitions, for his recruitment and training of other elite taekwondo athletes, despite knowing that Gaby was being abused and raped.

600.    As a direct and proximate result of the actions of the Defendants, Gaby has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

601.    Gaby claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## Counts of Amber Means for Violations of Federal Law

### COUNT 4

**Forced Labor in Violation of 18 U.S.C. § 1589(a), § 1595(a), § 2255**
*By Amber Means against Steven Lopez*

602.    Amber realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

603.    Amber is authorized to bring this civil claim against Defendant pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

604.    In violation of 18 U.S.C. §§ 1589(a) and 1595(a), Defendant Steven Lopez

knowingly obtained forced sexual services from Amber by means of serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2); and a scheme, plan, or pattern intended to cause Amber to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4).

605.    As a direct and proximate result of the actions of the Defendants, Amber has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

606.    Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 5

### Forced Labor in Violation of 18 U.S.C. § 1589(b), § 1595(a)
*By Amber Means against USAT*

607.    Amber realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

608.    Amber is authorized to bring this civil claim against Defendant pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

609.    In violation of 18 U.S.C. §§ 1589 and 1595(a), USAT knowingly benefitted from participation in a venture with the Lopez brothers, knowing or in reckless disregard of the fact that the venture was engaged in the providing or obtaining of Amber's labor or services by means of force, threats of force, physical restraint, threats of physical restraint, serious harm or threats of serious harm, and/or a scheme, plan, or pattern intended to cause Amber to believe that, if that she did not perform such labor or services, she would suffer serious harm or physical restraint.

90

610.     Defendant also knowingly benefitted from participating in a venture with the Lopez brothers which it knew or should have known was engaging in violations of the TVPA.

611.     USAT knew, or recklessly disregarded the fact that the Lopez brothers were obtaining Amber's forced labor and sexual services.

612.     They housed Amber at their facilities, paid her a stipend, observed her performance in competitions, and Amber reported—verbally and in formal written complaints—the Lopez brothers' abuse.

613.     Defendant USAT knew or should have known the conditions under which the Lopez brothers were "coaching" Amber.

614.     USAT knowingly or recklessly participated in Steven and Jean Lopez's scheme to force Amber into forced sexual acts.

615.     In addition, USAT, aided and abetted Steven and Jean  Lopez's violations of 18 U.S.C. § 1589(a) by providing knowing and substantial assistance to him when they knew or should have known that Amber was being subject to forced sexual acts against her will through means of actual force and threats of force, and that she was being abused and raped.

616.     USAT benefitted (financially and otherwise) from Steven and Jean Lopez's actions including by collecting money through sponsorships, licensing, grants, publicity, for medals achieved at competitions, and for his recruitment and training of other elite taekwondo athletes, despite knowing that Amber was being repeatedly sexually abused and raped.

617.     As a direct and proximate result of the actions of the Defendant, Amber has

suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

618.    Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

### COUNT 6

**Trafficking with Respect to Forced Labor
in Violation of 18 U.S.C. § 1590(a), § 1595(a), § 2255**
*By Amber Means against Steven Lopez*

619.    Amber realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

620.    Amber is authorized to bring this civil claim against Defendant Steven Lopez pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and § 2255.

621.    In violation of 18 U.S.C. §§ 1590(a) and 1595(a), Defendant knowingly recruited, enticed, harbored, transported, and/or obtained Amber for labor or services. Steven Lopez knowingly recruited and fraudulently enticed Amber to come from Washington State to Houston, Texas, to Cleveland, Ohio, to Colorado Springs, Colorado, to Sugar Land, Texas, to Des Moines, Iowa, to Beijing, China, and to various other cities and countries with the intention of forcing her into sexual labor and services for him.

622.    Defendant knowingly benefitted financially from the recruitment, enticement, harboring, transport, and obtaining of Amber. Steven Lopez received free sexual services and labor from Amber.

623.    As a direct and proximate result of the actions of the Defendant, Amber has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

624.   Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

### COUNT 7

**Sexual Exploitation, Transportation, and Illegal Sexual Activity in Violation of
18 U.S.C. §§ 2242, 2243, 2421, 2422, 2423(a), 2423(b), 2423(c), and 2255**
*By Amber Means against Steven Lopez*

625.   Amber realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

626.   Amber is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 2255.

627.   In violation of 18 U.S.C. §2243, Defendant Steven Lopez knowingly engaged in a sexual act with Amber, age 17, when he was age 29 or 30, in Des Moines, Iowa.

628.   In violation of 18 U.S.C. §2421, Defendants knowingly transported or attempted to transport Amber in interstate and/or foreign commerce with the intent that she engage in sexual activity for which one or both of them could be charged with a criminal offense under, e.g., 18 U.S.C. §§ 1589, 1590, 1591, 2242, 2243, 2422, 2423(a), 2423(b), 2423(c), or other applicable law.

629.   In violation of 18 U.S.C. §2422, Defendants knowingly persuaded, induced, enticed, or coerced Amber to travel in interstate and/or foreign commerce with the intent that she engage in a sex act for which a person could be charged with a criminal offense sexual activity for which he could be charged with a criminal offense under, e.g., 18 U.S.C. §§ 1589, 1590, 1591, 2243, 2421, 2422, 2423(a), 2423(b), 2423(c), or other applicable law.

630.   In violation of 18 U.S.C. §2423(a), Defendants knowingly transported Amber, and/or attempted to or conspired to transport Amber, who had not yet attained the age of 18 years, in interstate and/or foreign commerce with the intent that she engage in a sex act for which a person could be charged with a criminal offense under, e.g., 18 U.S.C. §§ 1589, 1590, 1591, 2242, 2243, 2421, 2422, 2423(b), 2423(c), or other applicable law.

631.   In violation of 18 U.S.C. §2423(b), Defendant traveled in interstate commerce for the purpose of engaging in illicit sexual conduct with Amber, a person under 18 years of age.

632.   In violation of 18 U.S.C. §2423(c), Defendant traveled in foreign commerce and engaged in illicit sexual conduct with Amber, a person under 18 years of age.

633.   As a direct and proximate result of the actions of the Defendants, Amber has suffered severe emotional distress, physical injuries, and economic losses.

634.   Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

### Counts of all Plaintiffs for Violations of Federal Law

### COUNT 8

**Obstruction, Attempted Obstruction, Interference with Enforcement in Violation of 18 U.S.C. § 1590(b), 1591(d), § 1595(a), and § 2255**

*By All Plaintiffs against Steven Lopez and USAT*

635.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

636.   Plaintiffs are authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a) and, for Plaintiff Amber Means, §

2255.

637.   In violation of 18 U.S.C. §§ 1590(b) and 1595(a), Defendant USAT, obstructed, attempted to obstruct, interfered, and or prevented the enforcement of this section by:

a.   ignoring verbal and written complaints of sexual abuse, trafficking, and forced labor and services;

b.   dismissing complaints of sexual abuse, trafficking, and forced labor and services;

c.   refusing to act on reports of sexual abuse, trafficking, and forced labor and services;

d.   delaying the investigation of reports of sexual abuse, trafficking, and forced labor and services;

e.   advising athletes to withdraw complaints of sexual abuse, trafficking, and forced labor and services when they knew the complaints were truthful;

f.   offering to put athletes back on team rosters only if they withdrew truthful complaints of sexual abuse, trafficking, and forced labor and services;

g.   threatening athletes with consequences for failure to withdraw complaints of sexual abuse, trafficking, and forced labor and services;

h.   making false statements about athletes regarding sexual abuse, trafficking, and forced labor and services;

i.   suspending ongoing investigations of Defendants Jean and Steven Lopez so that the Lopez brothers could coach and compete in the 2016 Olympics and 2017 World Championships to deliver more "medals and money" to Team USA;

j.   feeding false information to investigators and the media about Mandy Meloon;

k.   frustrating the SafeSport investigation of the Lopez brothers;

l.   retaliating against athletes who complained by suspending them or removing them from the team roster;

m. delaying in imposing restrictions and/or suspensions on the Lopez brothers;

n. delaying the hiring of Donald Alperstein from May 2014 to March 2015 and then dragging out the investigation until March 2017 and then handing over the investigation to Safe Sport in March 2017 and then not suspending either Jean Lopez or Steven Lopez until April 2018 (Jean) and May 2018 (Steven);

o. Failing to contact law enforcement immediately upon knowing that Jean and Steven Lopez were engaging in forced labor and services and sex trafficking;

p. Falsely telling Plaintiffs that police reports were being filed when, in fact, no police reports were filed; and

q. Failing to provide the FBI with immediate and detailed records and documents regarding the numerous sex crimes, trafficking, and forced labor and services violations by the Lopez brothers,

among other conduct detailed in the preceding allegations.

638.   As a direct and proximate result of the actions of the Defendants, Plaintiffs have suffered severe emotional distress, physical injuries, and economic losses.

639.   Plaintiffs claim damages in amounts to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

**Counts of All Plaintiffs for Violations of State Law**

**COUNT 9**
**NEGLIGENCE**

*By Plaintiff Mandy Meloon against USAT*

640.   Plaintiff Mandy Meloon realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

641.   Sexual assault, rape, trafficking, forced sexual services, domestic violence, dating violence and stalking are deeply traumatic crimes that can cause severe damages to survivors' physical, emotional, spiritual and psychological well-being.[82]

642.   It was well known by 2015 that sexual assault victims can experience secondary victimization, also known as secondary trauma or re-victimization, by being asked to describe or re-live their trauma.

643.   Survivors are harmed or retraumatized by insensitive, uninformed, or inadequate community, institutional, and justice system responses. [83]

644.   Sexual assault victims who encounter service providers who mirror the unequal power and control experienced in the abusive relationships that caused past trauma are likely to retraumatize victims.[84]

645.   Insensitive, ineffective, victim-blaming treatment or services retraumatizes the victim and results in a "second rape."[85]  In fact, as USAT's agent Donald Alperstein so fittingly recognized at the onset of his own investigation, "Trying to influence a witness is another violation and a further act of victimization."[86]

---

[82] United States Department of Justice, *The Importance of Understanding Trauma-Informed Care and Self-Care for Victim Service Providers*, July 30, 2014, *available at*: https://www.justice.gov/archives/ovw/blog/importance-understanding-trauma-informed-care-and-self-care-victim-service-providers (last visited October 10, 2019).

[83] *Id.*

[84] Haskell, Lori, C. Psych. & Dr. Melanie Randall, *The Impact of Trauma on Adult Sexual Assault Victims* (2019) p 26-27.

[85] Campbell R, Wasco SM, Ahrens CE, Sefl T, Barnes HE. *Preventing the "Second Rape": Rape Survivors' Experiences with Community Services Providers.* Journal of interpersonal violence 2001; 16(12): 231, 1239-1259.

[86] USAT14085

646.    Alperstein later wrote a letter to Mandy on March 22, 2017, that further reveals how Alperstein victimized Mandy and the other Plaintiffs. This letter functions as a confession from Alperstein, who spent three years conducting a grossly inadequate and below-par investigation of the Lopez brothers, all the while using Mandy and the other Plaintiffs to give his efforts the false aurora of legitimacy. Alperstein's March 22, 2017, letter made even more false promises, including that SafeSport will provide Mandy with "victim counseling services" (which never happened and was never going to happen) and that SafeSport taking over the Lopez investigation "would be a good idea for several reasons" (it was a disastrous idea: SafeSport did nothing and also had to start its investigation from scratch and re-interview all witnesses because Alperstein either had done nothing or had performed so ineptly that his work had no value). Alperstein concluded his letter with a recognition that he had caused Mandy to suffer physical symptoms of distress by forcing her to re-live her trauma. In short, Alperstein confessed to retraumatizing Mandy.[87]

647.    As set forth in detail throughout this Complaint and at all relevant times, USAT knew or should have known of the endemic problem of sexual abuse in elite sports and across NGBs and within USAT in particular, which led Defendant to adopt policies, impose trainings and certifications, and institute special procedures for reporting, investigating, and responding to complaints of sexual abuse; and which led Defendant to obtain sexual abuse insurance covering damage or injury because of abuse, molestation or exploitation arising from negligent employment, training, investigation,

---

[87] USAT 006095, March 22, 2017 Letter from Donald Alperstein to Mandy Meloon.

reporting or failure to report, or retention or supervision of a person for whom USAT is or was legally responsible.

648.    At least by 2015, USAT should have known that Mandy was and is a survivor of sexual assault by Jean Lopez and Steven Lopez.

649.    At all relevant times, Defendant Steven Lopez was a member of USAT.

650.    At all relevant times, Jean Lopez was a member of USAT.

651.    In 2015, USAT hired and retained Donald Alperstein and his staff (including Leah Wicks, an investigator) to work for them to investigate the Lopez brothers. Alperstein was at all times an agent acting for and on behalf of USAT.

652.    Before hiring Alperstein to conduct a sex abuse investigation, USAT did not perform any diligence or background research to figure out how to perform a proper sex abuse investigation. In hiring Alperstein, USAT did nothing to determine whether Alperstein was qualified to act as a sexual abuse investigator. USAT conducted no screening or investigation of its own investigator. In fact, Alperstein had no training and was not qualified to investigate sex abuse or to interact with sex abuse victims in a way that would avoid re-victimizing them.

653.    USAT owed a special duty of care and had a special relationship with Mandy and the other Plaintiffs because all were former athletes of USAT who were sexually abuse and exploited while performing as athletes for the benefit of USAT. Thus, based on this special relationship and the fact Mandy and the other Plaintiffs were especially vulnerable because of the trauma inflicted upon them by the Lopez brothers. USAT knew this and should have taken measures to guard against re-victimizing Mandy and the other Plaintiffs.

654.    USAT failed to act reasonably and failed to perform an adequate screening because it was motivated by something other than protecting athletes and ridding taekwondo of the Lopez brothers; in fact, USAT hired Alperstein (and not a real, qualified investigator) because he was a lawyer, and USAT wanted to manipulate the attorney-client privilege and work product protections to keep its factual investigations secret and off-limits, using the ruse of the attorney-client privilege and work product protections to do so.

655.    In part because he was not trained as an investigator and was unfamiliar with handling a sex abuse investigation, Alperstein portrayed his status or role vis-à-vis USAT to Mandy and the other Plaintiffs as being entirely independent.. He did not make clear what his role was, so Mandy and the other Plaintiffs reasonably assumed he was acting on their behalf, not that of USAT, and he further induced this belief based on the language he used in communicating with them.

656.    Alperstein was not functioning as a lawyer when he worked to investigate the Lopez brothers, and he was not working as a lawyer when he interviewed Mandy or any of the other named Plaintiffs. To this end, at no time did Alperstein disclose to Mandy or any of the other named Plaintiffs that he was adverse or that he was working on behalf of USAT as its lawyer.

657.    USAT, through Alperstein, voluntarily and affirmatively reached out to Mandy in 2015 regarding allegations previously made by Mandy against the Lopez brothers and USAT. In doing so, Alperstein was acting as an agent of USAT.

658.    At the time, in 2015, Mandy was outside the ring, so to speak, and was not involved any Lopez investigation. She did not initiate any discussions with Alperstein in

2015 regarding the Lopez brothers. In 2015, she had accepted the fact that USAT had chosen the Lopez brothers over the victims (including her) who the Lopezes had raped and abused, and she was trying to cope with her circumstances.

659.     In May 2015, Mandy specifically told Alperstein that she needed to even further distance herself from the Lopezes and was seeking orders of protection against both Steven and Jean and that "things are getting very scary for me and I'm scared."[88]

660.     Alperstein and USAT, however, affirmatively reached out and pulled Mandy back into the world of USAT and into the Lopez sex investigation. They once again used Mandy, exploiting her for their own personal benefit, without being honest or transparent about what they were really doing.

661.     By voluntarily reaching out to Mandy in 2015 and making affirmative representations to Mandy, USAT and Alperstein (its agent) voluntarily undertook a duty to Mandy to conduct a good faith, independent investigation of the Lopez brothers.

662.     USAT and Alperstein, in 2015, voluntarily assumed the duty to render services on behalf of Mandy. In fact, Alperstein and his colleagues, including Leah Wicks, repeatedly made specific promises to Mandy that they were acting in her interests and that she should "trust" him:

   a.   April 24, 2015: After twice speaking with Mandy, Alperstein urged her to reach out to Leah Wicks while he was on vacation and assured her that reliving the trauma would be worth it. He stated: "I know how hard it was for you to share your story with me, and all I can say in return is that it is important that you did so, that **it will make a difference**, and that I respect

---

[88] USAT-ESI16917

an honor your courage and commitment. **I look forward to working with you to set the record straight and to protecting athletes** yet to come… **You are a champion** in my book."[89]

b. <u>April 26, 2015</u>: Following an extensive interview with Wicks, Alperstein reassured Mandy to secure her continued cooperation, "Thanks again, Mandy for standing up. **YOU ARE MAKING A DIFFERENCE**."[90]

c. <u>May 11, 2015</u>: Alperstein told Mandy that the case against Jean hinges on her, writing: "I'm sorry to hear you are struggling. I have my best wishes that things will improve significantly and soon…. I'm a [sic] proceeding as before and really am depending on your help."[91]

d. <u>December 31, 2015</u>: In his repeated attempts to induce her trust, Alperstein told Mandy: "First, we haven't spoken in a while, and I want to catch up and see how you are doing. I've missed our occasional chats, and I want to know you are OK, because I'm a mother hen and I worry a lot. My bad! I want to know if you are OK, and what's new with your daughter, because I know how important that is for you."[92]

e. January 5, 2016: Relentless in his fact-gathering, Alperstein wrote Mandy: "All your memories and knowledge will help me build the cases against people who don't belong in sports. Most of them don't belong in society, but there isn't much I can do about that. With your help, though, we can make

---

[89] USAT-ESI16641 (emphasis added).

[90] USAT-ESI5979 (emphasis added).

[91] USAT14078

[92] USAT8507

progress not only with USAT but with the USOC and the police. I would like your permission to share your narrative with certain people. I won't do it if you tell me not to because I will not violate your trust and confidence. But if I have your consent, we can enlist other people in our effort to bring some justice to what happened to you and other athletes. You can say yes or no to each of these. You can say no to all of them. Or you can tell me that I may share the narrative with whomever I think it will help."[93]

f.  May 11, 2016: Shortly after Mandy was incarcerated, Alperstein continued to press her for information, stating to her: "Before moving forward with the case against Jean Lopez, I want to be sure you'll be there to help me present the evidence, so I have not yet filed it. I want to be sure you will be available to tell your story[.]" He persisted in trying to build her trust in him: "Let me know how you are doing, and if there is any way I can help. Despite all that has happened, you are still a hero in my eyes for standing up for what is right."[94]

g.  October 11, 2016: Alperstein persisted in getting Mandy to cooperate in the investigation, writing: "I'm hoping for your help in a couple of ways. First, since you are my key witness in the Jean Lopez disciplinary case and an important witness in the Steven Lopez matter…"[95]

---

[93]  USAT6023

[94]  USAT6046

[95]  USAT6040

h. <u>November 18, 2016</u>: Alperstein continued to try to convince Mandy to recount her trauma, while claiming he understood the pain it would cause. He stated: "In the meantime, though, if you have the strength to help me, you could do me a very big favor and really help my cases against Steven and Jean Lopez. Many of our conversations and your interview with my investigator, Leah Wicks, took place when you were not in the best situations and best of mental health. My notes and the investigator's report are somewhat confused, and I know they are incomplete in recounting your interactions with the Lopez brothers. It would really help me if you could sit down and write out in an organized way everything that they did to you and to other people. I realize **I'm asking you to do a really hard thing** and a big project. **I'm basically asking you to relive terrible times**."[96]

i. <u>December 23, 2016</u>:  Alperstein wrote to Mandy: "In one of your letters you say you get nervous when you don't hear from me. I want you to know that even when I'm not writing, I'm thinking about you and working on your case and other TDK [sic] cases. **I'm not going to abandon you!**" He then urged her to recount her trauma: "One of the things I asked you in my last letter is whether you think you have the strength to **write a narrative or chronology of the times you were abused and where you witnessed others being abused**, and also time when you saw taekwondo people committing crimes."[97]

---

[96] USAT6053 (emphasis added).

[97] USAT5662 (emphasis added).

j.  <u>July 17, 2017</u>: More than two years after initially reaching out to Mandy, with no discipline or reprimand ever handed down to the Lopez brothers, Alperstein still proclaimed his dedication to Mandy, telling her "Mandy, I want you to know that I'm still in your corner and that you still have my greatest respect. I know it's been a hard road, but sometimes life's journey has a detour or two. I remain your biggest fan, and I want only good things for you."[98]

663.   Throughout 2015-2018, USAT and Alperstein led Mandy to believe that USAT was undertaking a good faith investigation to determine if its current members, Jean and Steven Lopez and other USAT members, posed an unreasonable risk of harm to other current USAT-member athletes, including minor athletes.

664.   But USAT's primary motive was not, as Alperstein promised, to protect the athletes or to remove the Lopez brothers from the sport. Instead, USAT was seeking to avoid congressional investigation and further regulation, suspension, or dismantling by the USOC and Congress.

665.   In fact, because USAT had already been on probation for two years, in 2012-13 (during which time the United States Olympic Committee was actively running USAT, while its officers and directors were side-lined),[99] USAT was especially sensitive to the need to make it appear that it was taking the Lopez brothers investigation seriously.

---

[98] USAT8425

[99] *From the desk of the CEO: USA Taekwondo probation lifted*, Oct. 14, 2013, available at: https://www.teamusa.org/USA-Taekwondo/Features/2013/October/14/From-the-desk-of-the-CEO-USA-Taekwondo-probation-lifted

To do so, it needed to convince Mandy and the other Plaintiffs that it was seriously and legitimately going to police the Lopez brothers and remove them from the sport.

666.   What Mandy did not know was that USAT was phoning-it-in and conducting a mock investigation that would provide plausible deniability but would not actually remove the Lopezes (the money-makers of the sport) from taekwondo. To this end, on August 21, 2015, Leah Wicks emailed to a witness that she and Alperstein were "winding down [their] investigation[.]"[100]

667.   Thus, publicly, to Mandy and others, USAT proclaimed that it was pursuing the Lopez brothers at full speed and were leaving no stone unturned. Privately, however, Alperstein and Wicks were already writing that they were "winding down" their investigation in 2015 (this email is marked Highly Confidential, which confirms that the email was between only Wicks and a witness and was not disseminated). They nevertheless strung along Mandy and the other Plaintiffs for 2.5 more years, until 2017, before they called off their investigation and handed it over to SafeSport.

668.   Throughout 2015-2018, USAT continually reaffirmed and ratified that it was undertaking and assuming the duty to investigate sexual abuse within the sport, focusing in particular on the allegations raised by Mandy against the Lopez brothers.

669.   USAT did so by its constant communications to Mandy, by and through its agents, including Donald Alperstein and other USAT officials.

670.   As a result of USAT's targeting of Mandy in 2015-18, it assumed and created a special relationship with her as a victim of the Lopez brothers. This special relationship was created when USAT affirmatively reached out, through its investigator,

---

[100] USAT 009695 (marked "Highly Confidential").

Donald Alperstein, to investigate allegations of prior abuse by one or more USAT members.

671.    USAT represented to Mandy that it was undertaking an investigation of the Lopez brothers with the goal of having them "banned from the sport."

672.    To Mandy's detriment, USAT represented by word and action that it was conducting a good faith investigation into the Lopezes by:

k.   Hiring and paying Donald Alperstein and advertising him as USAT's independent counsel (from March 2015 through present)[101];

l.   Hiring and paying Leah Wicks as Alperstein's investigator to interview victims and advertising her as independent (same timeframe)[102];

m.   Enticing survivors to come forward and share their stories by publicly proclaiming "Make the commitment: Report—Stop Abuse in Sport"[103].

n.   Posting on the USAT Website (since April 2015) and testifying to Congress (in May 2018) that "USA Taekwondo is committed to removing any and all barriers to the safe and effective reporting of abuse within USA Taekwondo"[104];

---

[101]   USAT14159 – also, this website is still up: https://www.teamusa.org/USA-Taekwondo/Features/2015/April/23/Safe-Sport-Reporting

[102]   USAT14159

[103]   USAT14159 ("If you are aware of any misconduct which may have occurred at any time now or in the past, please join the other athletes that have come forward and reported their experiences to make the commitment to stop abuse in sport." This is also the concept (although not quoted) in the current TKD SafeSport strategy material available at https://www.teamusa.org/-/media/USA_Taekwondo/Images/2019-06-June/Safe-Sport-Strategy-2019.pdf?la=en&hash=EF662AAB83523339A1E45FD1DE075ED7190C0200

[104]   USAT05011; McNally written testimony at p 5, available at https://docs.house.gov/meetings/IF/IF02/20180523/108356/HHRG-115-IF02-Wstate-McNallyS-20180523.pdf.

o.  Advertising to Plaintiffs and other victims: "You are not alone. You will be heard."[105];

p.  Retaining another independent investigator, The Dan Beebe Group, to analyze "SafeSport issues" within USA Taekwondo and audit USAT's compliance with mandatory SafeSport policies for preventing and detecting sex abuse within USA Taekwondo in 2015[106];

q.  Repeatedly interviewing Plaintiffs and asking them to recount the trauma inflicted by the Lopezes;

r.  Continually reassuring victims who were hesitant to come forward that with their help and testimony, the sexual abusers within USAT would be prosecuted[107];

s.  Telling Mandy that she is the "star witnesses" and "a hero";

t.  Filing an internal ethics complaint against Steven Lopez in December 2015, amending this complaint in April 2016, and representing to Plaintiffs that it would be used to remove Steven from USAT participation.

u.  Repeatedly representing to Plaintiffs that it would be immediately turning over their complaints to law enforcement.

673.  In addition, USAT's duty to Mandy was amplified by the fact that Mandy is or was a USAT member herself, a former decorated athlete and USA National Team member.

---

[105] USAT14159

[106] USOC-GIL-11772 (Dan Beebe report)

[107] USAT6094 (Alperstein letter to Mandy: "But I want you to believe that if going through I all again helps make you better, helps vindicate other victims and helps rid the sport of abusers, that your sacrifice will be [sic] have been worth it. I've told you before you are my hero.").

674.    To the extent Mandy was no longer a member of USAT, that occurred **only because** she was sexually assaulted and exploited out of the sport by the Lopez brothers, who were supposed to be coaching and supporting her. In other words, but-for the sexual abuse and forced sexual services inflicted upon her by the Lopez brothers, who were clothed in authority by USAT, Mandy would have remained a current, active member of USAT. Mandy was identified as a star in the sport, and Mandy intended to continue competing, just as Steven Lopez has done well into his 40s, in taekwondo at the Olympic level. Instead, USAT and the USOC chose to leave the Lopez brothers in the sport, which forced Mandy to reluctantly drop out.

675.    At all relevant times, Mandy reasonably relied on USAT's promise to perform services (to investigate and remove the Lopez brothers) and she was led to believe that USAT was undertaking a good faith investigation to determine if she had been sexually assaulted by Jean and/or Steven Lopez and other USAT members and that USAT was actually working in good faith to eradicate sexual abuse, clean up taekwondo, and have the Lopez brothers "banned from the sport."  If the Lopez brothers had been removed from the sport, Mandy could have resumed competing in taekwondo as an athlete—which would have led to lucrative endorsements and a career in taekwondo, just like Steven and Jean Lopez have enjoyed for decades.

676. USAT's affirmative step of reaching out to Mandy and making representations to her through Alperstein was intended to induce and did induce her participation in the investigation.

677.    Because of USAT's affirmative step of reaching out to Mandy, and USAT's representations through Alperstein, Mandy reasonably relied on USAT to conduct the

investigation in good faith and to behave reasonably and with all due care toward her as it investigated allegations against its member(s).

678.   Because USAT's investigator, Alperstein, repeatedly conveyed to Mandy that USAT was diligently pursuing discipline against the Lopezes—specifically telling her that USAT was trying to "have both Lopez brothers banned from the sport"—and that she was the "star witness" and a "hero," Mandy reasonably relied on these representations.

679.   By voluntarily reaching out to Mandy in 2015 regarding the Lopez brothers and inducing her participation by means of various representations, USAT undertook and actively assumed a duty to investigate the Lopez brothers honestly and in good faith and with reasonable care to prevent secondary victimization to Mandy.

680.   USAT's representations created a foreseeable risk that Mandy would suffer significant secondary trauma (known as revictimization) if and when she discovered that USAT's investigation was not independent, was not conducted in good faith, and was never intended to actually remove the Lopez brothers from the sport.

681.   Alperstein (who was an agent of USAT) specifically recognized this risk in his writings to Mandy but asked her to proceed anyway in telling him over and over again about her trauma, forcing her to re-live and reexperience the trauma for his benefit.

682.   In breach of its voluntarily assumed duty to Mandy render services on her behalf, *see* Restatement (Second) of Torts § 323, USAT performed an unreasonable and flawed sex abuse investigation, which dragged out for several years, during which USAT permitted, encouraged, and supported the Lopez brothers' continued involvement in competing and coaching in the sport.

683.   In fact, Alperstein never even attempted to have the Lopez brothers removed from taekwondo, never even interviewed Steven or Jean Lopez, never conducted any hearings, and ultimately dumped his hollow investigation into the lap of SafeSport in 2017, after spending several years doing sham interviews that re-victimized Mandy and the other plaintiffs.

684.   When Alperstein turned over his investigation to SafeSport, he provided nothing of any value—which is evidenced by the fact that SafeSport started over, from scratch, and re-interviewed Mandy and the other Plaintiffs. If Alperstein had performed a legitimate, good faith investigation, he would have avoided the need for SafeSport to start from zero. But the fact SafeSport had to start over again further cements that Alperstein's investigation was not conducted in good faith and flunks any measure of a legitimate sex abuse investigation.

685.   At no time did Alperstein disclose to Mandy or the other Plaintiffs that he was actually never going to do anything to remove the Lopez from the sport or that their interviews would never be used in any proceeding (because no proceeding would ever be initiated), nor did he reveal to them that SafeSport would re-interview (and revictimize) them all over again when it took over Alperstein's sham investigation. In other words, Alperstein used the sham Lopez brothers investigation to enrich himself (by billing USAT for his services year after year) and to portray USAT as being legitimately concerned with ending sex abuse in the sport. In reality, however, neither USAT nor Alperstein had any intention of removing the Lopez brothers, cleaning up the sport, or helping Mandy or the other Plaintiffs.

686.   Had Alperstein and USAT been honest with Mandy and the other Plaintiffs about the true nature of the Lopez investigation, they never would have participated in the sham interviews or been led to believe that the Lopez brothers (the rapists who abused them) would be removed the sport.

687.   USAT breached its voluntarily-assumed duty to Mandy to conduct a good faith independent investigation in multiple ways, each of which is further proof that the investigation of the Lopez brothers by USAT and Alperstein was a sham:

a.  By violating its own bylaws, which mandate the prompt investigation allegations of sex abuse;

b.  By falsely and repeatedly telling Plaintiffs that the prosecution of the Lopez brothers hinged on their cooperation and involvement, despite the fact that USAT was never actually going to punish the Lopezes for their crimes due to their position within USAT and the Olympic community[108];

c.  By never filing an ethics complaint against Jean Lopez, despite ample long-known evidence and Alperstein's July 2015 report that Jean committed numerous Code of Conduct, SafeSport, and criminal violations and that he "represents an immediate danger to other USAT members"[109];

d.  By filing an ethics complaint against Steven Lopez so fraught with procedural issues that it would never be prosecuted;

---

[108] USAT6046 (Alperstein writes to Mandy that he was not moving forward against Jean because he wanted her to be there in person to "tell [her] story." He also stated "I did file the case against Steven Lopez, but we agreed to wait until after the Olympic Games to pursue it because disrupting the Olympic preparation process now will unfairly impact even more innocent athletes…" May 11, 2016).

[109] USAT14063

e.   By failing to ever assemble a qualified hearing panel in the Steven Lopez matter;

f.   By directing that the ethics proceedings against Steven be stayed;

g.   By actively suspending the investigation of the Lopez brothers in mid-2016, in deference to the 2016 Olympics, where the Lopez brothers were lauded by USAT as the star athlete and head coach who could deliver medals and money to USAT[110];

h.   By reaching back out after the 2016 Olympics were complete and promising to renew the investigation and prosecution;

i.   By failing to pursue proceedings against Jean Lopez, even after the 2016 Olympics[111];

j.   By continuing to obsessively fact-gather and re-traumatize Plaintiffs over and over again in late 2016, despite the fact that USAT officials and Alperstein were aware that SafeSport had exclusive jurisdiction and the internal prosecutions of the Lopezes by USAT would never happen[112];

k.   By failing to *ever* interview either Jean or Steven Lopez;

l.   By failing to ever conduct a hearing about the abuse by Jean or Steven Lopez;

m.   By directing that the ethics complaint against Steven be dismissed;

n.   By directing Alperstein to hand over his investigatory materials to SafeSport;

---

[110] USAT8828, USAT14393, USAT8822, USAT14390, USAT6046

[111] USAT14375, USAT143474

[112] USAT14374

o.  By repeatedly claiming to have suspended or banned the Lopezes from participating in competitions, and then subsequently reversing course and allowing them to compete and/or coach;

p.  By unreasonably delaying notification to law enforcement (late 2016)[113] or the FBI (2017)[114] of sexual abuse—including sexual abuse against minors—by Jean Lopez and Steven Lopez;

q.  By allowing Steven Lopez to participate at the 2017 World Championships despite credible reports of sexual abuse and pending SafeSport investigation;

r.  By recklessly misstating the parameters and legitimacy of its investigation and making false statements to Congress in 2018 regarding the Lopez brothers and USAT's efforts to clean up the sport from sex abuse, which included its misstatements regarding Alperstein: falsely telling Congress that USAT had "immediately retained" Alperstein as "independent outside counsel" to "uncover any previously unreported incidents" and "to pursue sanctions against offenders"[115];

s.  By recklessly telling Congress on May 25, 2018, that its retained counsel "operated without any limitation on its budget, with no control by [USAT] as

---

[113] USAT014181

[114] USAT006153

[115] USAT05011; McNally written testimony at p 5, available at  https://docs.house.gov/meetings/IF/IF02/20180523/108356/HHRG-115-IF02-Wstate-McNallyS-20180523.pdf.

to who he should or should not pursue, and with only rudimentary intermittent reporting requirements to [USAT]."[116]

t.  By publicly asserting that USAT "places tremendous importance on protecting and preserving the safety of [its] athletes"; that it gave Alperstein "unfettered ability to carry out his task…and prosecute fully any violations" and that USAT "diligently provided any and all information to relevant law enforcement agencies, including local police and the FBI."[117]

688.  As alleged herein, USAT's investigation was a delay tactic and was carried out recklessly and without any attempt to actually pursue and remove the Lopez brothers from the sport. Ultimately, USAT never did anything other than deceive Mandy and others into believing it was going to do something (or try in good faith to do something) to remove the Lopez brothers from taekwondo.

689.  Mandy suffered significant damages when she discovered that:

a.  USAT failed to suspend Steven or Jean despite knowledge of abuse and pendency of proceedings/investigation (beginning 2015 and continuing through present);

b.  USAT suspended the Alperstein investigation and proceedings so Steven Lopez could continue competing for Team USA (May 2016);

c.  USAT sent Steven Lopez to the 2016 Olympics (August 2016);

---

[116] Testimony of Steve McNally, U.S. House Energy and Commerce Committee, Oversight and Investigations Subcommittee, *Hearing on the Olympic Community's Ability to Protect Athletes from Sexual Abuse*, CQ-ROLLCALL, 2018 WLNR 16155107 (May 25, 2018).

[117] Nancy Armour & Rachel Axon, *Allegations Hit Lopez Brothers*, USA TODAY (June 9, 2017).

     d.  USAT directed Alperstein to turn over his files to the United States Center for SafeSport because USAT was abandoning its investigation, which began in 2015, after conducted several interviews of Mandy (March 2017);

     e.  USAT directed Alperstein to dismiss the complaint against Steven and thus abandoned the case that Alperstein promised Mandy he would never give up on (April 2017);

     f.  USAT misrepresented the investigation to Congress and publicly told Congress that it had operated in good faith, when in fact Mandy and the other Plaintiffs knew that USAT had not done so (May 2018).

690.  USAT's breach of its assumed duty to act with reasonable care toward Mandy in undertaking an investigation against the Lopez brothers has caused Mandy physical injuries, severe emotional distress, and institutional abandonment and betrayal.

691.  Had USAT acted reasonable to carry out a good faith, independent investigation into the Lopezes, Mandy would not have undergone the new injuries she's experienced over the last several years.

692.  Mandy has suffered extensive physical, mental and emotional trauma because of the actual rapes and sexual assaults she endured by the Lopez brothers, but Mandy independently and separately suffered physical, mental, and emotional trauma as a result of USAT's actions in recent years.

693.  Mandy was separately and independently retraumatized, revictimized, and harmed by Defendant USAT when, beginning in 2015 and continuing at least through USAT's transfer of the investigation to SafeSport in March 2017 when USAT pried into Plaintiffs' private lives, prodded them for years-old information, and reopened their

wounds in exchange for the false promise of finally addressing known past abuses of Jean and Steven Lopez.

694.    Mandy was separately and independently retraumatized, revictimized, and harmed by USAT when it took actions inconsistent with the representation that it sought to ban the Lopez brothers from the Sport, including its delaying to report to law enforcement, its stay/suspension of the investigation/disciplinary proceedings, its financial and other support of the Lopezes at USAT competitions, its ultimate abandonment of the proceedings against Steven, its testimony to Congress in May 2018, and public statements to media and through its website.

695.    Through USAT's promises to act, and through its representations about its actions, USAT purported to render a service that was reasonably calculated to prevent the very type of harm that Mandy has now endured: physical injury, physical trauma, complex emotional distress, and mental anguish.

696.    In addition to severe emotional, psychological and other injury, Mandy has suffered physical injury as a result of USAT's promises to act and its conduct in so acting, including symptoms typical of Post-Traumatic Stress Syndrome ("PTSD") such as racing heart, nausea, vomiting, sweating, shortness of breath, fluctuations in blood pressure, headaches, and pain.

697.    As a result of USAT's negligence, Mandy has suffered ascertainable, physical injuries including:

    a.  Post-traumatic stress disorder, prolonged suffering and mental health diagnoses, which have caused bodily suffering, from 2015 to present;

b. Became physically ill after discussing her case of abuse by Jean and Steven Lopez with Donald Alperstein, as conveyed to USAT CEO Keith Ferguson in February 2017[118];

c. Experiences reoccurring flashbacks, fear and depression after learning Steven was allowed to attend the 2016 Olympics;

d. Suffers debilitating fear of retaliation by Lopezes after she detailed her abuse to Alperstein[119];

e. Suffers from chronic PTSD since 2017 when she was contacted by SafeSport's Kathleen Smith and had to recount the entire decade of sexual trauma;

f. Experiences continued trauma and PTSD symptoms arising from the fear that Jean or Steven could be physically assaulting USAT members today;

g. Continues to experience anger, nightmares, irritation, rage and physical reactions and aversions when confronted with these facts, even today.

698.   As a direct and proximate result of the negligent actions and inactions of Defendant USAT, Mandy has suffered physical injuries, PTSD, severe emotional distress, economic losses caused by unemployment or loss of employment or loss of business opportunities, and these injuries continue.

699.   Mandy claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

---

[118] USAT6094

[119] USAT-ESI16917

**COUNT 10**
**NEGLIGENCE**
*By Plaintiff Heidi Gilbert against USAT*

700.    Plaintiff Heidi Gilbert realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

701.    Sexual assault, rape, trafficking, forced sexual services, domestic violence, dating violence and stalking are deeply traumatic crimes that can cause severe damages to survivors' physical, emotional, spiritual and psychological well-being.[120]

702.    It was well known by 2015 that sexual assault victims can experience secondary victimization, also known as secondary trauma or re-victimization, by being asked to describe or re-live their trauma.

703.    Survivors are harmed or retraumatized by insensitive, uninformed, or inadequate community, institutional, and justice system responses. [121]

704.    Sexual assault victims who encounter service providers who mirror the unequal power and control experienced in the abusive relationships that caused past trauma are likely to retraumatize victims.[122]

---

[120] United States Department of Justice, *The Importance of Understanding Trauma-Informed Care and Self-Care for Victim Service Providers*, July 30, 2014, *available at*: https://www.justice.gov/archives/ovw/blog/importance-understanding-trauma-informed-care-and-self-care-victim-service-providers (last visited October 10, 2019).

[121] *Id.*

[122] Haskell, Lori, C. Psych. & Dr. Melanie Randall, *The Impact of Trauma on Adult Sexual Assault Victims* (2019) p 26-27.

119

705.    Insensitive, ineffective, victim-blaming treatment or services retraumatizes the victim and results in a "second rape."[123]  In fact, as USAT's agent Donald Alperstein so fittingly recognized at the onset of his own investigation, "Trying to influence a witness is another violation and a further act of victimization."[124]

706.    As set forth in detail throughout this Complaint and at all relevant times, USAT knew or should have known of the endemic problem of sexual abuse in elite sports and across NGBs and within USAT in particular, which led Defendant to adopt policies, impose trainings and certifications, and institute special procedures for reporting, investigating, and responding to complaints of sexual abuse; and which led Defendant to obtain sexual abuse insurance covering damage or injury because of abuse, molestation or exploitation arising from negligent employment, training, investigation, reporting or failure to report, or retention or supervision of a person for whom USAT is or was legally responsible.

707.    At least by 2015, USAT should have known that Heidi was and is a survivor of sexual assault by Jean Lopez and Steven Lopez.

708.    At all relevant times, Defendant Steven Lopez was a member of USAT.

709.    At all relevant times, Jean Lopez was a member of USAT.

710.    In 2015, USAT hired and retained Donald Alperstein and his staff (including Leah Wicks, an investigator) to work for them to investigate the Lopez brothers. Alperstein was at all times an agent acting for and on behalf of USAT.

---

[123] Campbell R, Wasco SM, Ahrens CE, Sefl T, Barnes HE. *Preventing the "Second Rape": Rape Survivors' Experiences with Community Services Providers.* Journal of interpersonal violence 2001; 16(12): 231, 1239-1259.

[124] USAT14085

711.    Before hiring Alperstein to conduct a sex abuse investigation, USAT did not perform any diligence or background research to figure out how to perform a proper sex abuse investigation. In hiring Alperstein, USAT did nothing to determine whether Alperstein was qualified to act as a sexual abuse investigator. USAT conducted no screening or investigation of its own investigator. In fact, Alperstein had no training and was not qualified to investigate sex abuse or to interact with sex abuse victims in a way that would avoid re-victimizing them.

712.    USAT owed a special duty of care and had a special relationship with Heidi and the other Plaintiffs because all were former athletes of USAT who were sexually abuse and exploited while performing as athletes for the benefit of USAT. Thus, based on this special relationship and the fact Heidi and the other Plaintiffs were especially vulnerable because of the trauma inflicted upon them by the Lopez brothers. USAT knew this and should have taken measures to guard against re-victimizing Heidi and the other Plaintiffs.

713.    USAT failed to act reasonably and failed to perform an adequate screening because it was motivated by something other than protecting athletes and ridding taekwondo of the Lopez brothers; in fact, USAT hired Alperstein (and not a real, qualified investigator) because he was a lawyer, and USAT wanted to manipulate the attorney-client privilege and work product protections to keep its factual investigations secret and off-limits, using the ruse of the attorney-client privilege and work product protections to do so.

714.    In part because he was not trained as an investigator and was unfamiliar with handling a sex abuse investigation, Alperstein portrayed his status or role vis-à-vis

USAT to Heidi and the other Plaintiffs as being entirely independent. He did not make clear what his role was, so Heidi and the other Plaintiffs reasonably assumed he was acting on their behalf, not that of USAT, and he further induced this belief based on the language he used in communicating with them.

715.   Alperstein was not functioning as a lawyer when he worked to investigate the Lopez brothers, and he was not working as a lawyer when he interviewed Heidi or any of the other named Plaintiffs. To this end, at no time did Alperstein disclose to Heidi or any of the other named Plaintiffs that he was adverse or that he was working on behalf of USAT as its lawyer.

716.   USAT, through Alperstein, voluntarily and affirmatively reached out to Heidi in 2015 regarding allegations previously made by Heidi against the Lopez brothers and USAT. In doing so, Alperstein was acting as an agent of USAT.

717.   At the time, in 2015, Heidi was no longer in USAT and was not looking to be involved with any investigation. She had left USAT and did not initiate any discussions with Alperstein in 2015 regarding the Lopez brothers.

718.   Alperstein and USAT, however, affirmatively reached out and pulled Heidi back into the world of USAT and into the Lopez sex investigation.

719.   By voluntarily reaching out to Heidi in 2015 and making affirmative representations to Heidi, USAT voluntarily undertook a duty to Heidi to conduct a good faith, independent investigation of the Lopez brothers.

720.   USAT and Alperstein, in 2015, voluntarily assumed the duty to render services on behalf of Heidi. In fact, Alperstein and his colleagues, including Leah Wicks,

repeatedly made specific promises to Heidi that they were acting in her interests and that she should "trust" him:

      a. April 15, 2015: Alperstein met with USAT member athlete Nia Abdallah in his efforts to use her friendships with victims to extort information about their abuse, telling her "I don't think I could make any significant headway without your help and the assistance of other willing and courageous people." Nia responds to Alperstein with Heidi's phone number, saying "Heidi Gilbert said that she will talk to you."[125]

      b. April 23, 2015: Wicks conducted the first of three separate, grueling interviews of Heidi, where she persuaded Heidi to share her story of abuse, in the name of helping the investigation to internally prosecute the Lopezes.[126]

      c. April 27, 2015: Wicks conducted her second lengthy interview of Heidi, continually prodding for information and reagitating the trauma.[127]

      d. June 10, 2015: Wicks completes her third extensive interview of Heidi, where she is forced to recount abuse by both Lopez brothers.[128]

---

[125] USAT-ESI5821

[126] USAT-ESI5940

[127] USAT-ESI6026

[128] USAT-ESI7807

e.  March 30, 2016: Alperstein followed up with Heidi after speaking with her to affirm his dedication to finding victims and "Most of all, thank you for your courage and willingness to stand up and be counted among those victims and tell your story. Without you and the others who share your determination not to let this happen again, I could accomplish nothing. I said it when we spoke, but I'll say it again: you are a hero to me and to all the athletes whose lives will be better because of you."[129]

f.  April 5, 2017: Alperstein reached out to Heidi, for the last time, to influence her to agree to share her contact information with SafeSport, despite Heidi's reluctance about the entire process.[130]

721.   Throughout 2015-2018, USAT and Alperstein led Heidi to believe that USAT was undertaking a good faith investigation to determine if its current members, Jean and Steven Lopez and other USAT members, posed an unreasonable risk of harm to other current USAT-member athletes, including minor athletes.

722.   But USAT's primary motive was not, as Alperstein promised, to protect the athletes or to remove the Lopez brothers from the sport. Instead, USAT was seeking to avoid congressional investigation and further regulation, suspension, or dismantling by the USOC and Congress.

723.   In fact, because USAT had already been on probation for two years, in 2012-13 (during which time the United States Olympic Committee was actively running

---

[129] USAT14169

[130] USAT-ESI15351

124

USAT, while its officers and directors were side-lined),[131] USAT was especially sensitive to the need to make it appear that it was taking the Lopez brothers investigation seriously. To do so, it needed to convince Heidi and the other Plaintiffs that it was seriously and legitimately going to police the Lopez brothers and remove them from the sport.

724.    What Heidi did not know was that USAT was phoning-it-in and conducting a mock investigation that would provide plausible deniability but would never actually remove the Lopezes (the money-makers of the sport) from taekwondo. To this end, on August 21, 2015, Leah Wicks emailed to a witness that she and Alperstein were "winding down [their] investigation[.]"[132]

725.    Thus, publicly, to Heidi and others, USAT proclaimed that it was pursuing the Lopez brothers at full speed and were leaving no stone unturned. Privately, however, Alperstein and Wicks were already writing that they were "winding down" their investigation in 2015 (this email is marked Highly Confidential, which confirms that the email was between only Wicks and a witness and was not disseminated). They nevertheless strung along Heidi and the other Plaintiffs for 2.5 more years, until 2017, before they called off their investigation and handed it over to SafeSport.

726.    Throughout 2015-2018, USAT continually reaffirmed and ratified that it was undertaking and assuming the duty to investigate sexual abuse within the sport, focusing in particular on the allegations raised by Heidi against the Lopez brothers.

---

[131] *From the desk of the CEO: USA Taekwondo probation lifted*, Oct. 14, 2013, available at: https://www.teamusa.org/USA-Taekwondo/Features/2013/October/14/From-the-desk-of-the-CEO-USA-Taekwondo-probation-lifted

[132] USAT 009695 (marked "Highly Confidential").

727.    USAT did so by its constant communications to Heidi, by and through its agents, including Donald Alperstein and other USAT officials.

728.    As a result of USAT's targeting of Heidi in 2015-18, it assumed and created a special relationship with her as a victim of the Lopez brothers. This special relationship was created when USAT affirmatively reached out, through its investigator, Donald Alperstein, to investigate allegations of prior abuse by one or more USAT members.

729.    USAT represented to Heidi that it was undertaking an investigation of the Lopez brothers with the goal of having them "banned from the sport."

730.    To Heidi's detriment, USAT represented by word and action that it was conducting a good faith investigation into the Lopezes by:

a.  Hiring and paying Donald Alperstein and advertising him as USAT's independent counsel (from March 2015 through present)[133];

b.  Hiring and paying Leah Wicks as Alperstein's investigator to interview victims and advertising her as independent (same timeframe)[134];

c.  Enticing survivors to come forward and share their stories by publicly proclaiming "Make the commitment: Report—Stop Abuse in Sport"[135].

d.  Posting on the USAT Website (since April 2015) and testifying to Congress (in May 2018) that "USA Taekwondo is committed to removing any and all

---

[133]   USAT14159 – also, this website is still up:   https://www.teamusa.org/USA-Taekwondo/Features/2015/April/23/Safe-Sport-Reporting

[134]   USAT14159

[135]   USAT14159 ("If you are aware of any misconduct which may have occurred at any time now or in the past, please join the other athletes that have come forward and reported their experiences to make the commitment to stop abuse in sport." This is also the concept (although not quoted) in the current TKD safe sport strategy material available at https://www.teamusa.org/-/media/USA_Taekwondo/Images/2019-06-June/Safe-Sport-Strategy-2019.pdf?la=en&hash=EF662AAB83523339A1E45FD1DE075ED7190C0200

barriers to the safe and effective reporting of abuse within USA Taekwondo"[136];

e. Advertising to Plaintiffs and other victims: "You are not alone. You will be heard."[137];

f. Retaining another independent investigator, The Dan Beebe Group, to analyze "SafeSport issues" within USA Taekwondo and audit USAT's compliance with mandatory SafeSport policies for preventing and detecting sex abuse within USA Taekwondo in 2015[138];

g. Repeatedly interviewing Plaintiffs and asking them to recount the trauma inflicted by the Lopezes;

h. Continually reassuring victims who were hesitant to come forward that with their help and testimony, the sexual abusers within USAT would be prosecuted[139];

i. Telling Heidi that she is "a hero to [Alperstein] and all the athletes whose lives will be better because of you."[140];

---

[136] USAT05011; McNally written testimony at p 5, available at https://docs.house.gov/meetings/IF/IF02/20180523/108356/HHRG-115-IF02-Wstate-McNallyS-20180523.pdf.

[137] USAT14159

[138] USOC-GIL-11772 (Dan Beebe report)

[139] In fact, when Heidi expressed her hesitation about recounting her abuse, Alperstein then began to contact Heidi's mom Marcee to influence her to get her daughter's participation in his fact-gathering.

[140] USAT14168

j.  Filing an internal ethics complaint against Steven Lopez in December 2015, amending this complaint in April 2016, and representing to Plaintiffs that it would be used to remove Steven from USAT participation.

k.  Repeatedly representing to Plaintiffs that it would be immediately turning over their complaints to law enforcement.

731.  In addition, USAT's duty to Heidi was amplified by the fact that Heidi was a USAT member herself, a former decorated athlete and USA National Team member.

732.  To the extent Heidi was no longer a member of USAT, that occurred **only because** she was sexually assaulted and exploited out of the sport by the Lopez brothers, who were supposed to be coaching and supporting her. In other words, but-for the sexual abuse and forced sexual services inflicted upon her by the Lopez brothers, who were clothed in authority by USAT, Heidi would have remained a current, active member of USAT. Heidi was identified as a star in the sport, and Heidi intended to continue competing, just as Steven Lopez has done well into his 40s, in taekwondo at the Olympic level. Instead, USAT and the USOC chose to leave the Lopez brothers in the sport, which forced Heidi to reluctantly drop out.

733.  At all relevant times, Heidi reasonably relied on USAT's promise to perform services (to investigate and remove the Lopez brothers) and she was led to believe that USAT was undertaking a good faith investigation to determine if she had been sexually assaulted by Jean and/or Steven Lopez and other USAT members and that USAT was actually working in good faith to eradicate sexual abuse, clean up taekwondo, and have the Lopez brothers "banned from the sport." If the Lopez brothers had been removed from the sport, Heidi could have resumed competing in taekwondo as an athlete—which

would have led to lucrative endorsements and a career in taekwondo, just like Steven and Jean Lopez have enjoyed for decades.

734.    USAT's affirmative step of reaching out to Heidi and making representations to her through Alperstein was intended to induce and did induce her participation in the investigation.

735.    Because of USAT's affirmative step of reaching out to Heidi, and USAT's representations through Alperstein, Heidi reasonably relied on USAT to conduct the investigation in good faith and to behave reasonably and with all due care toward her as it investigated allegations against its member(s).

736.    Because USAT's investigator, Alperstein, repeatedly conveyed to Heidi that USAT was diligently pursuing discipline against the Lopezes—specifically telling her that USAT was trying to "have both Lopez brothers banned from the sport"—and that she was the "star witness" and a "hero," Heidi reasonably relied on these representations.

737.    By voluntarily reaching out to Heidi in 2015 regarding the Lopez brothers and inducing her participation by means of various representations, USAT undertook and actively assumed a duty to investigate the Lopez brothers honestly and in good faith and with reasonable care to prevent secondary victimization to Heidi.

738.    USAT's representations created a foreseeable risk that Heidi would suffer significant secondary trauma (known as revictimization) if and when she discovered that USAT's investigation was not independent, was not conducted in good faith, and was never intended to actually remove the Lopez brothers from the sport.

739.    Alperstein (who was an agent of USAT) specifically recognized this risk but asked Heidi to proceed anyway in telling him over and over again about her trauma, forcing her to re-live and reexperience the trauma for his benefit.

740.    In breach of its voluntarily assumed duty to Heidi render services on her behalf, *see* Restatement (Second) of Torts § 323, USAT performed an unreasonable and flawed sex abuse investigation, which dragged out for several years, during which USAT permitted, encouraged, and supported the Lopez brothers' continued involvement in competing and coaching in the sport.

741.    In fact, Alperstein never even attempted to have the Lopez brothers removed from taekwondo, never even interviewed Steven or Jean Lopez, never conducted any hearings, and ultimately dumped his hollow investigation into the lap of SafeSport in 2017, after spending several years doing sham interviews that re-victimized Heidi and the other plaintiffs.

742.    When Alperstein turned over his investigation to SafeSport, he provided nothing of any value—which is evidenced by the fact that SafeSport started over, from scratch, and re-interviewed Heidi and the other Plaintiffs. If Alperstein had performed a legitimate, good faith investigation, he would have avoided the need for SafeSport to start from zero. But the fact SafeSport had to start over again further cements that Alperstein's investigation was not conducted in good faith and flunks any measure of a legitimate sex abuse investigation.

743.    At no time did Alperstein disclose to Heidi or the other Plaintiffs that he was actually never going to do anything to remove the Lopez from the sport or that their interviews would never be used in any proceeding (because no proceeding would ever

be initiated), nor did he reveal to them that SafeSport would re-interview (and revictimize) them all over again when it took over Alperstein's sham investigation. In other words, Alperstein used the sham Lopez brothers investigation to enrich himself (by billing USAT for his services year after year) and to portray USAT as being legitimately concerned with ending sex abuse in the sport. In reality, however, neither USAT nor Alperstein had any intention of removing the Lopez brothers, cleaning up the sport, or helping Heidi or the other Plaintiffs.

744.   Had Alperstein and USAT been honest with Heidi and the other Plaintiffs about the true nature of the Lopez investigation, they never would have participated in the sham interviews or been led to believe that the Lopez brothers (the rapists who abused them) would be removed the sport.

745.   USAT breached its voluntarily-assumed duty to Heidi to conduct a good faith independent investigation in multiple ways, each of which is further proof that the investigation of the Lopez brothers by USAT and Alperstein was a sham:

a.   By violating its own bylaws, which mandate the prompt investigation allegations of sex abuse;

b.   By falsely and repeatedly telling Plaintiffs that the prosecution of the Lopez brothers hinged on their cooperation and involvement, despite the fact that USAT was never actually going to punish the Lopezes for their crimes due to their position within USAT and the Olympic community;

c.   By never filing an ethics complaint against Jean Lopez, despite ample long-known evidence and Alperstein's July 2015 report that Jean committed

numerous Code of Conduct, SafeSport, and criminal violations and that he "represents an immediate danger to other USAT members"[141];

d.  By filing an ethics complaint against Steven Lopez so fraught with procedural issues that it would never be prosecuted;

e.  By failing to ever assemble a qualified hearing panel in the Steven Lopez matter;

f.  By directing that the ethics proceedings against Steven be stayed;

g.  By actively suspending the investigation of the Lopez brothers in mid-2016, in deference to the 2016 Olympics, where the Lopez brothers were lauded by USAT as the star athlete and head coach who could deliver medals and money to USAT[142];

h.  By reaching back out after the 2016 Olympics were complete and promising to renew the investigation and prosecution;

i.  By failing to pursue proceedings against Jean Lopez, even after the 2016 Olympics[143];

j.  By continuing to obsessively fact-gather and re-traumatize Plaintiffs over and over again in late 2016, despite the fact that USAT officials and Alperstein were aware that SafeSport had exclusive jurisdiction and the internal prosecutions of the Lopezes by USAT would never happen[144];

---

[141] USAT14063

[142] USAT8828, USAT14393, USAT8822, USAT14390, USAT6046

[143] USAT14375, USAT143474

[144] USAT14374

k.  By failing to *ever* interview either Jean or Steven Lopez;

l.  By failing to ever conduct a hearing about the abuse by Jean or Steven Lopez;

m.  By directing that the ethics complaint against Steven be dismissed;

n.  By directing Alperstein to hand over his investigatory materials to SafeSport;

o.  By repeatedly claiming to have suspended or banned the Lopezes from participating in competitions, and then subsequently reversing course and allowing them to compete and/or coach;

p.  By unreasonably delaying notification to law enforcement (late 2016)[145] or the FBI (2017)[146] of sexual abuse—including sexual abuse against minors—by Jean Lopez and Steven Lopez;

q.  By allowing Steven Lopez to participate at the 2017 World Championships despite credible reports of sexual abuse and pending SafeSport investigation;

r.  By recklessly misstating the parameters and legitimacy of its investigation and making false statements to Congress in 2018 regarding the Lopez brothers and USAT's efforts to clean up the sport from sex abuse, which included its misstatements regarding Alperstein: falsely telling Congress that USAT had "immediately retained" Alperstein as "independent outside

---

[145] USAT014181

[146] USAT006153

counsel" to "uncover any previously unreported incidents" and "to pursue sanctions against offenders"[147];

s.   By recklessly telling Congress on May 25, 2018, that its retained counsel "operated without any limitation on its budget, with no control by [USAT] as to who he should or should not pursue, and with only rudimentary intermittent reporting requirements to [USAT]."[148]

t.   By publicly asserting that USAT "places tremendous importance on protecting and preserving the safety of [its] athletes"; that it gave Alperstein "unfettered ability to carry out his task…and prosecute fully any violations" and that USAT "diligently provided any and all information to relevant law enforcement agencies, including local police and the FBI."[149]

746.   As alleged herein, USAT's investigation was a delay tactic and was carried out recklessly and without any attempt to actually pursue and remove the Lopez brothers from the sport. Ultimately, USAT never did anything other than deceive Heidi and others into believing it was going to do something (or try in good faith to do something) to remove the Lopez brothers from taekwondo.

747.   Heidi suffered significant damages when she discovered that:

---

[147] USAT05011; McNally written testimony at p 5, available at https://docs.house.gov/meetings/IF/IF02/20180523/108356/HHRG-115-IF02-Wstate-McNallyS-20180523.pdf.

[148] Testimony of Steve McNally, U.S. House Energy and Commerce Committee, Oversight and Investigations Subcommittee, *Hearing on the Olympic Community's Ability to Protect Athletes from Sexual Abuse*, CQ-ROLLCALL, 2018 WLNR 16155107 (May 25, 2018).

[149] Nancy Armour & Rachel Axon, *Allegations Hit Lopez Brothers*, USA TODAY (June 9, 2017).

a. USAT failed to suspend Steven or Jean despite knowledge of abuse and pendency of proceedings/investigation (beginning 2015 and continuing through present);

b. USAT suspended the Alperstein investigation and proceedings so Steven Lopez could continue competing for Team USA (May 2016);

c. USAT sent Steven Lopez to the 2016 Olympics (August 2016);

d. USAT directed Alperstein to turn over his files to the United States Center for SafeSport because USAT was abandoning its investigation, which began in 2015, after conducted several interviews of Heidi (March 2017);

e. USAT directed Alperstein to dismiss the complaint against Steven and thus abandoned the case that Alperstein promised Heidi he would never give up on (April 2017);

f. USAT misrepresented the investigation to Congress and publicly told Congress that it had operated in good faith, when in fact Heidi and the other Plaintiffs knew that USAT had not done so (May 2018).

748. USAT's breach of its assumed duty to act with reasonable care toward Heidi in undertaking an investigation against the Lopez brothers has caused Heidi physical injuries, severe emotional distress, and institutional abandonment and betrayal.

749. Had USAT acted reasonable to carry out a good faith, independent investigation into the Lopezes, Heidi would not have undergone the new injuries she's experienced over the last several years.

750. Heidi has suffered extensive physical, mental and emotional trauma because of the actual rapes and sexual assaults she endured by the Lopez brothers, but

Heidi independently and separately suffered physical, mental, and emotional trauma as a result of USAT's actions in recent years.

751.   Heidi was separately and independently retraumatized, revictimized, and harmed by Defendant USAT when, beginning in 2015 and continuing at least through USAT's transfer of the investigation to SafeSport in March 2017 when USAT pried into Plaintiffs' private lives, prodded them for years-old information, and reopened their wounds in exchange for the false promise of finally addressing known past abuses of Jean and Steven Lopez.

752.   Heidi was separately and independently retraumatized, revictimized, and harmed by USAT when it took actions inconsistent with the representation that it sought to ban the Lopez brothers from the Sport, including its delaying to report to law enforcement, its stay/suspension of the investigation/disciplinary proceedings, its financial and other support of the Lopezes at USAT competitions, its ultimate abandonment of the proceedings against Steven, its testimony to Congress in May 2018, and public statements to media and through its website.

753.   Through USAT's promises to act, and through its representations about its actions, USAT purported to render a service that was reasonably calculated to prevent the very type of harm that Heidi has now endured: physical injury, physical trauma, complex emotional distress, and mental anguish.

754.   In addition to severe emotional, psychological and other injury, Heidi has suffered physical injury as a result of USAT's promises to act and its conduct in so acting, including symptoms typical of Post-Traumatic Stress Syndrome ("PTSD") such as racing

heart, nausea, vomiting, sweating, shortness of breath, fluctuations in blood pressure, headaches, and pain.

755.   As a result of USAT's negligence, Heidi has suffered ascertainable, physical injuries including:

a.  Severe depression after every single instance she was contacted by a USAT official, since 2016;

b.  "Feel[ing] a huge cloud come over [her] ever time she had to discuss the Lopezes with investigators since 2016;

c.  Inability to focus on tasks, deployment of unhealthy coping mechanisms, depression and anxiety since being contacted by Alperstein in 2015;

d.  Depression and anxiety since being interviewed multiple times by Leah Wicks;

e.  Feeling physically ill, disgusted, and experiencing debilitating anxiety when she found out Steven Lopez was being allowed to compete in the 2016 Olympic games;

f.  Anxiety, frustration, hopelessness and depression when the case was handed off to SafeSport and she recounted her abuse to investigator Kathleen Smith in May 2017;

g.  Hopelessness, anger, insomnia, depression and anger when she learned the ban of the Lopezes was being lifted in 2018;

h.  Ongoing inability to perform daily functions and symptoms of PTSD to this day;

i.  Insomnia and anxiety to this day.

756.    As a direct and proximate result of the negligent actions and inactions of Defendant USAT, Heidi has suffered physical injuries, PTSD, severe emotional distress, economic losses caused by unemployment or loss of employment or loss of business opportunities, and these injuries continue.

757.    Heidi claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

### COUNT 11
### NEGLIGENCE

*By Plaintiff Amber Means against USAT*

758.    Plaintiff Amber Means realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

759.    Sexual assault, rape, trafficking, forced sexual services, domestic violence, dating violence and stalking are deeply traumatic crimes that can cause severe damages to survivors' physical, emotional, spiritual and psychological well-being.[150]

760.    It was well known by 2015 that sexual assault victims can experience secondary victimization, also known as secondary trauma or re-victimization, by being asked to describe or re-live their trauma.

761.    Survivors are harmed or retraumatized by insensitive, uninformed, or inadequate community, institutional, and justice system responses. [151]

---

[150] United States Department of Justice, *The Importance of Understanding Trauma-Informed Care and Self-Care for Victim Service Providers*, July 30, 2014, *available at*: https://www.justice.gov/archives/ovw/blog/importance-understanding-trauma-informed-care-and-self-care-victim-service-providers (last visited October 10, 2019).

[151] *Id.*

762.   Sexual assault victims who encounter service providers who mirror the unequal power and control experienced in the abusive relationships that caused past trauma are likely to retraumatize victims.[152]

763.   Insensitive, ineffective, victim-blaming treatment or services retraumatizes the victim and results in a "second rape."[153]  In fact, as USAT's agent Donald Alperstein so fittingly recognized at the onset of his own investigation, "Trying to influence a witness is another violation and a further act of victimization."[154]

764.   As set forth in detail throughout this Complaint and at all relevant times, USAT knew or should have known of the endemic problem of sexual abuse in elite sports and across NGBs and within USAT in particular, which led Defendant to adopt policies, impose trainings and certifications, and institute special procedures for reporting, investigating, and responding to complaints of sexual abuse; and which led Defendant to obtain sexual abuse insurance covering damage or injury because of abuse, molestation or exploitation arising from negligent employment, training, investigation, reporting or failure to report, or retention or supervision of a person for whom USAT is or was legally responsible.

765.   At least by 2015, USAT should have known that Amber was and is a survivor of sexual assault by Jean Lopez and Steven Lopez.

766.   At all relevant times, Defendant Steven Lopez was a member of USAT.

---

[152] Haskell, Lori, C. Psych. & Dr. Melanie Randall, *The Impact of Trauma on Adult Sexual Assault Victims* (2019) p 26-27.

[153] Campbell R, Wasco SM, Ahrens CE, Sefl T, Barnes HE. *Preventing the "Second Rape": Rape Survivors' Experiences with Community Services Providers.* Journal of interpersonal violence 2001; 16(12): 231, 1239-1259.

[154] USAT14085

767.    At all relevant times, Jean Lopez was a member of USAT.

768.    In 2015, USAT hired and retained Donald Alperstein and his staff (including Leah Wicks, an investigator) to work for them to investigate the Lopez brothers. Alperstein was at all times an agent acting for and on behalf of USAT.

769.    Before hiring Alperstein to conduct a sex abuse investigation, USAT did not perform any diligence or background research to figure out how to perform a proper sex abuse investigation. In hiring Alperstein, USAT did nothing to determine whether Alperstein was qualified to act as a sexual abuse investigator. USAT conducted no screening or investigation of its own investigator. In fact, Alperstein had no training and was not qualified to investigate sex abuse or to interact with sex abuse victims in a way that would avoid re-victimizing them.

770.    USAT owed a special duty of care and had a special relationship with Amber and the other Plaintiffs because all were former athletes of USAT who were sexually abuse and exploited while performing as athletes for the benefit of USAT. Thus, based on this special relationship and the fact Amber and the other Plaintiffs were especially vulnerable because of the trauma inflicted upon them by the Lopez brothers. USAT knew this and should have taken measures to guard against re-victimizing Amber and the other Plaintiffs.

771.    USAT failed to act reasonably and failed to perform an adequate screening because it was motivated by something other than protecting athletes and ridding taekwondo of the Lopez brothers; in fact, USAT hired Alperstein (and not a real, qualified investigator) because he was a lawyer, and USAT wanted to manipulate the attorney-client privilege and work product protections to keep its factual investigations secret and

off-limits, using the ruse of the attorney-client privilege and work product protections to do so.

772.    In part because he was not trained as an investigator and was unfamiliar with handling a sex abuse investigation, Alperstein portrayed his status or role vis-à-vis USAT to Amber and the other Plaintiffs as being entirely independent. He did not make clear what his role was, so Amber and the other Plaintiffs reasonably assumed he was acting on their behalf, not that of USAT, and he further induced this belief based on the language he used in communicating with them.

773.    Alperstein was not functioning as a lawyer when he worked to investigate the Lopez brothers, and he was not working as a lawyer when he interviewed Amber or any of the other named Plaintiffs. To this end, at no time did Alperstein disclose to Amber or any of the other named Plaintiffs that he was adverse or that he was working on behalf of USAT as its lawyer.

774.    USAT, through Alperstein, voluntarily and affirmatively reached out to Amber in 2015 regarding allegations previously made by Amber against the Lopez brothers and USAT. In doing so, Alperstein was acting as an agent of USAT.

775.    At the time, in 2015, Amber was no longer in USAT and was not looking to be involved with any investigation. She had left USAT and did not initiate any discussions with Alperstein in 2015 regarding the Lopez brothers.

776.    Alperstein and USAT, however, affirmatively reached out and pulled Amber back into the world of USAT and into the Lopez sex investigation.

777.   By voluntarily reaching out to Amber in 2015 and making affirmative representations to Amber, USAT voluntarily undertook a duty to Amber to conduct a good faith, independent investigation of the Lopez brothers.

778.   USAT and Alperstein, in 2015, voluntarily assumed the duty to render services on behalf of Amber. In fact, Alperstein and his colleagues, including Leah Wicks, repeatedly made specific promises to Amber that they were acting in her interests and that she should "trust" him:

    a.  April 26, 2015: Wicks first reached out to Amber, requiring her to relive her abuse in detail, all in the name of Alperstein's "investigation".[155]

    b.  June 11, 2015: Leah Wicks again cold called Amber and conducts an extensive interview where she is prodded for additional details about what she experienced at the hands of the Lopez brothers, including being repeatedly drugged and raped.[156]

    c.  July 7, 2015: Wicks callously contacted Amber for a third interview to question her about additional sexual assaults she endured during her time as a USAT member.[157]

    d.  September 9, 2015: Alperstein prodded Amber for additional information via text and Amber respectfully responded, "I gave a few different statements and all the information I have on the matter to

---

[155] USAT7063

[156] USAT-ESI7802

[157] USAT-ESI7907

Leah, but do not want to be involved any further. Thank you for taking the time and taking action, **it's long past time**." Relentless, Alperstein replied that he needs her help in order to protect other young athletes, stating "The one thing I still need to know is whether you will help me prosecute Peter Lopez by testifying about the two incidents you described to me and Leah. I hope so, because that will help me protect other young athletes. But as I promised you when we spoke, I won't force you to do it. I can't tell your story without your testimony, and I was calling to ask if I can count on your help. Let me know. And thanks." Amber then wrote back, assuring Alperstein that Jean and Steven were the ones who presented the real danger: "I don't see how he is the only one being prosecuted? Jean and Steven Lopez are the ones who need to be addressed. My incidents with Peter are not something I wish to be a part of but if it comes to Jean or Steven in the future I would be happy to. They're the problem." Alperstein ends the conversation "Ok. That time will come, and I wil be back in touch… **My word is good.**"[158]

e. April 1, 2016: Following phone call with Amber, in which she was forced to AGAIN recount her abuse at the hands of Steven Lopez, Alperstein made additional inquiries, and reassured her all along, "Amber, if we can prove these things, it makes a very powerful case

---

[158] USAT014546 (emphasis added)

against Steven. You are my star witness and (yeah, I know I've said it, but it's true) my hero."[159]

f.  April 1, 2016, later the same day: After repeated e-mail correspondence throughout the day in which Amber was forced to recount gruesome specifics about the assaults, Alperstein then asked her to review it all in writing, an extreme trauma for any victim of sexual assault.[160]

g.  July 14, 2016: As Amber's desire to participate continued to dissolve, Alperstein then heartlessly began to use Amber's mother to try to induce her daughter to speak. He explained that the case against Steven was halted because of "some procedural issues" and "the looming Olympic Games"… "**My dedication to vindication of victims and to ridding USAT of its dangerous element remains unwavering**."[161]

h.  September 15, 2016: Alperstein continued to try to convince Amber that his investigation was proceeding, with her participation, writing: "Now that the Olympics are over and things are settling down, I want to get moving again on the Steven Lopez disciplinary case. I'm just checking in to see how you are doing, to confirm that you are available to help me present the case by testifying" and "I look

---

[159] USAT014532-3

[160] USAT14531

[161] USAT14377 (emphasis added)

forward to reconnecting and to moving forward with this case so that you and the other victims can see justice done."[162]

i. September 16,2016: Alperstein attempted to explain to Amber why he still hadn't procured a hearing date against Steven, because he was "just "warming up the file as we move to that point."[163]

j. November 2, 2016: Alperstein e-mailed Amber "You should always feel free to contact me if you any if you have questions or information, of if I can help you in any way." And further attempted to ingratiate himself by saying "say hi to your mom for me!"[164]

k. March 21, 2017: Alperstein sheepishly reached out to Amber after going radio silent for six months, saying "I'm sure you recall, but just in case, I'm the attorney in Denver that USA Taekwondo hired to prosecute disciplinary cases. It's been a while since we spoke, but that doesn't mean nothing's been going on. I fact, a lot has happened regarding Jean and Steven Lopez."[165]

l. April 26, 2017: Two years (to the date) after first revictimizing Amber by inducing her to relive her sexual abuse, Alperstein alerted Amber's mom, Marcee, that SafeSport would be handing the case and despite the fact that he knew that communicating about the Lopezes was "difficult and sensitive right now" he still sought Amber's

---

[162] USAT14528

[163] USAT14524

[164] USAT14183

[165] USAT14523

> participation. Marcee conveyed her frustration about what her daughter was being subjected to: "this will be like starting over and… be time consuming."[166]

779.   Throughout 2015-2018, USAT and Alperstein led Amber to believe that USAT was undertaking a good faith investigation to determine if its current members, Jean and Steven Lopez and other USAT members, posed an unreasonable risk of harm to other current USAT-member athletes, including minor athletes.

780.   But USAT's primary motive was not, as Alperstein promised, to protect the athletes or to remove the Lopez brothers from the sport. Instead, USAT was seeking to avoid congressional investigation and further regulation, suspension, or dismantling by the USOC and Congress.

781.   In fact, because USAT had already been on probation for two years, in 2012-13 (during which time the United States Olympic Committee was actively running USAT, while its officers and directors were side-lined),[167] USAT was especially sensitive to the need to make it appear that it was taking the Lopez brothers investigation seriously. To do so, it needed to convince Amber and the other Plaintiffs that it was seriously and legitimately going to police the Lopez brothers and remove them from the sport.

782.   What Amber did not know was that USAT was phoning-it-in and conducting a mock investigation that would provide plausible deniability but would never actually remove the Lopezes (the money-makers of the sport) from taekwondo. To this end, on

---

[166] USAT14127

[167] *From the desk of the CEO: USA Taekwondo probation lifted*, Oct. 14, 2013, available at: https://www.teamusa.org/USA-Taekwondo/Features/2013/October/14/From-the-desk-of-the-CEO-USA-Taekwondo-probation-lifted

August 21, 2015, Leah Wicks emailed to a witness that she and Alperstein were "winding down [their] investigation[.]"[168]

783. Thus, publicly, to Amber and others, USAT proclaimed that it was pursuing the Lopez brothers at full speed and were leaving no stone unturned. Privately, however, Alperstein and Wicks were already writing that they were "winding down" their investigation in 2015 (this email is marked Highly Confidential, which confirms that the email was between only Wicks and a witness and was not disseminated). They nevertheless strung along Amber and the other Plaintiffs for 2.5 more years, until 2017, before they called off their investigation and handed it over to SafeSport.

784. Throughout 2015-2018, USAT continually reaffirmed and ratified that it was undertaking and assuming the duty to investigate sexual abuse within the sport, focusing in particular on the allegations raised by on the allegations raised by Amber against the Lopez brothers.

785. USAT did so by its constant communications to Amber, by and through its agents, including Donald Alperstein and other USAT officials.

786. As a result of USAT's targeting of Amber in 2015-18, it assumed and created a special relationship with her as a victim of the Lopez brothers. This special relationship was created when USAT affirmatively reached out, through its investigator, Donald Alperstein, to investigate allegations of prior abuse by one or more USAT members.

787. USAT represented to Amber that it was undertaking an investigation of the Lopez brothers with the goal of having them "banned from the sport."

---

[168] USAT 009695 (marked "Highly Confidential").

788.    To Amber's detriment, USAT represented by word and action that it was conducting a good faith investigation into the Lopezes by:

    a.  Hiring and paying Donald Alperstein and advertising him as USAT's independent counsel (from March 2015 through present)[169];

    b.  Hiring and paying Leah Wicks as Alperstein's investigator to interview victims and advertising her as independent (same timeframe)[170];

    c.  Enticing survivors to come forward and share their stories by publicly proclaiming "Make the commitment: Report—Stop Abuse in Sport"[171].

    d.  Posting on the USAT Website (since April 2015) and testifying to Congress (in May 2018) that "USA Taekwondo is committed to removing any and all barriers to the safe and effective reporting of abuse within USA Taekwondo"[172];

---

[169]  USAT14159 – also, this website is still up: https://www.teamusa.org/USA-Taekwondo/Features/2015/April/23/Safe-Sport-Reporting

[170]  USAT14159

[171]  USAT14159 ("If you are aware of any misconduct which may have occurred at any time now or in the past, please join the other athletes that have come forward and reported their experiences to make the commitment to stop abuse in sport." This is also the concept (although not quoted) in the current TKD safe sport strategy material available at https://www.teamusa.org/-/media/USA_Taekwondo/Images/2019-06-June/Safe-Sport-Strategy-2019.pdf?la=en&hash=EF662AAB83523339A1E45FD1DE075ED7190C0200

[172]  USAT05011; McNally written testimony at p 5, available at https://docs.house.gov/meetings/IF/IF02/20180523/108356/HHRG-115-IF02-Wstate-McNallyS-20180523.pdf.

e.   Advertising to Plaintiffs and other victims: "You are not alone. You will be heard."[173];

f.   Retaining another independent investigator, The Dan Beebe Group, to analyze "SafeSport issues" within USA Taekwondo and audit USAT's compliance with mandatory SafeSport policies for preventing and detecting sex abuse within USA Taekwondo in 2015[174];

g.   Repeatedly interviewing Plaintiffs and asking them to recount the trauma inflicted by the Lopezes;

h.   Continually reassuring victims who were hesitant to come forward that with their help and testimony, the sexual abusers within USAT would be prosecuted[175];

i.   Telling Amber that she is the "star witnesses" and "a hero"[176];

j.   Filing an internal ethics complaint against Steven Lopez in December 2015, amending this complaint in April 2016, and representing to Plaintiffs that it would be used to remove Steven from USAT participation.

k.   Repeatedly representing to Plaintiffs that it would be immediately turning over their complaints to law enforcement.

---

[173] USAT14159

[174] USOC-GIL-11772 (Dan Beebe report)

[175] In fact, when Amber expressed her hesitation about recounting her abuse, Alperstein then began to contact Amber's mother to influence her to get her daughter's participation in his fact-gathering.

[176] USAT014532-3

789.   In addition, USAT's duty to Amber was amplified by the fact that Amber was a USAT member herself, a former decorated athlete and USA National Team member.

790.   To the extent Amber was no longer a member of USAT, that occurred **only because** she was sexually assaulted and exploited out of the sport by the Lopez brothers, who were supposed to be coaching and supporting her. In other words, but-for the sexual abuse and forced sexual services inflicted upon her by the Lopez brothers, who were clothed in authority by USAT, Amber would have remained a current, active member of USAT. Amber was identified as a star in the sport, and Amber intended to continue competing, just as Steven Lopez has done well into his 40s, in taekwondo at the Olympic level. Instead, USAT and the USOC chose to leave the Lopez brothers in the sport, which forced Amber to reluctantly drop out.

791.   At all relevant times, Amber reasonably relied on USAT's promise to perform services (to investigate and remove the Lopez brothers) and she was led to believe that USAT was undertaking a good faith investigation to determine if she had been sexually assaulted by Jean and/or Steven Lopez and other USAT members and that USAT was actually working in good faith to eradicate sexual abuse, clean up taekwondo, and have the Lopez brothers "banned from the sport."  If the Lopez brothers had been removed from the sport, Amber could have resumed competing in taekwondo as an athlete—which would have led to lucrative endorsements and a career in taekwondo, just like Steven and Jean Lopez have enjoyed for decades.

792.   USAT's affirmative step of reaching out to Amber and making representations to her through Alperstein was intended to induce and did induce her participation in the investigation.

793.    Because of USAT's affirmative step of reaching out to Amber, and USAT's representations through Alperstein, Amber reasonably relied on USAT to conduct the investigation in good faith and to behave reasonably and with all due care toward her as it investigated allegations against its member(s).

794.    Because USAT's investigator, Alperstein, repeatedly conveyed to Amber that USAT was diligently pursuing discipline against the Lopezes—specifically telling her that USAT was trying to "have both Lopez brothers banned from the sport"—and that she was the "star witness" and a "hero," Amber reasonably relied on these representations.

795.    By voluntarily reaching out to Amber in 2015 regarding the Lopez brothers and inducing her participation by means of various representations, USAT undertook and actively assumed a duty to investigate the Lopez brothers honestly and in good faith and with reasonable care to prevent secondary victimization to Amber.

796.    USAT's representations created a foreseeable risk that Amber would suffer significant secondary trauma (known as revictimization) if and when she discovered that USAT's investigation was not independent, was not conducted in good faith, and was never intended to actually remove the Lopez brothers from the sport.

797.    Alperstein (who was an agent of USAT) specifically recognized this risk but asked Amber to proceed anyway in telling him over and over again about her trauma, forcing her to re-live and reexperience the trauma for his benefit.

798.    In breach of its voluntarily assumed duty to Amber render services on her behalf, *see* Restatement (Second) of Torts § 323, USAT performed an unreasonable and flawed sex abuse investigation, which dragged out for several years, during which USAT

permitted, encouraged, and supported the Lopez brothers' continued involvement in competing and coaching in the sport.

799.   In fact, Alperstein never even attempted to have the Lopez brothers removed from taekwondo, never even interviewed Steven or Jean Lopez, never conducted any hearings, and ultimately dumped his hollow investigation into the lap of SafeSport in 2017, after spending several years doing sham interviews that re-victimized Amber and the other plaintiffs.

800.   When USAT directed Alperstein to turn over his investigation to SafeSport, he provided nothing of any value—which is evidenced by the fact that SafeSport started over, from scratch, and re-interviewed Amber and the other Plaintiffs. If Alperstein had performed a legitimate, good faith investigation, he would have avoided the need for SafeSport to start from zero. But the fact SafeSport had to start over again further cements that Alperstein's investigation was not conducted in good faith and flunks any measure of a legitimate sex abuse investigation.

801.   At no time did Alperstein disclose to Amber or the other Plaintiffs that he was actually never going to do anything to remove the Lopez from the sport or that their interviews would never be used in any proceeding (because no proceeding would ever be initiated), nor did he reveal to them that SafeSport would re-interview (and revictimize) them all over again when it took over Alperstein's sham investigation. In other words, Alperstein used the sham Lopez brothers investigation to enrich himself (by billing USAT for his services year after year) and to portray USAT as being legitimately concerned with ending sex abuse in the sport. In reality, however, neither USAT nor Alperstein had

any intention of removing the Lopez brothers, cleaning up the sport, or helping Amber or the other Plaintiffs.

802.    Had Alperstein and USAT been honest with Amber and the other Plaintiffs about the true nature of the Lopez investigation, they never would have participated in the sham interviews or been led to believe that the Lopez brothers (the rapists who abused them) would be removed the sport.

803.    USAT breached its voluntarily-assumed duty to Amber to conduct a good faith independent investigation in multiple ways, each of which is further proof that the investigation of the Lopez brothers by USAT and Alperstein was a sham:

a.   By violating its own bylaws, which mandate the prompt investigation allegations of sex abuse;

b.   By falsely and repeatedly telling Plaintiffs that the prosecution of the Lopez brothers hinged on their cooperation and involvement, despite the fact that USAT was never actually going to punish the Lopezes for their crimes due to their position within USAT and the Olympic community;

c.   By never filing an ethics complaint against Jean Lopez, despite ample long-known evidence and Alperstein's July 2015 report that Jean committed numerous Code of Conduct, SafeSport, and criminal violations and that he "represents an immediate danger to other USAT members"[177];

d.   By filing an ethics complaint against Steven Lopez so fraught with procedural issues that it would never be prosecuted;

---

[177] USAT14063

e.  By failing to ever assemble a qualified hearing panel in the Steven Lopez matter;

f.  By directing that the ethics proceedings against Steven be stayed;

g.  By actively suspending the investigation of the Lopez brothers in mid-2016, in deference to the 2016 Olympics, where the Lopez brothers were lauded by USAT as the star athlete and head coach who could deliver medals and money to USAT[178];

h.  By reaching back out after the 2016 Olympics were complete and promising to renew the investigation and prosecution;

i.  By failing to pursue proceedings against Jean Lopez, even after the 2016 Olympics[179];

j.  By continuing to obsessively fact-gather and re-traumatize Plaintiffs over and over again in late 2016, despite the fact that USAT officials and Alperstein were aware that SafeSport had exclusive jurisdiction and the internal prosecutions of the Lopezes by USAT would never happen[180];

k.  By failing to *ever* interview either Jean or Steven Lopez;

l.  By failing to ever conduct a hearing about the abuse by Jean or Steven Lopez;

m.  By directing that the ethics complaint against Steven be dismissed;

n.  By directing Alperstein to hand over his investigatory materials to SafeSport;

---

[178] USAT8828, USAT14393, USAT8822, USAT14390, USAT6046

[179] USAT14375, USAT143474

[180] USAT14374

o. By repeatedly claiming to have suspended or banned the Lopezes from participating in competitions, and then subsequently reversing course and allowing them to compete and/or coach;

p. By unreasonably delaying notification to law enforcement (late 2016)[181] or the FBI (2017)[182] of sexual abuse—including sexual abuse against minors—by Jean Lopez and Steven Lopez;

q. By allowing Steven Lopez to participate at the 2017 World Championships despite credible reports of sexual abuse and pending SafeSport investigation;

r. By recklessly misstating the parameters and legitimacy of its investigation and making false statements to Congress in 2018 regarding the Lopez brothers and USAT's efforts to clean up the sport from sex abuse, which included its misstatements regarding Alperstein: falsely telling Congress that USAT had "immediately retained" Alperstein as "independent outside counsel" to "uncover any previously unreported incidents" and "to pursue sanctions against offenders"[183];

s. By recklessly telling Congress on May 25, 2018, that its retained counsel "operated without any limitation on its budget, with no control by [USAT] as

---

[181] USAT014181

[182] USAT006153

[183] USAT05011; McNally written testimony at p 5, available at https://docs.house.gov/meetings/IF/IF02/20180523/108356/HHRG-115-IF02-Wstate-McNallyS-20180523.pdf.

155

to who he should or should not pursue, and with only rudimentary intermittent reporting requirements to [USAT]."[184]

t.   By publicly asserting that USAT "places tremendous importance on protecting and preserving the safety of [its] athletes"; that it gave Alperstein "unfettered ability to carry out his task…and prosecute fully any violations" and that USAT "diligently provided any and all information to relevant law enforcement agencies, including local police and the FBI."[185]

804.   As alleged herein, USAT's investigation was a delay tactic and was carried out recklessly and without any attempt to actually pursue and remove the Lopez brothers from the sport. Ultimately, USAT never did anything other than deceive Amber and others into believing it was going to do something (or try in good faith to do something) to remove the Lopez brothers from taekwondo.

805.   Amber suffered significant damages when she discovered that:

a.   USAT failed to suspend Steven or Jean despite knowledge of abuse and pendency of proceedings/investigation (beginning 2015 and continuing through present);

b.   USAT suspended the Alperstein investigation and proceedings so Steven Lopez could continue competing for Team USA (May 2016);

c.   USAT sent Steven Lopez to the 2016 Olympics (August 2016);

---

[184] Testimony of Steve McNally, U.S. House Energy and Commerce Committee, Oversight and Investigations Subcommittee, *Hearing on the Olympic Community's Ability to Protect Athletes from Sexual Abuse*, CQ-ROLLCALL, 2018 WLNR 16155107 (May 25, 2018).

[185] Nancy Armour & Rachel Axon, *Allegations Hit Lopez Brothers*, USA TODAY (June 9, 2017).

    d.   USAT directed Alperstein to turn over his files to the United States Center for SafeSport because USAT was abandoning its investigation, which began in 2015, after conducted several interviews of Amber; (March 2017);

    e.   USAT directed Alperstein to dismiss the complaint against Steven and thus abandoned the case that Alperstein promised Amber he would never give up on (April 2017);

    f.   USAT misrepresented the investigation to Congress and publicly told Congress that it had operated in good faith, when in fact Amber and the other Plaintiffs knew that USAT had not done so (May 2018).

806.   USAT's breach of its assumed duty to act with reasonable care toward Amber in undertaking an investigation against the Lopez brothers has caused Amber physical injuries, severe emotional distress, and institutional abandonment and betrayal.

807.   Had USAT acted reasonable to carry out a good faith, independent investigation into the Lopezes, Amber would not have undergone the new injuries she's experienced over the last several years.

808.   Amber has suffered extensive physical, mental and emotional trauma because of the actual rapes and sexual assaults she endured by the Lopez brothers, but Amber independently and separately suffered physical, mental, and emotional trauma as a result of USAT's actions in recent years.

809.   Amber was separately and independently retraumatized, revictimized, and harmed by Defendant USAT when, beginning in 2015 and continuing at least through USAT's transfer of the investigation to SafeSport in March 2017 when USAT pried into

Plaintiffs' private lives, prodded them for years-old information, and reopened their wounds in exchange for the false promise of finally addressing known past abuses of Jean and Steven Lopez.

810.   Amber was separately and independently retraumatized, revictimized, and harmed by USAT when it took actions inconsistent with the representation that it sought to ban the Lopez brothers from the Sport, including its delaying to report to law enforcement, its stay/suspension of the investigation/disciplinary proceedings, its financial and other support of the Lopezes at USAT competitions, its ultimate abandonment of the proceedings against Steven, its testimony to Congress in May 2018, and public statements to media and through its website.

811.   Through USAT's promises to act, and through its representations about its actions, USAT purported to render a service that was reasonably calculated to prevent the very type of harm that Amber has now endured: physical injury, physical trauma, complex emotional distress, and mental anguish.

812.   In addition to severe emotional, psychological and other injury, Amber has suffered physical injury as a result of USAT's promises to act and its conduct in so acting, including symptoms typical of Post-Traumatic Stress Syndrome ("PTSD") such as racing heart, nausea, vomiting, sweating, shortness of breath, fluctuations in blood pressure, headaches, and pain.

813.   As a result of USAT's negligence, Amber has suffered ascertainable, physical injuries including:

> a. Recurrent anxiety and depressive episodes since first being contacted by Alperstein in 2016;

b. Traumatic and persistent dreams reliving her sexual abuse since being interviewed by Leah Wicks;

c. Depression, discouragement, and shame when she found out Steven Lopez was being allowed to compete in 2016 Olympic games;

d. Anxiety, depression and loss of pay at work due to being required to provide additional testimony when the case was handed off to SafeSport and investigator Kathleen Smith contacted her in early 2017;

e. Physical panic attacks that continue to occur to this day;

f. Ongoing bouts of insomnia from anxiety that occur to this day;

g. Having difficulty focusing at work and being forced to take sick days for mental health recovery to this day;

h. Feelings of hopelessness knowing that despite the fact that she came forward and recounted her abuse, the victims of the Lopez brothers are still not believed and the Lopez brothers continue to enjoy Olympian status as the heroes of the sport of taekwondo.

814. As a direct and proximate result of the negligent actions and inactions of Defendant USAT, Amber has suffered physical injuries, PTSD, severe emotional distress, economic losses caused by unemployment or loss of employment or loss of business opportunities, and these injuries continue.

815. Amber claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

**COUNT 12**
**NEGLIGENCE**

*By Plaintiff Gaby Joslin against USAT*

816.    Plaintiff Gaby Joslin realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

817.    Sexual assault, rape, trafficking, forced sexual services, domestic violence, dating violence and stalking are deeply traumatic crimes that can cause severe damages to survivors' physical, emotional, spiritual and psychological well-being.[186]

818.    It was well known by 2015 that sexual assault victims can experience secondary victimization, also known as secondary trauma or re-victimization, by being asked to describe or re-live their trauma.

819.    Survivors are harmed or retraumatized by insensitive, uninformed, or inadequate community, institutional, and justice system responses. [187]

820.    Sexual assault victims who encounter service providers who mirror the unequal power and control experienced in the abusive relationships that caused past trauma are likely to retraumatize victims.[188]

---

[186] United States Department of Justice, *The Importance of Understanding Trauma-Informed Care and Self-Care for Victim Service Providers*, July 30, 2014, *available at*: https://www.justice.gov/archives/ovw/blog/importance-understanding-trauma-informed-care-and-self-care-victim-service-providers (last visited October 10, 2019).

[187] *Id.*

[188] Haskell, Lori, C. Psych. & Dr. Melanie Randall, *The Impact of Trauma on Adult Sexual Assault Victims* (2019) p 26-27.

821.    Insensitive, ineffective, victim-blaming treatment or services retraumatizes the victim and results in a "second rape."[189]  In fact, as USAT's agent Donald Alperstein so fittingly recognized at the onset of his own investigation, "Trying to influence a witness is another violation and a further act of victimization."[190]

822.    As set forth in detail throughout this Complaint and at all relevant times, USAT knew or should have known of the endemic problem of sexual abuse in elite sports and across NGBs and within USAT in particular, which led Defendant to adopt policies, impose trainings and certifications, and institute special procedures for reporting, investigating, and responding to complaints of sexual abuse; and which led Defendant to obtain sexual abuse insurance covering damage or injury because of abuse, molestation or exploitation arising from negligent employment, training, investigation, reporting or failure to report, or retention or supervision of a person for whom USAT is or was legally responsible.

823.    At least by 2015, USAT should have known that Gaby was and is a survivor of sexual assault by Jean Lopez and Steven Lopez.

824.    At all relevant times, Defendant Steven Lopez was a member of USAT.

825.    At all relevant times, Jean Lopez was a member of USAT.

826.    In 2015, USAT hired and retained Donald Alperstein and his staff (including Leah Wicks, an investigator) to work for them to investigate the Lopez brothers. Alperstein was at all times an agent acting for and on behalf of USAT.

---

[189] Campbell R, Wasco SM, Ahrens CE, Sefl T, Barnes HE. *Preventing the "Second Rape": Rape Survivors' Experiences with Community Services Providers.* Journal of interpersonal violence 2001; 16(12): 231, 1239-1259.

[190] USAT14085

827.    Before hiring Alperstein to conduct a sex abuse investigation, USAT did not perform any diligence or background research to figure out how to perform a proper sex abuse investigation. In hiring Alperstein, USAT did nothing to determine whether Alperstein was qualified to act as a sexual abuse investigator. USAT conducted no screening or investigation of its own investigator. In fact, Alperstein had no training and was not qualified to investigate sex abuse or to interact with sex abuse victims in a way that would avoid re-victimizing them.

828.    USAT owed a special duty of care and had a special relationship with Gaby and the other Plaintiffs because all were former athletes of USAT who were sexually abuse and exploited while performing as athletes for the benefit of USAT. Thus, based on this special relationship and the fact Gaby and the other Plaintiffs were especially vulnerable because of the trauma inflicted upon them by the Lopez brothers. USAT knew this and should have taken measures to guard against re-victimizing Gaby and the other Plaintiffs.

829.    USAT failed to act reasonably and failed to perform an adequate screening because it was motivated by something other than protecting athletes and ridding taekwondo of the Lopez brothers; in fact, USAT hired Alperstein (and not a real, qualified investigator) because he was a lawyer, and USAT wanted to manipulate the attorney-client privilege and work product protections to keep its factual investigations secret and off-limits, using the ruse of the attorney-client privilege and work product protections to do so.

830.    In part because he was not trained as an investigator and was unfamiliar with handling a sex abuse investigation, Alperstein portrayed his status or role vis-à-vis

USAT to Gaby and the other Plaintiffs as being entirely independent. He did not make clear what his role was, so Gaby and the other Plaintiffs reasonably assumed he was acting on their behalf, not that of USAT, and he further induced this belief based on the language he used in communicating with them.

831.    Alperstein was not functioning as a lawyer when he worked to investigate the Lopez brothers, and he was not working as a lawyer when he interviewed Gaby or any of the other named Plaintiffs. To this end, at no time did Alperstein disclose to Gaby or any of the other named Plaintiffs that he was adverse or that he was working on behalf of USAT as its lawyer.

832.    USAT, through Alperstein, voluntarily and affirmatively reached out to Gaby in 2015 regarding allegations previously made by Gaby against the Lopez brothers and USAT. In doing so, Alperstein was acting as an agent of USAT.

833.    At the time, in 2015, Gaby was no longer in USAT and was not looking to be involved with any investigation. She had left USAT and did not initiate any discussions with Alperstein in 2015 regarding the Lopez brothers.

834.    Alperstein and USAT, however, affirmatively reached out and pulled Gaby back into the world of USAT and into the Lopez sex investigation.

835.    By voluntarily reaching out to Gaby in 2015 and making affirmative representations to Gaby, USAT voluntarily undertook a duty to Gaby to conduct a good faith, independent investigation of the Lopez brothers.

836.    In April 2015, Alperstein and Wicks used the USAT Athlete Advisory Council representative, Lynda Laurin, to seek out Gaby and garner her trust. At the behest of Alperstein and Wicks, Laurin wrote to Gaby that USAT had engaged "an investigator with

expertise in cases of abuse and other inappropriate sexual conduct." Gaby reasonably relied on this representation and agreed to speak with them.

837.   USAT and Alperstein, in 2015, voluntarily assumed the duty to render services on behalf of Gaby. In fact, Alperstein and his colleagues, including Leah Wicks, repeatedly made specific promises to Gaby that they were acting in her interests and that she should "trust" him:

    a.  April 24, 2015: Wicks first contacted Gaby to conduct an in-depth interview, forcing her to recount deeply disturbing memories of the sexual assaults.[191]

    b.  November 1, 2016: A year and a half after first being contacted regarding the inquiry into the Lopezes, Gaby was contacted again by Alperstein out of the blue, seeking her cooperation as a witness to help "move forward with a case."[192] During the entire time period from when Gaby was forced to relive the trauma to Wicks to when she received this e-mail from Alperstein, neither of them every followed up with her, checked in on her or provided her any type of case update about the internal prosecution into the Lopezes.

    c.  November 2, 2016: Alperstein followed-up with Gaby the next day to convey how much he needed her help: "I am under a lot of pressure to report Jean Lopez to his local police department for behavior that you and other's [sic] witnessed, and of which you and others were actual victims."[193]

---

[191] USAT-ESI7049

[192] USAT014182

[193] USAT141481

d.  November 16, 2016: Alperstein continued to prod for information, regardless of the trauma he was inflicting upon her with every correspondence, writing "I'd like you to consider sharing additional details, but again, I don't need an answer right now. You know I hope that you will feel motivated to help me have both Lopez brothers banned from the sport, but you also know that I will protect and respect your feelings about what you will and won't reveal."[194]

838.  Throughout 2015-2018, USAT and Alperstein led Gaby to believe that USAT was undertaking a good faith investigation to determine if its current members, Jean and Steven Lopez and other USAT members, posed an unreasonable risk of harm to other current USAT-member athletes, including minor athletes.

839.  But USAT's primary motive was not, as Alperstein promised, to protect the athletes or to remove the Lopez brothers from the sport. Instead, USAT was seeking to avoid congressional investigation and further regulation, suspension, or dismantling by the USOC and Congress.

840.  In fact, because USAT had already been on probation for two years, in 2012-13 (during which time the United States Olympic Committee was actively running USAT, while its officers and directors were side-lined),[195] USAT was especially sensitive to the need to make it appear that it was taking the Lopez brothers investigation seriously.

---

[194] USAT014172-78

[195] *From the desk of the CEO: USA Taekwondo probation lifted*, Oct. 14, 2013, available at: https://www.teamusa.org/USA-Taekwondo/Features/2013/October/14/From-the-desk-of-the-CEO-USA-Taekwondo-probation-lifted

To do so, it needed to convince Gaby and the other Plaintiffs that it was seriously and legitimately going to police the Lopez brothers and remove them from the sport.

841.   What Gaby did not know was that USAT was phoning-it-in and conducting a mock investigation that would provide plausible deniability but would never actually remove the Lopezes (the money-makers of the sport) from taekwondo. To this end, on August 21, 2015, Leah Wicks emailed to a witness that she and Alperstein were "winding down [their] investigation[.]"[196]

842.   Thus, publicly, to Gaby and others, USAT proclaimed that it was pursuing the Lopez brothers at full speed and were leaving no stone unturned. Privately, however, Alperstein and Wicks were already writing that they were "winding down" their investigation in 2015 (this email is marked Highly Confidential, which confirms that the email was between only Wicks and a witness and was not disseminated). They nevertheless strung along Gaby and the other Plaintiffs for 2.5 more years, until 2017, before they called off their investigation and handed it over to SafeSport.

843.   Throughout 2015-2018, USAT continually reaffirmed and ratified that it was undertaking and assuming the duty to investigate sexual abuse within the sport, focusing in particular on the allegations on the allegations raised by Gaby against the Lopez brothers.

844.   USAT did so by its constant communications to Gaby, by and through its agents, including Donald Alperstein and other USAT officials.

845.   As a result of USAT's targeting of Gaby in 2015-18, it assumed and created a special relationship with her as a victim of the Lopez brothers. This special relationship

---

[196] USAT 009695 (designated "Highly Confidential").

was created when USAT affirmatively reached out, through its investigator, Donald Alperstein, to investigate allegations of prior abuse by one or more USAT members.

846.   USAT represented to Gaby that it was undertaking an investigation of the Lopez brothers with the goal of having them "banned from the sport."

847.   To Gaby's detriment, USAT represented by word and action that it was conducting a good faith investigation into the Lopezes by:

    a.   Hiring and paying Donald Alperstein and advertising him as USAT's independent counsel (from March 2015 through present)[197];

    b.   Hiring and paying Leah Wicks as Alperstein's investigator to interview victims and advertising her as independent (same timeframe)[198];

    c.   Enticing survivors to come forward and share their stories by publicly proclaiming "Make the commitment: Report—Stop Abuse in Sport"[199].

    d.   Posting on the USAT Website (since April 2015) and testifying to Congress (in May 2018) that "USA Taekwondo is committed to removing any and all barriers to the safe and effective reporting of abuse within USA Taekwondo"[200];

---

[197]   USAT14159 – also, this website is still up: https://www.teamusa.org/USA-Taekwondo/Features/2015/April/23/Safe-Sport-Reporting

[198]   USAT14159

[199]   USAT14159 ("If you are aware of any misconduct which may have occurred at any time now or in the past, please join the other athletes that have come forward and reported their experiences to make the commitment to stop abuse in sport." This is also the concept (although not quoted) in the current TKD safe sport strategy material available at https://www.teamusa.org/-/media/USA_Taekwondo/Images/2019-06-June/Safe-Sport-Strategy-2019.pdf?la=en&hash=EF662AAB83523339A1E45FD1DE075ED7190C0200

[200]   USAT05011; McNally written testimony at p 5, available at https://docs.house.gov/meetings/IF/IF02/20180523/108356/HHRG-115-IF02-Wstate-McNallyS-20180523.pdf.

e. Using the USA Taekwondo Athlete Advisory Committee, whom the athletes and former athletes trusted, to recruit Gaby and other victims to share their stories of abuse for the purpose of "protecting the future of young female athletes in sport Taekwondo" in 2015 and beyond[201];

f. Advertising to Plaintiffs and other victims: "You are not alone. You will be heard."[202];

g. Retaining another independent investigator, The Dan Beebe Group, to analyze "SafeSport issues" within USA Taekwondo and audit USAT's compliance with mandatory SafeSport policies for preventing and detecting sex abuse within USA Taekwondo in 2015[203];

h. Repeatedly interviewing Plaintiffs and asking them to recount the trauma inflicted by the Lopezes;

i. Continually reassuring victims who were hesitant to come forward that with their help and testimony, the sexual abusers within USAT would be prosecuted[204];

j. Filing an internal ethics complaint against Steven Lopez in December 2015, amending this complaint in April 2016, and representing to Plaintiffs that it would be used to remove Steven from USAT participation.

k. Repeatedly representing to Plaintiffs that it would be immediately turning over their complaints to law enforcement.

---

[201] USAT14091

[202] USAT14159

[203] USOC-GIL-11772 (Dan Beebe report)

848.    In addition, USAT's duty to Gaby was amplified by the fact that Gaby was a USAT member herself, a former decorated athlete and USA National Team member.

849.    To the extent Gaby was no longer a member of USAT, that occurred **only because** she was sexually assaulted and exploited out of the sport by the Lopez brothers, who were supposed to be coaching and supporting her. In other words, but-for the sexual abuse and forced sexual services inflicted upon her by the Lopez brothers, who were clothed in authority by USAT, Gaby would have remained a current, active member of USAT. Gaby was identified as a star in the sport, and Gaby intended to continue competing, just as Steven Lopez has done well into his 40s, in taekwondo at the Olympic level. Instead, USAT and the USOC chose to leave the Lopez brothers in the sport, which forced Gaby to reluctantly drop out.

850.    At all relevant times, Gaby reasonably relied on USAT's promise to perform services (to investigate and remove the Lopez brothers) and she was led to believe that USAT was undertaking a good faith investigation to determine if she had been sexually assaulted by Jean and/or Steven Lopez and other USAT members and that USAT was actually working in good faith to eradicate sexual abuse, clean up taekwondo, and have the Lopez brothers "banned from the sport."  If the Lopez brothers had been removed from the sport, Gaby could have resumed competing in taekwondo as an athlete—which would have led to lucrative endorsements and a career in taekwondo, just like Steven and Jean Lopez have enjoyed for decades.

851. USAT's affirmative step of reaching out to Gaby and making representations to her through Alperstein was intended to induce and did induce her participation in the investigation.

852.   Because of USAT's affirmative step of reaching out to Gaby, and USAT's representations through Alperstein, Gaby reasonably relied on USAT to conduct the investigation in good faith and to behave reasonably and with all due care toward her as it investigated allegations against its member(s).

853.   Because USAT's investigator, Alperstein, repeatedly conveyed to Gaby that USAT was diligently pursuing discipline against the Lopezes—specifically telling her that USAT was trying to "have both Lopez brothers banned from the sport"—and that he needed her help to prosecute them, Gaby reasonably relied on these representations.

854.   By voluntarily reaching out to Gaby in 2015 regarding the Lopez brothers and inducing her participation by means of various representations, USAT undertook and actively assumed a duty to investigate the Lopez brothers honestly and in good faith and with reasonable care to prevent secondary victimization to Gaby.

855.   USAT's representations created a foreseeable risk that Gaby would suffer significant secondary trauma (known as revictimization) if and when she discovered that USAT's investigation was not independent, was not conducted in good faith, and was never intended to actually remove the Lopez brothers from the sport.

856.   Alperstein (who was an agent of USAT) specifically recognized this risk but asked Gaby to proceed anyway in telling him over and over again about her trauma, forcing her to re-live and reexperience the trauma for his benefit.

857.   In breach of its voluntarily assumed duty to Gaby render services on her behalf, *see* Restatement (Second) of Torts § 323, USAT performed an unreasonable and flawed sex abuse investigation, which dragged out for several years, during which USAT

permitted, encouraged, and supported the Lopez brothers' continued involvement in competing and coaching in the sport.

858.    In fact, Alperstein never even attempted to have the Lopez brothers removed from taekwondo, never even interviewed Steven or Jean Lopez, never conducted any hearings, and ultimately dumped his hollow investigation into the lap of SafeSport in 2017, after spending several years doing sham interviews that re-victimized Gaby and the other plaintiffs.

859.    When USAT directed Alperstein to turn over his investigation to SafeSport, he provided nothing of any value—which is evidenced by the fact that SafeSport started over, from scratch, and re-interviewed Gaby and the other Plaintiffs. If Alperstein had performed a legitimate, good faith investigation, he would have avoided the need for SafeSport to start from zero. But the fact SafeSport had to start over again further cements that Alperstein's investigation was not conducted in good faith and flunks any measure of a legitimate sex abuse investigation.

860.    At no time did Alperstein disclose to Gaby or the other Plaintiffs that he was actually never going to do anything to remove the Lopez from the sport or that their interviews would never be used in any proceeding (because no proceeding would ever be initiated), nor did he reveal to them that SafeSport would re-interview (and revictimize) them all over again when it took over Alperstein's sham investigation. In other words, Alperstein used the sham Lopez brothers investigation to enrich himself (by billing USAT for his services year after year) and to portray USAT as being legitimately concerned with ending sex abuse in the sport. In reality, however, neither USAT nor Alperstein had

any intention of removing the Lopez brothers, cleaning up the sport, or helping Gaby or the other Plaintiffs.

861.   Had Alperstein and USAT been honest with Gaby and the other Plaintiffs about the true nature of the Lopez investigation, they never would have participated in the sham interviews or been led to believe that the Lopez brothers (the rapists who abused them) would be removed the sport.

862.   USAT breached its voluntarily-assumed duty to Gaby to conduct a good faith independent investigation in multiple ways, each of which is further proof that the investigation of the Lopez brothers by USAT and Alperstein was a sham:

   a.   By violating its own bylaws, which mandate the prompt investigation allegations of sex abuse;

   b.   By falsely and repeatedly telling Plaintiffs that the prosecution of the Lopez brothers hinged on their cooperation and involvement, despite the fact that USAT was never actually going to punish the Lopezes for their crimes due to their position within USAT and the Olympic community;

   c.   By never filing an ethics complaint against Jean Lopez, despite ample long-known evidence and Alperstein's July 2015 report that Jean committed numerous Code of Conduct, SafeSport, and criminal violations and that he "represents an immediate danger to other USAT members"[205];

   d.   By filing an ethics complaint against Steven Lopez so fraught with procedural issues that it would never be prosecuted;

---

[205] USAT14063

e.  By failing to ever assemble a qualified hearing panel in the Steven Lopez matter;

f.  By directing that the ethics proceedings against Steven be stayed;

g.  By actively suspending the investigation of the Lopez brothers in mid-2016, in deference to the 2016 Olympics, where the Lopez brothers were lauded by USAT as the star athlete and head coach who could deliver medals and money to USAT[206];

h.  By reaching back out after the 2016 Olympics were complete and promising to renew the investigation and prosecution;

i.  By failing to pursue proceedings against Jean Lopez, even after the 2016 Olympics[207];

j.  By continuing to obsessively fact-gather and re-traumatize Plaintiffs over and over again in late 2016, despite the fact that USAT officials and Alperstein were aware that SafeSport had exclusive jurisdiction and the internal prosecutions of the Lopezes by USAT would never happen[208];

k.  By failing to *ever* interview either Jean or Steven Lopez;

l.  By failing to ever conduct a hearing about the abuse by Jean or Steven Lopez;

m.  By directing that the ethics complaint against Steven be dismissed;

n.  By directing Alperstein to hand over his investigatory materials to SafeSport;

---

[206] USAT8828, USAT14393, USAT8822, USAT14390, USAT6046

[207] USAT14375, USAT143474

[208] USAT14374

o.  By repeatedly claiming to have suspended or banned the Lopezes from participating in competitions, and then subsequently reversing course and allowing them to compete and/or coach;

p.  By unreasonably delaying notification to law enforcement (late 2016)[209] or the FBI (2017)[210] of sexual abuse—including sexual abuse against minors—by Jean Lopez and Steven Lopez;

q.  By allowing Steven Lopez to participate at the 2017 World Championships despite credible reports of sexual abuse and pending SafeSport investigation;

r.  By recklessly misstating the parameters and legitimacy of its investigation and making false statements to Congress in 2018 regarding the Lopez brothers and USAT's efforts to clean up the sport from sex abuse, which included its misstatements regarding Alperstein: falsely telling Congress that USAT had "immediately retained" Alperstein as "independent outside counsel" to "uncover any previously unreported incidents" and "to pursue sanctions against offenders"[211];

s.  By recklessly telling Congress on May 25, 2018, that its retained counsel "operated without any limitation on its budget, with no control by [USAT] as

---

[209] USAT014181

[210] USAT006153

[211] USAT05011; McNally written testimony at p 5, available at https://docs.house.gov/meetings/IF/IF02/20180523/108356/HHRG-115-IF02-Wstate-McNallyS-20180523.pdf.

to who he should or should not pursue, and with only rudimentary intermittent reporting requirements to [USAT]."[212]

t.  By publicly asserting that USAT "places tremendous importance on protecting and preserving the safety of [its] athletes"; that it gave Alperstein "unfettered ability to carry out his task…and prosecute fully any violations" and that USAT "diligently provided any and all information to relevant law enforcement agencies, including local police and the FBI."[213]

863.  As alleged herein, USAT's investigation was a delay tactic and was carried out recklessly and without any attempt to actually pursue and remove the Lopez brothers from the sport. Ultimately, USAT never did anything other than deceive Gaby and others into believing it was going to do something (or try in good faith to do something) to remove the Lopez brothers from taekwondo.

864.  Gaby suffered significant damages when she discovered that:

a.  USAT failed to suspend Steven or Jean despite knowledge of abuse and pendency of proceedings/investigation (beginning 2015 and continuing through present);

b.  USAT suspended the Alperstein investigation and proceedings so Steven Lopez could continue competing for Team USA (May 2016);

c.  USAT sent Steven Lopez to the 2016 Olympics (August 2016);

---

[212] Testimony of Steve McNally, U.S. House Energy and Commerce Committee, Oversight and Investigations Subcommittee, *Hearing on the Olympic Community's Ability to Protect Athletes from Sexual Abuse*, CQ-ROLLCALL, 2018 WLNR 16155107 (May 25, 2018).

[213] Nancy Armour & Rachel Axon, *Allegations Hit Lopez Brothers*, USA TODAY (June 9, 2017).

d.  USAT directed Alperstein to turn over his files to the United States Center for SafeSport because USAT was abandoning its investigation, which began in 2015, after conducted several interviews of Gaby; (March 2017);

e.  USAT directed Alperstein to dismiss the complaint against Steven and thus abandoned the case that Alperstein promised Gaby he would never give up on (April 2017);

f.  USAT misrepresented the investigation to Congress and publicly told Congress that it had operated in good faith, when in fact Gaby and the other Plaintiffs knew that USAT had not done so (May 2018).

865.  USAT's breach of its assumed duty to act with reasonable care toward Gaby in undertaking an investigation against the Lopez brothers has caused Gaby physical injuries, severe emotional distress, and institutional abandonment and betrayal.

866.  Had USAT acted reasonable to carry out a good faith, independent investigation into the Lopezes, Gaby would not have undergone the new injuries she's experienced over the last several years.

867.  Gaby has suffered extensive physical, mental and emotional trauma because of the actual rapes and sexual assaults she endured by the Lopez brothers, but Gaby independently and separately suffered physical, mental, and emotional trauma as a result of USAT's actions in recent years.

868.  Gaby was separately and independently retraumatized, revictimized, and harmed by Defendant USAT when, beginning in 2015 and continuing at least through USAT's transfer of the investigation to SafeSport in March 2017 when USAT pried into Plaintiffs' private lives, prodded them for years-old information, and reopened their

wounds in exchange for the false promise of finally addressing known past abuses of Jean and Steven Lopez.

869.   Gaby was separately and independently retraumatized, revictimized, and harmed by USAT when it took actions inconsistent with the representation that it sought to ban the Lopez brothers from the Sport, including its delaying to report to law enforcement, its stay/suspension of the investigation/disciplinary proceedings, its financial and other support of the Lopezes at USAT competitions, its ultimate abandonment of the proceedings against Steven, its testimony to Congress in May 2018, and public statements to media and through its website.

870.   Through USAT's promises to act, and through its representations about its actions, USAT purported to render a service that was reasonably calculated to prevent the very type of harm that Gaby has now endured: physical injury, physical trauma, complex emotional distress, and mental anguish.

871.   In addition to severe emotional, psychological and other injury, Gaby has suffered physical injury as a result of USAT's promises to act and its conduct in so acting, including symptoms typical of Post-Traumatic Stress Syndrome ("PTSD") such as racing heart, nausea, vomiting, sweating, shortness of breath, fluctuations in blood pressure, headaches, and pain.

872.   As a result of USAT's negligence, Gaby has suffered ascertainable, physical injuries including:

   a.   PTSD resulting in paralyzing depression for up to 3 days at a time, since 2016;

b. Recurrent panic attacks, anxiety, insomnia and hypervigilance since being contacted by Alperstein in 2016;

c. Paralytic depression, extreme confusion, inability to focus/concentrate and anxiety attacks since being contacted by Leah Wicks;

d. Hopelessness, depression, inability to focus, loss of appetite, and an inability to perform daily tasks when she found out Steven Lopez was being allowed to compete in 2016 Olympic games;

e. Anxiety, hypervigilance, insomnia, disturbing dreams, and depression when the case was handed off to SafeSport and she was forced to relive her abuse to investigator Kathleen Smith in May 2017;

f. Panic attacks, paranoia and fear of being in public places, traumatic flashbacks when she learned the ban of the Lopezes was not being enforced in 2018;

g. Ongoing inability to perform daily functions, inability to work, and symptoms of PTSD to this day;

h. Severe paranoia and alienation of relationships with loved ones, to this day;

i. Sudden onset of anxiety and panic attacks to this day.

873. As a direct and proximate result of the negligent actions and inactions of Defendant USAT, Gaby has suffered physical injuries, PTSD, severe emotional distress, economic losses caused by unemployment or loss of employment or loss of business opportunities, and these injuries continue.

874. Gaby claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs are entitled to and hereby demand a jury trial in this matter.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully requests that this Court will:

a.      Enter judgment against Defendants, jointly and severally, in such amounts as will fully and adequately compensate Plaintiffs for the damages they have suffered, in an amount to be determined at trial;

b.      Award Plaintiffs punitive damages against Defendants, jointly and severally, in an amount to be determined by the jury for Defendants' violations of federal law;

c.      Award Plaintiffs pre-judgment and post-judgment interest;

d.      Award Plaintiffs their actual expenses of litigation, including reasonable attorney's fees;

e.      Award Plaintiffs injunctive relief that requires USAT to put in place (and fund) supervision and compliance protocols that actually prevent, uncover, and stop the sexual abuse, exploitation, and trafficking of Team USA's athletes;

f.      Award Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully Submitted,

/s/ *Rex A. Sharp*
Rex A. Sharp

179

Ryan C. Hudson
Larkin E. Walsh
Sarah T. Bradshaw
Sharp Barton LLP
5301 W. 75th St.
Prairie Village, KS 66208
913.901.0505
913.901.0419 (fax)
rex@sharpbarton.com
ryan@sharpbarton.com
larkin@sharpbarton.com
sarah@sharpbarton.com
www.sharpbarton.com

Daniel A. Lipman
Parker Lipman LLP
3200 Cherry Creek South Dr, Suite #520
Denver, CO 80202
720-638-9424
303-964-1900 (fax)
dan@parkerlipman.com
www.parkerlipman.com

Stephen John Estey
ESTEY & BOMBERGER, LLP
2869 India Street
San Diego, CA  92103
619.295.0035
steve@estey-bomberger.com
www.estey-bomberger.com

B. Robert Allard
CORSIGLIA, MCMAHON & ALLARD, LLP
96 N. Third Street, Suite 620
San Jose, California 95112
(408) 289-1417
rallard@cmalaw.net
www.cmalaw.net

**Counsel for Plaintiffs**

## APPENDIX OF SECONDARY SOURCES

### Congressional Hearings & Statements

Statement of Mr. Scott Blackmun, U.S. Senate Commerce, Science and Transportation Committee, Subcommittee on Consumer Protection, Product Safety, Insurance, and Data Security, *Hearing on Preventing Abuse in Athletics*, 2018 WL 2684439 (June 5, 2018).

Testimony of Sen. Richard Blumenthal, U.S. Senate Commerce, Science and Transportation Committee, Subcommittee on Consumer Protection, Product Safety, Insurance, and Data Security, *Hearing on Protecting Amateur Athletes*, CQ-ROLLCALL, 2018 WLNR 22755090 (July 26, 2018).

Senator Susan Collins, *At Press Conference with Former Olympic Gymnasts, Senator Collins Urges Colleagues to Support Legislation She Introduced with Senator Feinstein to Protect Athletes from Sexual Abuse*, COLLINS.SENATE.GOV, https://www.collins.senate.gov/newsroom/press-conference-former-olympic-gymnasts-senator-collins-urges-colleagues-support. (Jan. 30, 2018).

Testimony of Rep. Diana Degette, U.S. House Energy and Commerce Committee, Oversight and Investigations Subcommittee, *Hearing on the Olympic Community's Ability to Protect Athletes from Sexual Abuse*, CQ-ROLLCALL, 2018 WLNR 16155107 (May 25, 2018).

Statement of Ms. Bridie Farrell, U.S. Senate Commerce, Science and Transportation Committee, Subcommittee on Consumer Protection, Product Safety, Insurance, and Data Security, *Hearing on Olympic Sex Abuse*, 2018 WL 1877187 (Apr. 18, 2018).

Testimony of Sen. Feinstein, 164 CONG. REC. S589-02, 2018 WL 636521 (Jan. 30, 2018).

Testimony of Sen. Feinstein, 163 CONG. REC. S1634-01, 2017 WL 900895 (Mar. 7, 2017).

Testimony of Rep. Gregg Harper, U.S. House Energy and Commerce Committee, Oversight and Investigations Subcommittee, *May 23, 2018 Hearing on the Olympic Community's Ability to Protect Athletes from Sexual Abuse*, CQ-ROLLCALL, 2018 WLNR 16155107 (May 25, 2018).

Testimony of Sen. Jerry Moran, U.S. Senate Commerce, Science and Transportation Committee, Subcommittee on Consumer Protection, Product Safety, Insurance, and Data Security, *Hearing on Protecting Amateur Athletes*, CQ-ROLLCALL, 2018 WLNR 22755090 (July 26, 2018).

Testimony of Han Xiao, U.S. Senate Commerce, Science and Transportation Committee, Subcommittee on Consumer Protection, Product Safety, Insurance, and Data Security, *Hearing on Protecting Amateur Athletes*, CQ-ROLLCALL, 2018 WLNR 22755090 (July 26, 2018).

**The Washington Post**

Will Hobson, *Former Head of USA Gymnastics Pleads the Fifth*, WASH. POST (June 5, 2018).

Will Hobson, *Senate Call for USOC Head to Resign*, WASH POST. (Feb. 3, 2018).

Will Hobson, *USOC Fostered a Culture of Sex Abuse*, WASH POST. (Feb. 25, 2018).

Will Hobson & Steven Rich, *An Athlete Accused Her Coach of Sex Abuse. Olympic Officials Stayed on the Sideline*, WASH POST. (Feb. 14, 2017).

Will Hobson & Steven Rich, *Every Six Weeks for More Than 36 Years*, WASH POST, (Nov. 17, 2017).

Will Hobson & Steven Rich, *Road to Gold, Littered With Victims*, WASH POST. (Nov. 19, 2017).

Will Hobson, *USOC Apologizes to Abuse Victims*, WASH. POST (Mar. 29, 2017).

Will Hobson & Steven Rich, *USOC Was Alerted to Abuse Problems Years Ago*, WASH POST (Mar. 7, 2017).

Sally Jenkins, *Congress Must Hold USOC Accountable for Its Spending*, WASH. POST (Mar. 28, 2018).

Sally Jenkins, *Just Like the Olympic Flame, USOC Needs to Be Extinguished*, WASH. POST (Feb. 27, 2018).

Sally Jenkins, *A Painful Legacy of Knowledge, Inaction and Misplaced Priorities*, WASH. POST (Mar. 1, 2018).

Sally Jenkins, *The USOC Needs a New Leader Who Cares About Athletes More Than Expense Accounts*, WASH. POST (July 3, 2018).

## USA Today

Nancy Armour & Rachel Axon, *Allegations Hit Lopez Brothers*, USA TODAY (June 9, 2017).

Nancy Armour & Rachel Axon, *Executive Director Moves on From USA Taekwondo*, USA TODAY (Sept. 6, 2017).

Nancy Armour & Rachel Axon, *Lopez Cannot Be Allowed to Compete*, USA TODAY (July 14, 2017).

Nancy Armour & Rachel Axon, *Lopez Investigation Enters 14th Month*, USA TODAY (April 18, 2018).

Nancy Armour & Rachel Axon, *Olympic Coach Banned for Sexual Misconduct*, USA TODAY (April 5, 2018).

Nancy Armour & Rachel Axon, *USA Taekwondo Ignored Rules, Let Felon Compete*, USA TODAY (July 12, 2017).


## Website Pages

*About the USOC*, TEAMUSA.ORG, https://www.teamusa.org/About-the-USOC.

Scott Blackmun, *Open Letter to Team USA Athletes Regarding Nassar Case*, https://www.teamusa.org/News/2018/January/24/Open-Letters-To-Team-USA-Athletes-Regarding-Nassar-Case. (Jan. 24, 2018).

*Commercial Terms*, TEAMUSA.ORG, https://www.teamusa.org/Athlete-Resources/Athlete-Ombudsman/Commercial-Terms.

*Inside the USOC,* TEAMUSA.ORG, https://www.teamusa.org/about-the-usoc/inside-the-usoc.

*Safesport,* SAFESPORT.ORG, www.safesport.org.

*Sponsors*, TEAMUSA.ORG, https://www.teamusa.org/sponsors.

UNITED STATES OLYMPIC COMMITTEE 2016 ANNUAL REPORT, http://2016annualreport.teamusa.org/USOC_32554_AR16.pdf.

*USOC Board of Directors Lifts USA Taekwondo Probation*, https://www.teamusa.org/USA-Taekwondo/Features/2013/October/11/USOC-decision. (Oct. 11, 2013).

**Other Sources**

David Barron, *USA Gymnastics May Need to Be Replaced*, HOUSTON CHRON. (Jan. 20, 2018).

Eli Bremer, et al., *Reducing Financial Waste & Improving Governance: Proposed Reforms to the U.S. Olympic Committee* (July 23, 2018).

Brian Cazeneuve, *USOC to Rescue Wayward U.S. Fencing Association*, SPORTS ILLUSTRATED (June 25, 2008).

Juliet Macur, *Congress Excoriates USOC for Scandals*, N.Y. TIMES, B-8, (May 23, 2018).

Juliet Macur, *Who Has U.S.A. Gymnastics' Back at This Point? The U.S.O.C., for Some Reason*, N.Y. TIMES (Jan. 18, 2018).

Diana Moskovitz, *SafeSport, The USOC"s Attempt to Stop Child Abuse, Is Set Up to Fail—Just Like It Was Supposed To*, DEADSPIN, (July 24, 2018).

Amy Rosewater, *NBC, IOC Ink $7.75 Billion Deal for Games*, TEAMUSA.ORG, https://www.teamusa.org/News/2014/May/07/NBC-IOC-Ink-775-Billion-Deal-For-Games. (May 7, 2014).

Ben Shpigel, *Three Siblings Headed to Beijing in Taekwondo*, N.Y. TIMES (June 21, 2008).

Alexandra Starr, *Decorated Taekwondo Athlete Steven Lopez Temporarily Barred Amid Assault Claims*, NPR (May 7, 2018).

Lynn Zinser, *Skeleton Federation Accepts U.S.O.C. Reorganization*, N.Y. TIMES (Apr. 26, 2006).

990 FINDER, http://foundationcenter.org/find-funding/990-finder (search: United States Olympic Committee).

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true and correct copy of the foregoing document was

filed and served, via the CM/ECF system on February 7, 2020, on all counsel of record.

*(A duly signed original is available at the office of Rex A. Sharp, PA)*

By:     */s/ Rex A. Sharp*
        Attorney for Plaintiffs